# EXHIBIT "C"

# DEPOSITION OF DITECH REPRESENTATIVE JANET GIOELLO

Case 6:21-cv-00842-WWB-DCI   Document 1-3   Filed 05/13/21   Page 2 of 349 PageID 87

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT,
IN AND FOR ORANGE COUNTY, FLORIDA

CASE NO.:  2019-CA-009560-O


DITECH FINANCIAL, LLC, F/K/A
GREEN TREE SERVICING, LLC,

    Plaintiff,

**ORIGINAL**

vs.

DENNIS DELIA, et al.,

    Defendants.

_____/



DEPOSITION OF:  JANET FARAH GIOELLO

TAKEN ON BEHALF OF THE DEFENDANT, DENNIS DELIA


DATE TAKEN:        FRIDAY, NOVEMBER 8, 2019

TIME:              1:00 P.M. - 2:51 P.M.

PLACE:             1916 EAST ROBINSON STREET
                   ORLANDO, FLORIDA  32803

REPORTED BY:       AMY J. MARTINEZ, PROFESSIONAL COURT
                   REPORTER AND NOTARY PUBLIC

Page 2

1                         APPEARANCES:

2

3                    WENDY S. GRIFFITH, ESQUIRE
              Robertson, Anschutz & Schneider, P.L.
4                6409 Congress Avenue, Suite 100
                    Boca Raton, Florida  33487
5                       (561) 241-6901
                    wgriffith@rasflaw.com
6
               Attorney on behalf of the Plaintiff
7

8

9                     GEORGE GINGO, ESQUIRE
                        Gingo & Orth, PLLC
                   1702 South Washington Avenue
10                  Titusville, Florida  32780
                        (321) 264-9624
11                  gingo.george@gmail.com

12      Attorney on behalf of the Defendant, Dennis Delia

13

14

15                        ALSO PRESENT:

16                  DENNIS DELIA, DEFENDANT

17

18

19

20

21

22

23

24

25

1                    I N D E X

2                                        PAGE

3  TESTIMONY OF JANET FARAH GIOELLO

4      Direct Examination by Mr. Gingo.................5

5  CERTIFICATE OF OATH...............................76

6  CERTIFICATE OF REPORTER...........................77

7

8             - - - - -

9              E X H I B I T S

10 DEFENDANT'S EXHIBIT

11 No. 1  Notice of Default..........................10

12 No. 2  Payment History............................10

13 No. 3  Mortgage Note..............................17

14 No. 4  Escrow breakdown...........................20

15 No. 5  Corporate Advance History Screen...........39

16 No. 6  Form 8-K, November 8, 2012.................57

17 No. 7  Form 8-K, November 27, 2012................57

18 No. 8  Servicing Transfer Agreement...............57

19 No. 9  Loan Schedule re Fannie Mae/ResCap/GMAC....57

20 No. 10 Agreement for Partial Assignment and
          Assumption.................................57
21
   No. 11 Limited Power of Attorney (10/8/09)........61
22
   No. 12 Limited Power of Attorney (2/1/13).........61
23
   No. 13 Transfer letter to Dennis Delia...........63
24
   No. 14 Affidavit of Lost Note....................65
25

1                    INDEX CONTINUED

2    No. 15 Assignment of Mortgage.........................65

3    No. 16 Assignment of Mortgage.........................65

4    No. 17 Assignment of Mortgage.........................65

5

6

7

8

9

10

11

12

13

14

15                    - - - - -

16                    STIPULATIONS

17

18    It is hereby stipulated and agreed by and between

19   counsel present at this deposition and by the Deponent

20   that the witness' review of this deposition would be

21   waived.

22

23

24

25

1                          PROCEEDINGS

2     Thereupon,

3                      JANET FARAH GIOELLO,

4     having been first duly sworn by this court reporter, was

5     examined and testified upon her oath as follows:

6                          DIRECT EXAMINATION

7     BY MR. GINGO:

8          Q.    What is your full name?

9          A.    Janet Gioello.

10         Q.    Ms. Gioello, who do you currently work for?

11         A.    Ditech Financial, LLC.

12         Q.    And how long have you worked for Ditech?

13         A.    Six years.

14         Q.    What is your title with Ditech?

15         A.    I'm a contested witness specialist and

16    assistant vice president.

17         Q.    Where is your main office?

18         A.    I'm a remote employee, but I work sometimes

19    out of the Jacksonville, Florida office.

20         Q.    Okay.  Are you the custodian of the file in

21    this particular case?

22         A.    We have a custodian department for the file.

23         Q.    So you personally are not the custodian today

24    of the file?

25         A.    We have a custodian department --

1        Q.    Okay.

2        A.    -- that --

3        Q.    And really what I'm asking is, do you have

4   access to the hard file, the paper file, what exists in

5   this case?

6        A.    Well, most documents are online.

7              When you say "hard file," are you talking

8   about the original note?

9        Q.    Well, whatever might be transferred over with

10  a servicing change, all the documents that come with

11  that, the collateral.

12       A.    Everything is scanned into the system, and I

13  have full access to our system.

14       Q.    Okay.  So would it be safe to say that you've

15  not laid hands on any of the actual physical paperwork

16  in this case?

17       A.    The physical paperwork is with the custodian.

18       Q.    Okay.  And there's some documents here I see.

19  Can you go over what, perhaps, you've brought.

20       A.    You want them in order?

21       Q.    Yeah.

22       A.    Okay.

23       Q.    Just go off the top there.

24             So the first one you have is a note?

25       A.    Correct.  This is a copy of the original note.

1      Q.   Okay.  And these documents that you have here,

2   were they printed by you or by somebody else in your

3   company?

4      A.   By the law firm that we hired.

5      Q.   Okay.  So how did these documents get into the

6   law firm's system?

7      A.   They were sent from our custodian to the law

8   firm.

9      Q.   Okay.  All right.  That makes sense.

10          Can I take a look at the first one, the note?

11     A.   (Witness hands document to Counsel.)

12     Q.   All right.  What's the next document you have?

13     A.   This is a copy of the mortgage.

14     Q.   All right.  Okay.  And the next one you have?

15     A.   This is the Lost Note Affidavit --

16     Q.   All right.

17     A.   -- signed by Teresa Harris --

18     Q.   Okay.

19     A.   -- with our custodian department.

20     Q.   Let's set that one over here.

21          Let's see your next one, please.

22     A.   This is an Assignment of Mortgage.

23     Q.   All right.  And who's that assignment from?

24     A.   This one is dated March 26, 2009, and it's

25   from MERS.

Page 8

1      Q.   From MERS.  Okay.  So it's MERS.

2           And who's it to?

3      A.   It's transferring to GMAC Mortgage

4  Corporation.

5      Q.   Okay.  And that's -- what's the date on that?

6      A.   March 26, 2009.

7      Q.   May I see that?

8      A.   Sure.

9      Q.   Thank you.

10          Okay.  And I see on the mortgage this is a

11  MERS mortgage loan.  All right.  Set that one off on the

12  side.

13          What's the next one you have?

14     A.   This is also another Assignment of Mortgage.

15  This one is from MERS to Green Tree Servicing, LLC.

16     Q.   From MERS to Green Tree.

17     A.   Green Tree.

18     Q.   And --

19     A.   Green Tree is -- it was a name change,

20  basically.  It's now known as Ditech Financial, LLC.

21     Q.   And what's the date on that one?

22     A.   This one is dated March 6, 2013.

23     Q.   Okay.  Now, I noticed that the first

24  assignment you gave me assigns the note.  Does that one

25  assign the note also?

1     A.    It says, "By these presents does convey,

2  grant, assign, transfer and set over the described

3  Mortgage together with all interest secured thereby, all

4  liens, and any rights due or to become due thereon to

5  Green Tree Servicing, LLC."

6     Q.    Okay.  So if this first one says, "together

7  with the note," you don't see any language that says

8  "together with the note" on that one?

9     A.    No.  I just read to you what it says.

10    Q.    Okay.  You can set that one over here.

11    A.    Okay.

12    Q.    What's the next one you have?

13    A.    All right.  This one is an Assignment of

14 Mortgage.  It says, "Corrective Gap Assignment."

15    Q.    And who's it from?

16    A.    It's to --

17    Q.    Well, let's go with from first.

18    A.    All right.  This one is from -- hold on one

19 second -- ResCap Liquidating Trust, as successor in

20 interest to GMAC Mortgage, LLC, successor by merger to

21 GMAC Mortgage Corporation to MERS --

22    Q.    So that's --

23    A.    -- as nominee for USAA Federal Savings Bank.

24    Q.    Okay.  That's from ResCap to MERS?

25    A.    Correct, as nominee for USAA Federal Savings

1    Bank.

2          Q.    Okay.  What's the date on that?

3          A.    August 8, 2017.  It was to remedy a gap in the

4    recorded ownership --

5          Q.    Okay.

6          A.    -- of the mortgage.

7          Q.    All right.  Let's set that one here.

8                And what's the next document?

9          A.    This one is a payment history.

10         Q.    Okay.  May I take a quick look at that?

11         A.    Sure.  Uh-huh.

12         Q.    Before I leave off of this one, do you have a

13   copy of the Notice of Default that was sent to

14   Mr. Delia?

15         A.    We do.  This is the one sent by Ditech.

16         Q.    I think it was June of this year, or July

17   maybe.

18         A.    Yes, June 21st, 2019.

19         Q.    Okay.  Let me take a look at that.

20               MR. GINGO:  That will be 1.  This will be 2.

21               (Defendant's Exhibit Nos. 1 and 2 were marked

22   for identification.)

23   BY MR. GINGO:

24         Q.    Okay.  I'm going to hand you what's been

25   marked as 1 and 2.  1 is the Notice of Default that was

1    sent to Mr. Delia, and 2 will be -- what did you call

2    this document?

3        A.    The payment history.

4        Q.    The payment history.

5             Let's take a look at these two documents.  And

6    my questions are going to relate to the Notice of

7    Default, and I'm going to have you refer to Document 2

8    for the evidence related to the questions I'm going to

9    ask you.

10       A.    Okay.

11       Q.    So the first question I have for you is, on

12   this Notice of Default -- and please excuse me.  I'm

13   losing the vision in my right eye, which is giving me

14   all kinds of issues --

15       A.    Okay.

16       Q.    -- could you tell me what the principal amount

17   is that's stated in that document?

18       A.    This says the total monthly payment is due.

19   It doesn't say the UPB.

20       Q.    When you say "UPB" --

21       A.    Unpaid principal balance.

22       Q.    Okay.  So can you tell from that document what

23   the unpaid principal balance might be?

24       A.    This is just showing the total to cure the

25   default --

1       Q.    Okay.

2       A.    -- of the loan.  So looking at this, it's

3   not -- I don't -- it's not on here.  It's on the payment

4   history.

5       Q.    Okay.  So can you look at the payment history?

6       A.    Uh-huh.

7       Q.    And as of the date of this document, which is

8   June -- does that say June 21, 2019 --

9       A.    Yes.

10      Q.    -- Notice of Default?

11            Okay.  Can you tell me, based on the payment

12  history, what the amount of the UPB was on that date?

13      A.    Okay.  As of 6/21, you said?

14      Q.    Yes.

15      A.    It says '18, and this is '19.  Okay.  So -- it

16  looks like it's cut off.  The principal balance is up

17  here on the -- on the far right.

18            THE WITNESS:  Do you have another copy?  I

19      have it in an email.

20            MS. GRIFFITH:  (Perusing documents.)

21            THE WITNESS:  I have a copy of the full

22      payment history in an email.  It's the Sunrise

23      payment history.  It's a little easier to read.  I

24      can -- can I send it to you, and then --

25            MS. GRIFFITH:  Yeah.

1              THE WITNESS:  Is that okay?

2              MR. GINGO:  That's fine with me.

3              THE WITNESS:  It's just easier to read.

4              MR. GINGO:  Sure.

5              THE WITNESS:  It's right here, and I'll just

6      send it to you.  See that payment history?

7              MS. GRIFFITH:  Uh-huh.

8              THE WITNESS:  I'm just going to open it just

9      to see.

10             Just so you know, this is what I sent to

11     myself that you can actually see the principal

12     balance on each row.

13             MR. GINGO:  Now, do you have any problem with

14     emailing that to me?

15             MS. GRIFFITH:  I'll ask you.

16             THE WITNESS:  No.  That's fine.

17             MS. GRIFFITH:  Okay.

18             MR. GINGO:  It will go to georgegingo --

19     G-E-O-R-G-E, G-I-N-G-O --

20             THE WITNESS:  Do you want to send it from

21     here?  I don't mind.  It's my work email, so ...

22             MS. GRIFFITH:  At?

23             MR. GINGO:  -- @gmail.com.

24             THE WITNESS:  All right.  So ...

25

```
 1   BY MR. GINGO:

 2        Q.   June 21, 2019.

 3        A.   June 21, 2019.  Okay.

 4             MS. GRIFFITH:  This is not something you want

 5        to disclose, correct?  You just want that sent,

 6        right?

 7             THE WITNESS:  Yeah, just the payment history.

 8        That one was just my prep.

 9             Okay.  So 6 -- let me get back to the date

10        because I have to scroll over.  It has an entry for

11        6/7 and 6/25.  So I'm going to show you from 6/25.

12   BY MR. GINGO:

13        Q.   Okay.

14        A.   It's 198,194.20.

15        Q.   198,194.20?

16        A.   Correct.

17        Q.   That's perfect.  Thank you.

18        A.   Uh-huh.

19        Q.   I do believe that's the same amount of money

20   that's in your complaint.

21        A.   Okay.

22        Q.   In looking back at the Notice of Default, in

23   the "Total Monthly Payments Due" section, it lists a

24   number of payments from 2012 forward, and it states the

25   amount due in section --
```

Page 15

1      A.    Yeah, the due is on the next page.

2      Q.    1446 per month or thereabouts?

3      A.    Yeah.  At one point, it was a different

4   amount, though.  In 2016, it was different amounts.

5      Q.    So the note says payments are supposed to be

6   $1,310.85 a month.  Why is it different from what you

7   have here?

8      A.    So it looks like in 2016 it changed from 1446

9   to 2741.41.  And due to the escrow -- this is an escrow

10   account.  So whenever you're short on escrow, it's going

11   to change the payment amount.

12      Q.    Okay.  So are you saying that -- would you

13   agree that the principal amount -- or the amount that

14   was owed under the note of $1,310.85 is still

15   represented in your numbers here?  The additional

16   amount --

17      A.    One thousand -- I'm sorry.  What was the

18   number?

19      Q.    $1,310.85.  That's still represented in the

20   figures given here, but the additional amounts are due

21   to escrow.  Is that what you're saying?

22      A.    I would have to look at the account to see how

23   much was the payment and how much was escrow at the

24   time --

25      Q.    All right.  Well, let's --

1        A.    -- but this is a total.

2        Q.    Okay.  Well, let's look at that then.

3        A.    Okay.

4        Q.    On this date in Document 1 -- and it's dated

5    8/12/2012 -- the amount is 1446.12.  How much of that is

6    composed of amounts due under the note?

7        A.    Let me see if I can find it on here.  If not,

8    I'll look on my other one.

9        Q.    And what's the remaining amount due too?

10       A.    Yeah.  It's not going to show on here because

11   there wasn't a payment made.  If there was a payment

12   made, it would show how much went to principal and how

13   much went to interest.  So I would have to go back to

14   when he was making payments, which I think was in 2006.

15             So here we go.  Here it's saying principal

16   paid of 237.24, the interest was 1,073.61, and the

17   escrow was 135.27.

18       Q.    What's the --

19       A.    And then it changes depending on the escrow,

20   if you're short or not.

21       Q.    And what's the time period you're looking at

22   there?

23       A.    When he was making payments.

24       Q.    Back in 2006?

25       A.    Correct.

1       Q.   All right.

2       A.   I mean, without having my system pulled up,

3  because it's easy to find.  I mean, I have my computer,

4  but -- I don't know if you want me to go onto the

5  system, but I could if needed.

6            MR. GINGO:  Okay.  And I'm going to have that

7       marked as 3.

8            (Defendant's Exhibit No. 3 was marked for

9  identification.)

10           MS. GRIFFITH:  What is that?  Is that the note

11      that's being marked?

12           MR. GINGO:  Yeah, the note will be 3.

13  BY MR. GINGO:

14      Q.   So I'll have you look at No. 3 here on the

15  note.

16      A.   Okay.

17      Q.   Would you agree that the payments for

18  principal and interest on the note are $1310.85 per

19  month?

20      A.   At the time the note was executed, yes.

21      Q.   Has the interest -- is this a variable rate

22  note?

23      A.   No, but the escrow changes.

24      Q.   Okay.  So that figure that I just read to you,

25  the $1310.58 figure, does that include escrow?

Page 18

1      A.    I would have to look at the settlement

2   statement, the HUD-1, which I don't believe that was

3   asked to be brought today.

4            MS. GRIFFITH:  I probably have it.

5            THE WITNESS:  (Witness reading.)

6            It doesn't say escrow.  In here, it says,

7        "Each monthly payment will be applied as its

8        scheduled due date and will be applied to interest

9        before principal."

10  BY MR. GINGO:

11     Q.   So, then, isn't it true that note does not

12  provide for escrow, just for principal and interest?

13     A.   For the note, yes.

14     Q.   Okay.  So, then, looking back at Document 1,

15  the Notice of Default, this figure here of 1446.12,

16  isn't it true that would be composed of $1310.85 in

17  principal and interest with the difference of $135.27

18  being escrow?  And you can use a calculator if you'd

19  like.

20     A.   Yeah.  I think that's what I saw on that last

21  page that I was showing you.  Yeah.

22          135.27?

23     Q.   Yes.  And that's for --

24     A.   And that's what it says here.

25     Q.   -- escrow.

1          And what is escrow composed of?

2     A.   The insurance --

3     Q.   Is --

4     A.   -- insurance and taxes.

5     Q.   Gotcha.

6          Now, taking a look at Document 1, the figure

7   changes from June 1 of 2016, if I'm reading that right,

8   of 1446.12 such that on July 1 of 2016 it goes up to

9   $2,791.41.  Am I correct in that?

10    A.   Yes.

11    Q.   What is the -- why did it increase?

12    A.   And this was 7/1/2016?

13    Q.   Yes.

14    A.   Okay.  I would have to refer to the escrow

15  breakdown that we have here.

16    Q.   Okay.  Go ahead, if you would.

17    A.   Okay.  So let me see.  Let me go back.

18  7/1/2016.  My eyes are not the best with these little

19  print.

20    Q.   Wait until you're 60.

21    A.   It appears that they included the shortage and

22  the deficiency due.

23    Q.   Okay.

24    A.   Okay.  So that is rolled up into the payment.

25    Q.   The greater figure.

1          Okay.  Help me with the math, if you would.

2     And you can use my calculator or your own calculator.

3     What --

4          A.   Did you want to -- I'm sorry to cut you off.

5     Did you want to take a look at this?

6          Q.   Yeah.

7          A.   Because it has everything kind of listed --

8          Q.   All right.

9          A.   -- the shortage, the -- and it goes all the

10    way back to 2016.

11          MR. GINGO:  Well, let me have that marked.

12    BY MR. GINGO:

13          Q.   What do you call this document?

14          A.   It's an escrow breakdown.

15          Q.   Okay.

16          MR. GINGO:  We'll have that as 4.

17          THE WITNESS:  Which --

18          THE COURT REPORTER:  Hold on one second.  Hold

19     on one second.

20          (Defendant's Exhibit No. 4 was marked for

21     identification.)

22          THE WITNESS:  Sorry.

23          THE COURT REPORTER:  Okay.

24          THE WITNESS:  I was going to say that the

25     escrow breakdown that you just listed as an exhibit

1   will show you from the point of where the payment

2   changed.

3 BY MR. GINGO:

4   Q. Okay. So I'm going to go back to 4. And

5 let's do the math first. So we know the note is

6 1310.85.

7   And would you like to use my calculator or

8 yours?

9   A. I can use mine.

10   Q. Okay. How much money over the principal and

11 interest is attributed to this escrow issue we just

12 discussed? And that's as of July 1 of 2016. So perhaps

13 you can take your calculator and subtract the 1310

14 figure of the note from that figure.

15   A. Okay. 1310.85 minus 2791.41. So it's

16 1480.56.

17   Q. Okay. So that's an additional amount per

18 month that's being charged due to this escrow issue; is

19 that right?

20   A. Escrow and the deficiency and amount due.

21   Q. Okay. Well, let's talk about the escrow. As

22 of that date, how much was composed of escrow? So in

23 other words, the $1480.56, I'm envisioning, is composed

24 of three different numbers; escrow, deficiency, and

25 amount due. So if you can give me the numbers for each

1    of those.

2         A.    Okay.  It actually is pretty -- it's all

3    listed right here, if you want to take a look at it.

4         Q.    Okay.  And you're pointing to?

5         A.    To the very top.  It actually shows you that

6    1310.85 was principal and interest.

7         Q.    Before you go any further --

8         A.    Okay.

9         Q.    -- let me -- hold on just a second.  I'm just

10   going to read it into the record.  1, 2 -- oh, the pages

11   appear to be numbered.  Maybe not.

12        A.    They're different ones stapled together, yeah.

13        Q.    I'm just going to write numbers on the bottom

14   left.

15        A.    Okay.

16        Q.    1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11.  Okay.

17   That has 12 pages.

18              I'm going to hand it back to you --

19        A.    Okay.

20        Q.    -- and then maybe you can refer to the page

21   number on the bottom left.

22        A.    Sure.

23              Okay.  On page 11 --

24        Q.    Okay.

25        A.    -- of the escrow breakdown, at the very top,

1    it will give you a summary of exactly how we got to the

2    new payment amount of 2791.41.

3         Q.    Okay.

4         A.    So if you want to take a look at that.

5         Q.    Okay.  I see -- I see principal and interest,

6    1310.85.  I see escrow, 128.90.  It says, "Total current

7    payment:  1439.75."  And then I see more figures, new

8    payment effective 7/1/16.

9         A.    Correct.

10        Q.    Principal and interest, 1310.85; escrow,

11   482.86; and escrow shortage of 997.70; total new

12   payment, 2791.41.

13        A.    Which is what it says here.

14        Q.    Which is the number you've got.

15        A.    Right.

16        Q.    Okay.  Where did you get the word "deficiency"

17   from?

18        A.    On the very bottom of the statement.  Or it

19   might have been on the first page of the statement.

20   Right here.  Let's see.  I got to go back to -- okay.

21   The other one was on the front.  This one is right here.

22        Q.    Okay.  So you're looking at page 11, near the

23   bottom left.  Can you put your finger where you saw the

24   word "deficiency."

25        A.    Escrow shortage (indicating).

Page 24

1       Q.   Okay.  Now you're on page 9 --

2       A.   Yeah.

3       Q.   -- the bottom right?

4       A.   Yeah.

5       Q.   Shortage and/or deficiency due.  Okay.

6            What does it mean when they say "deficiency"?

7       A.   The loan is past due, so they -- they include

8  the past due amount into the new payment, I believe, is

9  what it is.  I'm not in the escrow department, so ...

10      Q.   So is it safe to say that in that deficiency

11 component there are other charges that are included

12 other than taxes and insurance, maybe property

13 inspection fees, that sort of thing?

14      A.   I believe so, yes.  Attorney fees.

15      Q.   Okay.  So Document No. 2 is your transaction

16 history, right?

17      A.   Yes.

18      Q.   Can you look at that document and tell me what

19 was actually included in that figure, the escrow?

20      A.   I believe the breakdown would be on the escrow

21 breakdown.

22      Q.   So you're saying we need to look at a

23 different document than Document No. 2?

24      A.   I can look on here.

25           No, it has it on here.  It has --

1      Q.   Okay.

2      A.   There are inspection fees.

3      Q.   Say that again.

4      A.   Inspection fees.

5      Q.   Okay.  So let's talk about that.  So you're

6   saying this figure, the escrow figure, which is included

7   in the Notice of Default, includes inspection fees.

8   What else does it include?

9      A.   Foreclosure attorney fees.

10     Q.   Can you tell me how much?

11     A.   I don't have a breakdown of all those fees.

12     Q.   Where would that breakdown be found?  What

13   kind of document would have that?

14     A.   It might be here on the judgment figures.

15     Q.   Okay.

16     A.   I would just need to look at it.

17     Q.   Sure.

18     A.   Let me -- I just don't want to get these

19   all --

20     Q.   Well, why don't we set them in order.

21     A.   Yeah.

22     Q.   Flip these back.

23          So now you're looking at the judgment figures,

24   which is --

25     A.   Which is the Corporate Advance History Screen.

1    Q.   Okay.

2    A.   So there's like -- well, I mean, I don't know

3  if you want me to start back at 2016.

4    Q.   Well, if you -- this Notice of Default is

5  dated June 21 of 2019.  So all I care about are the

6  attorneys' fees that were --

7    A.   Okay.

8    Q.   -- included in this Notice of Default --

9    A.   Okay.

10   Q.   -- up to that date.  Nothing after that.

11   A.   Okay.  So there's hazard insurance, taxes --

12   Q.   Okay.  And so does that summarize --

13   A.   -- late fees.

14   Q.   And what you're looking at, does it

15  summarize all of those or ...

16   A.   Yeah.  Like, the late fees, it will have,

17  like, a total amount.

18   Q.   Okay.  So what's the total on late fees?

19   A.   Let me make sure that's the only one.

20       1,173.35.

21   Q.   Okay.  So is it safe to say then that the late

22  fees of $1,173.35 are included in the figures in the

23  Notice of Default?

24   A.   That letter was dated before this total.  This

25  total includes 2017.  Is it -- no.  This was in '19.

1    Yes, then it's included.

2         Q.   Okay.  So that's all I'm looking for.  I want

3    to see what the component parts are of the numbers that

4    are in the Notice of Default.  That's my focus.

5         So we have late fees of 1173.35.  What else do

6    we have?

7         A.   There's corporate advance transactions:

8    4,563.73, property inspections.

9         Q.   Okay.  Let me stop you right there.  I didn't

10   catch that number.  Four thousand dollars and?

11        A.   $4,563.73.

12        Q.   And that is for?  What's it called?

13        A.   Property inspections.

14        Q.   That's property inspections.  Okay.

15        A.   I'm going to tell you if it includes something

16   else.  I have to go page by page.

17        Q.   All right.

18        A.   There's attorney fees and costs.

19        Q.   How much are those?

20        A.   I would have to calculate them separately

21   because they're not listed.

22        Q.   How many different pieces of paper are --

23        A.   Let's see.  There's one --

24        Q.   I mean, if it's relatively easy.

25        A.   There's a whole page here.  There's a whole

1    page here.

2         Q.   Well, let's do those --

3         A.   There's a whole page there.

4         Q.   It's very important.  So let's start with the

5    oldest one you have.  And if you can use a calculator

6    and we'll just go through them.  So I'd like to know the

7    date, the fees being charged for, and the amount.

8         A.   We had a system conversion, so the dates are

9    all going to be the same.  Because they moved from one

10   system to another, so all of these dates are the same.

11        Q.   What's the date you're looking at?

12        A.   4/5/2016.

13        Q.   4/5 of '16?

14        A.   Correct.

15        Q.   Does that mean -- if the system converted on

16   that date, does that mean that all the attorneys' fees

17   that bear that date occurred on that date or before that

18   date?

19        A.   On that date or before.

20        Q.   Okay.  Well, that will work.  I can work with

21   that.

22        A.   Okay.

23        Q.   Let's go ahead and --

24        A.   There was no way to convert it over with all

25   the dates listed individually.

1      Q.    That's fine.

2      A.    Okay.  All right.  So here we have a little

3   bit of different -- so all of those pages were all

4   attorney fees, court costs.

5      Q.    Well, can you just start calling them out and

6   I'll write them down.

7      A.    Okay.  Well, I'm going to go all the way to

8   the beginning then --

9      Q.    Okay.

10     A.    -- and pull these out.

11     Q.    And so the beginning is closest to you?

12     A.    Yeah.

13     Q.    Okay.

14     A.    No.  The beginning is going to be back here.

15           So you don't want the inspection fees?  You

16   just want the attorney fees, correct?

17     Q.    Well, that's all I want to work on right now.

18     A.    Okay.  All right.  So it starts here, and

19   it's -- the first amount is $600.

20     Q.    And the date incurred?

21     A.    They're all going to have the same date.

22     Q.    Oh, that's right.

23     A.    4/5/2016.

24     Q.    Okay.  And, then, what's your next one?

25     A.    Do you -- there is an ID number.  I don't --

1   let me see if they're all different, the ID numbers.

2        Q.   And by ID number --

3        A.   They are.

4             It just says ID number.  I don't know if you

5   want to write that down.

6        Q.   I'll write it down.  What's that?

7        A.   160.

8        Q.   Do you know --

9        A.   It just identifies the actual transaction --

10       Q.   Okay.

11       A.   -- so they can go back and see the original

12  date --

13       Q.   Gotcha.

14       A.   -- if they needed to.

15       Q.   Okay.  What's your next one?

16       A.   Okay.  ID No. 159.  And it's going to go 158,

17  157, 156.

18       Q.   Okay.

19       A.   Okay.  So it's going to be -- okay.  So the

20  next amount is 257, $257.

21       Q.   Okay.

22       A.   The next one is $11.25.

23       Q.   Okay.

24       A.   The next one is $13.  The next one is $16.50.

25       Q.   Okay.

1      A.   Oh.  Actually, scratch 11.25, 13, and 16.50

2  because those are all inspection fees.

3      Q.   Okay.

4      A.   I think that was the only page that had them

5  mixed.

6      Q.   And while you're on that issue.  So did the

7  same thing happen with inspection fees --

8      A.   Yes.

9      Q.   -- there was a conversion on 4/5/16 and --

10     A.   Yes.

11     Q.   So that $4,563.75 in inspection fees, that all

12  occurred on April 5th, 2016, or before?

13     A.   Yes.

14     Q.   Okay.  All right.  I'm ready for you.

15     A.   Okay.  So, so far the only attorney fees we

16  have are $600 and $257.

17     Q.   Okay.

18     A.   Okay.  So, then, the next one is going to be

19  ID No. 165 for $20.

20     Q.   All right.

21     A.   The next one will be $36.50.

22     Q.   Okay.

23     A.   The next one is $205.

24     Q.   Okay.

25     A.   The next one is $600.

1      Q.   Okay.

2      A.   The next one is $325.

3      Q.   Okay.

4      A.   The next one is $18.50.

5      Q.   Okay.

6      A.   The next one is $108.

7      Q.   All right.

8      A.   The next one is $157.50.

9      Q.   Okay.

10     A.   The next one is $75.

11     Q.   Okay.

12     A.   The next one is $892.50.

13     Q.   Okay.

14     A.   The next one is $200.

15     Q.   All right.

16     A.   The next is $180.

17     Q.   All right.

18     A.   The next one is $200.

19     Q.   All right.

20     A.   The next is $666.

21     Q.   Okay.

22     A.   The next one is $144.

23     Q.   All right.

24     A.   Then we have $250.

25     Q.   Okay.

1      A.   $850.

2      Q.   All right.

3      A.   $375.

4      Q.   Okay.

5      A.   $87.

6      Q.   Okay.

7      A.   $200.

8      Q.   All right.

9      A.   We have $850.

10     Q.   Okay.

11     A.   There's court costs on this page, and there's

12  also a loan -- a recorded loan assignment on this page.

13  So do you want me to skip those?

14     Q.   Well, let me have the court costs.

15     A.   Okay.  Court costs:  We have $25, $70, $70,

16  and we have a foreclosure cost of $70.  It's publishing

17  the foreclosure, I believe.  And then we have a recorded

18  loan assignment for $18.50 on that page.

19     Q.   And those are all April 5th --

20     A.   Well --

21     Q.   -- 2016, and prior?

22     A.   That's the way it's listed here, yes, but it

23  would be prior.

24     Q.   Okay.  All right.

25     A.   All right.  So the next page we do have more

1    attorney fees.  And it's $25, $200, $125, $25, $275,

2    $300 --

3         Q.   Okay.

4         A.   -- $150 --

5         Q.   Okay.

6         A.   -- $100 --

7         Q.   All right.

8         A.   -- $400 and 550, $550.

9         Q.   Okay.  Does that end at all?

10        A.   No.  There's all of these pages.

11        Q.   Oh, okay.  Let's keep going.

12        A.   Okay.

13        Q.   And these are all from April 5th, 2016, and

14   prior?

15        A.   All the way -- no.  Because once we get to

16   where Ditech had it and then the note -- I mean, when

17   the -- after the conversion, after 4/5, then it will

18   have the date -- it will have the correct date.

19        Q.   So let us know when you go more recent than

20   April 5th of 2016.

21        A.   Okay.

22        Q.   Does that make sense?

23        A.   Yeah.  Yes.

24        Q.   Okay.  So the last one you said was 550.

25        A.   I hope I didn't lose track of where I was.

1           Okay.  So 550.

2      Q.   Okay.

3      A.   All right.  So you got that one.  So I need to

4   just -- all right.  Okay.  The next one is $50.

5      Q.   Okay.

6      A.   $700.

7      Q.   All right.

8      A.   $775.

9      Q.   Okay.

10     A.   $1,025.

11     Q.   Okay.

12     A.   $200.

13     Q.   All right.

14     A.   $437.50.

15     Q.   Okay.

16     A.   $300.

17     Q.   Okay.

18     A.   $250.

19     Q.   Okay.

20     A.   $120.

21     Q.   Okay.

22     A.   $200.

23     Q.   All right.

24     A.   We got $437.50.

25     Q.   Okay.

1       A.   $700.

2       Q.   All right.

3       A.   $250.

4       Q.   All right.

5       A.   $250.

6       Q.   All right.

7       A.   And then the next item is court cost for $50.

8       Q.   Okay.

9       A.   All right.  I'm going to skip that one because

10  it's an inspection fee and that other one had the total.

11      Q.   Okay.  That's fine.

12      A.   Okay.  So court cost for $65.

13      Q.   Okay.

14      A.   And I'm skipping the next.  It's an inspection

15  fee.

16      Q.   Okay.

17      A.   And so the attorney fee is -- the next item is

18  $900.

19      Q.   All right.

20      A.   $250.

21      Q.   Okay.

22      A.   $1,500.

23      Q.   All right.

24      A.   We have court cost --

25      Q.   Okay.

1        A.   -- $801.85.  It's court cost.

2        Q.   Okay.

3        A.   The next one is also a court cost, $263.50.

4        Q.   All right.

5        A.   Okay.  And then you have an inspection fee,

6    which I'm not going to tell you.

7        Q.   All right.

8        A.   $250 is the next attorney fee.

9        Q.   Okay.

10       A.   We have inspection, inspection, inspection.

11   We have attorney fee for $250.

12       Q.   Okay.

13       A.   Another one for $250.

14       Q.   All right.

15       A.   Inspection, inspection.  We have service -- I

16   think that says service release loan.  SRLN.  Oh, okay.

17   That's one we did that there's a loan conversion number,

18   so we're not going to include that one in there.

19   Inspection.

20            So the next attorney fee is $125.

21       Q.   Okay.

22       A.   And then we have inspection fee on this page.

23            MS. GRIFFITH:  You wanted her to stop at

24   4/5/16, correct?

25            MR. GINGO:  Yeah.

1          MS. GRIFFITH:  Okay.

2   BY MR. GINGO:

3       Q.   So now let's do this.  I'm going to mark those

4   pages, the ones that you read from.  So those will be --

5   I don't want this whole stack.  I just want the ones

6   that contain the information that you just testified to

7   here today.  So if we can -- if you can find the page

8   that you originally referred to -- I think it was maybe

9   ID 160, $600 --

10      A.   Okay.

11      Q.   -- that all the way to the present.

12      A.   Now, these are all property inspections, so.

13  Property inspection.  Okay.  Yeah.

14      Q.   Does that make sense?

15      A.   Yes.

16      Q.   Okay.

17      A.   Do you want to check it to make sure that's

18  what you need?

19      Q.   And so we have three stacks now.  We have

20  stuff I didn't want you to talk about --

21      A.   Okay.

22      Q.   -- stuff you did talk about, and stuff you

23  haven't talked about, which we'll probably get to in a

24  second.

25      A.   Okay.

1       Q.   Is that right?  Does that make sense?

2       A.   Yes.

3            So you don't want to discuss this?

4       Q.   Not right now.  I'll get to it.

5       A.   Okay.

6       Q.   Because that's older stuff, right?

7       A.   Right.

8       Q.   So I'm going to have this marked.  What do we

9  call this again?

10      A.   Those are judgment figures.  Corporate Advance

11  History is the name of the document.

12      Q.   Corporate Advance History.

13      A.   And it says it right there on top, Corporate

14  Advance History Screen.

15      Q.   Screen, yeah.

16           (Defendant's Exhibit No. 5 was marked for

17  identification.)

18  BY MR. GINGO:

19      Q.   So I'm wondering if maybe we can add these up

20  real quick.  I wrote these down.  And if you -- if I can

21  show you what I wrote, perhaps you can add these on your

22  computer.

23      A.   Okay.

24      Q.   I'll call them out.

25      A.   Okay.

Page 40

1      Q.   So the first one is 600.  $257, $20, $36.50,

2  $205 --

3      A.   Let me just clear this.  You're going to have

4  to repeat that.

5      Q.   Okay.

6      A.   Okay.  What was it?

7      Q.   Do you want me to start from the beginning?

8      A.   No, just the last one.

9      Q.   $205, $600, $325, $18.50, $108, $157.50, $75,

10  $892.50, $200, $180, $200, $666, $144 --

11      A.   144?

12      Q.   Correct.

13           -- $250, $850, $375, $87, $200, $850.  And I'm

14  just reading the attorneys' fees.  I'm skipping the

15  court costs for right now.

16      A.   Okay.

17      Q.   $18.57, $25, $200, $125, $25, $275, $300,

18  $150, $100, $400, $550, $50, $700, $775, $1,025, $200,

19  $437.50, $300, $250, $120, $200, $437.50, $700, $250,

20  $250, $900, $250, $1,500 --

21      A.   1,500.

22      Q.   -- $250, $250, $250, and $125.

23           What do you get for a total?

24      A.   (Witness indicating.)

25      Q.   $18,685.57, correct?

1      A.   Correct.

2      Q.   So that figure is included in the numbers in

3  the Notice of Default, correct?

4      A.   It's part of the escrow advance, I believe.

5  Let me see the very back page.  Escrow.

6      Q.   The increase in escrow, correct?

7      A.   It's part of the escrow balance.

8      Q.   Okay.  Gotcha.

9           All right.  Are you aware that there was

10 several settlement agreements in this case where Ditech

11 agreed not to charge attorneys' fees and costs to my

12 client?

13     A.   (Witness shaking head.)

14     Q.   No?

15     A.   Was that in a prior case?

16     Q.   Yes, in several prior cases.

17     A.   I just reviewed the case -- this case.

18     Q.   When you reviewed this case, were you aware

19 that there was a prior foreclosure case?

20     A.   The attorney advised me that there was, but I

21 was -- when I reviewed the documents, I reviewed the

22 documents that we brought here today.

23     Q.   And I'm not attacking you in any way.  But did

24 you review any settlement agreements from any of the

25 prior cases?

1      A.   No.

2      Q.   Now I'm going to switch over to title,

3   documents relating to title of this promissory note and

4   mortgage.  In the Request for Admissions -- well, let me

5   ask you this:  Have you had a chance to look at the

6   Request for Admissions and the answers that you folks

7   gave regarding those documents?

8      A.   Yes.  I believe they were all denied.

9      Q.   Well, the first one was admitted.

10     A.   Which was the chain of title?

11     Q.   Right.

12     A.   Yes.

13     Q.   And so here today would you agree that the

14  chain of title on this particular note went from USAA

15  Federal Savings Bank to GMAC Mortgage Corp to GMAC

16  Mortgage, LLC, to ResCap Liquidating Trust to Ditech

17  Financial, LLC?

18     A.   Yes.

19     Q.   Okay.  And in my Request for Admissions, I

20  asked whether you had documentation to support that

21  chain of title of transfer and you indicated that you

22  did.  So let's look at -- let's look at the transfer

23  first from USAA to Federal Savings Bank to GMAC Mortgage

24  Corporation.

25     A.   Okay.

Page 43

1      Q.    What documents do you have that GMAC Mortgage

2  Corporation actually took ownership of the note?

3      A.    Okay.  So are we done with this?  I can --

4      Q.    Yeah.

5      A.    -- put these off to the side?

6      Q.    Before we put this away, there were three

7  sections.  There was the bottom section that I didn't

8  get to.

9      A.    Right.

10     Q.    And let me just -- I'll put that over here.

11     A.    Okay.

12     Q.    Actually, I'm going to put that down here.

13     A.    Yeah.  This, we did not get to.

14     Q.    That one we didn't get to.

15     A.    Right.

16     Q.    And maybe we'll -- I probably won't.  I'll

17  probably just ignore that.

18     A.    Okay.

19     Q.    Let me -- let me hang on to that.

20     A.    Okay.

21     Q.    And then -- as a matter of fact, I think I'll

22  just let you have this thing back.  And I'm just going

23  to staple it.

24         All right.  So looking at USAA Federal Savings

25  Bank, the transfer to GMAC Mortgage, why don't you show

Page 44

1    me evidence that GMAC actually took the note.

2         A.   All right.  Well, I'm going to kind of tell

3    you --

4         Q.   Sure.

5         A.   -- exactly what I have here, and then you can

6    look at them.

7         Q.   Sure.

8         A.   Will that work?  I mean --

9         Q.   It may.

10        A.   And then, of course -- you know, of course,

11   I'll answer any questions that you have.

12              But what we have here is the -- the USAA

13   Federal Savings Bank default letter.  And then we also

14   have the form 8-K for Walter Investments.  This is the

15   Asset and Purchase Agreement.  And then we have --

16        Q.   Well, let's do one at a time because I can

17   tell that -- if you're talking 8-K, that's going to be

18   complicated.  So let's go with the very first one you

19   have.

20        A.   Okay.

21        Q.   So let's -- tell me what that is.

22        A.   This is a default letter from USAA Federal

23   Savings Bank to Mr. Dennis -- Delia?

24        Q.   Delia.

25        A.   -- and sent to the property address advising

1  Mr. Dennis Delia of the default.  Your account was due

2  for 5/1/2006.  And so I don't know if you want to look

3  at that.

4      Q.   Okay.  So this isn't a title document, but

5  this is a document showing that USAA Federal Savings

6  Bank thinks he's in default, right?

7      A.   Right.

8      Q.   Okay.  Now, this has a paperclip on it.  And

9  when I pull it off, it looks like there's a document

10 that's stapled and then there's one that's looseleaf.

11 Can you describe if the looseleaf document is supposed

12 to part of the stapled --

13     A.   Yes, it is supposed to be.  It's just showing

14 that the Notice of Default is showing on our system and

15 that it was sent by USAA.

16     Q.   Okay.  All right.

17     A.   So it's basically -- this is Ditech's system

18 of records.

19     Q.   Okay.

20     A.   And it's showing that USAA sent out the

21 Notice of Default letter to the property address on this

22 date.

23     Q.   Okay.

24     A.   So it's part of our system of records.

25     Q.   Okay.  And is this for me?

Page 46

1     A.   Yeah.  I mean, you can keep that on top.

2     Q.   I'm going to staple that and I'm going to toss

3  it over to the side.

4     A.   Okay.

5     Q.   Okay.  So what did you --

6     A.   All right.  So the first Ocwen here is an

7  Asset Purchase Agreement between Ocwen Loan Servicing

8  and Residential Capital, LLC, Residential Funding

9  Company, GMAC Mortgage, LLC, Executive Trustee Services,

10  LLC, and it has GMACM Borrower, LLC and RFC Borrower,

11  LLC, dated November 2nd, 2012.

12     Q.   Okay.  11/2/12.

13     A.   So it's basically an Asset Purchase Agreement

14  between Ocwen Loan Servicing and Residential Capital.

15     Q.   Gotcha.

16     A.   And subsidiaries, yeah.

17     Q.   And it's called an 8-K, right?

18     A.   Correct, Form 8-K.

19     Q.   All right.  So that was 11/2 of '12.  All

20  right.

21     A.   Okay.  And this one is an amendment to the

22  Asset Purchase Agreement.

23     Q.   And what's the date of the amendment?

24     A.   Oh, okay.  I'm sorry.  Let's see.

25  November 27th, 2012.

1      Q.    All right.  And before we move off of these.

2      A.    Sure.

3      Q.    So these two documents, the 8-K and the

4    amendment, do they describe the particular note and

5    mortgage in the document?

6      A.    No, but I'm getting to that, because it's part

7    of a loan schedule that I have in here.  I can move to

8    that if you want me to.

9      Q.    Well, let's see what's next in line.

10     A.    Okay.  So this is an Agreement for Partial

11   Assignment and Assumption Under the Asset Purchase

12   Agreement.

13     Q.    Okay.

14     A.    Okay.  So -- and it tells you the parties

15   here.  And I'll tell you the date that this was -- let's

16   see.  It's on the back.  Well, it was signed by

17   everybody, but I don't see the date.  One second.  It's

18   just talking about the employees, how they transferred

19   from one company to another.

20     Q.    What is that document entitled?

21     A.    Agreement for Partial Assignment and

22   Assumption Under the Asset Purchase Agreement.

23   Actually, it's dated January 31st, 2013.  It's right

24   here on the first page.

25     Q.    '13, you say?

Page 48

1      A.    Yes.

2      Q.    And who are the parties?

3      A.    Walter Investment Management Corp., Green Tree

4  Servicing, Ocwen Loan Servicing, Residential Capital,

5  LLC, Residential Funding, LLC, GMAC Mortgage, LLC,

6  Executive Trustee Services, LLC --

7      Q.    Okay.  And that's dated 1/31/13.

8      A.    And there was a few others.  But, yes, it's

9  January 31st, 2013.

10      Q.    All right.  Okay.  And now you're --

11      A.    And, now, this is the loan schedule, which

12  shows that this loan was a part of this agreement.

13      Q.    All right.  So this loan schedule is filed in

14  some public records somewhere?

15      A.    That's part of our system of records.

16      Q.    Okay.  And where did you guys get this

17  document?

18      A.    We have a group that handles that with our

19  corporate legal department.

20      Q.    Okay.  And this says, "Loan Schedule re

21  Fannie Mae/ResCap/GMAC."

22            Was this a Fannie Mae loan?

23      A.    It still is.

24      Q.    It's owned by Fannie Mae?

25      A.    Yes.

Page 49

1        Q.    Okay.  All right.  And that -- this document,

2    which has redactions on it --

3        A.    Correct.

4        Q.    -- this goes with the Agreement for Partial

5    Assignment and Assumption?

6        A.    Yes, the Asset Purchase Agreement --

7        Q.    Okay.

8        A.    -- between the companies.  So this loan

9    schedule goes with that.

10       Q.    All right.  So before we jump off of this.

11       A.    Sure.

12       Q.    So the loan that's at issue here today,

13   because it's attached to this Agreement for Partial

14   Assignment, what does it say -- this document say about

15   who was owning it and who was buying it?  Who does it

16   say?  Who was the owner at the time?

17       A.    The owner was Fannie Mae.

18       Q.    Okay.  So you're saying that this Agreement

19   for Partial Assignment and Assumption says that

20   Fannie Mae owned this loan and that Fannie Mae is

21   selling it to somebody else?

22       A.    Fannie May is still the owner.

23       Q.    Still the owner?

24       A.    Yes.

25       Q.    Well, what are they selling here?

1      A.   We are just -- Ditech is the servicer.

2  Fannie Mae owns the loan.

3      Q.   Okay.  So -- all right.  I think I'm

4  understanding now.

5           So who was the original owner of the loan when

6  this loan was instituted?

7      A.   I believe it was U -- I think -- I think

8  there's -- there's something that we have that shows

9  that.  Hold on a second.  Yeah.  We have a Limited Power

10 of Attorney to Ditech from ResCap, and Fannie Mae is an

11 investor.  It's showing that here, even -- 1/12/2016.

12     Q.   Okay.

13     A.   And on -- it's on a Limited Power of Attorney.

14     Q.   All right.  So going back to when this loan

15 was initiated by USAA Federal Savings Bank, did USAA

16 Federal Savings Bank sell this loan to Fannie Mae?

17     A.   I believe so.  Yes.

18     Q.   Is there any document showing that they sold

19 it to Fannie Mae?

20          THE WITNESS:  Do we have anything with us

21     today?

22          I can only speak to -- without having the

23     documentation with me, I can only speak to the fact

24     that I know Fannie Mae is the owner currently,

25     since it's been with Ditech.

1  BY MR. GINGO:

2      Q.   All right.

3      A.   Even before it was transferred to Ditech, it

4  was Fannie Mae.  So I'm sure that we could get that

5  information.  I just don't have it today.

6      Q.   All right.  So let me -- just to make this

7  record clear.

8      A.   Sure.

9      Q.   You don't -- you believe that Fannie Mae was

10  the purchaser from USAA Federal Savings Bank of the

11  loan?

12      A.   What I'm -- no.  What I'm saying is Fannie Mae

13  is the owner.

14      Q.   And I understand that.  I understand your

15  position.  My question is, when did they become the

16  owner and who did they take it from?

17      A.   Let me see.

18      Q.   And then following up on that, is there any

19  document that demonstrates --

20      A.   Yeah, I'm sure we have the documents.  I just

21  don't have them with me today.

22      Q.   Okay.

23      A.   And if Fannie Mae was not the owner the whole

24  time, then I'm sure we have the documentation to speak

25  to that.  The --

Page 52

1      Q.    Well, maybe this will make it easier.   Do you

2   know when Fannie Mae became the owner?

3      A.    I don't have that with me today.

4      Q.    If Fannie Mae became the owner of the -- and

5   there's -- let me break this out.   There's an owner of

6   the loan, and then there's an owner of servicing rights.

7   And so I want to make sure that there's no confusion

8   over the two.

9      A.    No.   I'm -- yeah.   That's fine.

10     Q.    When I see this transfer that you gave me

11  earlier, this Assignment of Mortgage from MERS on

12  March 26, 2009, did they transfer merely servicing to

13  GMAC Mortgage Corporation or did they transfer the

14  ownership of the loan to GMAC Mortgage Corporation?

15     A.    Servicing.

16     Q.    Okay.   When GMAC Mortgage Corporation

17  transferred the loan to GMAC Mortgage, LLC, did they

18  transfer just servicing or ownership?

19     A.    MERS shows the list of how it changes

20  servicers.   That's -- the way that MERS is, they changed

21  from the servicer.   And you can't foreclose in the name

22  of MERS, so then you have to transfer it out of the name

23  of MERS in order to foreclose on the property.

24     Q.    So there's a list from MERS that shows who had

25  servicing rights of this loan?

Page 53

1     A.    Yes.

2     Q.    And do you have access to that?

3     A.    There's not many people that do, but our

4  corporate legal department does.

5     Q.    I've never seen such a list.

6     A.    It's called the MERS Milestone.

7     Q.    MERS Milestone.

8           And so --

9     A.    They don't recommend -- they don't usually

10  send them outside of the company, but there is a listing

11  of it.

12     Q.    So I would just think that that would be

13  proprietary information that they wouldn't expect to be

14  given out.

15     A.    Right.

16     Q.    Can you tell me if you've read that list and

17  what it said in terms of the servicers, who were the

18  servicers on this loan.

19     A.    I did not read it before today, no.  I used to

20  have access to the system a while back, but, like I

21  said, they're very strict on who has access to those

22  systems now.

23     Q.    Okay.  So just for clarification, GMAC

24  Mortgage Corporation then sold servicing rights, not

25  ownership of the loan, to GMAC Mortgage, LLC; is that

Page 54

1    correct?

2        A.   From my knowledge, yes.

3        Q.   And then from GMAC Mortgage, LLC to ResCap

4    Liquidating Trust, was it just servicing rights or was

5    it the ownership of the note that was sold?

6        A.   You're saying that it was a trust.

7        Q.   So let me show you the Request for Admissions.

8        A.   (Witness reading document.)

9             Servicing Transfer Agreement.  So this says

10   "servicing transfer."  Okay.  See, and it says here,

11   "Sellers under agreements with Fannie Mae to servicing

12   the Fannie Mae agency loans in accordance with Fannie

13   Mae Guidelines."

14            So Fannie Mae has been the investor.  GMAC and

15   Executive Trustee Services are the -- were the servicer.

16   It's a Service and Transfer Agreement.

17       Q.   Okay.  In Request for Admissions, I have this

18   diagram that I created.  It says, "Admit that the chain

19   of title to the note is as follows:  USAA Federal

20   Savings Bank to GMAC Mortgage Corporation to GMAC

21   Mortgage, LLC to ResCap Liquidating Trust to Ditech

22   Financial, LLC."

23       A.   Right --

24       Q.   And you folks --

25       A.   -- as servicer.

Page 55

1          Q.   Okay.  I didn't -- I didn't say the word

2     "servicer" in here.  I just put "chain of title to the

3     note."  But --

4          A.   They have the right to enforce the note.  All

5     of these chains have the right to enforce the note.

6          Q.   Okay.  And I see where you're going, but I'd

7     like you to stick with the words I'm asking.

8          A.   Okay.

9          Q.   My Request for Admissions says, "Admit that

10    the chain of title to the note is as follows," and you

11    admitted that chain of title.  It sounds like you're

12    wanting to change your answer to that admission because

13    now it sounds like not chain of title to the note but

14    chain of title to servicing --

15         A.   It's the same thing.

16         Q.   -- as represented by you.

17              And I would beg to differ --

18         A.   Okay.

19         Q.   -- on the law.

20         A.   Okay.

21         Q.   There's a difference.

22              But are you saying now that your answer to

23    Request to Admission No. 1 really means this is the

24    chain of servicing to the note?

25         A.   No.  What I mean is, Request to Admission

1    No. 1, everybody listed has the right to enforce the

2    note.  They have the right to enforce the note.

3        Q.   Okay.  And they --

4        A.   That's what I'm saying.

5        Q.   And they give --

6        A.   And they are the servicers for the note.

7        Q.   Okay.  And you're saying they didn't own the

8    note, they just have the rights to servicing the note?

9        A.   Correct.

10       Q.   All right.

11       A.   To my knowledge, that's exactly the chain of

12   title.

13       Q.   Okay.  The chain of title to servicing.

14            And I don't know if you're familiar with

15   Res Law, but it describes who a servicer is and what a

16   servicer is.

17       A.   Uh-huh.

18       Q.   But I'm not -- I'm not talking about

19   servicing.  You're talking about servicing, and I think

20   we're getting confused.  All I'm talking about is

21   ownership of the note.  So you've narrowed it down for

22   me.  You've told me now that Fannie Mae is the owner,

23   and I didn't know that.

24       A.   Correct.

25       Q.   So now I need to see some documents that show

1    that USAA Federal Savings Bank sold the note to Fannie

2    Mae, or to somebody and Fannie Mae bought it.  Can you

3    help put that together?  How did the note -- ownership

4    of the note -- I'm not talking servicing rights.  I'm

5    just talking ownership of the note.  How did it go from

6    USAA to Fannie Mae?

7         A.   Can I see a copy of the note?

8         Q.   Yep.  Oh, I think she has it.

9              THE COURT REPORTER:  I don't know which number

10        it is.

11             THE WITNESS:  3.  Exhibit No. 3.

12             I just want to read this.

13             MR. GINGO:  While she's doing that, I'm going

14        to go ahead and put these in.  So this will be the

15        next one, which I think is 6.

16             Counsel, it's the 8-K.

17             (A discussion was held off the record.)

18             (Defendant's Exhibit Nos. 6 through 10 were

19   marked for identification.)

20   BY MR. GINGO:

21        Q.   Okay.  I think we're ready for you.

22        A.   Okay.  Looking at the note, it says that

23   USAA Federal Savings Bank is the lender --

24        Q.   Correct.

25        A.   -- and the note holder.  It doesn't say owner.

1    So therefore, I believe -- and I would need to confirm

2    this -- that Fannie Mae is the owner and has been the

3    owner.

4        Q.    And I --

5        A.    But I need to confirm that.

6        Q.    Okay.  And I think I understand what you're

7    saying.

8        A.    Okay.

9        Q.    You're saying that at the inception of the

10   loan Fannie Mae was the owner at the very get-go.

11       A.    And I don't want to say that I'm 100 percent

12   positive because -- I can confirm that, but I can't

13   confirm that with the documents that I have --

14       Q.    Okay.

15       A.    -- in front of me.

16       Q.    And you've been doing this six years.  So what

17   kind of a document normally would say that, would say

18   that at the inception of the loan it looks like it came

19   from USAA and then Fannie Mae was actually in the

20   background as the owner?

21       A.    Well, we would have the Power of Attorney --

22   well, we have the Power of Attorney from Fannie Mae, but

23   it would be dated all the way back to, you know, when --

24   USAA Federal Savings Bank.  It would just be on our

25   system of records.

1       Q.   Okay.  So you're saying you have a Power of

2    Attorney from Fannie Mae back in 2006?

3       A.   Not -- no, because we didn't -- we are not

4    USAA.  I would have to confirm that with the corporate

5    legal department who handles -- who has all these

6    documents.  Like, the Purchase and Sales Service

7    Agreement and all those come from our corporate legal

8    department.

9       Q.   Okay.

10      A.   They would have documentation showing whether

11   Fannie Mae was the owner the whole time, according --

12   you know, from inception.  I just know that Fannie Mae

13   has been the owner since this loan -- even before this

14   loan was transferred.

15      Q.   In your records?

16      A.   Yes.  And it shows here that it was.

17      Q.   And you've tapped that a couple times.  What

18   is that you're tapping?

19      A.   This is the -- well, this one is from GMAC

20   Mortgage, LLC to Green Tree Servicing.  It's a Limited

21   Power of Attorney.

22      Q.   Okay.  Can I take a look at that?

23      A.   Sure.

24           And then this is --

25      Q.   Hold on a second.  We'll go too fast and I'll

Page 60

1    get them mixed up.

2         Okay.  So you've handed me a Limited Power of

3    Attorney from -- dated 10/1/09, to Green Tree by GMAC

4    Mortgage, LLC.  And are you -- and I haven't read this.

5    But are you saying that this is the -- mentions in

6    here -- Fannie Mae anywhere in here?

7         A.   I would have to read through the whole thing

8    to know that.

9         Q.   Why don't you take a look at that --

10        A.   Okay.

11        Q.   -- and see if Fannie Mae is in there at all.

12        A.   (Witness reading.)

13             It's just referring to a Servicing Agreement.

14        Q.   Okay.

15        A.   It's not talking about ownership.

16        Q.   Okay.

17        A.   It's talking about the servicing rights.

18        Q.   All right.  Well, let's mark that one.  Well,

19    when you're done, we'll mark it and she can hang onto

20    it.

21        A.   (Witness reading.)

22        Q.   So what you just looked at was 11.  And this

23    does not show you that Fannie Mae originally took it --

24    took the note, and this is just a Power of Attorney as

25    to servicing?

1      A.    Correct.

2      Q.    And it's strictly between Green Tree and

3   GMAC --

4      A.    Correct.

5      Q.    -- Mortgage, LLC?

6            MR. GINGO:  Okay.  That's 11.

7            (Defendant's Exhibit No. 11 was marked for

8   identification.)

9   BY MR. GINGO:

10     Q.    And we have another Power of Attorney here.

11  Take a look at that one, and I'll ask you the same

12  questions.

13     A.    (Witness reading.)

14           Okay.

15     Q.    Okay.  She'll mark this as 12, and I'll ask

16  you a couple of questions about it.

17           (Defendant's Exhibit No. 12 was marked for

18  identification.)

19  BY MR. GINGO:

20     Q.    Okay.  So you're looking at 12.

21     A.    Uh-huh.

22     Q.    Can you tell me what that is?

23     A.    It's a Limited Power of Attorney to Ditech

24  Financial from ResCap Liquidating Trust, Ocwen Loan

25  Servicing, GMAC Mortgage, LLC, successor by merger to

1    GMAC Mortgage Corporation, Residential Funding Company,

2    LLC, formally known as Residential Funding Corporation

3    Homecoming Financial, LLC.

4        Q.   Now, does that document merely give servicing

5    powers to Ditech?

6        A.   Yes.

7        Q.   But it doesn't transfer ownership of the note,

8    correct?

9        A.   No, but it does say that the investor is

10   Fannie Mae on this Limited Power of Attorney.

11       Q.   Okay.  You have a couple other documents

12   there.  Why don't you tell me what you're looking at.

13       A.   Sure.

14            Okay.  What do you -- I don't know which one

15   you want me to do first.

16       Q.   Just do the one that says Delaware.

17       A.   This one is a merger documentation.  It's just

18   showing that Green Tree and Ditech are the same company.

19       Q.   Oh, okay.  All right.

20       A.   It was just a name change.

21       Q.   Yeah.  You can keep that.  You'll get no issue

22   on that from me.

23       A.   Okay.

24       Q.   What's the next one?

25       A.   And this is -- it's a welcome letter.

1    Actually, it's a transfer letter saying -- I'm sorry.

2    It is a welcome letter, "Welcome to Green Tree."  And

3    it's addressed to Dennis Delia at the property address

4    advising Mr. Dennis, on February 15th, 2013, that

5    effective February 1st, 2013, the servicing of his

6    mortgage loan and the right to collect on the loan

7    payments is being transferred from GMAC to Green Tree,

8    effective February 1st, 2013.

9         Q.   Let's have her mark that --

10        A.   Okay.

11        Q.   -- and I'll take a quick look at it.

12             (Defendant's Exhibit No. 13 was marked for

13    identification.)

14    BY MR. GINGO:

15        Q.   Do you know if this type of letter,

16    Document 13, typically says who the owner is of the

17    note?

18        A.   I don't believe so.  I would have to read

19    through the whole thing, but, I mean, it's just letting

20    the borrower know that the servicing has transferred

21    from one company to the other.

22        Q.   Okay.

23        A.   But according to the Limited Power of

24    Attorney, Fannie Mae was the owner in 2013, so ...

25        Q.   Yep.  I saw that.

Page 64

1     A.    Okay.

2     Q.    And you have something here.

3     A.    Oh.  This is just our system notes.

4     Q.    Oh, okay.

5     A.    Note history.

6     Q.    Are those for me?

7           MS. GRIFFITH:  Let's see.  So your Notice of

8     Depo just asks for trial exhibits; is that correct?

9           MR. GINGO:  Let me look.  I think it had

10    everything to do with the complaint.  The evidence

11    that the Plaintiff has that the party it took the

12    note from was entitled to enforce the instrument

13    when loss of possession occurred.  Let me ask some

14    questions about that if that's in there.

15          MS. GRIFFITH:  Which -- what's your question?

16          MR. GINGO:  Well, what I'll do is, rather than

17    just -- why don't you just give it to her rather

18    than me taking it from you.  I'll just ask her some

19    questions, and she can refer to that for her

20    answers.

21          (Mr. Delia exited the room.)

22          MS. GRIFFITH:  Okay.

23          MR. GINGO:  But I just lost my client.  Let's

24    just take a momentary break.

25          You can do those too.

Page 65

1              (Defendant's Exhibit Nos. 14 through 17 were

2     marked for identification.)

3              (Mr. Delia reenters the room.)

4     BY MR. GINGO:

5        Q.   I'm going to ask you some questions about the

6     Affidavit of Lost Note.

7        A.   Okay.

8        Q.   So I have your 14, which is the Affidavit of

9     Lost Note.  In paragraph 7, it says, "Ditech acquired

10    the right to enforce note from ResCap Liquidating Trust

11    as successor in interest to GMAC Mortgage, LLC,

12    successor by merger to GMAC Mortgage Corporation, which

13    was entitled to enforce the note when the loss of

14    possession occurred."

15             So in reading that -- in reading that

16    paragraph -- I'm going to hand you the document -- you

17    tell me who had possession of the original note when it

18    got lost.

19       A.   I can't answer that by looking at this.  What

20    I can say is that when Ditech acquired the note, it was

21    already lost.  The -- I even spoke to the person who

22    actually signed this Affidavit of Lost Note in regards

23    to this case, and she had said that she made all efforts

24    to locate the original note but was told that it was

25    destroyed in David Stern's office prior to Ditech

Page 66

1    acquiring this loan.

2        Q.   Okay.  So --

3        A.   So all I can really speak to is what -- what

4    we did to try to obtain the original note.

5        Q.   Okay.  Is there any documentation that exists

6    anywhere that -- as far as you know, that indicates that

7    David Stern actually received the original wet ink

8    promissory note?

9        A.   That's not something that is part of our

10   system of records, to my knowledge.  The -- I believe

11   the prior law firm that was handling this has that

12   information.  And I don't -- I know David Stern is out

13   of business, but I believe it was Albertelli Law.  And

14   Teresa Harris, during her review of, you know, the --

15   where the original note is, I think -- I'm not

16   100 percent certain, but she said that she exhausted all

17   efforts in trying to locate it by reaching out to the

18   law firms.  And I believe on our system of records,

19   because I saw it yesterday, there is, like, a note from

20   the Court saying that the originals were destroyed.

21       Q.   Okay.  So -- and I believe you're referring to

22   an older foreclosure case; is that correct?

23       A.   It was -- it was pertaining to this loan.  So

24   I was just looking at our system of records in regards

25   to where the original note is.

1      Q.    So was there a document from a Court that you

2    seen that says that the original notes were destroyed?

3      A.    Yes.

4      Q.    And when did you see that?

5      A.    Last night.

6      Q.    And what did it say exactly?

7      A.    I -- I mean, I -- the gist of it was -- it was

8    from the Court, and it said that the documents had been

9    destroyed.

10      Q.    Was it a court order or was it --

11      A.    It was a notice from the Court.

12      Q.    Was it a notice from an attorney who filed

13    something in the court or --

14      A.    I don't believe so.

15      Q.    Did it look like a court order?

16      A.    No.

17      Q.    Do you know the case number that that was

18    associated with?

19      A.    It was -- it was about the loan number, the

20    loan -- I don't remember a case number, but it was on

21    our system of records regarding this loan, and there's

22    only one note.

23      Q.    Okay.  So if I can clarify.  Isn't it true

24    that you have no evidence that Fannie Mae actually took

25    possession of the original wet ink promissory note?

Page 68

1          A.    No.   I said that Fannie Mae is the investor of

2     the note.

3          Q.    No, no.   My question is --

4          A.    Okay.

5          Q.    -- that they took possession of the actual

6     original wet ink promissory note.   Isn't it true that

7     you have no evidence that Fannie Mae took possession of

8     the original wet ink promissory note?

9          A.    I didn't -- I don't know that.   I mean, I know

10    that Fannie Mae is the investor of the loan --

11         Q.    Let me ask it --

12         A.    -- so ...

13         Q.    -- a different way.

14         A.    Yeah.

15         Q.    Do you have any proof that Fannie Mae took

16    possession of the original wet ink promissory note?

17         A.    We may.   I don't have it here today.

18         Q.    And that's fine.

19         A.    Okay.

20         Q.    Okay.   So the answer is at this point you

21    don't know of any evidence like that; is that correct?

22         A.    I don't have it here today.   I don't -- I

23    don't -- I can't say yes or no if I don't -- if I didn't

24    review that information.

25         Q.    Have you ever seen any evidence that

1    Fannie Mae took actual possession of the original wet

2    ink promissory note?

3         A.   I believe it's with the -- it was probably

4    with the custodian, not with Fannie Mae physically.

5         Q.   I'm not asking you to speculate --

6         A.   Yeah.

7         Q.   -- as to what somebody else may have seen or

8    heard.

9         A.   Okay.

10        Q.   I'm asking what you saw and you've heard.

11             Did you see any documents that demonstrated

12   that Fannie Mae took possession of the original wet ink

13   promissory note?

14             MS. GRIFFITH:  Okay.  You've asked her three

15        times now.

16             MR. GINGO:  But she --

17             MS. GRIFFITH:  So I'm going to instruct her

18        not to answer because you've asked three times.

19        She's answered twice.  So don't answer that.  Move

20        on to another question.

21             MR. GINGO:  It was nonresponsive.

22             MS. GRIFFITH:  Okay.  Move on to another

23        question or clarify your question that you've asked

24        three times.

25             MR. GINGO:  I have clarified it.

Page 70

1           MS. GRIFFITH:  Well, you got the response

2       twice that she's given you.

3   BY MR. GINGO:

4       Q.   Do you have any evidence from USAA Federal

5   Savings Bank that it transferred the original promissory

6   note to Fannie Mae?

7       A.   Not here today.

8       Q.   Have you ever seen such evidence?

9       A.   No, not in my review.

10      Q.   Do you have any evidence -- well, have you --

11  strike that.

12           Have you seen any documentary evidence that

13  GMAC Mortgage Corporation actually took possession of

14  the original wet ink promissory note?

15      A.   I believe there's an AOM assigning the note

16  and the mortgage.  I would just have to refer back to

17  the AOMs to tell you which one it was where they

18  assigned the note and the mortgage.  So they would have

19  had to have possession in order to assign it.

20      Q.   Okay.  So earlier today you've handed me three

21  documents.  One is an Assignment of Mortgage from MERS

22  to USAA, it looks like, as nominee to USAA Federal

23  Savings Bank to Green Tree.  That's Exhibit 15.  You

24  take a look at that.  While you're looking at that, I'll

25  also give you 16, which is an Assignment of Mortgage

1    from ResCap Liquidating Trust to MERS.  That's 16.  And

2    I'll hand you the other one, which is Document 17, which

3    is an Assignment of Mortgage from MERS to GMAC Mortgage

4    Corporation.  So if you can look at those.

5         A.   (Witness perusing document.)

6              Okay.  What was your question?

7         Q.   So I'm wondering if you have seen any

8    documentary evidence that USAA Federal Savings Bank

9    transferred the actual wet ink promissory note to

10   GMAC Mortgage Corporation.

11        A.   I'm not sure when the note was lost.

12        Q.   You have a document pack to your left, between

13   you and your counsel, probably case notes.  Have you

14   reviewed that to see if that indicates when the note was

15   lost?

16        A.   What case notes?

17        Q.   Well, there's a document pack right here.  Is

18   that case notes?

19        A.   That's -- that's just history.  When people

20   call in to the system -- when -- like, if Mr. Dennis

21   [sic] calls in to the system, they notate everything.

22   So that's not going to have what you're asking me.

23        Q.   So what would the answer be?

24        A.   What was your question again?

25        Q.   Have you seen any documentary evidence that

1    shows that USAA Federal Savings Bank transferred the

2    note to GMAC Mortgage Corporation?

3        A.   I don't have that because, I believe -- I'm

4    not sure exactly when the note was lost.  So, I mean, if

5    it was lost and it -- you're transferring the servicing

6    rights.  That's what these are.  They're transferring

7    the servicing rights.

8        Q.   So is there any --

9        A.   Not the physical note.

10       Q.   Is there any document that you've seen that

11   indicates a date that the note was lost?

12       A.   I'm going to read this and see if it's on

13   here.

14           (Witness reading.)

15          It doesn't have it on here.  It just says,

16   "Ditech acquired the right to enforce the note from

17   ResCap Liquidating Trust, as successor in interest to

18   GMAC Mortgage, LLC, successor by merger to GMAC Mortgage

19   Corporation, which was entitled to enforce the note when

20   the loss of possession occurred.  Ditech made a diligent

21   good faith effort to locate the original note consistent

22   with its policies and procedures."

23       Q.   Does Ditech know who had physical possession

24   of the note when it was lost?

25       A.   I can only speak to what the Affidavit of Lost

1   Note says:  "The original note has been inadvertently

2   lost, misplaced, or destroyed, or in the wrongful

3   possession of an unknown person, or a person who cannot

4   be found, or it is not amenable to service of process.

5   The original note is not in the custody or control of

6   Ditech.  According to the records, the note has been

7   paid, satisfied" -- "has not been paid, satisfied,

8   pledged, or transferred."

9        Q.   Is there any documents that indicates when it

10  was first realized that the note was lost?

11       A.   Not by Ditech because it was already lost

12  prior to us acquiring the note.

13       Q.   All right.  Did Ditech reach back to ResCap

14  Liquidating Trust to find out if they actually possessed

15  the original wet ink note?

16       A.   I believe they were not even in business at

17  the time.  I'm just going off my memory there.  But GMAC

18  is no longer in business.

19       Q.   I'm talking about ResCap, ResCap Liquidating

20  Trust.

21       A.   But they're a successor of interest to

22  GMAC Mortgage.

23       Q.   So is it Ditech's position that Ditech doesn't

24  know who had possession of the note when it was lost?

25       A.   It was lost prior to Ditech acquiring the

1    loan.

2         Q.    Are you a -- any type of an agent or a member

3    of MERS yourself?

4         A.    No.

5         Q.    You indicated you have some kind of access to

6    MERS.  What is it that you have access to MERS?

7         A.    I don't have access to MERS.

8         Q.    Can you explain what you had mentioned before

9    about MERS?

10        A.    I used to have access to a MERS Milestone

11   Report.

12        Q.    Okay.  All right.  And to have that access,

13   did you have to be some kind of a member or agent of

14   MERS?

15        A.    No.

16        Q.    Did you have to sign some kind of an agreement

17   with MERS?

18        A.    No.

19        Q.    Do you know if MERS takes actual possession of

20   physical notes?

21        A.    Not to my knowledge.

22        Q.    This one assignment that you have here that

23   was dated March 26, 2009, an assignment from MERS to

24   GMAC Mortgage Corporation, it says the note was

25   transferred.  Then wouldn't that be incorrect?  The note

1    was not transferred if MERS never had possession of the

2    note.

3         A.    You're transferring the right to enforce the

4    note, not the physical.

5         Q.    Okay.  All right.  Very good.  Thank you.

6               Is there anything here that would tell you

7    what the current attorneys' fees are that were incurred

8    in this court case?

9         A.    Not to my knowledge.

10              MR. GINGO:  So I guess that's it.  I have

11         nothing further for you.

12              MS. GRIFFITH:  I have no questions.

13              MR. GINGO:  So we'll take a copy of that.

14              (The deposition was concluded at 2:50 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OATH

 2    STATE OF FLORIDA  )

 3    COUNTY OF ORANGE  )

 4

 5     I, Amy J. Martinez, Court Reporter and Notary Public,

 6    State of Florida, certify that the aforementioned

 7    witness, JANET FARAH GIOELLO, personally appeared before

 8    me and was duly sworn on the 8th day of November, 2019.

 9

10

11     WITNESS my hand and official seal this 20th day of

12    November, 2019.

13

14

15

16

17          AMY J. MARTINEZ/ COURT REPORTER
            Notary Public - State of Florida
18          My Commission No.: GG174696
            Expires:  February 2, 2022
19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE OF REPORTER

 2   STATE OF FLORIDA   )

 3   COUNTY OF ORANGE   )

 4

 5    I, Amy J. Martinez, Professional Court Reporter,

 6   certify that I was authorized to and did

 7   stenographically report the foregoing proceedings; that

 8   a review of the transcript was not requested; and that

 9   the transcript, pages 4 through 75, is a true and

10   complete record of my stenographic notes.

11

12    I further certify that I am not a relative, employee,

13   attorney, or counsel of any of the parties, nor am I a

14   relative or employee of any of the attorneys or counsel

15   connected with the action, nor am I financially

16   interested in the action.

17

18         DATED this 20th day of November, 2019.

19

20

21        AMY J. MARTINEZ, COURT REPORTER

22

23

24

25
```

Ditech Financial LLC
P.O. Box 9058
Temecula, CA 92589-9058



2344766282

Send Payments to:
Ditech Financial LLC
Ditech Payment Processing
PO Box 660934
Dallas, TX  75266-0934

Send Correspondence to:
Ditech Financial LLC
P.O. Box 15009
Tempe, AZ  85284-0109

20190620-285

DENNIS  DELIA
2400 CHELSEA ST
ORLANDO, FL  32803-2124



**ditech.**

06/21/2019

DENNIS  DELIA
2400 CHELSEA ST
ORLANDO, FL 32803-2124

| Loan Number: | 33139262 |
|---|---|
| Property Address: | 2400 CHELSEA ST |
| | ORLANDO, FL 32803-2124 |

Dear DENNIS  DELIA:

This letter is formal notice by Ditech Financial LLC, the Servicer of the above-referenced loan, on behalf of Federal National Mortgage Association, that you are in default under the terms of the documents creating and securing your Loan described above, including the Note and Deed of Trust/Mortgage/Security Deed ("Security Instrument"), for failure to pay amounts due.

You have a right to cure your default.  To cure the default, you must pay the full amount of the default on this loan by 07/26/2019 (or if said date falls on a Saturday, Sunday, or legal holiday, then on the first business day thereafter).  Failure to cure the default on or before this date may result in acceleration of the sums secured by the Security Instrument, foreclosure by judicial proceeding and sale of the property.

As of the date of this notice, the total amount required to cure the default is $241,205.15, which consists of the following:

| Next Payment Due Date: | | 08/01/2012 |
|---|---|---|
| Total Monthly Payments Due: | | $173,330.52 |
| 08/01/2012 | at | $1,446.12 |
| 09/01/2012 | at | $1,446.12 |
| 10/01/2012 | at | $1,446.12 |
| 11/01/2012 | at | $1,446.12 |
| 12/01/2012 | at | $1,446.12 |
| 01/01/2013 | at | $1,446.12 |
| 02/01/2013 | at | $1,446.12 |
| 03/01/2013 | at | $1,446.12 |
| 04/01/2013 | at | $1,446.12 |
| 05/01/2013 | at | $1,446.12 |
| 06/01/2013 | at | $1,446.12 |
| 07/01/2013 | at | $1,446.12 |

| | | |
|---|---|---|
| 06/01/2014 | at | $1,446.12 |
| 07/01/2014 | at | $1,446.12 |
| 08/01/2014 | at | $1,446.12 |
| 09/01/2014 | at | $1,446.12 |
| 10/01/2014 | at | $1,446.12 |
| 11/01/2014 | at | $1,446.12 |
| 12/01/2014 | at | $1,446.12 |
| 01/01/2015 | at | $1,446.12 |
| 02/01/2015 | at | $1,446.12 |
| 03/01/2015 | at | $1,446.12 |
| 04/01/2015 | at | $1,446.12 |
| 05/01/2015 | at | $1,446.12 |
| 06/01/2015 | at | $1,446.12 |
| 07/01/2015 | at | $1,446.12 |
| 08/01/2015 | at | $1,446.12 |
| 09/01/2015 | at | $1,446.12 |
| 10/01/2015 | at | $1,446.12 |
| 11/01/2015 | at | $1,446.12 |
| 12/01/2015 | at | $1,446.12 |
| 01/01/2016 | at | $1,446.12 |
| 02/01/2016 | at | $1,446.12 |
| 03/01/2016 | at | $1,446.12 |
| 04/01/2016 | at | $1,446.12 |
| 05/01/2016 | at | $1,446.12 |
| 06/01/2016 | at | $1,446.12 |
| 07/01/2016 | at | $2,791.41 |
| 08/01/2016 | at | $2,791.41 |
| 09/01/2016 | at | $2,791.41 |
| 10/01/2016 | at | $2,791.41 |
| 11/01/2016 | at | $2,791.41 |
| 12/01/2016 | at | $2,791.41 |
| 01/01/2017 | at | $2,567.47 |
| 02/01/2017 | at | $2,567.47 |
| 03/01/2017 | at | $2,567.47 |
| 04/01/2017 | at | $2,567.47 |
| 05/01/2017 | at | $2,567.47 |
| 06/01/2017 | at | $2,567.47 |
| 07/01/2017 | at | $2,769.06 |
| 08/01/2017 | at | $2,769.06 |
| 09/01/2017 | at | $2,769.06 |
| 10/01/2017 | at | $2,769.06 |
| 11/01/2017 | at | $2,769.06 |
| 12/01/2017 | at | $2,769.06 |
| 01/01/2018 | at | $2,769.06 |
| 02/01/2018 | at | $4,035.48 |
| 03/01/2018 | at | $4,035.48 |
| 04/01/2018 | at | $4,035.48 |
| 05/01/2018 | at | $4,035.48 |
| 06/01/2018 | at | $4,035.48 |

| 04/01/2019 | at | $2,302.80 |
| 05/01/2019 | at | $2,302.80 |
| 06/01/2019 | at | $2,302.80 |

| Late Charges: | | $255.79 |
| Other Charges: | Uncollected NSF Fees: | $0.00 |
| | Other Fees: | $0.00 |
| | Corporate Advance Balance: | $2,197.00 |
| | Escrow Advance Balance: | $65,421.84 |
| | Unapplied Balance: | ($0.00) |

**TOTAL YOU MUST PAY TO CURE DEFAULT:**          **$241,205.15**

You can cure this default by making a payment of $241,205.15 by 07/26/2019. Please note any additional monthly payments, late charges and other charges that may be due under the Note, Security Instrument and applicable law after the date of this notice must also be paid to bring your account current. You may contact our Loss Mitigation Department at 1-800-643-0202 to obtain updated payment information. This letter is in no way intended as a payoff statement for your mortgage, it merely states an amount necessary to cure the current default. Please include your loan number and property address with your payment and send to:

> Ditech Financial LLC
> Ditech Payment Processing P.O. Box 660934
> Dallas, TX 75266-0934

If you wish to dispute the delinquency, or if you dispute the calculation of amount of the delinquency and reinstatement amount, you may contact us by calling 1-800-643-0202. Or call us via TDD at 1-800-643-0202 #711.

IF YOU ARE UNABLE TO BRING YOUR ACCOUNT CURRENT, Ditech Financial LLC offers consumer assistance programs designed to help resolve delinquencies and avoid foreclosure. These services are provided without cost to our customers. You may be eligible for a loan workout plan or other similar alternative. If you would like to learn more about these programs, you may contact the Loss Mitigation Department at 1-800-643-0202, Monday - Friday 7 am to 8 pm and Saturday 7 am to 1 pm CST. WE ARE VERY INTERESTED IN ASSISTING YOU.

You have the right to reinstate the loan after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense to acceleration and foreclosure. If foreclosure proceedings are undertaken, we may pursue a deficiency judgment, if permitted by applicable law. Failure to respond to this letter may result in the loss of your property. To the extent your obligation has been discharged or is subject to the automatic stay in a bankruptcy case, this notice is for informational purposes only and does not constitute a demand for payment or an attempt to collect a debt as your personal obligation. If you are represented by an attorney, please provide us with the attorney's name, address and telephone number.

Ditech Financial LLC is attempting to collect a debt, and any information obtained will be used for that

You are notified that this default and any other legal action that may occur as a result thereof may be reported to one or more local and national credit reporting agencies by Ditech Financial LLC.

**Attention Servicemembers and Dependents**: Servicemembers on active duty, or a spouse or dependent of such a servicemember, may be entitled to certain protections under the Servicemembers Civil Relief Act ("SCRA") regarding the servicemember's interest rate and the risk of foreclosure. SCRA and certain state laws provide important protections for you, including prohibiting foreclosure under most circumstances. If you are currently in the military service, or have been within the last twelve (12) months, **AND** joined after signing the Note and Security Instrument now in default, please notify Ditech Financial LLC immediately. When contacting Ditech Financial LLC as to your military service, you must provide positive proof as to your military status. Servicemembers and dependents with questions about the SCRA should contact their unit's Judge Advocate, or their installation's Legal Assistance Officer. Homeowner counseling is also available at agencies such as Military OneSource (www.militaryonesource.mil; 1-800-342-9647) and Armed Forces Legal Assistance (http://legalassistance.law.af.mil), and through HUD-certified housing counselors (http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm). You can also contact us toll-free at 1-800-643-0202 if you have questions about your rights under SCRA.

For your benefit and assistance, there are government approved homeownership counseling agencies designed to help homeowners avoid losing their homes. To obtain a list of approved counseling agencies, please call 1-800-569-4287 or visit http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm. You may also contact the Homeownership Preservation Foundation's Hope hotline at 1-888-995-HOPE (4673).

This matter is very important. Please give it your immediate attention.


Sincerely,

Ditech Financial LLC
P.O. Box 15009
Tempe, AZ 85284-0109
1-800-643-0202

Ditech Financial LLC
P.O. Box 9058
Temecula, CA 92589-9058



2344766281

PRESORT
First-Class Mail
U.S. Postage and
Fees Paid
WSO

Send Payments to:
Ditech Financial LLC
Ditech Payment Processing
PO Box 660934
Dallas, TX  75266-0934

20190620-285

Send Correspondence to:
Ditech Financial LLC
P.O. Box 15009
Tempe, AZ  85284-0109

DENNIS  DELIA
PO BOX 309
TITUSVILLE, FL  32781-0309

**ditech.**

06/21/2019

DENNIS  DELIA
PO BOX 309
TITUSVILLE, FL 32781-0309

| | |
|---|---|
| Loan Number: | 33139262 |
| Property Address: | 2400 CHELSEA ST |
| | ORLANDO, FL 32803-2124 |

Dear DENNIS  DELIA:

This letter is formal notice by Ditech Financial LLC, the Servicer of the above-referenced loan, on behalf of
Federal National Mortgage Association, that you are in default under the terms of the documents creating and
securing your Loan described above, including the Note and Deed of Trust/Mortgage/Security Deed ("Security
Instrument"), for failure to pay amounts due.

You have a right to cure your default.  To cure the default, you must pay the full amount of the default on this
loan by 07/26/2019 (or if said date falls on a Saturday, Sunday, or legal holiday, then on the first business day
thereafter).  Failure to cure the default on or before this date may result in acceleration of the sums secured by
the Security Instrument, foreclosure by judicial proceeding and sale of the property.

As of the date of this notice, the total amount required to cure the default is $241,205.15, which consists of the
following:

| | | |
|---|---|---|
| Next Payment Due Date: | | 08/01/2012 |
| Total Monthly Payments Due: | | $173,330.52 |
| 08/01/2012 | at | $1,446.12 |
| 09/01/2012 | at | $1,446.12 |
| 10/01/2012 | at | $1,446.12 |
| 11/01/2012 | at | $1,446.12 |
| 12/01/2012 | at | $1,446.12 |
| 01/01/2013 | at | $1,446.12 |
| 02/01/2013 | at | $1,446.12 |
| 03/01/2013 | at | $1,446.12 |
| 04/01/2013 | at | $1,446.12 |
| 05/01/2013 | at | $1,446.12 |
| 06/01/2013 | at | $1,446.12 |
| 07/01/2013 | at | $1,446.12 |

| | | |
|---|---|---|
| 06/01/2014 | at | $1,446.12 |
| 07/01/2014 | at | $1,446.12 |
| 08/01/2014 | at | $1,446.12 |
| 09/01/2014 | at | $1,446.12 |
| 10/01/2014 | at | $1,446.12 |
| 11/01/2014 | at | $1,446.12 |
| 12/01/2014 | at | $1,446.12 |
| 01/01/2015 | at | $1,446.12 |
| 02/01/2015 | at | $1,446.12 |
| 03/01/2015 | at | $1,446.12 |
| 04/01/2015 | at | $1,446.12 |
| 05/01/2015 | at | $1,446.12 |
| 06/01/2015 | at | $1,446.12 |
| 07/01/2015 | at | $1,446.12 |
| 08/01/2015 | at | $1,446.12 |
| 09/01/2015 | at | $1,446.12 |
| 10/01/2015 | at | $1,446.12 |
| 11/01/2015 | at | $1,446.12 |
| 12/01/2015 | at | $1,446.12 |
| 01/01/2016 | at | $1,446.12 |
| 02/01/2016 | at | $1,446.12 |
| 03/01/2016 | at | $1,446.12 |
| 04/01/2016 | at | $1,446.12 |
| 05/01/2016 | at | $1,446.12 |
| 06/01/2016 | at | $1,446.12 |
| 07/01/2016 | at | $2,791.41 |
| 08/01/2016 | at | $2,791.41 |
| 09/01/2016 | at | $2,791.41 |
| 10/01/2016 | at | $2,791.41 |
| 11/01/2016 | at | $2,791.41 |
| 12/01/2016 | at | $2,791.41 |
| 01/01/2017 | at | $2,567.47 |
| 02/01/2017 | at | $2,567.47 |
| 03/01/2017 | at | $2,567.47 |
| 04/01/2017 | at | $2,567.47 |
| 05/01/2017 | at | $2,567.47 |
| 06/01/2017 | at | $2,567.47 |
| 07/01/2017 | at | $2,769.06 |
| 08/01/2017 | at | $2,769.06 |
| 09/01/2017 | at | $2,769.06 |
| 10/01/2017 | at | $2,769.06 |
| 11/01/2017 | at | $2,769.06 |
| 12/01/2017 | at | $2,769.06 |
| 01/01/2018 | at | $2,769.06 |
| 02/01/2018 | at | $4,035.48 |
| 03/01/2018 | at | $4,035.48 |
| 04/01/2018 | at | $4,035.48 |
| 05/01/2018 | at | $4,035.48 |
| 06/01/2018 | at | $4,035.48 |

| 04/01/2019 | at | $2,302.80 |
| 05/01/2019 | at | $2,302.80 |
| 06/01/2019 | at | $2,302.80 |

| Late Charges: | | $255.79 |
| Other Charges: | Uncollected NSF Fees: | $0.00 |
| | Other Fees: | $0.00 |
| | Corporate Advance Balance: | $2,197.00 |
| | Escrow Advance Balance: | $65,421.84 |
| | Unapplied Balance: | ($0.00) |

**TOTAL YOU MUST PAY TO CURE DEFAULT:**          **$241,205.15**

You can cure this default by making a payment of $241,205.15 by 07/26/2019. Please note any additional monthly payments, late charges and other charges that may be due under the Note, Security Instrument and applicable law after the date of this notice must also be paid to bring your account current. You may contact our Loss Mitigation Department at 1-800-643-0202 to obtain updated payment information. This letter is in no way intended as a payoff statement for your mortgage, it merely states an amount necessary to cure the current default. Please include your loan number and property address with your payment and send to:

> Ditech Financial LLC
> Ditech Payment Processing P.O. Box 660934
> Dallas, TX 75266-0934

If you wish to dispute the delinquency, or if you dispute the calculation of amount of the delinquency and reinstatement amount, you may contact us by calling 1-800-643-0202. Or call us via TDD at 1-800-643-0202 #711.

IF YOU ARE UNABLE TO BRING YOUR ACCOUNT CURRENT, Ditech Financial LLC offers consumer assistance programs designed to help resolve delinquencies and avoid foreclosure. These services are provided without cost to our customers. You may be eligible for a loan workout plan or other similar alternative. If you would like to learn more about these programs, you may contact the Loss Mitigation Department at 1-800-643-0202, Monday - Friday 7 am to 8 pm and Saturday 7 am to 1 pm CST. WE ARE VERY INTERESTED IN ASSISTING YOU.

You have the right to reinstate the loan after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense to acceleration and foreclosure. If foreclosure proceedings are undertaken, we may pursue a deficiency judgment, if permitted by applicable law. Failure to respond to this letter may result in the loss of your property. To the extent your obligation has been discharged or is subject to the automatic stay in a bankruptcy case, this notice is for informational purposes only and does not constitute a demand for payment or an attempt to collect a debt as your personal obligation. If you are represented by an attorney, please provide us with the attorney's name, address and telephone number.

Ditech Financial LLC is attempting to collect a debt, and any information obtained will be used for that

You are notified that this default and any other legal action that may occur as a result thereof may be reported to one or more local and national credit reporting agencies by Ditech Financial LLC.

**Attention Servicemembers and Dependents**: Servicemembers on active duty, or a spouse or dependent of such a servicemember, may be entitled to certain protections under the Servicemembers Civil Relief Act ("SCRA") regarding the servicemember's interest rate and the risk of foreclosure. SCRA and certain state laws provide important protections for you, including prohibiting foreclosure under most circumstances. If you are currently in the military service, or have been within the last twelve (12) months, **AND** joined after signing the Note and Security Instrument now in default, please notify Ditech Financial LLC immediately. When contacting Ditech Financial LLC as to your military service, you must provide positive proof as to your military status. Servicemembers and dependents with questions about the SCRA should contact their unit's Judge Advocate, or their installation's Legal Assistance Officer. Homeowner counseling is also available at agencies such as Military OneSource (www.militaryonesource.mil; 1-800-342-9647) and Armed Forces Legal Assistance (http://legalassistance.law.af.mil), and through HUD-certified housing counselors (http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm). You can also contact us toll-free at 1-800-643-0202 if you have questions about your rights under SCRA.

For your benefit and assistance, there are government approved homeownership counseling agencies designed to help homeowners avoid losing their homes. To obtain a list of approved counseling agencies, please call 1-800-569-4287 or visit http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm. You may also contact the Homeownership Preservation Foundation's Hope hotline at 1-888-995-HOPE (4673).

This matter is very important. Please give it your immediate attention.

Sincerely,

Ditech Financial LLC
P.O. Box 15009
Tempe, AZ 85284-0109
1-800-643-0202

# Web History for Account: 33139262

33139262                                    Inv #   2A9

Prin Bal:   19

Borrowers          DENNIS DELIA          Address   2400 CHELSEA ST, ORLANDO, FL, 32803

| Source | Tran Date | Back Date | Tran Amount | Tran Code | Tran Desc | Process | Process Desc | Due Paid | Prin Paid | Int Paid | Escrow Paid | Late Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MSP | 10/15/2019 | | -$248.34 | 351 | Hazard Ins Disb | 000 | Automated Escrow Transaction | 10/01/19 | $0.00 | $0.00 | -$248.34 | | |
| MSP | 09/16/2019 | | $15.00 | 631 | Corp Adv Disb | | ADV | | $0.00 | $0.00 | | | |
| MSP | 09/09/2019 | | $225.00 | 632 | Corp Adv Disb | | ADV | | $0.00 | $0.00 | | | |
| MSP | 09/06/2019 | | -$225.75 | 351 | Hazard Ins Disb | 000 | Automated Escrow Transaction | 09/01/19 | $0.00 | $0.00 | -$225.75 | | |
| MSP | 08/30/2019 | | $2,002.73 | 632 | Corp Adv Disb | | ADV FC COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 08/30/2019 | | $100.00 | 632 | Corp Adv Disb | | ADV FC COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 08/30/2019 | | $9.00 | 632 | Corp Adv Disb | | ADV FC COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 08/15/2019 | | $15.00 | 631 | Corp Adv Disb | | ADV | | $0.00 | $0.00 | | | |
| MSP | 08/08/2019 | | -$225.75 | 351 | Hazard Ins Disb | HXC | Transaction | 08/01/19 | $0.00 | $0.00 | -$225.75 | | |
| MSP | 07/10/2019 | | -$225.75 | 351 | Hazard Ins Disb | HX0 | Transaction | 07/01/19 | $0.00 | $0.00 | -$225.75 | | |
| MSP | 06/25/2019 | | $15.00 | 631 | Corp Adv Disb | | ADV | | $0.00 | $0.00 | | | |
| MSP | 06/07/2019 | | -$225.75 | 351 | Hazard Ins Disb | HX0 | Transaction | 06/01/19 | $0.00 | $0.00 | -$225.75 | | |
| MSP | 05/29/2019 | | $15.00 | 631 | Corp Adv Disb | | ADV | | $0.00 | $0.00 | | | |
| MSP | 05/20/2019 | | $15.00 | 631 | Corp Adv Disb | | ADV | | $0.00 | $0.00 | | | |
| MSP | 05/20/2019 | | $15.00 | 631 | Corp Adv Disb | | ADV | | $0.00 | $0.00 | | | |
| MSP | 05/13/2019 | | -$225.75 | 351 | Hazard Ins Disb | HX1 | Transaction | 05/01/19 | $0.00 | $0.00 | -$225.75 | | |
| MSP | 04/09/2019 | | -$225.75 | 351 | Hazard Ins Disb | HX2 | Transaction | 04/01/19 | $0.00 | $0.00 | -$225.75 | | |
| MSP | 03/07/2019 | | -$225.75 | 351 | Hazard Ins Disb | HX0 | Transaction | 03/01/19 | $0.00 | $0.00 | -$225.75 | | |
| MSP | 02/07/2019 | | -$225.75 | 351 | Hazard Ins Disb | HX2 | Transaction | 02/01/19 | $0.00 | $0.00 | -$225.75 | | |
| MSP | 01/08/2019 | | -$225.75 | 351 | Hazard Ins Disb | HX4 | Transaction | 01/01/19 | $0.00 | $0.00 | -$225.75 | | |

Page 1 out of 25



| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Due Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MSP | 12/07/2018 | | -$225.75 | 351 | Hazard Ins Disb | HX1 | Transaction | 12/01/18 | $0.00 | $0.00 | -$225.75 | | |
| MSP | 11/15/2018 | | -$3,378.47 | 312 | County Tax Disb | EGL | Transaction | 11/01/18 | $0.00 | $0.00 | -$3,378.47 | | |
| MSP | 11/07/2018 | | -$225.75 | 351 | Hazard Ins Disb | HX1 | Transaction | 11/01/18 | $0.00 | $0.00 | -$225.75 | | |
| MSP | 10/18/2018 | | $77.00 | 633 | Corp Adv Disb | | ADV COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 10/17/2018 | | -$225.75 | 351 | Hazard Ins Disb | HX2 | Transaction | 10/01/18 | $0.00 | $0.00 | -$225.75 | | |
| MSP | 10/12/2018 | | $215.00 | 633 | Corp Adv Disb | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 10/03/2018 | | $107.50 | 633 | Corp Adv Disb | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 10/03/2018 | | $107.50 | 633 | Corp Adv Disb | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 09/28/2018 | | $1,035.00 | 633 | Corp Adv Disb | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 09/10/2018 | | -$205.26 | 351 | Hazard Ins Disb | HX1 | Transaction | 09/01/18 | $0.00 | $0.00 | -$205.26 | | |
| MSP | 08/14/2018 | | $250.00 | 633 | Corp Adv Disb | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 08/07/2018 | | -$205.34 | 351 | Hazard Ins Disb | HX2 | Transaction | 08/01/18 | $0.00 | $0.00 | -$205.34 | | |
| MSP | 07/31/2018 | | -$15.00 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$15.00 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$15.00 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| SP | 07/31/2018 | | -$15.00 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$15.00 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$15.00 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |

Page 2 out of 25

| Source | Tran Date | Back Date | Tran Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|--------|-----------|-----------|-------------|-----------|-----------|---------|--------------|------|-----------|----------|-------------|------|----------|
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| ISP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |

Page 3 out of 25

| Source | Tran Date | Back Date | Tran Amount | Tran Code | Tran Desc | Process | Process Desc | Due Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|--------|-----------|-----------|-------------|-----------|-----------|---------|--------------|----------|-----------|----------|-------------|------|----------|
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| ISP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| ISP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| SP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |

Page 5 out of 25

| Source | Tran Date | Back Date | Tran Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|--------|-----------|-----------|-------------|-----------|-----------|---------|--------------|------|-----------|----------|-------------|------|----------|
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| ISP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$14.75 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$13.00 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$16.50 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$16.50 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$14.75 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$16.50 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$13.00 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$16.50 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$13.00 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$11.25 | 745 | Restricted Corp Adv | | ADV APPRAISAL FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$257.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |

Page 6 out of 25

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|--------|------|-----------|--------|-----------|-----------|---------|--------------|------|-----------|----------|-------------|------|----------|
| MSP | 07/31/2018 | | -$600.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$325.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$600.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$205.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$36.50 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$20.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$892.50 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$75.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$157.50 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$108.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$18.50 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$144.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$666.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$200.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$180.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$200.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$200.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |

| Source | Tran Date | Back Date | Tran Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MSP | 07/31/2018 | | -$87.00 | 745 | Restricted Corp Adv | | ADV ATTORNEY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$375.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$850.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$250.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$1,000.00 | 745 | Restricted Corp Adv | | ADV COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$850.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$412.47 | 745 | Restricted Corp Adv | | ADV COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$70.00 | 745 | Restricted Corp Adv | | ADV PUBLICATION | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$70.00 | 745 | Restricted Corp Adv | | ADV COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$70.00 | 745 | Restricted Corp Adv | | ADV COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$25.00 | 745 | Restricted Corp Adv | | ADV COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$18.50 | 745 | Restricted Corp Adv | | ADV RECORDING FEE | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$275.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$25.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$125.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$200.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$25.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$550.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$400.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$100.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$150.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$300.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$200.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |

Page 8 out of 25

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|--------|------|-----------|--------|-----------|-----------|---------|--------------|------|-----------|----------|-------------|------|----------|
| MSP | 07/31/2018 | | -$1,025.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$775.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$700.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$50.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$200.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$120.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$250.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$300.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$437.50 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$50.00 | 745 | Restricted Corp Adv | | ADV COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$250.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$250.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$700.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$437.50 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$250.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$900.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$65.00 | 745 | Restricted Corp Adv | | ADV COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$250.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$263.50 | 745 | Restricted Corp Adv | | ADV COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$801.85 | 745 | Restricted Corp Adv | | ADV COURT COSTS | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$1,500.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$250.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$250.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$125.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Due Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MSP | 07/31/2018 | | -$1,505.00 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$322.50 | 745 | Restricted Corp Adv | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$200.00 | 745 | Restricted Corp Adv | | ADV FC TITLE REPORT | | $0.00 | $0.00 | | | |
| MSP | 07/31/2018 | | -$200.00 | 745 | Restricted Corp Adv | | ADV FC TITLE REPORT | | $0.00 | $0.00 | | | |
| MSP | 07/09/2018 | | -$205.34 | 351 | Hazard Ins Disb | HX3 | Transaction | 07/01/18 | $0.00 | $0.00 | -$205.34 | | |
| MSP | 06/07/2018 | | -$205.34 | 351 | Hazard Ins Disb | HX1 | Transaction | 06/01/18 | $0.00 | $0.00 | -$205.34 | | |
| MSP | 05/08/2018 | | -$205.34 | 351 | Hazard Ins Disb | HX4 | Transaction | 05/01/18 | $0.00 | $0.00 | -$205.34 | | |
| MSP | 04/09/2018 | | -$205.34 | 351 | Hazard Ins Disb | HX1 | Transaction | 04/01/18 | $0.00 | $0.00 | -$205.34 | | |
| MSP | 03/07/2018 | | -$205.34 | 351 | Hazard Ins Disb | HX1 | Transaction | 03/01/18 | $0.00 | $0.00 | -$205.34 | | |
| MSP | 02/08/2018 | | $200.00 | 633 | Corp Adv Disb | | ADV FC TITLE REPORT | | $0.00 | $0.00 | | | |
| MSP | 02/08/2018 | | -$205.34 | 351 | Hazard Ins Disb | HX2 | Transaction | 02/01/18 | $0.00 | $0.00 | -$205.34 | | |
| MSP | 01/24/2018 | | $200.00 | 633 | Corp Adv Disb | | ADV FC TITLE REPORT | | $0.00 | $0.00 | | | |
| MSP | 01/09/2018 | | -$205.34 | 351 | Hazard Ins Disb | HX3 | Transaction | 01/01/18 | $0.00 | $0.00 | -$205.34 | | |
| MSP | 12/18/2017 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 12/07/2017 | | -$205.34 | 351 | Hazard Ins Disb | HX1 | Transaction | 12/01/17 | $0.00 | $0.00 | -$205.34 | | |
| MSP | 11/16/2017 | | -$3,330.05 | 312 | County Tax Disb | EGL | Transaction | 11/01/17 | $0.00 | $0.00 | -$3,330.05 | | |
| MSP | 11/07/2017 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 11/07/2017 | | -$205.34 | 351 | Hazard Ins Disb | HX4 | Transaction | 11/01/17 | $0.00 | $0.00 | -$205.34 | | |
| MSP | 10/18/2017 | | -$205.34 | 351 | Hazard Ins Disb | HX5 | Transaction | 10/01/17 | $0.00 | $0.00 | -$205.34 | | |
| MSP | 09/19/2017 | | $322.50 | 633 | Corp Adv Disb | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 09/07/2017 | | -$200.25 | 351 | Hazard Ins Disb | HX2 | Transaction | 09/01/17 | $0.00 | $0.00 | -$200.25 | | |
| MSP | 08/31/2017 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 08/08/2017 | | -$200.25 | 351 | Hazard Ins Disb | HX3 | Transaction | 08/01/17 | $0.00 | $0.00 | -$200.25 | | |
| MSP | 07/27/2017 | | $1,505.00 | 633 | Corp Adv Disb | | ADV FC ATTY FEES | | $0.00 | $0.00 | | | |
| MSP | 07/07/2017 | | -$200.25 | 351 | Hazard Ins Disb | HX1 | Transaction | 07/01/17 | $0.00 | $0.00 | -$200.25 | | |

Page 10 out of 25

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MSP | 06/08/2017 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 06/07/2017 | | -$200.25 | 351 | Hazard Ins Disb | HX1 | Transaction | 06/01/17 | $0.00 | $0.00 | -$200.25 | | |
| MSP | 05/12/2017 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 05/09/2017 | | -$200.25 | 351 | Hazard Ins Disb | HX4 | Transaction | 05/01/17 | $0.00 | $0.00 | -$200.25 | | |
| MSP | 04/11/2017 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 04/07/2017 | | -$200.25 | 351 | Hazard Ins Disb | HX1 | Transaction | 04/01/17 | $0.00 | $0.00 | -$200.25 | | |
| MSP | 03/13/2017 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 03/07/2017 | | -$200.25 | 351 | Hazard Ins Disb | HX3 | Transaction | 03/01/17 | $0.00 | $0.00 | -$200.25 | | |
| MSP | 02/17/2017 | | $0.00 | 143 | Balance Adjust | MMW | Transaction | | $0.00 | $0.00 | | | |
| MSP | 02/17/2017 | | $21,332.12 | 143 | Balance Adjust | MMW | Transaction | | $21,332.12 | $0.00 | | | |
| MSP | 02/08/2017 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 02/07/2017 | | -$200.25 | 351 | Hazard Ins Disb | HX3 | Transaction | 02/01/17 | $0.00 | $0.00 | -$200.25 | | |
| MSP | 01/26/2017 | | -$75,000.00 | 745 | Restricted Corp Adv | | ADV SENIOR LIEN | | $0.00 | $0.00 | | | |
| MSP | 01/09/2017 | | -$200.25 | 351 | Hazard Ins Disb | HX5 | Transaction | 01/01/17 | $0.00 | $0.00 | -$200.25 | | |
| MSP | 12/09/2016 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 12/07/2016 | | -$200.25 | 351 | Hazard Ins Disb | HX1 | Transaction | 12/01/16 | $0.00 | $0.00 | -$200.25 | | |
| MSP | 11/16/2016 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 11/16/2016 | | -$3,746.59 | 312 | County Tax Disb | EGL | Transaction | 11/01/16 | $0.00 | $0.00 | -$3,746.59 | | |
| MSP | 11/08/2016 | | -$200.25 | 351 | Hazard Ins Disb | HX4 | Transaction | 11/01/16 | $0.00 | $0.00 | -$200.25 | | |
| MSP | 10/24/2016 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 10/19/2016 | | -$200.25 | 351 | Hazard Ins Disb | HXR | Transaction | 10/01/16 | $0.00 | $0.00 | -$200.25 | | |
| MSP | 09/09/2016 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 08/15/2016 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 07/15/2016 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 06/16/2016 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |

Page 11 out of 25

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MSP | 05/12/2016 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| MSP | 04/25/2016 | | $15.00 | 633 | Corp Adv Disb | | ADV INSPECTION | | $0.00 | $0.00 | | | |
| GTA | 03/31/2016 | | -$75,000.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 449 | | | | $0.00 | $0.00 | | | -$75,000.00 |
| GTA | 03/18/2016 | | -$15.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 448 | | | | $0.00 | $0.00 | | | -$15.00 |
| GTA | 02/23/2016 | | -$125.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 447 | | | | $0.00 | $0.00 | | | -$125.00 |
| GTA | 02/15/2016 | | -$15.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 446 | | | | $0.00 | $0.00 | | | -$15.00 |
| GTA | 01/14/2016 | | -$15.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 445 | | | | $0.00 | $0.00 | | | -$15.00 |
| GTA | 12/15/2015 | | -$15.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 444 | | | | $0.00 | $0.00 | | | -$15.00 |
| GTA | 12/15/2015 | | -$250.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 443 | | | | $0.00 | $0.00 | | | -$250.00 |
| GTA | 11/27/2015 | | -$250.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 442 | | | | $0.00 | $0.00 | | | -$250.00 |
| GTA | 11/27/2015 | | -$1,500.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 441 | | | | $0.00 | $0.00 | | | -$1,500.00 |
| GTA | 11/19/2015 | | -$801.85 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 440 | | | | $0.00 | $0.00 | | | -$801.85 |
| GTA | 11/16/2015 | | -$263.50 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 439 | | | | $0.00 | $0.00 | | | -$263.50 |
| GTA | 11/13/2015 | | -$15.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 438 | | | | $0.00 | $0.00 | | | -$15.00 |
| GTA | 11/11/2015 | | -$3,468.31 | 210 | Disbursement:Escrow Only | E7 | Esc Disb-County | | $0.00 | $0.00 | | | |

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | ESC 80 | | | | $0.00 | $0.00 | -$3,468.31 | | |
| GTA | 10/21/2015 | | $2,326.00 | 150 | Payment:Insurance Only-Cash | E2 | Esc Disb-Insurance | | $0.00 | $0.00 | | | |
| | | | | | INS 14 | | | | $0.00 | $0.00 | | | $2,326.00 |
| GTA | 10/21/2015 | | -$2,326.00 | 210 | Disbursement:Escrow Only | F7 | Esc Disb-Hazard/Fire | | $0.00 | $0.00 | | | |
| | | | | | ESC 80 | | | | $0.00 | $0.00 | -$2,326.00 | | |
| GTA | 10/20/2015 | | -$2,326.00 | 211 | Disbursement:Insurance Only | 25 | Agency Feed | | $0.00 | $0.00 | | | |
| | | | | | INS 14 | | | | $0.00 | $0.00 | | | -$2,326.00 |
| GTA | 10/20/2015 | | -$250.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 437 | | | | $0.00 | $0.00 | | | -$250.00 |
| GTA | 10/15/2015 | | -$15.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 436 | | | | $0.00 | $0.00 | | | -$15.00 |
| GTA | 10/01/2015 | | -$65.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 435 | | | | $0.00 | $0.00 | | | -$65.00 |
| GTA | 09/24/2015 | | -$15.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 434 | | | | $0.00 | $0.00 | | | -$15.00 |
| GTA | 09/16/2015 | | -$900.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 433 | | | | $0.00 | $0.00 | | | -$900.00 |
| GTA | 08/26/2015 | | -$250.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 432 | | | | $0.00 | $0.00 | | | -$250.00 |
| GTA | 07/31/2015 | | -$437.50 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 431 | | | | $0.00 | $0.00 | | | -$437.50 |
| GTA | 07/31/2015 | | -$700.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 430 | | | | $0.00 | $0.00 | | | -$700.00 |
| GTA | 07/15/2015 | | -$250.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 429 | | | | $0.00 | $0.00 | | | -$250.00 |
| GTA | 07/02/2015 | | -$250.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 428 | | | | $0.00 | $0.00 | | | -$250.00 |

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GTA | 05/09/2015 | | -$50.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 427 | | | | $0.00 | $0.00 | | | -$50.00 |
| GTA | 04/15/2015 | | -$437.50 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 426 | | | | $0.00 | $0.00 | | | -$437.50 |
| GTA | 02/20/2015 | | -$300.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 425 | | | | $0.00 | $0.00 | | | -$300.00 |
| GTA | 01/29/2015 | | -$250.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 424 | | | | $0.00 | $0.00 | | | -$250.00 |
| GTA | 01/23/2015 | | $2,479.75 | 150 | Payment:Insurance Only-Cash | E2 | Esc Disb-Insurance | | $0.00 | $0.00 | | | |
| | | | | | INS 13 | | | | $0.00 | $0.00 | | | $2,479.75 |
| GTA | 01/23/2015 | | -$2,479.75 | 210 | Disbursement:Escrow Only | F7 | Esc Disb-Hazard/Fire | | $0.00 | $0.00 | | | |
| | | | | | ESC 80 | | | | $0.00 | $0.00 | -$2,479.75 | | |
| GTA | 01/22/2015 | | -$2,479.75 | 211 | Disbursement:Insurance Only | 25 | Agency Feed | | $0.00 | $0.00 | | | |
| | | | | | INS 13 | | | | $0.00 | $0.00 | | | -$2,479.75 |
| GTA | 11/08/2014 | 11/07/2014 | -$2,886.60 | 210 | Disbursement:Escrow Only | E7 | Esc Disb-County | | $0.00 | $0.00 | | | |
| | | | | | ESC 80 | | | | $0.00 | $0.00 | -$2,886.60 | | |
| GTA | 10/22/2014 | | -$238,915.89 | 776 | Reversal:Repo Error Correction | 10 | Full Charge-Off | 05/01/06 | -$219,526.32 | -$4,292.10 | | | |
| | | | | | INS 300 | | | 05/01/06 | $0.00 | $0.00 | | | -$15.00 |
| | | | | | INS 301 | | | 05/01/06 | $0.00 | $0.00 | | | -$15.00 |
| | | | | | INS 302 | | | 05/01/06 | $0.00 | $0.00 | | | -$15.00 |
| | | | | | INS 303 | | | 05/01/06 | $0.00 | $0.00 | | | -$15.00 |
| | | | | | INS 304 | | | 05/01/06 | $0.00 | $0.00 | | | -$15.00 |
| | | | | | INS 305 | | | 05/01/06 | $0.00 | $0.00 | | | -$15.00 |
| | | | | | INS 306 | | | 05/01/06 | $0.00 | $0.00 | | | -$15.00 |
| | | | | | INS 307 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 308 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 309 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 310 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |

| Source | Post Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Due/Paid | Prin Paid | Int Paid | Escrow Paid | Date Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | INS 311 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 312 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 313 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 314 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 315 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 316 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 317 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 318 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 319 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 320 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 321 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 322 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 323 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 324 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 325 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 326 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 327 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 328 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 329 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 330 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 331 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 332 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 333 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 334 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 335 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 336 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 337 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 338 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 339 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 340 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 341 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |

| Source | Tran Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Due Paid | Prin Paid | Int Paid | Escrow Paid | Date Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | INS 342 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 343 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 344 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 345 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 346 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 347 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 348 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 349 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 350 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 351 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 352 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 353 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 354 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 355 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 356 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 357 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 358 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 359 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 360 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 361 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 362 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 363 | | | 05/01/06 | $0.00 | $0.00 | | | -$14.75 |
| | | | | | INS 364 | | | 05/01/06 | $0.00 | $0.00 | | | -$13.00 |
| | | | | | INS 365 | | | 05/01/06 | $0.00 | $0.00 | | | -$16.50 |
| | | | | | INS 366 | | | 05/01/06 | $0.00 | $0.00 | | | -$16.50 |
| | | | | | INS 367 | | | 05/01/06 | $0.00 | $0.00 | | | -$14.75 |
| | | | | | INS 368 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 369 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 370 | | | 05/01/06 | $0.00 | $0.00 | | | -$16.50 |
| | | | | | INS 371 | | | 05/01/06 | $0.00 | $0.00 | | | -$13.00 |
| | | | | | INS 372 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Due Paid | Prin Paid | Int Paid | Escrow Paid | Late Paid | Ins Paid |
|--------|------|-----------|--------|-----------|-----------|---------|--------------|----------|-----------|----------|-------------|-----------|----------|
| | | | | | INS 373 | | | 05/01/06 | $0.00 | $0.00 | | | -$16.50 |
| | | | | | INS 374 | | | 05/01/06 | $0.00 | $0.00 | | | -$13.00 |
| | | | | | INS 375 | | | 05/01/06 | $0.00 | $0.00 | | | -$11.25 |
| | | | | | INS 376 | | | 05/01/06 | $0.00 | $0.00 | | | -$257.00 |
| | | | | | INS 377 | | | 05/01/06 | $0.00 | $0.00 | | | -$600.00 |
| | | | | | INS 378 | | | 05/01/06 | $0.00 | $0.00 | | | -$325.00 |
| | | | | | INS 379 | | | 05/01/06 | $0.00 | $0.00 | | | -$600.00 |
| | | | | | INS 380 | | | 05/01/06 | $0.00 | $0.00 | | | -$205.00 |
| | | | | | INS 381 | | | 05/01/06 | $0.00 | $0.00 | | | -$36.50 |
| | | | | | INS 382 | | | 05/01/06 | $0.00 | $0.00 | | | -$20.00 |
| | | | | | INS 383 | | | 05/01/06 | $0.00 | $0.00 | | | -$892.50 |
| | | | | | INS 384 | | | 05/01/06 | $0.00 | $0.00 | | | -$75.00 |
| | | | | | INS 385 | | | 05/01/06 | $0.00 | $0.00 | | | -$157.50 |
| | | | | | INS 386 | | | 05/01/06 | $0.00 | $0.00 | | | -$108.00 |
| | | | | | INS 387 | | | 05/01/06 | $0.00 | $0.00 | | | -$18.50 |
| | | | | | INS 388 | | | 05/01/06 | $0.00 | $0.00 | | | -$144.00 |
| | | | | | INS 389 | | | 05/01/06 | $0.00 | $0.00 | | | -$666.00 |
| | | | | | INS 390 | | | 05/01/06 | $0.00 | $0.00 | | | -$200.00 |
| | | | | | INS 391 | | | 05/01/06 | $0.00 | $0.00 | | | -$180.00 |
| | | | | | INS 392 | | | 05/01/06 | $0.00 | $0.00 | | | -$200.00 |
| | | | | | INS 393 | | | 05/01/06 | $0.00 | $0.00 | | | -$200.00 |
| | | | | | INS 394 | | | 05/01/06 | $0.00 | $0.00 | | | -$87.00 |
| | | | | | INS 395 | | | 05/01/06 | $0.00 | $0.00 | | | -$375.00 |
| | | | | | INS 396 | | | 05/01/06 | $0.00 | $0.00 | | | -$850.00 |
| | | | | | INS 397 | | | 05/01/06 | $0.00 | $0.00 | | | -$250.00 |
| | | | | | INS 398 | | | 05/01/06 | $0.00 | $0.00 | | | -$1,000.00 |
| | | | | | INS 399 | | | 05/01/06 | $0.00 | $0.00 | | | -$850.00 |
| | | | | | INS 400 | | | 05/01/06 | $0.00 | $0.00 | | | -$412.47 |
| | | | | | INS 402 | | | 05/01/06 | $0.00 | $0.00 | | | -$70.00 |
| | | | | | INS 403 | | | 05/01/06 | $0.00 | $0.00 | | | -$70.00 |
| | | | | | INS 404 | | | 05/01/06 | $0.00 | $0.00 | | | -$70.00 |

Page 17 out of 25

| Source | Tran Date | Tran Back Date | Tran Amount | Tran Code | Tran Desc | Process | Process Desc | Due Paid | Prin Paid | Int Paid | Escrow Paid | Date Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | INS 405 | | | 05/01/06 | $0.00 | $0.00 | | | -$25.00 |
| | | | | | INS 406 | | | 05/01/06 | $0.00 | $0.00 | | | -$18.50 |
| | | | | | INS 407 | | | 05/01/06 | $0.00 | $0.00 | | | -$275.00 |
| | | | | | INS 408 | | | 05/01/06 | $0.00 | $0.00 | | | -$25.00 |
| | | | | | INS 409 | | | 05/01/06 | $0.00 | $0.00 | | | -$125.00 |
| | | | | | INS 410 | | | 05/01/06 | $0.00 | $0.00 | | | -$200.00 |
| | | | | | INS 411 | | | 05/01/06 | $0.00 | $0.00 | | | -$25.00 |
| | | | | | INS 412 | | | 05/01/06 | $0.00 | $0.00 | | | -$550.00 |
| | | | | | INS 413 | | | 05/01/06 | $0.00 | $0.00 | | | -$400.00 |
| | | | | | INS 414 | | | 05/01/06 | $0.00 | $0.00 | | | -$100.00 |
| | | | | | INS 415 | | | 05/01/06 | $0.00 | $0.00 | | | -$150.00 |
| | | | | | INS 416 | | | 05/01/06 | $0.00 | $0.00 | | | -$300.00 |
| | | | | | INS 417 | | | 05/01/06 | $0.00 | $0.00 | | | -$200.00 |
| | | | | | INS 418 | | | 05/01/06 | $0.00 | $0.00 | | | -$1,025.00 |
| | | | | | INS 419 | | | 05/01/06 | $0.00 | $0.00 | | | -$775.00 |
| | | | | | INS 420 | | | 05/01/06 | $0.00 | $0.00 | | | -$700.00 |
| | | | | | INS 421 | | | 05/01/06 | $0.00 | $0.00 | | | -$50.00 |
| | | | | | INS 422 | | | 05/01/06 | $0.00 | $0.00 | | | -$200.00 |
| | | | | | INS 423 | | | 05/01/06 | $0.00 | $0.00 | | | -$120.00 |
| GTA | 10/22/2014 | 02/13/2014 | $36,907.32 | 150 | Payment:Insurance Only-Cash | G3 | Esc Disb-Neg Bal to Corp Adv | | $0.00 | $0.00 | | | |
| | | | | | INS 401 | | | | $0.00 | $0.00 | | | $36,907.32 |
| GTA | 10/22/2014 | | -$120.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 423 | | | | $0.00 | $0.00 | | | -$120.00 |
| GTA | 10/22/2014 | 02/13/2014 | -$36,907.32 | 540 | Reversal:Pymt Escrow Only-Cash | G3 | Esc Disb-Neg Bal to Corp Adv | | $0.00 | $0.00 | | | |
| | | | | | ESC 80 | | | | $0.00 | $0.00 | -$36,907.32 | | |
| GTA | 07/22/2014 | | -$200.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 422 | | | | $0.00 | $0.00 | | | -$200.00 |
| GTA | 07/22/2014 | | -$50.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 421 | | | | $0.00 | $0.00 | | | -$50.00 |

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|--------|------|-----------|--------|-----------|-----------|---------|--------------|------|-----------|----------|-------------|------|----------|
| GTA | 07/08/2014 | | -$700.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 420 | | | | $0.00 | $0.00 | | | -$700.00 |
| GTA | 07/08/2014 | | -$775.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 419 | | | | $0.00 | $0.00 | | | -$775.00 |
| GTA | 07/08/2014 | | -$1,025.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 418 | | | | $0.00 | $0.00 | | | -$1,025.00 |
| GTA | 07/08/2014 | | -$200.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 417 | | | | $0.00 | $0.00 | | | -$200.00 |
| GTA | 07/08/2014 | | -$300.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 416 | | | | $0.00 | $0.00 | | | -$300.00 |
| GTA | 06/16/2014 | | -$150.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 415 | | | | $0.00 | $0.00 | | | -$150.00 |
| GTA | 06/16/2014 | | -$100.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 414 | | | | $0.00 | $0.00 | | | -$100.00 |
| GTA | 06/16/2014 | | -$400.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 413 | | | | $0.00 | $0.00 | | | -$400.00 |
| GTA | 06/16/2014 | | -$550.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 412 | | | | $0.00 | $0.00 | | | -$550.00 |
| GTA | 06/16/2014 | | -$25.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 411 | | | | $0.00 | $0.00 | | | -$25.00 |
| GTA | 06/16/2014 | | -$200.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 410 | | | | $0.00 | $0.00 | | | -$200.00 |
| GTA | 06/16/2014 | | -$125.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 409 | | | | $0.00 | $0.00 | | | -$125.00 |
| GTA | 06/16/2014 | | -$25.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 408 | | | | $0.00 | $0.00 | | | -$25.00 |
| GTA | 06/16/2014 | | -$275.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|--------|------|-----------|--------|-----------|-----------|---------|--------------|------|-----------|----------|-------------|------|----------|
| | | | | | INS 407 | | | | $0.00 | $0.00 | | | -$275.00 |
| GTA | 04/16/2014 | | -$18.50 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 406 | | | | $0.00 | $0.00 | | | -$18.50 |
| GTA | 04/16/2014 | | -$25.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 405 | | | | $0.00 | $0.00 | | | -$25.00 |
| GTA | 04/05/2014 | | -$70.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 404 | | | | $0.00 | $0.00 | | | -$70.00 |
| GTA | 04/05/2014 | | -$70.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 403 | | | | $0.00 | $0.00 | | | -$70.00 |
| GTA | 03/17/2014 | | -$70.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 402 | | | | $0.00 | $0.00 | | | -$70.00 |
| GTA | 02/13/2014 | | $36,907.32 | 140 | Payment:Escrow Only-Cash | G3 | Esc Disb-Neg Bal to Corp Adv | | $0.00 | $0.00 | | | |
| | | | | | ESC 80 | | | | $0.00 | $0.00 | $36,907.32 | | |
| GTA | 02/13/2014 | | -$36,907.32 | 211 | Disbursement:Insurance Only | G3 | Esc Disb-Neg Bal to Corp Adv | | $0.00 | $0.00 | | | |
| | | | | | INS 401 | | | | $0.00 | $0.00 | | | -$36,907.32 |
| GTA | 02/13/2014 | | $233,442.39 | 275 | Repossession Incurred | 10 | Full Charge-Off | | $219,526.32 | $4,292.10 | | | |
| | | | | | INS 300 | | | | $0.00 | $0.00 | | | $15.00 |
| | | | | | INS 301 | | | | $0.00 | $0.00 | | | $15.00 |
| | | | | | INS 302 | | | | $0.00 | $0.00 | | | $15.00 |
| | | | | | INS 303 | | | | $0.00 | $0.00 | | | $15.00 |
| | | | | | INS 304 | | | | $0.00 | $0.00 | | | $15.00 |
| | | | | | INS 305 | | | | $0.00 | $0.00 | | | $15.00 |
| | | | | | INS 306 | | | | $0.00 | $0.00 | | | $15.00 |
| | | | | | INS 307 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 308 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 309 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 310 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 311 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 312 | | | | $0.00 | $0.00 | | | $11.25 |

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|--------|------|-----------|--------|-----------|-----------|---------|--------------|------|-----------|----------|-------------|------|----------|
| | | | | | INS 313 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 314 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 315 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 316 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 317 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 318 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 319 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 320 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 321 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 322 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 323 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 324 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 325 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 326 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 327 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 328 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 329 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 330 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 331 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 332 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 333 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 334 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 335 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 336 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 337 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 338 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 339 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 340 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 341 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 342 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 343 | | | | $0.00 | $0.00 | | | $11.25 |

| Source Date | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | INS 344 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 345 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 346 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 347 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 348 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 349 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 350 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 351 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 352 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 353 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 354 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 355 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 356 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 357 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 358 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 359 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 360 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 361 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 362 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 363 | | | | $0.00 | $0.00 | | | $14.75 |
| | | | | | INS 364 | | | | $0.00 | $0.00 | | | $13.00 |
| | | | | | INS 365 | | | | $0.00 | $0.00 | | | $16.50 |
| | | | | | INS 366 | | | | $0.00 | $0.00 | | | $16.50 |
| | | | | | INS 367 | | | | $0.00 | $0.00 | | | $14.75 |
| | | | | | INS 368 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 369 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 370 | | | | $0.00 | $0.00 | | | $16.50 |
| | | | | | INS 371 | | | | $0.00 | $0.00 | | | $13.00 |
| | | | | | INS 372 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 373 | | | | $0.00 | $0.00 | | | $16.50 |
| | | | | | INS 374 | | | | $0.00 | $0.00 | | | $13.00 |

| Source | Tran Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Due Paid | Prin Paid | Int Paid | Escrow Paid | Late Paid | Ins Paid |
|--------|-----------|-----------|--------|-----------|-----------|---------|--------------|----------|-----------|----------|-------------|-----------|----------|
| | | | | | INS 375 | | | | $0.00 | $0.00 | | | $11.25 |
| | | | | | INS 376 | | | | $0.00 | $0.00 | | | $257.00 |
| | | | | | INS 377 | | | | $0.00 | $0.00 | | | $600.00 |
| | | | | | INS 378 | | | | $0.00 | $0.00 | | | $325.00 |
| | | | | | INS 379 | | | | $0.00 | $0.00 | | | $600.00 |
| | | | | | INS 380 | | | | $0.00 | $0.00 | | | $205.00 |
| | | | | | INS 381 | | | | $0.00 | $0.00 | | | $36.50 |
| | | | | | INS 382 | | | | $0.00 | $0.00 | | | $20.00 |
| | | | | | INS 383 | | | | $0.00 | $0.00 | | | $892.50 |
| | | | | | INS 384 | | | | $0.00 | $0.00 | | | $75.00 |
| | | | | | INS 385 | | | | $0.00 | $0.00 | | | $157.50 |
| | | | | | INS 386 | | | | $0.00 | $0.00 | | | $108.00 |
| | | | | | INS 387 | | | | $0.00 | $0.00 | | | $18.50 |
| | | | | | INS 388 | | | | $0.00 | $0.00 | | | $144.00 |
| | | | | | INS 389 | | | | $0.00 | $0.00 | | | $666.00 |
| | | | | | INS 390 | | | | $0.00 | $0.00 | | | $200.00 |
| | | | | | INS 391 | | | | $0.00 | $0.00 | | | $180.00 |
| | | | | | INS 392 | | | | $0.00 | $0.00 | | | $200.00 |
| | | | | | INS 393 | | | | $0.00 | $0.00 | | | $200.00 |
| | | | | | INS 394 | | | | $0.00 | $0.00 | | | $87.00 |
| | | | | | INS 395 | | | | $0.00 | $0.00 | | | $375.00 |
| | | | | | INS 396 | | | | $0.00 | $0.00 | | | $850.00 |
| | | | | | INS 397 | | | | $0.00 | $0.00 | | | $250.00 |
| | | | | | INS 398 | | | | $0.00 | $0.00 | | | $1,000.00 |
| | | | | | INS 399 | | | | $0.00 | $0.00 | | | $850.00 |
| | | | | | INS 400 | | | | $0.00 | $0.00 | | | $412.47 |
| GTA | 01/27/2014 | | -$412.47 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 400 | | | | $0.00 | $0.00 | | | -$412.47 |
| GTA | 01/02/2014 | | -$850.00 | 211 | Disbursement:Insurance 16 Only | | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 399 | | | | $0.00 | $0.00 | | | -$850.00 |

Page 23 out of 25

| Source | Post Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|--------|-----------|-----------|--------|-----------|-----------|---------|--------------|------|-----------|----------|-------------|------|----------|
| GTA | 12/17/2013 | | -$1,000.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 398 | | | | $0.00 | $0.00 | | | -$1,000.00 |
| GTA | 11/15/2013 | | -$250.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 397 | | | | $0.00 | $0.00 | | | -$250.00 |
| GTA | 11/08/2013 | | -$2,501.92 | 210 | Disbursement:Escrow Only | E7 | Esc Disb-County | | $0.00 | $0.00 | | | |
| | | | | | ESC 80 | | | | $0.00 | $0.00 | -$2,501.92 | | |
| GTA | 10/09/2013 | | -$850.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 396 | | | | $0.00 | $0.00 | | | -$850.00 |
| GTA | 10/01/2013 | | -$375.00 | 211 | Disbursement:Insurance Only | 16 | Accounts Payable | | $0.00 | $0.00 | | | |
| | | | | | INS 395 | | | | $0.00 | $0.00 | | | -$375.00 |
| GTA | 05/15/2013 | | -$2,459.19 | 210 | Disbursement:Escrow Only | F7 | Esc Disb-Hazard/Fire | | $0.00 | $0.00 | | | |
| | | | | | ESC 80 | | | | $0.00 | $0.00 | -$2,459.19 | | |
| GTA | 01/31/2013 | | -$31,946.21 | 210 | Disbursement:Escrow Only | QU | Acquired Negative ESC-Unknown | | $0.00 | $0.00 | | | |
| | | | | | ESC 80 | | | | $0.00 | $0.00 | -$31,946.21 | | |
| CONV | 11/12/2012 | | -$2,500.61 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$2,500.61 | | |
| CONV | 04/23/2012 | | -$1,961.07 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$1,961.07 | | |
| CONV | 11/09/2011 | | -$2,616.48 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$2,616.48 | | |
| CONV | 04/21/2011 | | -$1,742.71 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$1,742.71 | | |
| CONV | 11/10/2010 | | -$2,953.84 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$2,953.84 | | |
| CONV | 04/21/2010 | | -$1,620.11 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$1,620.11 | | |
| CONV | 11/06/2009 | | -$3,384.29 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$3,384.29 | | |
| CONV | 05/12/2009 | | -$1,536.28 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$1,536.28 | | |
| CONV | 11/12/2008 | | -$3,869.38 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$3,869.38 | | |
| CONV | 04/22/2008 | | -$798.59 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$798.59 | | |
| CONV | 11/08/2007 | | -$4,021.61 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$4,021.61 | | |

| Source | Date | Back Date | Amount | Tran Code | Tran Desc | Process | Process Desc | Due Date Paid | Prin Paid | Int Paid | Escrow Paid | Paid | Ins Paid |
|--------|------|-----------|--------|-----------|-----------|---------|--------------|------|-----------|----------|-------------|------|----------|
| CONV | 04/23/2007 | | -$794.48 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$794.48 | | |
| CONV | 11/09/2006 | | -$4,334.69 | 210 | Disbursement:Escrow Only | | | 04/01/06 | $0.00 | $0.00 | -$4,334.69 | | |
| CONV | 07/28/2006 | | -$65.54 | 500 | Reversal:Pymt-Cash | | | 06/01/06 | $0.00 | $0.00 | | | |
| CONV | 07/28/2006 | | $1,511.66 | 100 | Payment:Cash | | | 04/01/06 | $234.94 | $1,075.91 | $128.90 | | |
| CONV | 07/28/2006 | | -$1,446.12 | 500 | Reversal:Pymt-Cash | | | 05/01/06 | -$237.24 | -$1,073.61 | -$135.27 | | |
| CONV | 07/28/2006 | | -$1,439.75 | 500 | Reversal:Pymt-Cash | | | 03/01/06 | -$234.94 | -$1,075.91 | -$128.90 | | |
| CONV | 07/28/2006 | | -$1,570.83 | 500 | Reversal:Pymt-Cash | | | 04/01/06 | -$236.09 | -$1,074.76 | -$128.90 | | |
| CONV | 06/19/2006 | | $65.54 | 165 | Fee Only - Cash | | | 06/01/06 | $0.00 | $0.00 | | | |
| CONV | 06/19/2006 | | $1,446.12 | 100 | Payment:Cash | | | 06/01/06 | $237.24 | $1,073.61 | $135.27 | | |
| CONV | 05/15/2006 | | -$685.70 | 210 | Disbursement:Escrow Only | | | 05/01/06 | $0.00 | $0.00 | -$685.70 | | |
| CONV | 05/09/2006 | | $1,570.83 | 100 | Payment:Cash | | | 05/01/06 | $236.09 | $1,074.76 | $128.90 | | |
| CONV | 05/09/2006 | | $1,439.75 | 100 | Payment:Cash | | | 04/01/06 | $234.94 | $1,075.91 | $128.90 | | |
| CONV | 04/10/2006 | | $1,374.00 | 100 | Payment:Cash | | | 03/01/06 | $233.79 | $1,077.06 | $128.90 | | |
| CONV | 02/20/2006 | | $1,701.91 | 100 | Payment:Cash | | | 02/01/06 | $232.65 | $1,078.20 | $128.90 | | |
| CONV | 02/20/2006 | | $1,439.75 | 100 | Payment:Cash | | | 01/01/06 | $231.52 | $1,079.33 | $128.90 | | |
| CONV | 01/04/2006 | | $65.75 | QSP | Acq Payment to Unapplied Funds/Susp | | | 12/01/05 | $0.00 | $0.00 | | | |
| CONV | 01/04/2006 | | $1,439.75 | 100 | Payment:Cash | | | 12/01/05 | $230.39 | $1,080.46 | $128.90 | | |
| CONV | 11/19/2005 | | $1,439.75 | 100 | Payment:Cash | | | 11/01/05 | $229.27 | $1,081.58 | $128.90 | | |
| CONV | 11/07/2005 | | -$982.91 | 210 | Disbursement:Escrow Only | | | 10/01/05 | $0.00 | $0.00 | -$982.91 | | |
| CONV | 10/12/2005 | | $1,439.75 | 100 | Payment:Cash | | | 09/01/05 | $227.04 | $1,083.81 | $128.90 | | |
| CONV | 10/12/2005 | | $1,505.29 | 100 | Payment:Cash | | | 10/01/05 | $228.15 | $1,082.70 | $128.90 | | |
| CONV | 08/11/2005 | | $1,439.75 | 100 | Payment:Cash | | | 08/01/05 | $225.93 | $1,084.92 | $128.90 | | |
| CONV | 06/20/2005 | | $759.44 | 135 | Interest Payment - Cash | | | 07/01/05 | $0.00 | $759.44 | | | |
| CONV | 06/20/2005 | | $696.44 | 140 | Payment:Escrow Only-Cash | | | 07/01/05 | $0.00 | $0.00 | $696.44 | | |

Report Date: 10/30/2019. History Show for Dates: 06/20/2005 to 10/30/2019

*Source: 'MSP' = History on the MSP servicing system, 'GTA' = History on the GTA servicing system, 'CONV' = Acquired History from other servicer.

**The Displayed Prin Bal is an estimate based on history trans. THIS BALANCE IS NOT A PAYOFF BALANCE. The current principal balance is $198,194.20. The Displayed Escrow Balance is an e Balance is ($66,347.43).

Page 25 out of 25

# NOTE

June 10, 2005         Orlando         FLORIDA

[Date]         [City]         [State]

2400  Chelsea Street, Orlando, FL  32803

[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 221,600.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is USAA Federal Savings Bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 5.875 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS

### (A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st     day of each month beginning on August 01, 2005     . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on July 01, 2035     , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at Attn: Payment Processing, P.O. Box 205, Waterloo, IA  50704 or at a different place if required by the Note Holder.

### (B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $     1,310.85 .

## 4.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

702075180                                                        505116903

MULTISTATE FIXED RATE NOTE–Single Family

US5N (0104)

VMP MORTGAGE FORMS - (800)521-729?

Page 1 of 3           Initials:



EXHIBIT
Defendants
11/6/19  AM

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be      5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

702075180

505116903

## 10. APPLICABLE LAW

Lender is a federally chartered savings bank governed, in part, by the Home Owner's Loan Act of 1933 and the rules and regulations promulgated pursuant thereto (the "Act"). To the extent permitted by the Act, this Note will be governed by applicable federal law and by the interest rate and usury provisions of the state of Texas.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
Dennis Delia                    -Borrower                                     -Borrower

_____ (Seal)      _____ (Seal)
                                -Borrower                                     -Borrower

_____ (Seal)      _____ (Seal)
                                -Borrower                                     -Borrower

_____ (Seal)      _____ (Seal)
                                -Borrower                                     -Borrower

Pay to the Order of                          [Sign Original Only]

_____
without recourse
USAA Federal Savings Bank
By_____
Name___ Eva Perez Huey
Title____ Post Closing Manager

702075180                                    505116903

JS5N (0104)

# ditech.
PO Box 6172
Rapid City, SD 57709-6172

**Disclosure Statement**

**Annual Escrow Account**

**Statement Date:** 12/26/2018
**Your Loan Account Number:** 0033139262

4-776-16420-0001427-001-000-010-000-000

**Questions?**

DENNIS DELIA
GEORGE M GINGO
400 ORANGE ST
TITUSVILLE FL 32796-2854

View your detailed, up-to-date escrow transactions online at myaccount.ditech.com

Call Customer Service at **1-800-643-0202**
M–F 8am to 12am ET
Saturday 8am to 5pm ET
Sunday 1pm to 5pm ET

## SECTION 1  WHY AM I RECEIVING THIS STATEMENT?

We review your escrow account every year to ensure it is properly funded, based on your upcoming taxes and/or insurance premiums. This statement provides details of any changes in your escrow account and resulting changes to your mortgage payment.

Our review shows your escrow account has a **shortage of $5,815.86**. Once we pay your upcoming insurance and/or tax payments, your escrow account will fall below the required minimum balance. See Section 4 for details. Your monthly mortgage payment is also changing **March 01, 2019**. Your new payment amount depends on which option below you choose:

**OPTION 1: Pay Shortage Now**

- Pay in full by check or money order by Feb. 22, 2019.
- Your new monthly mortgage payment will be $1,818.14.

**OPTION 2: Spread Shortage Over 12 months**
**(No action required)**

- Add $484.66 per month for 12 months to mortgage payment.
- Your new monthly mortgage payment will be $2,302.80.

## SECTION 2  WHY ARE MY PAYMENTS CHANGING?

Changes to monthly escrow amounts are common. They're often caused by a change in your taxes and/or insurance premiums. This table shows how your escrow and mortgage payments are changing.

|  | Current Payment | Changes | OPTION 1 New Payment | OPTION 2 New Payment |
|---|---|---|---|---|
| Due Date | 08/01/2012 |  | 03/01/2019 | 03/01/2019 |
| Principal and Interest | $1,310.85 |  | $1,310.85 | $1,310.85 |
| Escrow Payment | $135.27 | ↑ $372.02 | $507.29 | $507.29 |
| Escrow Shortage |  |  |  | $484.66 |
| **TOTAL** | **$1,446.12** | **↑ $372.02** | **$1,818.14** | **$2,302.80** |

| We use anticipated payments from your escrow account to determine your monthly escrow payment: | Combined Property Insurance | $2,709.00 |
|---|---|---|
|  | Combined Taxes | $3,378.47 |
|  | **TOTAL OUTGOING PAYMENTS** | $6,087.47  ÷ 12 months = **$507.29 Monthly Escrow** |

## SECTION 3  WHAT DO I NEED TO DO?

**TO PAY YOUR SHORTAGE NOW**

- Send a check or money order in the amount of $5,815.86, payable to Ditech Financial LLC by **Feb. 22, 2019**.
- Please write your Loan Account Number and "Escrow Shortage" on the check.
- Send the coupon at the bottom of this statement along with your check in the enclosed envelope.
- Unfortunately, you cannot make your escrow shortage payment online or over the phone.

**TO SPREAD YOUR SHORTAGE OUT**

No action is needed to spread your shortage payments out. If we don't receive a shortage check or money order from you, we'll automatically add shortage payments of $484.66 to your monthly payment.

**REMINDER**

If you use automatic bill pay, please contact your bank to adjust your mortgage payment amount, due March 01, 2019.

-----------------------------------------------------------------------

 ditech.

Please detach this escrow shortage coupon, write your loan number and "Escrow Shortage" on a check or money order made payable to Ditech Financial LLC, and mail both in the enclosed envelope with the mailing address visible in the window.

 EQUAL HOUSING LENDER

**ESCROW SHORTAGE COUPON**
This coupon and mailing address are for your escrow shortage payment only. DO NOT use for your regular monthly mortgage payment.

**Escrow Shortage Amount Due and Enclosed:**  **$5,815.86**

**LOAN ACCOUNT NUMBER: 0033139262**

DENNIS DELIA
GEORGE M GINGO
400 ORANGE ST
TITUSVILLE FL 32796-2854

DITECH FINANCIAL LLC
PO BOX 7153
PASADENA, CA 91109-7153

 03313926 2      00581586


EXHIBIT
Defendant's
4
1/8/19  Am

## SECTION 4   HOW IS MY ESCROW SHORTAGE CALCULATED?

Every year, we analyze what you'll need to pay in taxes and/or insurance premiums. We then calculate the amount you'll likely need in escrow to pay these bills. To determine if you have enough funds in your escrow account, we use this formula:

| | | |
|---|---|---|
| Lowest Projected Balance | -$4,801.28 | (in gray below) |
| - Minimum Escrow Balance | $1,014.58 | (in gray below) |
| **Shortage Amount** | **-$5,815.86** | |

Your escrow account has a minimum balance, as allowed by federal laws, state laws, or your mortgage contract. Your minimum balance includes up to two months of escrow payments to cover increases to your property taxes and/or homeowners insurance. Your minimum escrow balance is $1014.58.

This table shows expected payments in and out of your account over the next 12 months:

| Date | What We Expect You to Pay to Escrow | What We Expect to Pay Out | Payment Description | Expected Balance | Balance Needed In Your Account |
|---|---|---|---|---|---|
| Beginning Balance | | | | -$3,956.67 | $1,859.19 |
| 03/19 | $507.29 | $225.75 | HAZARD INS | -$3,675.13 | $2,140.73 |
| 04/19 | $507.29 | $225.75 | HAZARD INS | -$3,393.59 | $2,422.27 |
| 05/19 | $507.29 | $225.75 | HAZARD INS | -$3,112.05 | $2,703.81 |
| 06/19 | $507.29 | $225.75 | HAZARD INS | -$2,830.51 | $2,985.35 |
| 07/19 | $507.29 | $225.75 | HAZARD INS | -$2,548.97 | $3,266.89 |
| 08/19 | $507.29 | $225.75 | HAZARD INS | -$2,267.43 | $3,548.43 |
| 09/19 | $507.29 | $225.75 | HAZARD INS | -$1,985.89 | $3,829.97 |
| 10/19 | $507.29 | $225.75 | HAZARD INS | -$1,704.35 | $4,111.51 |
| 11/19 | $507.29 | $3,378.47 | CNTY TX PARC | -$4,575.53 | $1,240.33 |
| 11/19 | | $225.75 | HAZARD INS | -$4,801.28 | $1,014.58 |
| 12/19 | $507.29 | $225.75 | HAZARD INS | -$4,519.74 | $1,296.12 |
| 01/20 | $507.29 | $225.75 | HAZARD INS | -$4,238.20 | $1,577.66 |
| 02/20 | $507.29 | $225.75 | HAZARD INS | -$3,956.66 | $1,859.20 |
| Ending Balance | | | | -$3,956.66 | $1,859.20 |
| TOTAL | $6,087.48 | $6,087.47 | | | |

## SECTION 5   WHAT HAPPENED SINCE MY LAST ESCROW REVIEW?

In this table, you can see payments you made into your escrow account and outgoing payments we made from your escrow account. If we projected to pay out a significantly different amount, you'll see the difference noted in gray. These differences may impact whether you have enough funds in your escrow account.

| Date | What You Actually Paid to Escrow | What We Expected You to Pay to Escrow | What We Actually Paid Out | What We Expected to Pay Out | Payment Description | Actual Balance | Expected Balance from Last Review |
|---|---|---|---|---|---|---|---|
| Beginning Balance | | | | | | -$59,806.36 | $3,463.23 |
| 09/18 | | $482.84 | $205.26 | $205.34 | HAZARD INS | -$60,011.62 | $3,740.73 |
| 10/18 | | $482.84 | $225.75 | $205.34 | HAZARD INS | -$60,237.37 | $4,018.23 |
| 11/18 | | $482.84 | $3,378.47 | $3,330.05 | CNTY TX PARC | -$63,615.84 | $1,171.02 |
| 11/18 | | | $225.75 | $205.34 | HAZARD INS | -$63,841.59 | $965.68 |
| 12/18 | $57,726.33  E | $482.84 | $225.75  E | $205.34 | HAZARD INS | -$6,339.01 | $1,243.18 |
| 01/19 | $1,416.92  E | $482.84 | $225.75  E | $205.34 | HAZARD INS | -$5,147.84 | $1,520.68 |
| 02/19 | $1,416.92  E | $482.84 | $225.75  E | $205.34 | HAZARD INS | -$3,956.67 | $1,798.18 |
| Ending Balance | | | | | | -$3,956.67 | $1,798.18 |
| TOTAL | $60,562.17 | $2,897.04 | $4,712.48 | $4,562.09 | | | |

E = estimated future payment

**ditech.**  PO Box 6172
Rapid City , SD 57709-6172

**Disclosure Statement**

| | |
|---|---|
| Statement Date: | 06/27/2018 |
| Your Loan Account Number: | 0033139262 |

1-776-13918-0000362-001-100-010-000-000

**Questions?**

DENNIS DELIA
GEORGE M GINGO
400 ORANGE ST
TITUSVILLE FL 32796-2854

View your detailed, up-to-date escrow transactions online at myaccount.ditech.com

Call Customer Service at **1-800-643-0202**
Mon. – Fri. 7 am to 8 pm CST
Sat. 7 am to 1 pm CST

## SECTION 1   WHY AM I RECEIVING THIS STATEMENT?

We review your escrow account every year to ensure it is properly funded, based on your upcoming taxes and/or insurance premiums. This statement provides details of any changes in your escrow account and resulting changes to your mortgage payment.

Our review shows your escrow account has a **shortage of $11,208.94**. Once we pay your upcoming insurance and/or tax payments, your escrow account will fall below the required minimum balance. See Section 4 for details. Your monthly mortgage payment is also changing **September 01, 2018**. Your new payment amount depends on which option below you choose:

**OPTION 1: Pay Shortage Now**

- Pay in full by check or money order by **Aug. 25, 2018**.
- Your new monthly mortgage payment will be $1,793.69.

**OPTION 2: Spread Shortage Over 12 months (No action required)**

- Add $934.08 per month for 12 months to mortgage payment.
- Your new monthly mortgage payment will be $2,727.77.

## SECTION 2   WHY ARE MY PAYMENTS CHANGING?

Changes to monthly escrow amounts are common. They're often caused by a change in your taxes and/or insurance premiums. This table shows how your escrow and mortgage payments are changing.

| | Current Payment | Changes | OPTION 1 New Payment | OPTION 2 New Payment |
|---|---|---|---|---|
| Due Date | 08/01/2012 | | 09/01/2018 | 09/01/2018 |
| Principal and Interest | $1,310.85 | | $1,310.85 | $1,310.85 |
| Escrow Payment | $135.27 | ↑ $347.57 | $482.84 | $482.84 |
| Escrow Shortage | | | | $934.08 |
| **TOTAL** | **$1,446.12** | **↑ $347.57** | **$1,793.69** | **$2,727.77** |

We use anticipated payments from your escrow account to determine your monthly escrow payment:

| | |
|---|---|
| Combined Property Insurance | $2,464.08 |
| Combined Taxes | $3,330.05 |
| **TOTAL OUTGOING PAYMENTS** | $5,794.13  ÷ 12 months = $482.84 Monthly Escrow |

## SECTION 3   WHAT DO I NEED TO DO?

**TO PAY YOUR SHORTAGE NOW**

- Send a check or money order in the amount of $11,208.94, payable to Ditech Financial LLC by **Aug. 25, 2018**.
- Please write your Loan Account Number and "Escrow Shortage" on the check.
- Send the coupon at the bottom of this statement along with your check in the enclosed envelope.
- Unfortunately, you cannot make your escrow shortage payment online or over the phone.

**TO SPREAD YOUR SHORTAGE OUT**

No action is needed to spread your shortage payments out. If we don't receive a shortage check or money order from you, we'll automatically add shortage payments of $934.08 to your monthly payment.

**REMINDER**

If you use automatic bill pay, please contact your bank to adjust your mortgage payment amount, due September 01, 2018.

---

 **ditech.**

Please detach this escrow shortage coupon, write your loan number and "Escrow Shortage" on a check or money order made payable to Ditech Financial LLC, and mail both in the enclosed envelope with the mailing address visible in the window.

 EQUAL HOUSING LENDER

**ESCROW SHORTAGE COUPON**
This coupon and mailing address are for your escrow shortage payment only. DO NOT use for your regular monthly mortgage payment.

LOAN ACCOUNT NUMBER: 0033139262

DENNIS DELIA
GEORGE M GINGO
400 ORANGE ST
TITUSVILLE FL 32796-2854

Escrow Shortage Amount Due and Enclosed:   **$11,208.94**

DITECH FINANCIAL LLC
PO BOX 7153
PASADENA, CA 91109-7153

## SECTION 4  HOW IS MY ESCROW SHORTAGE CALCULATED?

Every year, we analyze what you'll need to pay in taxes and/or insurance premiums. We then calculate the amount you'll likely need in escrow to pay these bills. To determine if you have enough funds in your escrow account, we use this formula:

| | | |
|---|---|---|
| Lowest Projected Balance | -$10,243.26 | (in gray below) |
| - Minimum Escrow Balance | $965.68 | (in gray below) |
| **Shortage Amount** | **-$11,208.94** | |

Your escrow account has a minimum balance, as allowed by federal laws, state laws, or your mortgage contract. Your minimum balance includes up to two months of escrow payments to cover increases to your property taxes and/or homeowners insurance. Your minimum escrow balance is $965.68.

This table shows expected payments in and out of your account over the next 12 months:

| Date | What We Expect You to Pay to Escrow | What We Expect to Pay Out | Payment Description | Expected Balance | Balance Needed in Your Account |
|---|---|---|---|---|---|
| Beginning Balance | | | | -$7,745.71 | $3,463.23 |
| 09/18 | $482.84 | $205.34 | HAZARD INS | -$7,468.21 | $3,740.73 |
| 10/18 | $482.84 | $205.34 | HAZARD INS | -$7,190.71 | $4,018.23 |
| 11/18 | $482.84 | $3,330.05 | CNTY TX PARC | -$10,037.92 | $1,171.02 |
| 11/18 | | $205.34 | HAZARD INS | -$10,243.26 | $965.68 |
| 12/18 | $482.84 | $205.34 | HAZARD INS | -$9,965.76 | $1,243.18 |
| 01/19 | $482.84 | $205.34 | HAZARD INS | -$9,688.26 | $1,520.68 |
| 02/19 | $482.84 | $205.34 | HAZARD INS | -$9,410.76 | $1,798.18 |
| 03/19 | $482.84 | $205.34 | HAZARD INS | -$9,133.26 | $2,075.68 |
| 04/19 | $482.84 | $205.34 | HAZARD INS | -$8,855.76 | $2,353.18 |
| 05/19 | $482.84 | $205.34 | HAZARD INS | -$8,578.26 | $2,630.68 |
| 06/19 | $482.84 | $205.34 | HAZARD INS | -$8,300.76 | $2,908.18 |
| 07/19 | $482.84 | $205.34 | HAZARD INS | -$8,023.26 | $3,185.68 |
| 08/19 | $482.84 | $205.34 | HAZARD INS | -$7,745.76 | $3,463.18 |
| Ending Balance | | | | -$7,745.76 | $3,463.18 |
| **TOTAL** | **$5,794.08** | **$5,794.13** | | | |

## SECTION 5  WHAT HAPPENED SINCE MY LAST ESCROW REVIEW?

In this table, you can see payments you made into your escrow account and outgoing payments we made from your escrow account. If we projected to pay out a significantly different amount, you'll see the difference noted in gray. These differences may impact whether you have enough funds in your escrow account.

| Date | What You Actually Paid to Escrow | | What We Expected You to Pay to Escrow | What We Actually Paid Out | | What We Expected to Pay Out | Payment Description | Actual Balance | Expected Balance from Last Review |
|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | | | | | | | | -$58,368.98 | $1,520.73 |
| 02/18 | | | $482.84 | $205.34 | | $205.34 | HAZARD INS | -$58,574.32 | $1,798.23 |
| 03/18 | | | $482.84 | $205.34 | | $205.34 | HAZARD INS | -$58,779.66 | $2,075.73 |
| 04/18 | | | $482.84 | $205.34 | | $205.34 | HAZARD INS | -$58,985.00 | $2,353.23 |
| 05/18 | | | $482.84 | $205.34 | | $205.34 | HAZARD INS | -$59,190.34 | $2,630.73 |
| 06/18 | $46,611.39 | E | $482.84 | $205.34 | E | $205.34 | HAZARD INS | -$12,784.29 | $2,908.23 |
| 07/18 | $2,724.63 | E | $482.84 | $205.34 | E | $205.34 | HAZARD INS | -$10,265.00 | $3,185.73 |
| 08/18 | $2,724.63 | E | $482.84 | $205.34 | E | $205.34 | HAZARD INS | -$7,745.71 | $3,463.23 |
| Ending Balance | | | | | | | | -$7,745.71 | $3,463.23 |
| **TOTAL** | **$52,060.65** | | **$3,379.88** | **$1,437.38** | | **$1,437.38** | | | |

E = estimated future payment

4

# ditech.
PO Box 6172
Rapid City , SD 57709-6172

**Annual Escrow Account**
**Disclosure Statement**

| Statement Date: | 12/11/2017 |
|---|---|
| Your Loan Account Number: | 0033139262 |

2-776-11205-0002516-001-100-010-000-000

**Questions?**

DENNIS DELIA
C/O GEORGE M GINGO
400 ORANGE ST
TITUSVILLE FL 32796-2854

View your detailed, up-to-date escrow transactions online at myaccount.ditech.com

Call Customer Service at **1-800-643-0202**
Mon. – Fri. 7 am to 8 pm CST
Sat. 7 am to 1 pm CST

## SECTION 1  WHY AM I RECEIVING THIS STATEMENT?

We review your escrow account every year to ensure it is properly funded, based on your upcoming taxes and/or insurance premiums. This statement provides details of any changes in your escrow account and resulting changes to your mortgage payment.

Our review shows your escrow account has a **shortage of $26,901.47**. Once we pay your upcoming insurance and/or tax payments, your escrow account will fall below the required minimum balance. See Section 4 for details. Your monthly mortgage payment is also changing **February 01, 2018**. Your new payment amount depends on which option below you choose:

**OPTION 1: Pay Shortage Now**

- Pay in full by check or money order by Jan. 25, 2018.
- Your new monthly mortgage payment will be $1,793.69.

**OPTION 2: Spread Shortage Over 12 months**
**(No action required)**

- Add $2,241.79 per month for 12 months to mortgage payment.
- Your new monthly mortgage payment will be $4,035.48.

## SECTION 2  WHY ARE MY PAYMENTS CHANGING?

Changes to monthly escrow amounts are common. They're often caused by a change in your taxes and/or insurance premiums. This table shows how your escrow and mortgage payments are changing.

| | Current Payment | Changes | OPTION 1 New Payment | OPTION 2 New Payment |
|---|---|---|---|---|
| Due Date | 08/01/2012 | | 02/01/2018 | 02/01/2018 |
| Principal and Interest | $1,310.85 | | $1,310.85 | $1,310.85 |
| Escrow Payment | $135.27 | ↑ $347.57 | $482.84 | $482.84 |
| Escrow Shortage | | | | $2,241.79 |
| **TOTAL** | **$1,446.12** | **↑ $347.57** | **$1,793.69** | **$4,035.48** |

| We use anticipated payments from your escrow account to determine your monthly escrow payment: | | |
|---|---|---|
| Combined Property Insurance | $2,464.08 | |
| Combined Taxes | $3,330.05 | |
| **TOTAL OUTGOING PAYMENTS** | $5,794.13 | ÷ 12 months = $482.84 Monthly Escrow |

## SECTION 3  WHAT DO I NEED TO DO?

**TO PAY YOUR SHORTAGE NOW**

- Send a check or money order in the amount of $26,901.47, payable to Ditech Financial LLC by Jan. 25, 2018.
- Please write your Loan Account Number and "Escrow Shortage" on the check.
- Send the coupon at the bottom of this statement along with your check in the enclosed envelope.
- Unfortunately, you cannot make your escrow shortage payment online or over the phone.

**TO SPREAD YOUR SHORTAGE OUT**

No action is needed to spread your shortage payments out. If we don't receive a shortage check or money order from you, we'll automatically add shortage payments of $2,241.79 to your monthly payment.

**REMINDER**
If you use automatic bill pay, please contact your bank to adjust your mortgage payment amount, due February 01, 2018.

---

 **ditech.**

Please detach this escrow shortage coupon, write your loan number and "Escrow Shortage" on a check or money order made payable to **Ditech Financial LLC**, and mail both in the enclosed envelope with the mailing address visible in the window.


EQUAL HOUSING LENDER

**ESCROW SHORTAGE COUPON**
This coupon and mailing address are for your escrow shortage payment only. DO NOT use for your regular monthly mortgage payment.

| Escrow Shortage Amount Due and Enclosed: | $26,901.47 |
|---|---|

LOAN ACCOUNT NUMBER: 0033139262

DENNIS DELIA
C/O GEORGE M GINGO
400 ORANGE ST
TITUSVILLE FL 32796-2854

DITECH FINANCIAL LLC
PO BOX 7153
PASADENA, CA 91109-7153

## SECTION 4   HOW IS MY ESCROW SHORTAGE CALCULATED?

Every year, we analyze what you'll need to pay in taxes and/or insurance premiums. We then calculate the amount you'll likely need in escrow to pay these bills. To determine if you have enough funds in your escrow account, we use this formula:

| | | |
|---|---|---|
| Lowest Projected Balance | -$25,935.79 | (in gray below) |
| - Minimum Escrow Balance | $965.68 | (in gray below) |
| **Shortage Amount** | **-$26,901.47** | |

Your escrow account has a minimum balance, as allowed by federal laws, state laws, or your mortgage contract. Your minimum balance includes up to two months of escrow payments to cover increases to your property taxes and/or homeowners insurance. Your minimum escrow balance is $965.68.

This table shows expected payments in and out of your account over the next 12 months:

| Date | What We Expect You to Pay to Escrow | What We Expect to Pay Out | Payment Description | Expected Balance | Balance Needed in Your Account |
|---|---|---|---|---|---|
| Beginning Balance | | | | -$25,380.74 | $1,520.73 |
| 02/18 | $482.84 | $205.34 | HAZARD INS | -$25,103.24 | $1,798.23 |
| 03/18 | $482.84 | $205.34 | HAZARD INS | -$24,825.74 | $2,075.73 |
| 04/18 | $482.84 | $205.34 | HAZARD INS | -$24,548.24 | $2,353.23 |
| 05/18 | $482.84 | $205.34 | HAZARD INS | -$24,270.74 | $2,630.73 |
| 06/18 | $482.84 | $205.34 | HAZARD INS | -$23,993.24 | $2,908.23 |
| 07/18 | $482.84 | $205.34 | HAZARD INS | -$23,715.74 | $3,185.73 |
| 08/18 | $482.84 | $205.34 | HAZARD INS | -$23,438.24 | $3,463.23 |
| 09/18 | $482.84 | $205.34 | HAZARD INS | -$23,160.74 | $3,740.73 |
| 10/18 | $482.84 | $205.34 | HAZARD INS | -$22,883.24 | $4,018.23 |
| 11/18 | $482.84 | $3,330.05 | CNTY TX PARC | -$25,730.45 | $1,171.02 |
| 11/18 | | $205.34 | HAZARD INS | -$25,935.79 | $965.68 |
| 12/18 | $482.84 | $205.34 | HAZARD INS | -$25,658.29 | $1,243.18 |
| 01/19 | $482.84 | $205.34 | HAZARD INS | -$25,380.79 | $1,520.68 |
| Ending Balance | | | | -$25,380.79 | $1,520.68 |
| **TOTAL** | **$5,794.08** | **$5,794.13** | | | |

## SECTION 5   WHAT HAPPENED SINCE MY LAST ESCROW REVIEW?

In this table, you can see payments you made into your escrow account and outgoing payments we made from your escrow account. If we projected to pay out a significantly different amount, you'll see the difference noted in gray. These differences may impact whether you have enough funds in your escrow account.

| Date | What You Actually Paid to Escrow | | What We Expected You to Pay to Escrow | What We Actually Paid Out | What We Expected to Pay Out | | Payment Description | Actual Balance | Expected Balance from Last Review |
|---|---|---|---|---|---|---|---|---|---|
| Beginning Balance | | | | | | | | -$53,616.82 | $3,210.43 |
| 07/17 | | | $512.47 | $200.25 | $200.25 | | HAZARD INS | -$53,817.07 | $3,522.65 |
| 08/17 | | | $512.47 | $200.25 | $200.25 | | HAZARD INS | -$54,017.32 | $3,834.87 |
| 09/17 | | | $512.47 | $200.25 | $200.25 | | HAZARD INS | -$54,217.57 | $4,147.09 |
| 10/17 | | | $512.47 | $205.34 | $200.25 | | HAZARD INS | -$54,422.91 | $4,459.31 |
| 11/17 | | | $512.47 | $3,330.05 | $3,746.59 | | CNTY TX PARC | -$57,752.96 | $1,225.19 |
| 11/17 | | | | $205.34 | $200.25 | | HAZARD INS | -$57,958.30 | $1,024.94 |
| 12/17 | $31,530.03 | E | $512.47 | $205.34 | $200.25 | E | HAZARD INS | -$26,633.61 | $1,337.16 |
| 01/18 | $1,458.21 | E | $512.47 | $205.34 | $200.25 | E | HAZARD INS | -$25,380.74 | $1,649.38 |
| Ending Balance | | | | | | | | -$25,380.74 | $1,649.38 |
| **TOTAL** | **$32,988.24** | | **$3,587.29** | **$4,752.16** | **$5,148.34** | | | | |

E = estimated future payment



**ditech.**  PO Box 6172
Rapid City , SD 57709-6172

**Annual Escrow Account**
**Disclosure Statement**

**Statement Date:** 05/31/2017
**Your Loan Account Number:** 0033139262

0-776-08804-0000920-001-100-010-000-000

DENNIS DELIA
GEORGE M GINGO
400 ORANGE ST
TITUSVILLE FL 32796-2854

**Questions?**

View your detailed, up-to-date escrow transactions
online at myaccount.ditech.com

Call Customer Service at **1-800-643-0202**
Mon. – Fri. 7 am to 8 pm CST
Sat. 7 am to 1 pm CST

## SECTION 1   WHY AM I RECEIVING THIS STATEMENT?

We review your escrow account every year to ensure it is properly funded, based on your upcoming taxes and/or insurance premiums. This statement provides details of any changes in your escrow account and resulting changes to your mortgage payment.

Our review shows your escrow account has a **shortage of $34,046.48**. Once we pay your upcoming insurance and/or tax payments, your escrow account will fall below the required minimum balance. See Section 4 for details. Your monthly mortgage payment is also changing **July 01, 2017**. Your new payment amount depends on which option below you choose:

**OPTION 1: Pay Shortage Now**

- Pay in full by check or money order by **Jun. 24, 2017**.
- Your new monthly mortgage payment will be $1,823.32.

**OPTION 2: Spread Shortage Over 36 months**

- Add $945.74 per month for 36 months to mortgage payment.
- Your new monthly mortgage payment will be $2,769.06.

## SECTION 2   WHY ARE MY PAYMENTS CHANGING?

Changes to monthly escrow amounts are common. They're often caused by a change in your taxes and/or insurance premiums. This table shows how your escrow and mortgage payments are changing.

|  | Current Payment | Changes | OPTION 1 New Payment | OPTION 2 New Payment |
|---|---|---|---|---|
| Due Date | 08/01/2012 |  | 07/01/2017 | 07/01/2017 |
| Principal and Interest | $1,310.85 |  | $1,310.85 | $1,310.85 |
| Escrow Payment | $135.27 | ↑ $377.20 | $512.47 | $512.47 |
| Escrow Shortage |  |  |  | $945.74 |
| **TOTAL** | **$1,446.12** | **↑ $377.20** | **$1,823.32** | **$2,769.06** |

| We use anticipated payments from your escrow account to determine your monthly escrow payment: | Hazard Insurance | $2,403.00 |
|---|---|---|
|  | Combined Taxes | $3,746.59 |
|  | **TOTAL OUTGOING PAYMENTS** | $6,149.59 ÷ 12 months = **$512.47 Monthly Escrow** |

## SECTION 3   WHAT DO I NEED TO DO?

**TO PAY YOUR SHORTAGE NOW**

- Send a check or money order in the amount of $34,046.48, payable to Ditech Financial LLC by **June 24, 2017**.
- Please write your Loan Account Number and "Escrow Shortage" on the check.
- Send the coupon at the bottom of this statement along with your check in the enclosed envelope.
- Unfortunately, you cannot make your escrow shortage payment online or over the phone.

**TO SPREAD YOUR SHORTAGE OUT**

No action is needed to spread your shortage payments out. If we don't receive a shortage check or money order from you, we'll automatically add shortage payments of $945.74 to your monthly payment.

**REMINDER**

If you use automatic bill pay, please contact your bank to adjust your mortgage payment amount, due July 01, 2017.

------------------------------------------------------------------------------------------------



Please detach this escrow shortage coupon, write your loan number and "Escrow Shortage" on a check or money order made payable to Ditech Financial LLC, and mail both in the enclosed envelope with the mailing address visible in the window.


EQUAL HOUSING
LENDER

**ESCROW SHORTAGE COUPON**
This coupon and mailing address are for your escrow shortage payment only. DO NOT use for your regular monthly mortgage payment.

**Escrow Shortage Amount Due and Enclosed:**   **$34,046.48**   Due Date 06/24/2017

LOAN ACCOUNT NUMBER: 0033139262

DENNIS DELIA
GEORGE M GINGO
400 ORANGE ST
TITUSVILLE FL 32796-2854

DITECH FINANCIAL LLC
PO BOX 7153
PASADENA, CA 91109-7153

03313926 2        03404648

## SECTION 4   HOW IS MY ESCROW SHORTAGE CALCULATED?

Every year, we analyze what you'll need to pay in taxes and/or insurance premiums. We then calculate the amount you'll likely need in escrow to pay these bills. To determine if you have enough funds in your escrow account, we use this formula:

| | |
|---|---|
| Lowest Projected Balance | -$33,021.54  (in gray below) |
| - Minimum Escrow Balance | $1,024.94  (in gray below) |
| **Shortage Amount** | **-$34,046.48** |

Your escrow account has a minimum balance, as allowed by federal laws, state laws, or your mortgage contract. Your minimum balance includes up to two months of escrow payments to cover increases to your property taxes and/or homeowners insurance. Your minimum escrow balance is $1024.94.

This table shows expected payments in and out of your account over the next 12 months:

| Date | What We Expect You to Pay to Escrow | What We Expect to Pay Out | Payment Description | Expected Balance | Balance Needed in Your Account |
|---|---|---|---|---|---|
| Beginning Balance | | | | -$30,836.05 | $3,210.43 |
| 07/17 | $512.47 | $200.25 | HAZARD INS | -$30,523.83 | $3,522.65 |
| 08/17 | $512.47 | $200.25 | HAZARD INS | -$30,211.61 | $3,834.87 |
| 09/17 | $512.47 | $200.25 | HAZARD INS | -$29,899.39 | $4,147.09 |
| 10/17 | $512.47 | $200.25 | HAZARD INS | -$29,587.17 | $4,459.31 |
| 11/17 | $512.47 | $3,746.59 | CNTY TX PARC | -$32,821.29 | $1,225.19 |
| 11/17 | $0.00 | $200.25 | HAZARD INS | -$33,021.54 | $1,024.94 |
| 12/17 | $512.47 | $200.25 | HAZARD INS | -$32,709.32 | $1,337.16 |
| 01/18 | $512.47 | $200.25 | HAZARD INS | -$32,397.10 | $1,649.38 |
| 02/18 | $512.47 | $200.25 | HAZARD INS | -$32,084.88 | $1,961.60 |
| 03/18 | $512.47 | $200.25 | HAZARD INS | -$31,772.66 | $2,273.82 |
| 04/18 | $512.47 | $200.25 | HAZARD INS | -$31,460.44 | $2,586.04 |
| 05/18 | $512.47 | $200.25 | HAZARD INS | -$31,148.22 | $2,898.26 |
| 06/18 | $512.47 | $200.25 | HAZARD INS | -$30,836.00 | $3,210.48 |
| Ending Balance | | | | -$30,836.00 | $3,210.48 |
| **TOTAL** | **$6,149.64** | **$6,149.59** | | | |

## SECTION 5   WHAT HAPPENED SINCE MY LAST ESCROW REVIEW?

In this table, you can see payments you made into your escrow account and outgoing payments we made from your escrow account. If we projected to pay out a significantly different amount, you'll see the difference noted in gray. These differences may impact whether you have enough funds in your escrow account.

| Date | What You Actually Paid to Escrow | What We Expected You to Pay to Escrow | What We Actually Paid Out | What We Expected to Pay Out | Payment Description | Actual Balance | Expected Balance from Last Review |
|---|---|---|---|---|---|---|---|
| Beginning Balance | | | | | | -$52,415.32 | $1,467.79 |
| 01/17 | | $489.26 | $200.25 | | HAZARD INS | -$52,615.57 | $1,957.07 |
| 02/17 | | $489.26 | $200.25 | | HAZARD INS | -$52,815.82 | $2,446.35 |
| 03/17 | | $489.26 | $200.25 | | HAZARD INS | -$53,016.07 | $2,935.63 |
| 04/17 | | $489.26 | $200.25 | | HAZARD INS | -$53,216.32 | $3,424.91 |
| 05/17 | | $489.26 | $200.25 | | HAZARD INS | -$53,416.57 | $3,914.19 |
| 06/17 | $22,780.77  E | $489.26 | $200.25  E | | HAZARD INS | -$30,836.05 | $4,403.47 |
| 07/17 | E | $489.26 | | | | -$30,836.05 | $4,892.75 |
| 08/17 | E | $489.26 | | | | -$30,836.05 | $5,382.03 |
| 09/17 | E | $489.26 | | | | -$30,836.05 | $5,871.31 |
| 10/17 | E | $489.26 | | E | $2,403.00 | HAZARD INS | -$30,836.05 | $3,957.59 |
| 11/17 | E | $489.26 | | E | $3,468.31 | CNTY TX PARC | -$30,836.05 | $978.56 |
| 12/17 | E | $489.26 | | | | -$30,836.05 | $1,467.84 |
| Ending Balance | | | | | | -$30,836.05 | $1,467.84 |
| **TOTAL** | **$22,780.77** | **$5,871.36** | **$1,201.50** | **$5,871.31** | | | |

E = estimated future payment

REPRESENTATION OF PRINTED DOCUMENT

# ditech.

a Walter company

PO Box 6172
Rapid City , SD 57709-6172
1(877) 624-8026

8-776-05629-0000971-001-100-000-000-000

DENNIS DELIA
GEORGE M GINGO
400 ORANGE ST
TITUSVILLE FL 32796-2854

## Annual Escrow Account
## Disclosure Statement

| | |
|---|---|
| Statement Date | 10/19/2016 |
| Account Number | 0033139262 |

| | |
|---|---|
| Customer Service: | 1-877-624-8026 |
| Hours: | Mon. – Fri. 7:00AM to 8:00PM CST |
| | Sat. 7:00AM to 4:00PM CST |
| Website: | www.ditech.com |

| | |
|---|---|
| Payment Due Date: | 05/01/2006 |
| Principal and Interest: | $1,310.85 |
| Escrow: | $128.90 |
| Total Current Payment | $1,439.75 |

| | |
|---|---|
| New Payment Effective: | 01/01/2017 |
| Principal and Interest: | $1,310.85 |
| Escrow: | $489.28 |
| Escrow Shortage: | $767.34 |
| Total New Payment | $2,567.47 |

---

Ditech Financial LLC reviews your escrow account each year to determine if the current monthly payment amounts are sufficient to cover your projected property taxes and/or insurance premiums. Increases or decreases in your annual tax and/or insurance amounts may cause your monthly mortgage payment to change. Your monthly mortgage payment may also change if your loan totals include an adjustable rate feature or buy down assistance.

The section below sets forth your anticipated escrow activity for the next 12 months. Projected figures are based on information provided by sources which may include: The last tax or insurance payments disbursed, and figures provided to Ditech Financial LLC by your prior servicer.  See the reverse side for recent escrow history.

### ESCROW DISBURSEMENT

**Current Anticipated Disbursements**
This year, we anticipate that payments from your account will equal 5,871.31

| | |
|---|---|
| HAZARD INS | $2,403.00 |
| COUNTY TAX | $3,468.31 |
| Total Disbursements | $5,871.31 |

### PROJECTED ESCROW ACTIVITY FOR THE NEXT 12 MONTH ESCROW CYCLE

Your ending escrow balance from the last month of the account history is -$26,156.36. Your starting balance according to this analysis should be $4,345.73. This means you have a deficiency of -$26,156.36. The deficiency may be collected from you over a period of 12 months or more unless the deficiency is less than 1 month's escrow account payment, in which case we have the additional option of requesting payment within 30 days. We will ask you to pay it over 36 months.

After considering the deficiency of -$26,156.36, you will have a shortage of $1,457.79. This shortage may be collected from you over a period of 12 months or more unless the shortage is less than 1 month's escrow account payment, in which case we have the additional option of requesting payment within 30 days. We will ask you to pay it over 36 months.

| Month | To Escrow | From Escrow | Description | Required Balance | Projected Balance |
|---|---|---|---|---|---|
| | | | STARTING BALANCE | $1,467.79 | -$26,156.36 |
| JAN 17 | $489.28 | | | $1,957.07 | -$25,667.08 |
| FEB 17 | $489.28 | | | $2,446.35 | -$25,177.80 |
| MAR 17 | $489.28 | | | $2,935.63 | -$24,688.52 |
| APR 17 | $489.28 | | | $3,424.91 | -$24,199.24 |
| MAY 17 | $489.28 | | | $3,914.19 | -$23,709.96 |
| JUN 17 | $489.28 | | | $4,403.47 | -$23,220.68 |
| JUL 17 | $489.28 | | | $4,892.75 | -$22,731.40 |
| AUG 17 | $489.28 | | | $5,382.03 | -$22,242.12 |
| SEP 17 | $489.28 | | | $5,871.31 | -$21,752.84 |
| OCT 17 | $489.28 | -$2,403.00 | HAZARD INS | $3,957.59 | -$23,666.56 |
| NOV 17 | $489.28 | -$3,468.31 | CNTY TX PARC | $978.56 | -$26,645.59 |
| DEC 17 | $489.28 | | | $1,467.84 | -$26,156.31 |
| TOTAL | $5,871.36 | -$5,871.31 | | | |

**Escrow Payment Calculation**
$5,871.31 / 12 months = $489.28

### Calculation of Escrow Adjustment

| | |
|---|---|
| Beginning Required Balance | $1,467.79 |
| Beginning Projected Balance | -$26,156.36 |
| Escrow Shortage | $27,624.15 |
| Monthly Escrow Adjustment (Escrow Shortage divided by 36) | $767.34 |

CUSHION SELECTED BY SERVICER:
$978.56

An escrow analysis has been performed on your account, and your escrow account has a shortage of -$1,467.79 and a deficiency of -$26,156.36. The shortage and deficiency has been spread over the next 36 monthly payments. If your shortage of -$1,467.79 and deficiency of -$26,156.36 is paid prior to the effective date of 01/01/2017, your payment will be adjusted to $1,800.13 if no further activity occurs on your account. Please note that the new payment amount may not be reflected on your next billing statement if it is already in process.

Notice: Ditech Financial LLC is a licensed mortgage servicer and debt collector.

Notwithstanding anything herein to the contrary, if you have filed a bankruptcy petition and there is either an "automatic stay" in effect in your bankruptcy case or you have received in that case a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, however, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

When you send in a payment, Ditech Financial LLC may clear the check electronically.  Receipt of your check at the address listed on your payment coupon will authorize us to process your payment as an electronic debit to the checking account on which the check was written.

Your account history may answer your questions.  If not, please call our toll free number for further assistance at 1-877-624-8026.

## IMPORTANT MESSAGES

Our website has new content. Visit www.ditech.com to learn about new **Topics of Interest** and view our **expanded FAQ section.**  You can also click on the Borrower Services tab to register for **GT Portal** where you can make a payment, view your payment history, activate online statements and much more.

005-0814-1100F

---

INTERNET REPRINT
REPRESENTATION OF PRINTED DOCUMENT

# ditech.

a Walter company

Detach and return this portion with remittance
Please make checks payable to Ditech
**ACCOUNT NUMBER 0033139262**
Receipt of a personal check is authorization to collect payment electronically

EQUAL HOUSING
LENDER

Please use this coupon for escrow payments only.
Use of this coupon for funds not intended for escrow may result in delayed payment posting.

| | |
|---|---|
| SHORTAGE AND/OR DEFICIENCY DUE | $27,624.15 |
| TOTAL ENCLOSED $ | |

Enter total amount of payment enclosed

DENNIS DELIA
GEORGE M GINGO
400 ORANGE ST
TITUSVILLE FL 32796-2854

DITECH FINANCIAL LLC
PO BOX 7153
PASADENA, CA 91109-7153



03313926  2          02762415

**ESCROW ANALYSIS STATEMENT**
**ESCROW ANALYSIS HISTORY**

This is a review of the recent activity in your escrow account. It also compares our projections from your last review with the expected payments we made from your account.

| MONTH | PAYMENTS TO ESCROW | | PAYMENTS FROM ESCROW | | DESCRIPTION | ESCROW BALANCE | |
|---|---|---|---|---|---|---|---|
| | PROJECTED | ACTUAL | PROJECTED | ACTUAL | | PROJECTED | ACTUAL |
| | | | | | BEGINNING BALANCE | 4,345.73 | -48,067.98 |
| JUL | 482.86 | * | | | | 4,828.59 | -48,067.98 |
| AUG | 482.86 | * | | | | 5,311.45 | -48,067.98 |
| SEP | 482.86 | * | | | | 5,794.31 | -48,067.98 |
| OCT | 482.86 | 22,418.81 * E | 2,326.00 | | * E HAZARD INS | 3,951.17 | -25,649.17 |
| NOV | 482.86 | 1,480.56 * E | 3,468.31 | 3,468.31 E | CNTY TX PARC | 965.72 | -27,636.92 |
| DEC | 482.86 | 1,480.56 * E | | | | 1,448.58 | -26,156.36 |
| JAN | 482.86 | * E | | | | 1,931.44 | -26,156.36 |
| FEB | 482.86 | * E | | | | 2,414.30 | -26,156.36 |
| MAR | 482.86 | * E | | | | 2,897.16 | -26,156.36 |
| APR | 482.86 | * E | | | | 3,380.02 | -26,156.36 |
| MAY | 482.86 | * E | | | | 3,862.88 | -26,156.36 |
| JUN | 482.86 | * E | | | | 4,345.74 | -26,156.36 |
| TOTAL | 5,794.32 | 25,379.93 | 5,794.31 | 3,468.31 | | | |

An asterisk (*) indicates where a difference exists between your projected and expected account activity. The letter "E" beside an amount indicates that a payment or disbursement has not yet occurred, but is estimated to occur as shown. Payments are shown in the month received and not their month due. Please save this statement for comparison to your next analysis. Please direct any questions to our Customer Contact Center at (877) 624-8026. Discrepancies may be caused by the following:

**PAYMENT(S)**

- Monthly payment(s) were received less than OR greater than expected
- Monthly payment(s) were received earlier OR later than expected
- Previous overage was returned to escrow
- Previous deficiency/shortage was not paid entirely

**TAXES**

- Tax rate and/or assessed value changed
- Exemption status lost or changed
- Tax bill paid earlier OR later than expected
- Tax installment not paid
- Tax refund received
- New tax escrow requirement paid

**INSURANCE**

- Premium changes
- Coverage changed
- Additional premium paid
- Insurance bill paid earlier OR later than expected
- Premium not paid
- Premium refund received
- New insurance escrow requirement paid
- Force placed insurance premium paid

# ditech.

a Walter company

PO Box 6172
Rapid City , SD 57709-6172
1(877) 624-8026

## Disclosure Statement

| | |
|---|---|
| Statement Date: | 05/03/2016 |
| Account Number | 0033139262 |

| | |
|---|---|
| Customer Service: | 1-877-624-8026 |
| Hours: | Mon. – Fri. 7:00AM to 8:00PM CST |
| | Sat. 7:00AM to 4:00PM CST |
| Website: | www.ditech.com |

6-776-03490-0001878-001-100-000-000-000

DENNIS DELIA
GEORGE M GINGO
400 ORANGE ST
TITUSVILLE FL 32796-2854

| Payment Due Date: | 05/01/2008 |
|---|---|
| Principal and Interest: | $1,310.85 |
| Escrow: | $128.90 |
| **Total Current Payment** | **$1,439.75** |

| New Payment Effective: | 07/01/2016 |
|---|---|
| Principal and Interest: | $1,310.85 |
| Escrow: | $482.86 |
| Escrow Shortage: | $997.70 |
| **Total New Payment** | **$2,791.41** |

Ditech Financial LLC reviews your escrow account each year to determine if the current monthly payment amounts are sufficient to cover your projected property taxes and/or insurance premiums. Increases or decreases in your annual tax and/or insurance amounts may cause your monthly mortgage payment to change. Your monthly mortgage payment may also change if your loan totals include an adjustable rate feature or buy down assistance.

The section below sets forth your anticipated escrow activity for the next 12 months. Projected figures are based on information provided by sources which may include: The last tax or insurance payments disbursed, and figures provided to Ditech Financial LLC by your prior servicer. See the reverse side for recent escrow history.

### ESCROW DISBURSEMENT

**Current Anticipated Disbursements**
This year, we anticipate that payments from your account will equal 5,794.31

| | |
|---|---|
| HAZARD INS | $2,326.00 |
| COUNTY TAX | $3,468.31 |
| Total Disbursements | $5,794.31 |

### PROJECTED ESCROW ACTIVITY FOR THE NEXT 12 MONTH ESCROW CYCLE

Your projected starting escrow balance is -$31,571.41. Based on your projected escrow activity, your required starting escrow balance is $4,345.73. Accordingly, you have a shortage of $35,917.14.

| Month | Payments To Escrow | Payments From Escrow | Description | Required Balance | Projected Balance |
|---|---|---|---|---|---|
| | | | STARTING BALANCE | $4,345.73 | -$31,571.41 |
| JUL 16 | $482.86 | | | $4,828.59 | -$31,088.55 |
| AUG 16 | $482.86 | | | $5,311.45 | -$30,605.69 |
| SEP 16 | $482.86 | | | $5,794.31 | -$30,122.83 |
| OCT 16 | $482.86 | -$2,326.00 | HAZARD INS | $3,951.17 | -$31,965.97 |
| NOV 16 | $482.86 | -$3,468.31 | CNTY TX PARC | $965.72 | -$34,951.42 |
| DEC 16 | $482.86 | | | $1,448.58 | -$34,468.56 |
| JAN 17 | $482.86 | | | $1,931.44 | -$33,985.70 |
| FEB 17 | $482.86 | | | $2,414.30 | -$33,502.84 |
| MAR 17 | $482.86 | | | $2,897.16 | -$33,019.98 |
| APR 17 | $482.86 | | | $3,380.02 | -$32,537.12 |
| MAY 17 | $482.86 | | | $3,862.88 | -$32,054.26 |
| JUN 17 | $482.86 | | | $4,345.74 | -$31,571.40 |
| TOTAL | $5,794.32 | -$5,794.31 | | | |

Escrow  Payment Calculation
$5,794.31 / 12 months = $482.86

### Calculation of Escrow Adjustment

| | |
|---|---|
| Beginning Required Balance | $4,345.73 |
| Beginning Projected Balance | -$31,571.41 |
| Escrow Shortage | $35,917.14 |
| Monthly Escrow Adjustment (Escrow Shortage divided by 36) | $997.70 |

These calculations indicate the projected escrow balance will be less than the allowable low point. The resulting shortage is $35,917.14. If you choose to pay your shortage in full, your new  monthly payment will be $1,793.71. If you are currently in bankruptcy proceedings this amount may not include the amount in the Proof of Claim. Please contact us for additional details.

Notice: Ditech Financial LLC is a licensed mortgage servicer and debt collector.

Notwithstanding anything herein to the contrary, if you have filed a bankruptcy petition and there is either an "automatic stay" in effect in your bankruptcy case or you have received in that case a discharge of your personal liability for the obligation identified in this letter, we may not and do not intend to pursue collection of that obligation from you personally. If these circumstances apply, this notice is not and should not be construed to be a demand for payment from you personally. Unless the Bankruptcy Court has ordered otherwise, however, please also note that despite any such bankruptcy filing, whatever rights we hold in the property that secures the obligation remain unimpaired.

When you send in a check to make your payment, Ditech Financial LLC may clear the check electronically. Receipt of your check at the address listed on your payment coupon will authorize us to process your payment as an electronic debit to the checking account on which the check was written.

Your account history may answer your questions. If not, please call our toll free number for further assistance at 1-877-624-8026.

### IMPORTANT MESSAGES

Our website has new content. Visit www.ditech.com to learn about new **Topics of Interest** and view our **expanded FAQ section.** You can also click on the Borrower Services tab to register for **GT Portal** where you can make a payment, view your payment history, activate online statements and much more.

INTERNET REPRINT



| | |
|---|---|
| **Account Number:** | **0033139262** |
| DENNIS DELIA | |

**ANNUAL ESCROW ACCOUNT DISCLOSURE STATEMENT**
**ESCROW ANALYSIS HISTORY**

This is a review of the recent activity in your escrow account. It also compares our projections from your last review with the expected payments we made from your account.

| | PAYMENTS TO ESCROW | | PAYMENTS FROM ESCROW | | | ESCROW BALANCE | |
|---|---|---|---|---|---|---|---|
| MONTH | PROJECTED | ACTUAL | PROJECTED | ACTUAL | DESCRIPTION | PROJECTED | ACTUAL |
| | | | | | BEGINNING BALANCE | .00 | -48,067.98 |
| MAY 15 | | 16,361.30 * E | | | | 0.00 | -31,706.68 |
| JUN 15 | | 135.27 * E | | | | 0.00 | -31,571.41 |

An asterisk (*) indicates where a difference exists between your projected and expected account activity. The letter "E" beside an amount indicates that a payment or disbursement has not yet occurred, but is estimated to occur as shown. Payments are shown in the month received and not their month due. Please save this statement for comparison to your next analysis. Please direct any questions to our Customer Contact Center at (877) 624-8026. Discrepancies may be caused by the following:

**PAYMENT(S)**

- Monthly payment(s) were received less than OR greater than expected
- Monthly payment(s) were received earlier OR later than expected
- Previous overage was returned to escrow
- Previous deficiency/shortage was not paid entirely

**TAXES**

- Tax rate and/or assessed value changed
- Exemption status lost or changed
- Tax bill paid earlier OR later than expected
- Tax installment not paid
- Tax refund received
- New tax escrow requirement paid

**INSURANCE**

- Premium changes
- Coverage changed
- Additional premium paid
- Insurance bill paid earlier OR later than expected
- Premium not paid
- Premium refund received
- New insurance escrow requirement paid
- Force placed insurance premium paid

12

```
DDCH 0033139262   CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:21:45
D  DELIA         L:R F:S B:  R:    08/01/12 TYPE CONV. RES.            MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
----------------------------------------------------------- * MORE *-------
R____ PAYEE       ___ TRAN    ____ RSN   ___ USR  _____ ESC PAYEE
  _ SORT          _ SORT      _ SORT     _ SORT      _ SORT
DATE RANGE: _____ THRU _____
TRN USR  ID   DATE    TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION    DISBDT

633 GTA 0390 051216       15.00  PPTX000001 90R01 INSP INSPECTION

633 GTA 0388 042516       15.00  PPTX000001 90R01 INSP INSPECTION

745 GT3 0233 040516   75,000.00             90R01 SRLN #62379918/2400 C 033116

745 GT3 0232 040516       15.00             90R01 INSP -INSPECTION - EX 031816

745 GT3 0231 040516      125.00             90R01 FCAT --ATTORNEY FEE-A 022316
```



```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:21:47
D  DELIA         L:R F:S B:  R:    08/01/12 TYPE CONV. RES.              MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
-------------------------------------------------------------- * MORE *-------
R____ PAYEE      ___ TRAN     ____ RSN     ___ USR     _____ ESC PAYEE
   _ SORT          _ SORT       _ SORT      _ SORT       _ SORT
DATE RANGE: _____  THRU _____
TRN USR  ID   DATE     TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION        DISBDT

745 GT3 0230 040516      15.00              90R01 INSP -INSPECTION - EX 021516

745 GT3 0229 040516      15.00              90R01 INSP -INSPECTION - EX 011416

745 GT3 0228 040516      15.00              90R01 INSP -INSPECTION - EX 121515

745 GT3 0227 040516     250.00              90R01 FCAT --ATTORNEY FEE-A 121515

745 GT3 0226 040516     250.00              90R01 FCAT --ATTORNEY FEE-A 112715
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:21:49
D  DELIA          L:R F:S B:  R:     08/01/12 TYPE CONV. RES.              MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
--------------------------------------------------------- * MORE *-------
R____ PAYEE       ___ TRAN    ____ RSN    ___ USR  _____  ESC PAYEE
  _ SORT          _ SORT      _ SORT      _ SORT          _ SORT
DATE RANGE: _____  THRU _____
TRN USR  ID    DATE    TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION      DISBDT

745 GT3 0225 040516   1,500.00            90R01 FCAT --ATTORNEY FEE-A 112715

745 GT3 0224 040516     801.85            90R01 COCT --COURT COSTS    111915

745 GT3 0223 040516     263.50            90R01 COCT --COURT COSTS    111615

745 GT3 0222 040516      15.00            90R01 INSP -INSPECTION - EX 111315

745 GT3 0221 040516     250.00            90R01 FCAT --ATTORNEY FEE-A 102015
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:21:51
D  DELIA         L:R F:S B:  R:    08/01/12 TYPE CONV. RES.           MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
-------------------------------------------------------- * MORE *-------
 R____ PAYEE        ___ TRAN    ____ RSN    ___ USR  _____ ESC PAYEE
   _ SORT          _ SORT       _ SORT      _ SORT       _ SORT
 DATE RANGE: _____ THRU _____
 TRN USR  ID   DATE    TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION     DISBDT

  745 GT3 0220 040516      15.00            90R01 INSP -INSPECTION - EX 101515

  745 GT3 0219 040516      65.00            90R01 COCT --COURT COSTS    100115

  745 GT3 0218 040516      15.00            90R01 INSP -INSPECTION - EX 092415

  745 GT3 0217 040516     900.00            90R01 FCAT --ATTORNEY FEE-A 091615

  745 GT3 0216 040516     250.00            90R01 FCAT --ATTORNEY FEE-A 082615
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:21:52
D  DELIA         L:R F:S B:  R:   08/01/12 TYPE CONV. RES.              MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
-------------------------------------------------------------- * MORE *-------
R____ PAYEE        ____ TRAN     ____ RSN     ___ USR    _____ ESC PAYEE
  _ SORT           _ SORT        _ SORT       _ SORT       _ SORT
DATE RANGE: _____ THRU _____
TRN USR  ID   DATE     TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION      DISBDT

745 GT3 0215 040516      437.50             90R01 FCAT --ATTORNEY FEE-A 073115

745 GT3 0214 040516      700.00             90R01 FCAT --ATTORNEY FEE-A 073115

745 GT3 0213 040516      250.00             90R01 FCAT --ATTORNEY FEE-A 071515

745 GT3 0212 040516      250.00             90R01 FCAT --ATTORNEY FEE-A 070215

745 GT3 0211 040516       50.00             90R01 COCT -COURT COSTS        050915
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:21:54
D  DELIA         L:R F:S B:  R:     08/01/12 TYPE CONV. RES.              MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
--------------------------------------------------------------- * MORE *-------
R____ PAYEE        ___ TRAN      ____ RSN    ___ USR   _____ ESC PAYEE
    _ SORT           _ SORT        _ SORT      _ SORT          _ SORT
DATE RANGE: _____ THRU _____
TRN USR  ID   DATE     TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION       DISBDT

745 GT3 0210 040516     437.50             90R01 FCAT -ATTORNEY FEE-AP 041515

745 GT3 0209 040516     300.00             90R01 FCAT -ATTORNEY FEE-AP 022015

745 GT3 0208 040516     250.00             90R01 FCAT -ATTORNEY FEE-AP 012915

745 GT3 0207 040516     120.00             90R01 FCAT -ATTORNEY FEE-AP 102214

745 GT3 0206 040516     200.00             90R01 FCAT -ATTORNEY FEE-AP 072214
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:21:56
D  DELIA        L:R F:S B:  R:   08/01/12 TYPE CONV. RES.          MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
--------------------------------------------------------- * MORE *-------
 R____ PAYEE        ___ TRAN     ____ RSN    ___ USR   _____ ESC PAYEE
   _ SORT            _ SORT       _ SORT      _ SORT      _ SORT
 DATE RANGE: _____  THRU _____
 TRN USR  ID   DATE     TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION      DISBDT

 745 GT3 0205 040516       50.00             90R01 FCAT -ATTORNEY FEE-AP 072214

 745 GT3 0204 040516      700.00             90R01 FCAT -ATTORNEY FEE-AP 070814

 745 GT3 0203 040516      775.00             90R01 FCAT -ATTORNEY FEE-AP 070814

 745 GT3 0202 040516    1,025.00             90R01 FCAT -ATTORNEY FEE-AP 070814

 745 GT3 0201 040516      200.00             90R01 FCAT -ATTORNEY FEE-AP 070814
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:21:58
D  DELIA         L:R F:S B:  R:    08/01/12 TYPE CONV. RES.            MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
-------------------------------------------------------------- * MORE *-------
 R____ PAYEE        ___ TRAN    ____ RSN    ___ USR  _____ ESC PAYEE
  _ SORT            _ SORT      _ SORT      _ SORT             _ SORT
 DATE RANGE: _____ THRU _____
 TRN USR  ID   DATE     TRAN AMT ESC PAYEE  PAYEE RSN  DESCRIPTION       DISBDT

 745 GT3 0200 040516      300.00            90R01 FCAT -ATTORNEY FEE-AP 070814

 745 GT3 0199 040516      150.00            90R01 FCAT -ATTORNEY FEE-AP 061614

 745 GT3 0198 040516      100.00            90R01 FCAT -ATTORNEY FEE-AP 061614

 745 GT3 0197 040516      400.00            90R01 FCAT -ATTORNEY FEE-AP 061614

 745 GT3 0196 040516      550.00            90R01 FCAT -ATTORNEY FEE-AP 061614
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:21:59
D  DELIA         L:R F:S B:  R:     08/01/12 TYPE CONV. RES.              MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
----------------------------------------------------------- * MORE *-------
R____ PAYEE         ___ TRAN     ____ RSN    ___ USR    _____ ESC PAYEE
   _ SORT            _ SORT       _ SORT     _ SORT           _ SORT
DATE RANGE: _____ THRU _____
TRN USR  ID   DATE     TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION     DISBDT

745 GT3 0195 040516      25.00              90R01 FCAT -ATTORNEY FEE-AP 061614

745 GT3 0194 040516     200.00              90R01 FCAT -ATTORNEY FEE-AP 061614

745 GT3 0193 040516     125.00              90R01 FCAT -ATTORNEY FEE-AP 061614

745 GT3 0192 040516      25.00              90R01 FCAT -ATTORNEY FEE-AP 061614

745 GT3 0191 040516     275.00              90R01 FCAT -ATTORNEY FEE-AP 061614
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:22:01
D  DELIA          L:R F:S B:  R:    08/01/12 TYPE CONV. RES.            MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
-------------------------------------------------------- * MORE *-------
R____ PAYEE          ___ TRAN    ____ RSN    ___ USR  _____ ESC PAYEE
    _ SORT          _ SORT      _ SORT    _ SORT        _ SORT
DATE RANGE: _____   THRU _____
TRN USR  ID   DATE     TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION      DISBDT

745 GT3 0190 040516       18.50             90R01 RCRD -LOAN ASSIGNMENT 041614

745 GT3 0189 040516       25.00             90R01 COCT -COURT COSTS      041614

745 GT3 0188 040516       70.00             90R01 COCT -COURT COSTS      040514

745 GT3 0187 040516       70.00             90R01 COCT -COURT COSTS      040514

745 GT3 0186 040516       70.00             90R01 ADVT -FC COSTS - PUBL 031714
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:22:03
D  DELIA         L:R F:S B:  R:    08/01/12 TYPE CONV. RES.            MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
-------------------------------------------------------- * MORE *-------
R_____ PAYEE        ____ TRAN     ____ RSN    ___ USR    _____ ESC PAYEE
   _ SORT          _ SORT       _ SORT     _ SORT        _ SORT
DATE RANGE: _____        THRU _____
TRN USR  ID   DATE     TRAN AMT  ESC PAYEE   PAYEE RSN  DESCRIPTION      DISBDT

745 GT3 0185 040516   36,907.32-             90R01 NESC NEGATIVE TRUE ES 102214

745 GT3 0184 040516   36,907.32              90R01 NESC NEGATIVE TRUE ES 021314

745 GT3 0183 040516      412.47              90R01 COCT -COURT COSTS     012714

745 GT3 0182 040516      850.00              90R01 FCAT -ATTORNEY FEE-AP 010214

745 GT3 0181 040516    1,000.00              90R01 COCT -COURT COSTS     121713
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:22:05
D  DELIA          L:R F:S B:  R:    08/01/12 TYPE CONV. RES.            MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
------------------------------------------------------------ * MORE *-------
R____ PAYEE       ___ TRAN     ____ RSN     ___ USR     _____ ESC PAYEE
  _ SORT          _ SORT       _ SORT       _ SORT           _ SORT
DATE RANGE: _____ THRU _____
TRN USR  ID   DATE     TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION      DISBDT

745 GT3 0180 040516      250.00             90R01 FCAT -ATTORNEY FEE-AP 111513

745 GT3 0179 040516      850.00             90R01 FCAT -ATTORNEY FEE-AP 100913

745 GT3 0178 040516      375.00             90R01 FCAT -ATTORNEY FEE-AP 100113

745 GT3 0177 040516       87.00             90R01 ATTY ATTY FEES/COSTS  013113

745 GT3 0176 040516      200.00             90R01 ATTY ATTY FEES/COSTS  013113
```

```
DDCH 0033139262   CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:22:07
D  DELIA        L:R F:S B:  R:   08/01/12 TYPE CONV. RES.           MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
------------------------------------------------------ * MORE *-------
R____ PAYEE        ___ TRAN    ____ RSN    ___ USR    _____ ESC PAYEE
   _ SORT            _ SORT      _ SORT      _ SORT            _ SORT
DATE RANGE: _____   THRU _____
TRN USR  ID   DATE      TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION     DISBDT

745 GT3 0175 040516     200.00              90R01 ATTY ATTY FEES/COSTS  013113

745 GT3 0174 040516     180.00              90R01 ATTY ATTY FEES/COSTS  013113

745 GT3 0173 040516     200.00              90R01 ATTY ATTY FEES/COSTS  013113

745 GT3 0172 040516     666.00              90R01 ATTY ATTY FEES/COSTS  013113

745 GT3 0171 040516     144.00              90R01 ATTY ATTY FEES/COSTS  013113
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:22:09
D  DELIA         L:R F:S B:  R:     08/01/12 TYPE CONV. RES.            MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
------------------------------------------------------------- * MORE *-------
 R____ PAYEE      ___ TRAN     ____ RSN    ___ USR    _____ ESC PAYEE
  _ SORT          _ SORT       _ SORT    _ SORT              _ SORT
 DATE RANGE: _____ THRU _____
 TRN USR  ID   DATE    TRAN AMT  ESC PAYEE   PAYEE RSN  DESCRIPTION     DISBDT

 745 GT3 0170 040516      18.50            90R01 ATTY ATTY FEES/COSTS  013113

 745 GT3 0169 040516     108.00            90R01 ATTY ATTY FEES/COSTS  013113

 745 GT3 0168 040516     157.50            90R01 ATTY ATTY FEES/COSTS  013113

 745 GT3 0167 040516      75.00            90R01 ATTY ATTY FEES/COSTS  013113

 745 GT3 0166 040516     892.50            90R01 ATTY ATTY FEES/COSTS  013113
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:22:11
D  DELIA         L:R F:S B:  R:    08/01/12 TYPE CONV. RES.                MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
-------------------------------------------------------------- * MORE *-------
R____ PAYEE        ___ TRAN     ____ RSN    ___ USR    _____ ESC PAYEE
  _ SORT             _ SORT       _ SORT    _ SORT           _ SORT
DATE RANGE: _____      THRU _____
TRN USR  ID   DATE     TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION     DISBDT

 745 GT3 0165 040516      20.00             90R01 ATTY ATTY FEES/COSTS  013113

 745 GT3 0164 040516      36.50             90R01 ATTY ATTY FEES/COSTS  013113

 745 GT3 0163 040516     205.00             90R01 ATTY ATTY FEES/COSTS  013113

 745 GT3 0162 040516     600.00             90R01 ATTY ATTY FEES/COSTS  013113

 745 GT3 0161 040516     325.00             90R01 ATTY ATTY FEES/COSTS  013113
```

```
DDCH 0033139262    CORPORATE ADVANCE HISTORY SCREEN  2A9/001 09/10/19  11:22:12
D  DELIA           L:R F:S B:  R:     08/01/12 TYPE CONV. RES.              MAN 0
2400 CHELSEA ST ORLANDO FL 32803-0000
-------------------------------------------------------------- * MORE *-------
R____  PAYEE        ___ TRAN    ____ RSN    ___ USR    _____ ESC PAYEE
  _ SORT           _ SORT       _ SORT      _ SORT              _ SORT
DATE RANGE:         _____ THRU _____
TRN USR  ID   DATE     TRAN AMT ESC PAYEE  PAYEE RSN  DESCRIPTION       DISBDT

745 GT3 0160 040516      600.00            90R01 ATTY ATTY FEES/COSTS   013113

745 GT3 0159 040516      257.00            90R01 ATTY ATTY FEES/COSTS   013113

745 GT3 0158 040516       11.25            90R01 APPR PROP INSPECTION   013113

745 GT3 0157 040516       13.00            90R01 APPR PROP INSPECTION   013113

745 GT3 0156 040516       16.50            90R01 APPR PROP INSPECTION   013113
```

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): November 8, 2012 (November 2, 2012)

# Walter Investment Management Corp.

(Exact name of registrant as specified in its charter)

| Maryland | 001-13417 | 13-3950486 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

3000 Bayport Drive, Suite 1100
Tampa, Florida 33607
(813) 421-7605

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

(Former Name or Former Address, if Changed from Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))



Forward-Looking Statements

This Current Report on Form 8-K (including information included or incorporated by reference herein) includes "forward-looking statements" within the meaning of the safe harbor provisions of the United States Private Securities Litigation Reform Act of 1995. Such statements may include, but are not limited to, statements about the benefits of the proposed Transaction, including future financial and operating results, the Registrant's plans, objectives, expectations and intentions and other statements that are not historical facts. Such statements are based upon the current beliefs and expectations of the parties and are subject to significant risks and uncertainties. Actual results may differ from those set forth in the forward-looking statements.

Risks and uncertainties include: the failure of the Bankruptcy Court to approve the Transaction; uncertainties as to the purchase price to be paid at closing; the timing of the closing of the Transaction; the possibility that the Transaction may not close, including, but not limited to, due to the failure to satisfy the closing conditions; the effects of disruption from the Transaction making it more difficult to maintain business and operational relationships; as well as the risk of new and changing regulation and policies in the U.S. and internationally and the exposure to litigation and/or regulatory actions. Additional factors that could cause results to differ materially from those described in the forward-looking statements can be found in the Registrant's public disclosure filings with the Securities and Exchange Commission (the "SEC"). The Registrant disclaims any intent or obligation to update any forward-looking statements as a result of developments occurring after the period covered by this report or otherwise. Copies of the Registrant's SEC filings are available at the SEC's website at www.sec.gov.

No Offer or Solicitation.

This communication shall not constitute an offer to sell or the solicitation of an offer to buy any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offering of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended.

Item 9.01 Financial Statements and Exhibits.

    (d)   Exhibits

2.1    Asset Purchase Agreement between Ocwen Loan Servicing, LLC, and Residential Capital, LLC, Residential Funding Company, LLC, GMAC Mortgage, LLC, Executive Trustee Services, LLC, ETS of Washington, Inc., EPRE LLC, GMACM Borrower LLC, and RFC Borrower LLC dated as of November 2, 2012.*

*  The Company hereby undertakes to furnish supplementally a copy of any omitted schedule, annex or exhibit to such Asset Purchase Agreement to the U.S. Securities and Exchange Commission upon request.

**Item 1.01 Entry into a Material Definitive Agreement.**

As previously reported, Walter Investment Management Corp. (the "Company" or "Walter") entered into a Joint Bidding Agreement ("JBA") dated October 19, 2012 with Ocwen Loan Servicing LLC ("Ocwen") to jointly bid to acquire the mortgage servicing and originations and capital markets platforms (the "ResCap Assets") of Residential Capital LLC ("ResCap") in an auction sponsored by the U.S. Bankruptcy Court (the "Transaction"). Pursuant to the JBA, Walter agreed to acquire the rights and assume certain liabilities relating to all of ResCap's Fannie Mae mortgage servicing rights and related advances, and ResCap's mortgage originations and capital markets platforms (the "Walter Assets"). The remainder of the ResCap Assets and certain liabilities related thereto are to be acquired by Ocwen.

On October 24, 2012, Walter and Ocwen were determined at an auction sponsored by the US Bankruptcy Court to have submitted the highest and best bid to acquire the ResCap Assets. Walter and Ocwen presented a winning bid of $3 billion, with Walter's portion of the bid for the Walter Assets equal to approximately $540 million. The bid was subject to the negotiation of a mutually acceptable Asset Purchase Agreement ("APA") and the approval of the U.S. Bankruptcy Court. Ocwen and Walter jointly made an earnest money cash deposit of $72 million ($15 million of which was paid by Walter), which will be applied towards the purchase price upon closing of the Transaction.

On November 2, 2012, Ocwen entered into a definitive APA with Residential Capital, LLC, Residential Funding Company, LLC, GMAC Mortgage, LLC, Executive Trustee Services, LLC, ETS of Washington, Inc., EPRE LLC and the additional Sellers identified on Schedule A thereto (collectively, the "Sellers"). Consummation of the Transaction is subject to, among other things, (i) approval of the transaction by the Bankruptcy Court, (ii) certain licensing and regulatory approvals, including expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and (iii) certain customary closing conditions and termination rights. Subject to approval by the Bankruptcy Court and all of the conditions to closing, the Transaction is expected to close during the first quarter of 2013.

The APA contains specified termination rights for the parties. Among other circumstances, the APA may be terminated by either Ocwen or the Sellers if the closing has not occurred by March 31, 2012. Each party has the right to require the other party's specific performance to close the Transaction (provided all closing conditions are satisfied).

The foregoing summary of the APA is qualified in its entirety by reference to the APA which is filed with this Current Report on Form 8-K as Exhibit 2.1 and incorporated herein by reference.

The APA has been included to provide investors and security holders with information regarding its terms. It is not intended to provide any other financial information about Walter, Ocwen, the Sellers or any of their respective subsidiaries and affiliates. The representations, warranties and covenants contained in the APA were made only for purposes of that agreement and as of specific dates; were solely for the benefit of the parties to the APA; may be subject to limitations agreed upon by the parties, including being qualified by confidential disclosures made for the purposes of allocating contractual risk between the parties to the APA instead of establishing these matters as facts; and may be subject to standards of materiality applicable to the contracting parties that differ from those applicable to investors. Investors should not rely on the representations, warranties and covenants or any description thereof as characterizations of the actual state of facts or condition of Walter, Ocwen or the Sellers or any of their respective subsidiaries and affiliates. Moreover, information concerning the subject matter of the representations, warranties and covenants may change after the date of the Asset Purchase Agreement, which subsequent information may or may not be fully reflected in public disclosures by Walter.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

WALTER INVESTMENT MANAGEMENT CORP.

Date: November 8, 2012                                       By:      /s/ Stuart Boyd
                                                                      Stuart Boyd, Vice President,
                                                                      General Counsel and Secretary

Exhibit 2.1

Execution Copy

ASSET PURCHASE AGREEMENT

between

OCWEN LOAN SERVICING, LLC

and

RESIDENTIAL CAPITAL, LLC,

RESIDENTIAL FUNDING COMPANY, LLC,

GMAC MORTGAGE, LLC,

EXECUTIVE TRUSTEE SERVICES, LLC,

ETS OF WASHINGTON, INC.,

EPRE LLC,

GMACM BORROWER LLC

and

RFC BORROWER LLC

dated as of

November 2, 2012

**Table of Contents**

| | | Page |
|---|---|---|
| ARTICLE I | DEFINITIONS AND INTERPRETATION | 1 |
| Section 1.1 | Definitions | 1 |
| Section 1.2 | Interpretation | 30 |
| ARTICLE II | PURCHASE AND SALE OF ASSETS | 31 |
| Section 2.1 | Purchase and Sale of Assets | 31 |
| Section 2.2 | Assignment of Contracts, Leases and Other Assets | 33 |
| Section 2.3 | Excluded Assets | 34 |
| Section 2.4 | Post-Closing Asset Deliveries | 36 |
| Section 2.5 | Conveyance of Assets by Affiliate Sellers | 36 |
| Section 2.6 | Non-Assignable Purchased Assets; Necessary Consents | 37 |
| Section 2.7 | Assumption of Certain Liabilities | 37 |
| Section 2.8 | Retained Liabilities | 37 |
| Section 2.9 | Closing | 37 |
| Section 2.10 | Ancillary Agreements | 38 |
| Section 2.11 | Deliveries by Purchaser | 39 |
| Section 2.12 | Deliveries by Sellers | 39 |
| Section 2.13 | Consumer Privacy Matters | 40 |
| Section 2.14 | "As Is, Where Is" Transaction | 40 |
| Section 2.15 | Exclusion of Certain Agreements | 40 |
| Section 2.16 | [RESERVED] | 41 |
| Section 2.17 | Indemnity Escrow Agreement | 41 |
| ARTICLE III | PURCHASE PRICE; ADJUSTMENT; ALLOCATION | 41 |
| Section 3.1 | Purchase Price; Payment of Purchase Price | 41 |
| Section 3.2 | Purchase Price Adjustment; Final Payment | 42 |
| Section 3.3 | Allocation of the Purchase Price for Tax Purposes | 43 |
| Section 3.4 | Deposit | 44 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF SELLERS | 44 |
| Section 4.1 | Organization and Authority | 44 |
| Section 4.2 | Non-Contravention | 45 |
| Section 4.3 | Consents and Approvals | 45 |
| Section 4.4 | Financial Statements | 46 |
| Section 4.5 | Absence of Certain Changes or Events | 46 |
| Section 4.6 | Title to Assets | 46 |
| Section 4.7 | Purchased Assets Used in Business | 47 |
| Section 4.8 | Real Property Leases | 47 |
| Section 4.9 | Mortgage Servicing Portfolio; Servicing Agreements; the Business | 47 |
| Section 4.10 | Material Contracts | 49 |
| Section 4.11 | Compliance with Law, Licensing and Data Security | 50 |
| Section 4.12 | Employee Benefits | 50 |

-i-

## TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 4.13 | Employees | 51 |
| Section 4.14 | Litigation and Claims | 51 |
| Section 4.15 | Intellectual Property | 52 |
| Section 4.16 | Brokers, Finders and Financial Advisors | 53 |
| Section 4.17 | Ginnie Mae Loans | 53 |
| Section 4.18 | Tax Matters | 54 |
| Section 4.19 | Shared Services Agreement | 55 |
| **ARTICLE V** | **REPRESENTATIONS AND WARRANTIES OF PURCHASER** | 55 |
| Section 5.1 | Organization and Authority | 55 |
| Section 5.2 | Non-Contravention | 56 |
| Section 5.3 | Consents and Approvals | 56 |
| Section 5.4 | Financing | 56 |
| Section 5.5 | Non-reliance | 57 |
| Section 5.6 | Brokers, Finders and Financial Advisors | 57 |
| **ARTICLE VI** | **PRE-CLOSING MATTERS AND OTHER COVENANTS** | 57 |
| Section 6.1 | Subsequent Actions; Further Assurances | 57 |
| Section 6.2 | Third Party Consents | 58 |
| Section 6.3 | Access to Information; Interim Financial Information | 58 |
| Section 6.4 | Records; Post-Closing Access to Information | 59 |
| Section 6.5 | Interim Operations of the Business | 60 |
| Section 6.6 | Servicing Approvals and Licenses | 64 |
| Section 6.7 | Employee Matters | 64 |
| Section 6.8 | Notices of Certain Events | 67 |
| Section 6.9 | Tax Matters | 68 |
| Section 6.10 | Insurance | 69 |
| Section 6.11 | Mortgage Loan Schedules and Servicing Advance Schedules | 69 |
| Section 6.12 | Title Documents and Surveys | 69 |
| Section 6.13 | Schedules and Disclosure Memorandum | 69 |
| Section 6.14 | Bankruptcy Actions | 70 |
| Section 6.15 | Participation of Walter Entity | 71 |
| Section 6.16 | Consent Order and DOJ/AG Settlement | 71 |
| Section 6.17 | Antitrust Clearances and Obligations | 72 |
| Section 6.18 | Post-Closing Amounts Received and Paid | 73 |
| Section 6.19 | Confidentiality | 74 |
| Section 6.20 | Real Property Matters and Transition Services | 75 |
| Section 6.21 | Required Financial Information | 76 |
| Section 6.22 | PSA Amendments | 76 |
| Section 6.23 | Mortgage Loans Documents | 76 |
| Section 6.24 | Preparation for Transfer of Certain Purchased Mortgage Servicing | 76 |
| Section 6.25 | Purchaser Payment Cap | 77 |
| Section 6.26 | DIP Financing Agreements | 77 |
| Section 6.27 | [RESERVED] | 77 |
| Section 6.28 | Separation Services | 77 |

-ii-

**TABLE OF CONTENTS**
(continued)

| | | Page |
|---|---|---|
| Section 6.29 | Repurchase | 78 |
| Section 6.30 | Rebranding | 78 |
| **ARTICLE VII** | **BANKRUPTCY COURT MATTERS** | **78** |
| Section 7.1 | Competing Transaction | 78 |
| Section 7.2 | Bankruptcy Court Filings | 78 |
| **ARTICLE VIII** | **CONDITIONS** | **79** |
| Section 8.1 | Conditions to Obligations of Purchaser and Sellers | 79 |
| Section 8.2 | Conditions to Obligations of Sellers | 80 |
| Section 8.3 | Conditions to Obligations of Purchaser | 81 |
| **ARTICLE IX** | **TRANSFER OF SERVICING** | **82** |
| Section 9.1 | Transfer of Purchased Mortgage Servicing and MSRs | 82 |
| Section 9.2 | Costs of Transfer | 83 |
| **ARTICLE X** | **TERMINATION AND SURVIVAL** | **83** |
| Section 10.1 | Termination | 83 |
| Section 10.2 | Procedure and Effect of Termination | 85 |
| **ARTICLE XI** | **INDEMNIFICATION** | **86** |
| Section 11.1 | Indemnification by Sellers | 86 |
| Section 11.2 | Notice of Claims | 86 |
| Section 11.3 | Third Person Claims | 87 |
| Section 11.4 | Claims Against the Indemnity Escrowed Funds | 88 |
| Section 11.5 | Adjustment to Purchase Price | 88 |
| Section 11.6 | Survival | 88 |
| Section 11.7 | Exclusive Remedy | 89 |
| **ARTICLE XII** | **MISCELLANEOUS** | **89** |
| Section 12.1 | Expenses | 89 |
| Section 12.2 | Amendment; Waiver | 89 |
| Section 12.3 | Notices | 89 |
| Section 12.4 | Waivers | 90 |
| Section 12.5 | Counterparts | 91 |
| Section 12.6 | Applicable Law; WAIVER OF JURY TRIAL; Venue and Retention of Jurisdiction | 91 |
| Section 12.7 | Assignment | 92 |
| Section 12.8 | No Third-Party Beneficiaries | 92 |
| Section 12.9 | Public Announcements | 92 |
| Section 12.10 | Severability | 92 |
| Section 12.11 | Matters Related to Purchaser as Next Highest Bidder; Specific Performance | 93 |
| Section 12.12 | Waiver of Bulk Transfer Laws | 93 |
| Section 12.13 | Personal Liability | 93 |
| Section 12.14 | Entire Agreement | 93 |

-iii-

## SCHEDULES

| Schedule A | [Reserved] |
| Schedule B | Agency Special Requirements |
| Schedule C | Schedule of Purchased Assets and Assumed Liabilities |
| Schedule D | DIP Financing Agreements |
| Schedule E | Private Investor Servicing Agreements and Servicing Agreements for Other Serviced Loans |
| Schedule F | Agency Contracts |
| Schedule G | Knowledge of Sellers |
| Schedule H | Owned Real Property and Leased Real Property |
| Schedule I | Other Serviced Loans |
| Schedule J | [Reserved] |
| Schedule K | Computer Equipment Located at Real Property |
| Schedule L-1 | Other Purchased Assets |
| Schedule L-2 | Credits and Other Expenses |
| Schedule M | Ginnie Mae Loan Criteria |
| Schedule N | Owned Transferred IP |
| Schedule O | Other Assigned Contracts |
| Schedule P | Material Agreements |
| Schedule Q | Excluded Contracts and Assets |
| Schedule R | Material Employee Benefit Plans |
| Schedule S | Business Licenses |
| Schedule T | Deemed Eligible Servicing Agreements |
| Schedule U | ETS Contracts |
| Schedule 1.1 | Agency Timelines |
| Schedule 2.15(b) | Excludable Servicing Agreements |
| Schedule 3.1(a) | Purchase Price |
| Schedule 4.3 | Seller Consents and Approvals |
| Schedule 4.9(a) | Mortgage Loan Data Fields |
| Schedule 4.9(c) | Servicing Advances Data Fields |
| Schedule 5.3 | Purchaser Consents and Approvals |
| Schedule 8.3(vi) | Required Seller Consents |
| Schedule 8.3(viii) | Necessary Purchaser Business Licenses |

## EXHIBITS

| Exhibit 1 | [RESERVED] |
| Exhibit 2 | Deposit Escrow Agreement |
| Exhibit 3 | Sale Approval Order |
| Exhibit 4 | Sale Procedures |
| Exhibit 5 | Sale Procedures Order |
| Exhibit 6 | Form of GM Transition License |
| Exhibit 7 | Preliminary Form of Transition Services Agreement between AFI and Purchaser |
| Exhibit 8 | Shared Services Agreement |
| Exhibit 9 | Form of Mutual Release |
| Exhibit 10 | Form of Estate Subservicing Agreement |

Exhibit 11    Form of Estate Servicing Agreement

**DISCLOSURE MEMORANDUM**

-v-

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement, dated as of November 2, 2012, entered into between Ocwen Loan Servicing, LLC, a Delaware limited liability company ("Purchaser"), and Residential Capital, LLC ("ResCap"), Residential Funding Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage"), each of which is a Delaware limited liability company, Executive Trustee Services, LLC, a Delaware limited liability company (" ETS LLC"), ETS of Washington, Inc., a Washington corporation ("ETS WA" and together with ETS LLC, " ETS"), EPRE LLC, a Delaware limited liability company ( "EPRE"), GMACM Borrower LLC, a Delaware limited liability company (" GMACM Borrower"), and RFC Borrower LLC, a Delaware limited liability company ("RFC Borrower" and together with ResCap, RFC, GMAC Mortgage, ETS, EPRE and GMACM Borrower, the " Sellers").

**WHEREAS**, Sellers are engaged in the Business (as hereinafter defined);

**WHEREAS**, Sellers, together with other Affiliates (as hereinafter defined), filed voluntary petitions (" Petitions") for relief (collectively, the "Bankruptcy Case") under Chapter 11 of Title 11, U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on May 14, 2012 (the "Petition Date");

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Purchaser, and Purchaser wishes to purchase from Sellers, the Purchased Assets (as hereinafter defined), and Purchaser (or Purchaser's assignee or assignees pursuant to Section 12.7 hereof) wishes to purchase from Sellers, the Purchased Assets (as hereinafter defined), and Purchaser is willing to assume all of the Assumed Liabilities (as hereinafter defined); and

**WHEREAS**, Sellers, as debtors and debtors-in-possession, will continue in the possession of their respective assets and in the management of the Business pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I

### DEFINITIONS AND INTERPRETATION

**Section 1.1 Definitions.** As used in this Agreement, the following terms have the meanings set forth below:

"Adjustment Amount" has the meaning specified in Section 3.2(b).

"Adjustment Report" has the meaning specified in Section 3.2(d).

"Advance Facility" has the meaning specified in the definition of "Eligible Servicing Agreement."

"Advance Financing Person" has the meaning specified in the definition of "Eligible Servicing Agreement."

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified. For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 20% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by Contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings. Notwithstanding the foregoing, for purposes of this Agreement, unless otherwise specifically provided, Affiliates of the Sellers include only direct or indirect Subsidiaries of ResCap, and other Affiliates of AFI are excluded from the definition of Sellers' Affiliates and references to Affiliates of AFI exclude Sellers and their Affiliates.

"Affiliate Assignment" has the meaning specified in Section 12.7.

"Affiliate Purchased Assets" has the meaning specified in Section 2.5(a).

"Affiliate Seller" has the meaning specified in Section 2.5(a).

"AFI" means Ally Financial Inc., a Delaware corporation and the indirect parent of Sellers.

"AFI Transition Services Agreement" means the transition services agreement to be entered into by and among AFI, for itself and its Affiliates, and Purchaser pursuant to which Purchaser and AFI will each provide certain transition services from and after the Closing Date, a preliminary form of which is attached as Exhibit 7 hereto.

"Agency" means a government-sponsored secondary mortgage market enterprise or Government Entity acquiring, owning or guaranteeing Mortgage Loans, including for purposes of this Agreement, Fannie Mae, Ginnie Mae, Freddie Mac, FHA and HUD.

"Agency Consents" means the written consents, approvals or acknowledgements of Fannie Mae, Freddie Mac or Ginnie Mae containing the provisions set forth in Schedule 4.3, in form and substance satisfactory to Purchaser.

"Agency Contracts " means the Contracts between any Seller or any Subsidiary of any Seller and an Agency, and each Agency's respective seller and servicer guides utilized by the Agencies and other Investors to whom Sellers have sold Mortgage Loans and/or for which Sellers service Mortgage Loans, as listed on Schedule F hereto.

"Agency Loans" means Mortgage Loans being serviced by Sellers pursuant to an Agency Contract that are owned or guaranteed by Fannie Mae, Freddie Mac or Ginnie Mae or are intended to be included in a pool to be owned by Fannie Mae or Freddie Mac or guaranteed by Ginnie Mae, as identified in the Mortgage Loan Schedule, the Cut-Off Date Mortgage Loan Schedule, or the Closing Date Mortgage Loan Schedule, as applicable.

"Agency Special Requirements" means the Seller-specific reporting and servicing procedures required by the Agencies to be performed by Sellers as servicer of the Agency Loans, as set forth on Schedule B.

"Agreement" or "this Agreement" means this Asset Purchase Agreement, together with the Exhibits, Schedules and Disclosure Memorandum attached hereto, as any of them may be amended from time to time.

"Ancillary Agreements" means the Servicing Transfer Agreement and each of the agreements set forth in Section 2.10.

"Ancillary Income" means all income, revenue, fees, expenses, charges or other monies from or relating to the Mortgage Loans to which a Servicer is entitled (other than servicing fees and prepayment charges, premiums or penalties), including late charges, insufficient funds fees, assumption fees, income from Optional Products, interest on funds deposited in any Servicing Escrow Account or Servicing Custodial Account maintained pursuant to the Servicing Agreements, fees payable to a Seller under HAMP, HARP, HASP or any similar program, loss mitigation incentive fees, including those payable from an Agency in such instances for non-HAMP workouts, pay-off fees, modification fees, default interest, commissions and administrative fees on insurance and similar fees and charges, and all other incidental fees and charges.

"Antitrust Authority" has the meaning specified in Section 6.17(b).

"Applicable Law" means, as of the time of reference and as applicable, any Law that is applicable to the Business.

"Applicable Requirements" means and includes, as of the time of reference, with respect to the origination, purchase, sale and servicing of Mortgage Loans or the Servicing Agreements or the ETS Contracts, (in each case to the extent applicable to any particular Mortgage Loan or Servicing Agreement): (i) contractual obligations of Sellers (except those rendered unenforceable by the Bankruptcy Code), including with respect to any Servicing under any Servicing Agreement, Mortgage Loan Document or any other commitment or other contractual obligation relating to a Mortgage Loan, (ii) applicable underwriting, servicing and other guidelines of Sellers as incorporated in Seller/Servicer Guides, (iii) Applicable Laws, (iv) other applicable requirements and guidelines of any Government Entity or of any Investor, ETS Customer or Insurer and (v) applicable requirements of MERS.

"Assignment and Assumption Agreement" means one or more assignment and assumption agreements to be executed by Sellers and Purchaser in respect of specified Assumed Contracts and Assumed Liabilities, in a customary form as mutually agreed between Sellers and Purchaser.

"Assignment and Assumption of Lease Agreements" means one or more assignment and assumption of lease agreements to be executed by applicable Sellers and Purchaser in respect of the Real Property Leases, in a customary form as mutually agreed between Sellers and Purchaser.

"Assumed Contracts" has the meaning specified in Section 2.2.

"Assumed Contracts Procedures" means procedures pertaining to the assumption and assignment of the Assumed Contracts from the Sellers to the Purchaser, as set forth in the Sale Procedures, which shall include procedures pursuant to which (i) the Sellers shall (a) file a schedule setting forth each of the Assumed Contracts and the Sellers' estimates of the Cure Amounts, if any, with respect to the Assumed Contracts and (b) provide notice of such schedule to all affected parties and (ii) all affected parties shall file an objection, if any, to the Sellers' proposed assumption and assignment of the Assumed Contracts and the estimates of Cure Amounts set forth in such schedule by no later than 15 calendar days prior to the Sale Hearing or such earlier date as the Bankruptcy Court shall order.

"Assumed Liabilities" means:

    (i) the Business Employee Liabilities;

    (ii) the Liabilities relating to Permitted Liens with respect to Purchased Assets (to the extent not discharged in the Bankruptcy Case);

    (iii) the Liabilities arising under any Assumed Contract to the extent such Liabilities arise on and after the Closing;

    (iv) all Liabilities of the Business or Purchased Assets to the extent arising from the conduct of the Business on or after the Closing other than any Retained Liabilities;

    (v) to the extent that Purchaser requests the physical transfer of Purchased Mortgage Servicing from the Sellers' systems, any fees, costs and expenses related to the preparation for, and physical transfer of Purchased Mortgage Servicing from the Seller's systems, including all third party fees, costs and expenses incurred prior to the Closing;

    (vi) all Liabilities relating to MSRs for Agency Loans guaranteed by Ginnie Mae, whether arising prior to or after the Closing; and

    (vii) any applicable compensatory fees related to a failure to adhere to the foreclosure timelines relating to any Fannie Mae or Freddie Mac Agency Loan that is a Non-Lagging Defaulted Loan.

"Auction" has the meaning specified in the Sale Procedures Order.

"Auction Date" has the meaning specified in the Sale Procedures Order.

"Bankruptcy Case" has the meaning specified in the preamble.

4

"Bankruptcy Code" has the meaning specified in the preamble.

"Bankruptcy Court" has the meaning specified in the preamble.

"Bankruptcy Exceptions" means (i) as a result of Sellers operating as debtors in possession under the Bankruptcy Code, (a) Sellers' inability to maintain the services of their officers or other employees, including the possibility that a substantial number of Sellers' employees have left, or will leave, their positions, and (b) vendors and counterparties of Sellers failing to continue to perform their obligations to Sellers, and (ii) any limitation or obligation imposed on Sellers by Order of the Bankruptcy Court or the DIP Financing Agreements.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bill of Sale" means one or more bills of sale to be executed by Sellers and Purchaser in respect of certain Purchased Assets, in a customary form as mutually agreed between Sellers and Purchaser.

"Book Value" means, with respect to any asset, the book value of such asset determined in accordance with the Transaction Accounting Principles, as set forth on the Schedule of Purchased Assets and Liabilities, the Cut-off Date Schedule of Purchased Assets and Liabilities or the Closing Date Schedule of Purchased Assets and Liabilities, as applicable.

"Books and Records" means all books, ledgers, files, reports, plans, records, manuals, and other materials (in any form or medium) Related to the Business except those items identified on Schedule Q.

"Budget" means the budget annexed to the DIP Order.

"Business" means the business, directly or indirectly, engaged in by Sellers and Affiliate Sellers of (i) originating Mortgage Loans, including through Sellers' Consumer Lending Platform; (ii) owning the Other Purchased Assets; (iii) providing primary servicing, back-up servicing and related activities for Mortgage Loans and Other Serviced Loans; (iv) providing fee-based subservicing for Mortgage Loans; (v) providing master servicing for Private Investors in Private Investor Loans and investors in Other Serviced Loans; (vi) financing and reselling serviced Mortgage Loans and related capital markets transactions; (vii) other operations related to the foregoing and (viii) foreclosure trustee services and recovery services provided to ETS Customers. "Business" expressly excludes all activities, operations, products, transactions and services that are conducted under, or in connection with, any Excluded Assets.

"Business Day" means any day of the year, other than any Saturday, Sunday or any day on which banks located in New York, New York generally are closed for business.

"Business Employee" means each employee of any Seller whose primary responsibility is to provide services Related to the Business.

"Business Employee Liabilities" means all Claims and Liabilities of Sellers related to the Transferred Employees that Purchaser expressly agrees to assume pursuant to Section 6.7.

5

"Business Employee List" has the meaning specified in Section 4.13(a) hereof.

"Business Lending" means all systems and software owned by Sellers that are used to operate and facilitate loan originations via third party mortgage bankers and mortgage brokers including, WALT, pipeline management and underwriting tools.

"Business Licenses" means the Permits required by Law or by Fannie Mae, Freddie Mac or Ginnie Mae or other Government Entity in order to engage in the Business.

"Cash Deposit" has the meaning specified in Section 3.4.

"Claims" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, known or unknown.

"Closing" has the meaning specified in Section 2.9.

"Closing Date" means the date upon which the Closing occurs as determined in accordance with Section 2.9.

"Closing Date Mortgage Loan Schedule" means the Mortgage Loan Schedule as of the close of business on the day immediately preceding the Closing Date.

"Closing Date Schedule of Purchased Assets and Assumed Liabilities " means the unaudited Schedule of Purchased Assets and Assumed Liabilities as of the Closing Date.

"Closing Date Servicing Advance Schedule " means the Servicing Advance Schedule as of the close of business on the day immediately preceding the Closing Date.

"COBRA" means the continuation coverage provisions of the U.S. Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or any similar provisions of State or Local Law.

"Commitment Letters" means the two letter agreements dated October 19, 2012 each between Purchaser and Barclays Bank PLC.

"Competing Transaction" has the meaning specified in Section 7.1.

"Computer Equipment" means all equipment and devices (including data processing hardware and related telecommunications equipment, media, materials, program documentation and tools) owned or leased by Sellers and located at the Real Property, including the Computer Equipment set forth on Schedule K, together with Sellers' rights under all related warranties, other than the Computer Equipment identified on Schedule O.

"Confidential Information " has the meaning specified in Section 6.19(b).

6

"Consent" means the Permits, authorizations, consents, waivers, approvals and licenses from third parties or Government Entities necessary to consummate this Agreement and the transactions contemplated hereby and for Purchaser to operate the Business after the Closing.

"Consent Order" means the Consent Order entered into on April 13, 2011, by and among the FDIC, the FRB and AFI, Ally Bank, ResCap and GMAC Mortgage.

"Consumer Lending Platform" means the assets and operations of Sellers pursuant to which Sellers originate or broker Mortgage Loans, including traditional retail loan offices and a call center.

"Consumer Privacy Ombudsperson" has the meaning specified in Section 2.13.

"Contract" means any agreement, consensual obligation, promise, understanding, arrangement, commitment or undertaking of any nature (whether written or oral and whether express or implied), including leases, subleases, licenses, sublicenses, purchase orders, indentures and loan agreements (other than this Agreement and the Ancillary Agreements) (including each amendment, extension, exhibit, attachment, addendum, appendix, statement of work, change order and any other similar instrument or document relating thereto).

"Copyrights" has the meaning specified in the definition of "Intellectual Property."

"Core Representations" means:

(i) Section 4.4(a) (Financial Statements);

(ii) Section 4.5 (Absence of Certain Changes or Events);

(iii) Section 4.6 (Title to Assets);

(iv) Section 4.7 (Purchased Assets Used in the Business);

(v) Section 4.8 (Real Property Leases), limited to the first sentence thereof and clause (ii) of the third sentence thereof;

(vi) Section 4.9(a)-(c) (Mortgage Servicing Portfolio; Servicing Agreements; the Business);

(vii) Section 4.10 (Material Contracts), limited to the first two sentences thereof;

(viii) Section 4.14 (Litigation and Claims), limited to clause (ii) thereof;

(ix) Section 4.15 (Intellectual Property), limited to subsection (a) and, with respect to any Intellectual Property rights included with the Transferred IT Assets, subsection (c); and

(x) Section 4.17 (Ginnie Mae Loans).

7

"Cure Amount" means the amount payable in order to cure all defaults on Assumed Contracts and effectuate the assumption by Sellers of an Assumed Contract and the assignment to Purchaser pursuant to section 365 of the Bankruptcy Code as provided in the Sale Approval Order or other Order of the Bankruptcy Court.

"Cut-off Date" means the last day of the month immediately preceding the month of the expected Closing Date or such other date as Purchaser and Sellers may agree.

"Cut-off Date Mortgage Loan Schedule" has the meaning specified in  Section 4.9(a).

"Cut-off Date Purchase Price" has the meaning specified in  Section 2.11(a).

"Cut-off Date Schedule of Purchased Assets and Assumed Liabilities" means the unaudited Schedule of Purchased Assets and Assumed Liabilities dated as of the Cut-off Date.

"Cut-off Date Servicing Advance Schedule" has the meaning specified in Section 4.9(c).

"Deed of Transfer" means one or more deeds of transfer, each in a customary form as mutually agreed between Sellers and Purchaser, to be executed by the applicable Seller and, if required by applicable law, Purchaser in respect of the Owned Real Property, each of which shall be a special warranty deed, or the equivalent in the applicable jurisdiction, with a covenant against grantor's acts.

"De Minimis Interest" means an insubstantial interest, and shall equal a 0.01% interest, except as otherwise set forth in  Section 2.3(g) of the Disclosure Memorandum.

"Deposit Escrow Agreement" means the Deposit Escrow Agreement dated as of October 19, 2012 by and among Purchaser, Sellers and the Escrow Agent, attached as Exhibit 2 hereto.

"Determination" has the meaning specified in  Section 3.3(a).

"DIP Borrowers" means GMACM Borrower LLC, a wholly owned subsidiary of GMAC Mortgage, and RFC Borrower LLC, a wholly owned subsidiary of RFC.

"DIP Cash Proceeds" has the meaning set forth in  Section 2.3(a).

"DIP Financing Agreements" means the Debtor in Possession Loan and Security Agreements identified on  Schedule D hereto, as such agreements may be amended from time to time.

"DIP Order" means the Final Order or Final Orders (i) approving the DIP Financing Agreements; (ii) authorizing Debtors' post-petition financing on a senior secured, superpriority basis; (iii) authorizing the Debtors' use of Cash Collateral (as defined in the DIP Order); and (iv) granting Replacement Liens and Adequate Protection to Certain Pre-Petition Secured Creditors, entered by the Bankruptcy Court in the Bankruptcy Case.

"Disclosure Memorandum" has the meaning specified in  Section 6.13(a).

"Dispute Notice" has the meaning specified in Section 3.2(c).

"DOJ/AG Settlement" means the Consent Judgment filed with the U.S. District Court for the District of Columbia on March 12, 2012 to which AFI, ResCap and GMAC Mortgage are parties.

"Electronic Data File" means test "tape(s)," sale "tape(s)" and/or "transfer tape(s)" containing Mortgage Loan, Other Serviced Loan and/or servicing information delivered or to be delivered by Sellers to Purchaser in connection with the transfer of the Purchased Mortgage Servicing, the Advances and the Servicing Agreements contemplated hereby.

"Eligible Servicing Agreement" means a Servicing Agreement (including a master servicing agreement, primary servicing agreement or subservicing agreement) that

(a)     is described on Schedule T; or

(b)     contains the following provisions:

(i) expressly authorize the servicer, without the consent of any party thereto and notwithstanding any other limitation set forth therein, to enter into a financing or other facility (an "Advance Facility") under which such servicer assigns or pledges its rights under such servicing agreement to be reimbursed for any or all servicing advances to a lender or a special-purpose bankruptcy-remote entity and/or a trustee acting on behalf of holders of debt instruments or any other Person (any such Person, an "Advance Financing Person");

(ii) require the servicer and the Advance Financing Person to notify the related securitization trustee in writing of the existence of an Advance Facility and the identity of the Advance Financing Person;

(iii) provide that an Advance Facility notice may only be terminated by the joint written notice of the servicer and the related Advance Financing Person;

(iv) require the servicer to maintain and provide to any successor servicer and the related securitization trustee, a detailed accounting on a loan-by-loan basis as to amounts advanced, by, pledged or assigned to, and reimbursed to any Advance Financing Person that are recoverable on a loan-level;

(v) to the extent that such servicing agreement is not a Fannie Mae or Freddie Mac Agency Contract, require that as between a predecessor servicer and its Advance Financing Person, on the one hand, and a successor servicer and its Advance Financing Person (if any) on the other hand, reimbursement amounts in respect of servicing advances on a loan-by-loan basis with respect to each Mortgage Loan as shall be allocated on a "first-in, first-out" basis (such that servicing advances of a particular type that were disbursed first in time will be reimbursed prior to servicing advances of the same type with respect to the same Mortgage Loan that were disbursed later in time), subject to any exceptions for a "first-in, first-out" allocation of the kind set forth in the Advance Facility provisions in any servicing agreement described on Schedule T;

9

(vi) provide that the sections of such servicing agreement that authorize the servicer to enter into an Advance Facility may not be amended without the consent of the Advance Financing Person;

(vii) expressly provide that if so required pursuant to the terms of an Advance Facility, the Servicer may direct the trustee, securities administrator or master servicer, as applicable, and if so directed in writing such person will directly pay to the Advance Financing Person or such trustee the reimbursement amounts payable to the servicer pursuant to the agreement;

(viii) expressly provide that an Advance Financing Person whose obligations are limited to the financing of servicing advances shall not be required to meet the qualifications of a successor servicer or subservicer pursuant to the agreement;

(ix) expressly provide that in no event shall any reimbursement amounts be included in the funds available to be distributed to, or distributed to, security holders;

(x) expressly provide that upon the direction of and at the expense of the servicer, the trustee, the securities administrator and the master servicer (as applicable) each agrees to execute such acknowledgments, certificates and other documents (in each case, in form and substance reasonably satisfactory to such party) provided by the servicer recognizing the interests of any Advance Financing Person or trustee for and on behalf of the Advance Financing Person in reimbursement amounts; and

(xi) to the extent not otherwise inconsistent with the terms of such Servicing Agreement, expressly provide that the servicer (and any successor servicer) shall apply proceeds received in connection with a liquidation of, or final recovery of amounts under, any mortgage loan, as well as any recovery resulting from a partial collection of insurance proceeds, liquidation proceeds or condemnation proceeds in respect of any mortgage loan, to reimburse any previously unreimbursed servicer advances prior to applying such proceeds to the payment of interest and principal on such mortgage loan in accordance with the agreement.

"Enforceability Exceptions" has the meaning specified in Section 4.1.

"EPRE" has the meaning set forth in the preamble.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all regulations and rules issued thereunder, or any successor Law.

10

"Escrow Agent" means JPMorgan Chase Bank or such other bank or other financial institution reasonably acceptable to Sellers and Purchaser.

"Estate Servicing Agreement" is the Agreement between Purchaser and Sellers substantially in the form of   Exhibit 11.

"Estate Subservicing Agreement " is the Agreement between Purchaser and Sellers substantially in the form of  Exhibit 10.

"ETS" has the meaning specified in the preamble.

"ETS Contract Rights" means the rights of ETS LLC or ETS WA to earn compensation in respect of trustee services or recovery services under the ETS Contracts.

"ETS Contracts" means the Contracts pursuant to which ETS LLC or ETS WA provides foreclosure trustee services or recovery services listed on Schedule U.

"ETS Customer " means the counterparty or counterparties of ETS LLC or ETS WA under an ETS Contract.

"ETS LLC " has the meaning specified in the preamble.

"ETS WA" has the meaning specified in the preamble.

"Excluded Assets" has the meaning specified in Section 2.3.

"Fannie Mae" means Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

"FDIC" means the Federal Deposit Insurance Corporation or any successor thereto.

"Fed Funds Rate" means, for any date, the weighted average of the rates set forth in the weekly statistical release H.15(519) (or any successor publication) published by the Board of Governors of the Federal Reserve System opposite the caption "Federal Funds (Effective)."

"Fee-Based Subservicing Agreements " means the subservicing agreements (including letter agreements) with any counterparty, including any Affiliate of AFI, under which a Seller services Mortgage Loans as to which such counterparty owns the related Mortgage Servicing Rights and, in some cases, agrees to pay over a portion of the related Servicing Compensation to such counterparty, as set forth in  Schedule E hereto.

"FHA" means the Federal Housing Administration of HUD, or any successor thereto.

"FHA Loans" means mortgages insured by the FHA.

11

"Final Order" means an Order (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the Order has been affirmed by the highest court to which such Order was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such Order and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided that the theoretical possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, as amended, or any successor rules, may be filed with respect to such order or judgment shall not prevent such Order from being considered a Final Order.

"Fixtures and Equipment" means all furniture, furnishings, vehicles, equipment, Computer Equipment, tools and other tangible personal property owned by any Seller and located at any Real Property as of the Closing Date, including any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person.

"FRB" means the Board of Governors of the Federal Reserve System.

"Freddie Mac" means Freddie Mac, formerly known as The Federal Home Loan Mortgage Corporation, or any successor thereto.

"GAAP" means United States generally accepted accounting principles, applied on a consistent basis.

"Ginnie Mae" means the Government National Mortgage Association, a body corporate organized and existing under the laws of the United States of America within HUD, or any successor thereto.

"Ginnie Mae Loans" means Whole Loans owned by a Seller on the Closing Date that meet the criteria set forth on   Schedule M.

"GM Transition License." means a license from General Motors to Purchaser and certain of its Subsidiaries as designated by Purchaser to use "GMAC" as a trademark or servicemark for transitional purposes, substantially in the form attached as   Exhibit 6.

"GMAC Mortgage" has the meaning specified in the preamble.

"Government Authorization" means any Permit, environmental permit, certificate, consent, ratification, permission, authorization, approval, confirmation, decision, endorsement, waiver, certification, registration or qualification issued, granted, given or otherwise made available by or under the authority of, or filing with or notice to, any Government Entity or pursuant to any Law, including any approval to participate in any of its programs relating to Mortgage Servicing.

"Government Entity" means any United States federal, state or local, or any supranational, court, judicial or arbitral body, administrative or regulatory body or other governmental or quasi-Government Entity with competent jurisdiction (including any political or other subdivision thereof), including the Agencies, the FHA, HUD, the VA, the FRB, the FDIC, the IRS, any State Agency and any Antitrust Authority.

"HAMP" means the Treasury Department's Home Affordable Modification Program established in connection with the "Making Home Affordable" loan modification program, as in effect from time to time.

"HARP" means the Treasury Department's Home Affordable Refinance Program established in connection with the "Making Home Affordable" loan modification program, as in effect from time to time.

"HASP" means the Treasury Department's Homeowner Affordability and Stability Plan established in connection with the "Making Home Affordable" loan modification program, as in effect from time to time.

"HELOC" means a Mortgage Loan that is a home equity line of credit.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"HUD" means the Department of Housing and Urban Development of the United States of America.

"Improvements" means all buildings, structures, facilities and improvements located on any Owned Real Property, including buildings, structures, facilities and improvements that are under construction.

"Indebtedness" means (i) all indebtedness for borrowed money or for the deferred purchase price of property or services (other than current trade Liabilities incurred in the Ordinary Course of Business and payable in accordance with customary practices), (ii) any other indebtedness that is evidenced by a note, bond, debenture or similar instrument, (iii) liabilities under or in connection with letters of credit or bankers' acceptances or similar items, (iv) all obligations under financing leases, (v) all Liabilities secured by any Lien on any property, and (vi) all guarantee obligations.

"Indemnity Escrow Account" has the meaning specified in  Section 2.17.

"Indemnity Escrow Agent" has the meaning specified in Section 2.17.

"Indemnity Escrow Agreement" has the meaning specified in Section 2.17.

"Indemnity Escrow Amount" has the meaning specified in Section 2.17.

"Indemnity Escrowed Funds" has the meaning specified in Section 2.17.

"Independent Accounting Firm" means a nationally recognized independent accounting firm mutually chosen by Purchaser and ResCap.

"Insurance Policy" means (i) any private mortgage insurance or commitment of any private mortgage insurer to insure, (ii) any title insurance policy, (iii) any hazard insurance policy, (iv) any flood insurance policy, (v) any fidelity bond, direct surety bond, or errors and omissions insurance policy required by private mortgage insurers, (vi) any surety bonds required by state banking authorities for licensing purposes or (vii) any surety or guaranty agreement.

"Insurer" means an issuer of an Insurance Policy.

"Intellectual Property" means: (i) registered and unregistered trademarks, service marks, brand names, certification marks, collective marks, d/b/as, logos, symbols, trade dress, fictitious names, trade names and other indicia of origin, in each case, including all applications and registrations for the foregoing, all renewals of same, and any and all goodwill associated with any of the foregoing (collectively, " Trademarks"); (ii) patentable inventions and discoveries and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues; (iii) trade secrets, confidential information and non-public know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists (collectively, " Trade Secrets"); (iv) copyrightable published and unpublished works of authorship (including databases and other compilations of information), including computer software and documentation, registered and unregistered copyrights, registrations and applications therefor, and all renewals, extensions, restorations and reversions thereof (collectively, "Copyrights"); (v) Internet domain names and registrations thereof; (vi) Software; and (vii) any other similar type of intellectual property right.

"Intellectual Property License" means (i) any grant by any Seller to any third Person of any right of such Seller under its Intellectual Property, and (ii) any grant by any third Person to one or more Sellers of any right under such third Person's Intellectual Property, in each case to the extent Related to the Business.

"Investor" means an Agency, a Private Investor or any other Person who owns or holds Mortgage Loans or Other Serviced Loans or any interest therein, serviced or subserviced by a Seller pursuant to a Servicing Agreement, singly or in the aggregate

"IRS" means the Internal Revenue Service.

"IT Assets " means IT Inventories, Technical Documentation, Computer Equipment and Software Contracts whereby licenses are granted to one or more Sellers and/or their Subsidiaries in each case to the extent Related to the Business.

"IT Inventories" means (i) computer software code (in all media) and materials, including all software programs; (ii) computer software documentation, including user materials; and (iii) all other unused or reusable materials, stores, and supplies related to computer software, in each case to the extent Related to the Business.

"Knowledge of Sellers" concerning a particular subject, area or aspect of the Business, the affairs of any Seller, the Purchased Assets or the Assumed Liabilities, means the actual knowledge of any individual listed on  Schedule G hereto.

"Law" means any law, statute, ordinance, rule, regulation, code, Order, Permit, or other legal requirement enacted, issued, promulgated, enforced, or entered by a Government Entity.

14

"Lease" means each lease or other Contract pursuant to which a Seller leases any Real Property or personal property, either as lessor or lessee.

"Leased Real Property" means all real property, including leasehold improvements, that are the subject of the Real Property Leases.

"Liabilities" means any and all Indebtedness, liabilities, costs, Losses, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including whether arising out of any Contract or tort based on negligence or strict liability), and whether or not the same would be required by GAAP to be reflected in financial statements or disclosed in the notes thereto.

"Licensed Transferred IP" has the meaning specified in the definition of "Transferred Intellectual Property."

"Lien" means any lien, charge, pledge, deed of trust, right of first refusal, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, option, proxy, hypothecation, voting trust agreement, transfer restriction, easement, servitude, encroachment, or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Loss" or " Losses" means any and all damages, losses, actions, proceedings, causes of action, Liabilities, claims, Liens, penalties, fines, demands, Taxes, assessments, awards, judgments, settlements, costs and expenses, including (i) court costs and similar costs of litigation; (ii) reasonable attorneys' and consultants' fees, including those incurred in connection with (a) investigating or attempting to avoid the matter giving rise to the Losses or (b) successfully establishing a valid right to indemnification for Losses; and (iii) interest awarded as part of a judgment or settlement, if any, but in any event "Loss" or "Losses" shall exclude punitive damages claimed, incurred or suffered by any Person (which exclusion does not include any such damages for which such Person is liable to a third party as a direct, out-of-pocket cost of such Person).

"Material Adverse Effect" means any condition, circumstance, event, state of facts, change or effect that is materially adverse to the Business or the Purchased Assets or to Sellers' ability to effect the transactions contemplated herein or to perform their obligations under this Agreement and the Ancillary Agreements; provided that, for purposes of this Agreement, a Material Adverse Effect shall not include any condition, circumstance, event, state of facts, change or effect to the Business or the Purchased Assets resulting from (i) conditions, circumstances, events or changes to the housing or mortgage market or the mortgage servicing industry; (ii) the announcement or disclosure of the transactions contemplated herein; (iii) general economic, regulatory or political conditions or changes in the United States; (iv) military action or acts of terrorism; (v) changes in Law or changes in GAAP or in the application of GAAP that become effective after the date hereof that Sellers are required to adopt in accordance therewith; (vi) actions taken or not taken, in each case, at the request of Purchaser; (vii) conditions in or changes to any financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or market index); (viii) changes in or with respect to any of the Agencies, including in their legal organization, responsibilities, oversight obligations or roles in the mortgage loan and securities markets; or (ix) any effects on the Business resulting from the fact that Sellers will be operating as debtors-in-possession under the Bankruptcy Code; and provided further that, in the case of each of clauses (i), (iii), (iv), (v) and (vii), the Business or the Purchased Assets are not, or not reasonably likely to be, materially disproportionately affected by such condition, circumstance, event, state of facts, change or effect compared to other Persons engaged in the conduct of businesses similar to the Business.

15

"Material Contract" means any Assumed Contract to which any Seller is a party or by which any Seller or any of the Purchased Assets are bound or otherwise subject (i) not made in the Ordinary Course of Business that is to be performed in whole or in part after the date of this Agreement; (ii) involving any joint venture or partnership agreement; (iii) involving an agreement to share profits or excess cash flows and involving a liability or expenditure of greater than $250,000 during any 6-month period; (iii) that involves a liability or expenditure of greater than $250,000 during any 12-month period or $500,000 over the remaining term of such Contract; (iv) providing for the guarantee, indemnification, surety or similar obligation of any Person's obligations (other than any vendor contracts or Servicing Agreements entered into in the Ordinary Course of Business); (v) restricting or purporting to limit in any material respect the ability of any Seller or any of their Affiliates to compete in any line of business or to operate in any geographic area or that otherwise restricts in any material respect the Business from being conducted as conducted as of the date of this Agreement; (vi) entered into with any Government Entity, involving obligations that will continue following the Closing, other than Government Authorizations in the Ordinary Course of Business; (vii) granting any right of first refusal or first offer or similar right or that could require the disposition of any material assets of any Seller, or that limits the payment or dividend or other distributions by any Seller; (viii) requiring the purchase or use of all or substantially all of any Seller's requirements of a particular product or service; (ix) that provides for indemnification obligations in excess of $250,000; or (x) that is a Real Property Lease. Notwithstanding the foregoing, "Material Contract" does not include any Servicing Agreements or Mortgage Loan Documents.

"MERS" means the Mortgage Electronic Registration System maintained by Merscorp Holdings, Inc.

"Minnesota Data Center Interest" means the 51% interest in the Eden Prairie, Minnesota real property sold by EPRE to AFI pursuant to the Purchase and Sale Agreement between EPRE and AFI dated May 9, 2012.

"Mortgage Loan Documents" means, for any Mortgage Loan, all documents in the possession of Sellers or their custodians or other agents pertaining to such Mortgage Loan, including originals of the Mortgage Note, the mortgage or deed of trust and all assignments of the mortgage or deed of trust, all endorsements and allonges to the Mortgage Note, the title insurance policy with all endorsements thereto, any security agreement and financing statements, any account agreements, and any assignments, assumptions, modifications, continuations or amendments to, or affidavits of lost documents relating to, any of the foregoing.

"Mortgage Loan Schedule" has the meaning specified in Section 4.9(a).

16

"Mortgage Loan" means any U.S. individual residential (one-to-four family) mortgage loan or other extension of credit secured by a Lien on U.S. real property of a borrower originated, purchased or serviced by a Seller or any Affiliate Seller (which, for avoidance of doubt, may be a charged-off Mortgage Loan).

"Mortgage Note" means, with respect to a Mortgage Loan, a promissory note or notes, a loan agreement or other evidence of Indebtedness with respect to such Mortgage Loan, secured by a mortgage or mortgages or a deed or deeds of trust, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"Mortgage Servicing" means all right, title and interest of Sellers in and to:

(A)   With respect to Agency Loans:

(i) the right to service (including primary servicing and master servicing) Agency Loans under the Agency Contracts and Servicing Agreements, including the right to receive the Servicing Compensation;

(ii) the related servicing obligations as specified in the Agency Contracts and Servicing Agreements, including the obligations to administer and collect the payments of or relating to Agency Loans and to remit all amounts and provide information reporting to others;

(iii) the right of ownership, possession, control and use of any and all Servicing Files and Mortgage Loan Documents pertaining to the servicing of Agency Loans as provided in the Agency Contracts and Servicing Agreements;

(iv) the rights with respect to, and obligations to make, and right to reimbursement for any Servicing Advances with respect to such Agency Loans;

(v) the "clean-up call" right, if any, to purchase Agency Loans upon the aggregate principal balance thereof being reduced below a specified amount to the extent provided for in the Agency Contracts and Servicing Agreements;

(vi) any interest on escrow payments, Servicing Escrow Accounts or Servicing Custodial Accounts allowed by law or other similar payments or accounts with respect to the serviced Agency Loans to which the master servicer or servicer of the serviced Agency Loans is entitled and any amounts actually collected by Sellers with respect thereto;

(vii) all accounts and other rights to payment related to any of the property described in this definition, including, any rights that Seller may have as master servicer or servicer to any accounts established pursuant to the Servicing Agreements and any rights to direct the disposition, disbursement, distribution or investment of amounts deposited therein;

(viii) all other rights, powers, privileges and obligations of any Seller as Servicer under the Agency Contracts and Servicing Agreements.

17

(B)   With respect to Private Investor Loans and Other Serviced Loans:

(i) the right to service (including primary servicing and master servicing) Private Investor Loans and Other Serviced Loans under the relevant Servicing Agreements, including the right to receive Servicing Compensation;

(ii) the servicing fee and master servicing fee (if any) set forth in each related Servicing Agreement and the related Mortgage Loan Schedule;

(iii) the rights with respect to, and obligations to make, and right to reimbursement for any Servicing Advances with respect to such Private Investor Loans and Other Serviced Loans;

(iv) all rights of Sellers (to the extent owned by Sellers) to exercise "cleanup calls" and optional repurchase rights relating to delinquent Mortgage Loans as set forth in the applicable Servicing Agreements;

(v) all agreements or documents creating, defining or evidencing any such master servicing and servicing rights to the extent they relate to the rights of Sellers as master servicer or servicer thereunder;

(vi) any interest on escrow payments, Servicing Escrow Accounts or Servicing Custodial Accounts allowed by law or other similar payments or accounts with respect to the Serviced Mortgage Loans to which the master servicer or servicer of the Serviced Mortgage Loans is entitled and any amounts actually collected by Sellers with respect thereto;

(vii) all accounts and other rights to payment related to any of the property described in this definition, including, any rights that Seller may have as master servicer or servicer to any accounts established pursuant to the Servicing Agreements and any rights to direct the disposition, disbursement, distribution or investment of amounts deposited therein;

(viii) the nonexclusive right to possess and use any and all Servicing Files, Mortgage Loan Documents, servicing records, data tapes, computer records, or other information pertaining to the Private Investor Loans and Other Serviced Loans and relating to the past, present or prospective master servicing or servicing of the Private Investor Loans and Other Serviced Loans to the extent of Sellers' rights under the Servicing Agreements; and

(ix) all other rights, powers, privileges and obligations of any Seller as Servicer of Private Investor Loans and Other Serviced Loans, including any Seller duties as a REMIC Administrator.

"Mortgage Servicing Rights," or "MSRs," means financial assets representing the economic value to Sellers of Mortgage Servicing, including Servicing Compensation.

"Mutual Release" means a mutual release in the form set forth in Exhibit 9 hereto.

18

"Necessary Consent" has the meaning specified in Section 2.6.

"Non-Lagging Defaulted Loan" means a Fannie Mae or Freddie Mac Agency Loan serviced by the Sellers as of the Closing Date, with respect to which the date occurring 90 days prior to the expiration of the applicable foreclosure timeframe published by the applicable Agency as of the date of this Agreement and as set forth on Schedule 1.1 occurs after the Closing Date.

"Optional Products" means any life, accidental death or accident and health (disability) insurance or other optional products (including payment products, such as Paymap) purchased or obtained by a mortgagor in connection with a Mortgage Loan.

"Order" means, with respect to any Person, any award, decision, injunction, judgment, stipulation, order, ruling, subpoena, writ, decree, consent decree or verdict entered, issued, made or rendered by any Government Entity affecting such Person or any of its properties.

"Ordinary Course of Business" means the ordinary course of business of the Business during the six months immediately preceding the date of this Agreement including compliance with the Agency Special Requirements, as modified from time to time in order to comply with the Consent Order, the DOJ/AG Settlement and any other change required by any Government Entity or MERS, and, from and after the Petition Date, in accordance with the Budget.

"Organizational Documents" means: (i) with respect to a limited partnership, the certificate of limited partnership, limited partnership agreement and subscription agreements with such partnership's partners then in effect; (ii) with respect to a limited liability company, the certificate of formation, limited liability company agreement, operating agreement and subscription agreements with such company's members then in effect; (iii) with respect to a corporation, the articles or certificate of incorporation and by-laws of such corporation then in effect; and (iv) with respect to any other entity, comparable organizational documents of such entity, in each case, as then in effect.

"Other Purchased Assets" means the assets to be acquired by Purchaser set forth on Schedule L-1 hereto.

"Other Serviced Loans" means Mortgage Loans (other than Agency Loans or Private Investor Loans) and other secured and unsecured loans, whether or not securitized, owned by an Investor or a Seller and serviced by a Seller (as master servicer, servicer or otherwise), the servicing of which is intended to be transferred hereunder, as set forth on Schedule I hereto.

"Owned Real Property" means the U.S. real property that is owned by a Seller, as set forth on Schedule H hereto, and that is being sold, conveyed and transferred to Purchaser pursuant to this Agreement. Owned Real Property does not include any REO Property.

"Owned Transferred IP" has the meaning specified in the definition of "Transferred Intellectual Property."

19

"Permits" means permits, concessions, grants, franchises, licenses, variances, exemptions, exceptions, clearances, registrations, qualifications, filings and other authorizations and approvals required or issued by any Government Entity and Related to the Business.

"Permitted Liens" means (i) with respect to Owned Real Property, all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in policies of title insurance provided to Purchaser prior to the date of this Agreement or disclosed in title search reports made available by Sellers to Purchaser prior to the date of this Agreement; (ii) statutory liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings; provided that an appropriate reserve is established therefor against the carrying amount of the related assets; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business and the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings; provided that an appropriate reserve is established therefor against the carrying amount of the related assets; (iv) with respect to Owned Real Property, minor survey exceptions, reciprocal easement agreements and other customary encumbrances on title to real property; (v) with respect to Leased Real Property, statutory landlord's Liens under leases to which any Seller is a party; (vi) with respect to Real Property, requirements and restrictions of zoning, building and other similar Laws that are not violated in any material respect by the current use or occupancy of the Real Property or the activities conducted thereon as of the date of this Agreement; (vii) rights granted to any licensee of any Transferred Intellectual Property in the Ordinary Course of Business; (viii) Liens on equipment registered under the Uniform Commercial Code as adopted in any applicable state or similar legislation in other jurisdictions by any lessor or licensor of assets to a Seller (in respect of the Business) or in respect of the purchase price therefor (it being understood that all such Liens shall be discharged or released at the Closing); and (ix) Liens that will be and are discharged or released either prior to, or simultaneously with the Closing; provided that, except in the case of clause (ii), such exceptions (a) do not render title to the property encumbered thereby unmarketable and (b) do not, individually or in the aggregate, materially detract from the value or use of such property for its current purposes.

"Person" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Government Entity or other entity or organization.

"Petition Date" has the meaning specified in the preamble.

"Petitions" has the meaning specified in the preamble.

"Plan" means any (i) deferred compensation, bonus, retention, severance, termination pay, or incentive compensation plan, program, agreement or arrangement; (ii) stock purchase, stock bonus, stock option, restricted stock, phantom stock or other equity or equity-based compensation plan, program, agreement or arrangement; (iii) medical, surgical, vision, dental, disability, hospitalization, life insurance or other "employee welfare benefit plan" (within the meaning of Section 3(1) of ERISA); (iv) retirement, profit-sharing, savings or other "employee pension benefit plan" (within the meaning of Section 3(2) of ERISA); (iv) employment, consulting, retention, change in control, termination or severance agreement; or (v) other employee benefit plan, fund, program, agreement or arrangement, in each case, (A) adopted by or contributed to by any Seller with respect to any Business Employee, (B) with respect to which any Seller and any Business Employee is a party, or (C) with respect to which any Seller has any Liability with respect to any Business Employee or Purchaser could have any Liability.

20

"Post-Closing Pipeline" means Mortgage Loans to be originated and closed pursuant to the Consumer Lending Platform in respect of applications registered by the Sellers in accordance with the Sellers' customary procedures as of the Closing Date.

"Pre-Closing Tax Period" means any taxable period (or the allocable portion of a Straddle Period) ending on or before the close of business on the Closing Date.

"Private Investor" means a Seller or any person other than an Agency that owns Mortgage Loans master serviced, serviced or subserviced by Sellers pursuant to a Servicing Agreement.

"Private Investor Loans" means Serviced Mortgage Loans, other than Agency Loans or Other Serviced Loans, identified on the Mortgage Loan Schedule, the Cut-off Date Mortgage Loan Schedule or the Closing Date Mortgage Loan Schedule, as applicable.

"Private Investor Servicing Agreements" means, with respect to any Private Investor Loans, the applicable private investor servicing agreement, sale and servicing agreement, servicing agreement, subservicing agreement or other agreement, other than an Agency Contract, pursuant to which a Seller services a Serviced Mortgage Loan, as listed on Schedule E hereto.

"Privileged Documents" has the meaning specified in Section 2.4.

"PSA Amendment" means (a) an amendment to the provisions of any Servicing Agreement that relates to the replacement of the Servicer or the assignment or transfer of Mortgage Servicing responsibility, which amendment is determined by the Sellers and Purchaser to be reasonably necessary or appropriate to be entered into in connection with obtaining the Agency Consents, (b) an amendment permitting Purchaser to sell, transfer or assign the right to all or a portion of Servicing Compensation and other compensation payable to the servicer or master servicer or to any other Person and (c) any amendment to the terms of any Servicing Agreement, to cause such Servicing Agreement to be deemed an Eligible Servicing Agreement.

"Purchase Price" has the meaning specified in Section 3.1(a).

"Purchase Price Adjustment Statement" has the meaning specified in Section 3.2(a).

"Purchased Assets" has the meaning specified in Section 2.1.

"Purchased Mortgage Servicing" means all of Sellers' Mortgage Servicing in respect of Agency Loans, Private Investor Loans and Other Serviced Loans.

"Purchaser" has the meaning specified in the preamble.

21

"Purchaser Group Member" has the meaning specified in  Section 11.1(a).

"Purchaser Payable Cure Amount" means an amount equal to 50% of the Cure Amount, but in any event subject to the Purchaser Payment Cap.

"Purchaser Payment Cap" has the meaning set forth in  Section 6.25.

"Qualified Employment Offer" has the meaning set forth in  Section 6.7(c).

"Real Property" means the Owned Real Property and the Leased Real Property.

"Real Property Leases" means the real property leases, subleases, licenses or other agreements in which the Sellers are lessees or licensees, and subleases, sublicenses or other agreements in which Sellers are sublessees or sublicensees (or sublessors or sublicensors) that may be assumed by Purchaser pursuant to this Agreement as set forth on Schedule H  hereto.

"Related to the Business" means required for, held for, or used in the conduct of the Business as conducted by Sellers in the Ordinary Course of Business.

"REMIC" means a real estate mortgage investment conduit within the meaning of Section 860D(a) of the Tax Code or any other entity or arrangement that has purported to be a real estate mortgage investment conduit under Section 860D(a) of the Tax Code irrespective of whether such entity or arrangement qualifies as a REMIC under Section 860D(a) of the Tax Code.

"REMIC Administrator" means the person designated as such under the terms of the documents governing the creation and administration of any REMIC, and generally having the duty to prepare and file tax returns on behalf such REMIC and to perform tax compliance and administrative duties with respect to such REMIC.

"REMIC Regular Interest" means a regular interest, as defined in Section 860G(a)(1) of the Tax Code, in a REMIC, or any interest that has been represented or otherwise held out to be a regular interest in a REMIC irrespective of whether such interest qualifies as a regular interest in a REMIC as defined in Section 860G(a)(1) of the Tax Code.

"REMIC Residual Interest" means a residual interest, as defined in Section 860G(a)(2) of the Tax Code, in a REMIC, or any interest that has been represented or otherwise held out to be a residual interest in a REMIC irrespective of whether such interest qualifies as a residual interest in a REMIC as defined in Section 860G(a)(2) of the Tax Code.

"REO Property" means real property acquired under servicing agreements, whether or not Servicing Agreements, through foreclosure, acceptance of a deed in lieu of foreclosure or otherwise in connection with the default or imminent default of a Mortgage Loan.

"ResCap" has the meaning specified in the preamble.

22

"Retained Liabilities" means any and all Liabilities of any kind or nature whatsoever of a Seller or any of its Affiliates (other than any Assumed Liabilities), including any Liabilities arising under, in connection with or otherwise related to

(a) any action, inaction, event, state of facts, circumstance or condition occurring or failing to occur, or existing or failing to exist, on or prior to the Closing Date and any third-party Claim or defense relating thereto, regardless of when asserted, including any Claim or defense that is not discharged in the Bankruptcy Case, as a result of the operation of Section 363(o) of the Bankruptcy Code or otherwise;

(b) the Cure Amount;

(c) any financial penalties under the Consent Order or the DOJ/AG Settlement and except as expressly provided in this Agreement, any other payments, Claims and Liabilities under the Consent Order or the DOJ/AG Settlement;

(d) except as specifically provided in Section 6.7,

(i) any Plan or other employee benefit or compensation plan, policy, program, agreement or arrangement, including any employment, retention, change in control, severance or similar agreement;

(ii) salaries, wages, bonuses, vacation or severance pay or other compensation, payments or benefits earned, accrued or arising prior to or in connection with the Closing Date or in connection with the Closing, including any such payments or benefits due on account of a Business Employee's termination of employment;

(iii) Title IV of ERISA;

(iv) a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA;

(v) COBRA;

(vi) any Transferred Employee with respect to any period or event occurring prior to the date on which he or she becomes an employee of Purchaser or one of its Affiliates;

(vii) any former or current, active or inactive, employee, officer, agent, consultant, independent contractor or subcontractor of any Seller with respect to any period;

(viii) any employment-related grievance or any claim with respect to any personal injuries sustained in connection with the employment or retention of a Person by any Seller, including workers' compensation or disability, regardless of when such claim is made or asserted; or

23

(ix) WARN;

(e) any and all lawsuits or governmental examinations, audits or investigations commenced and claims made or pertaining to the period prior to the Closing Date (including any and all class actions, qui tam claims, False Claims Act litigation or other similar litigation);

(f) the origination or securitization of Mortgage Loans by Sellers or any Affiliate of Sellers, including repurchase obligations relating thereto;

(g) any act or omission of any originator, holder or servicer of Mortgage Loans occurring prior to the Closing Date;

(h) any Liability related to an Excluded Asset;

(i) any Tax Liabilities with respect to the Business for any Pre-Closing Tax Period;

(j) the Agency Special Requirements; and

(k) any applicable compensatory fees for any Fannie Mae or Freddie Mac Agency Loan that is not an Assumed Liability.

"RFC" has the meaning specified in the preamble.

"Sale Approval Order" means a Final Order or Final Orders of the Bankruptcy Court issued pursuant to sections 105, 363, and 365 of the Bankruptcy Code, in substantially the form set forth in Exhibit 3 hereto, authorizing and approving, among other things, (i) the sale, transfer and assignment of the Purchased Assets to Purchaser in accordance with the terms and conditions of this Agreement, free and clear of all Claims and Liens, (ii) the assumption and assignment of the Assumed Contracts in connection therewith and as a part thereof and the fixing of the Cure Amounts with respect to the Assumed Contracts, (iii) that except for the Purchaser Payable Cure Amount, the Purchaser shall not be liable for any Cure Amount or otherwise obligated to cure any defaults, known or unknown, arising prior to Closing under any Assumed Contract (whether or not such Assumed Contract is an Assumed Pre-Petition Contract) and (iv) that Purchaser is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

"Sale Hearing" has the meaning specified in the Sale Procedures Order.

"Sale Motion" means the motion filed by Sellers with the Bankruptcy Court for the approval of the Sale Procedures Order and the Sale Approval Order, in form and substance reasonably satisfactory to Purchaser, and Sellers.

"Sale Procedures " means the Sale Procedures substantially in the form set forth in Exhibit 4, as such procedures may be amended and approved in the Sale Procedures Order and in form and substance reasonably satisfactory to Purchaser.

"Sale Procedures Order" means a Final Order of the Bankruptcy Court, in the form set forth in   Exhibit 5, with modifications, if any, to be in form and substance reasonably satisfactory to Purchaser that, among other things, approves the Assumed Contracts Procedures and the Sale Procedures.

"Schedule of Purchased Assets and Assumed Liabilities " means the schedule setting forth the Book Value of the Purchased Assets and the greater of Book Value or nominal value of the Assumed Liabilities, calculated in accordance with the Transaction Accounting Principles as of the date specified therein, as attached as Schedule C.

"SEC" means the Securities and Exchange Commission.

"Section 6.16 Amendment" has the meaning set forth in Section 6.16.

"Seller/Servicer Guides" means the (i) seller and servicer guides utilized by the Agencies and other Investors to whom Sellers have sold Mortgage Loans and/or for which Sellers service Mortgage Loans and (ii) the manuals, guidelines and related employee reference materials utilized by Sellers to govern their relationships under which Mortgage Loans originated directly by Sellers are made.

"Sellers" has the meaning specified in the preamble.

"Separation Services" has the meaning specified in Section 6.28.

"Serviced Mortgage Loan" means any Mortgage Loan for which a Seller is acting as Servicer under a Servicing Agreement or providing services under an ETS Contract and any REO Property resulting from the foreclosure or other liquidation of such a Mortgage Loan.

"Serviced Mortgagor" means the obligor(s) (including any lessee(s), borrower(s) or guarantor(s)) under a Mortgage Loan for which any Seller is acting as Servicer.

"Servicer" means the Person responsible for performing loan servicing functions (including primary servicing and master servicing) with respect to a Mortgage Loan under the applicable Servicing Agreement.

"Servicing Advance Schedule " has the meaning specified in Section 4.9(c).

"Servicing Advances" means, with respect to each Agency Loan, Private Investor Loan or Other Serviced Loan, the aggregate outstanding amount that, as of any date of determination, has been advanced directly by Sellers from their own funds or from funds advanced under any loan facility (but not with funds borrowed from any custodial or other accounts under a Servicing Agreement) in connection with servicing (including master servicing) of such Mortgage Loans in accordance with the applicable Servicing Agreements for which Sellers have a right of reimbursement under the applicable Servicing Agreement, including with respect to principal, interest, Taxes, insurance premiums, corporate and other advances and all accrued but unpaid interest thereon as permitted by Applicable Requirements and the applicable Servicing Agreement, including in each case the right to reimbursement for, and enforce payment of, such Servicing Advances. For the avoidance of doubt, "Servicing Advances" shall not include any HELOC draws.

25

"Servicing Agreements" means all Contracts pursuant to which any Seller provides servicing, including primary servicing or master servicing and related activities (including duties as a REMIC Administrator), and includes the Agency Contracts listed on  Schedule F, and the Private Investor Servicing Agreements and Servicing Agreements for Other Serviced Loans, in each case as listed on  Schedule E.

"Servicing Compensation " means any servicing fees and other compensation, including any Ancillary Income and any excess servicing spread that a servicer is entitled to receive, collect or retain as Servicer with respect to a Mortgage Loan or otherwise under any Servicing Agreement and any compensation payable to ETS under an ETS Contract.

"Servicing Custodial Account " means each trust account or bank account maintained by a Seller, as Servicer, pursuant to a Servicing Agreement, for the benefit of an Investor or an ETS Customer.

"Servicing Escrow Accounts" means those accounts established and maintained by a Seller with commercial banking institutions or savings and loan associations under Applicable Requirements or the provisions of Servicing Agreements (other than Servicing Custodial Accounts) for (i) the deposit and retention of all collections of taxes, assessments, ground rents, hazard and mortgage insurance or comparable items on account of Mortgage Loans; (ii) the deposit and retention of buydown funds on account of Mortgage Loans, and (iii) all other escrow or similar accounts maintained by a Seller with respect to Mortgage Loans.

"Servicing File" means, for each Mortgage Loan, copies of such Mortgage Loan Documents and all other documents, files and other items related thereto required to be maintained by the Servicer pursuant to the applicable Servicing Agreement or ETS pursuant to the applicable ETS Contracts and, if not specifically set forth in the applicable Servicing Agreement or ETS Contract, pursuant to the servicing standard identified in such Servicing Agreement or ETS Contract, respectively.

"Servicing Transfer Agreement" means the agreement to be entered into between Purchaser and Sellers containing the terms and conditions for the transfer by Sellers to Purchaser of the Purchased Mortgage Servicing and Servicing Advances, pursuant to  Section 9.1.

"Severance Threshold " means an amount equal to the lesser of (i) 70% in value of the aggregate severance benefits that would otherwise be payable as of the Closing Date if no Business Employee were offered employment by Purchaser or the Walter Entity and (ii) $34.7 million.

"Shared Services Agreement" means the Shared Services Agreement dated May 13, 2012 between AFI and ResCap, attached hereto as  Exhibit 8.

26

"Software" means (a) all computer and computer network software, firmware, programs, applications and databases in any form, including any content or other information associated or used therewith, along with all source code, object code, operating systems, specifications, data, database management code, utilities, libraries, scripts, graphical user interfaces, menus, images, icons, forms, methods of processing, software engines, platforms, data formats and all other code and documentation, whether in human readable form or otherwise, and all copies of the foregoing in any and all formats or media, in each case owned by or licensed to Sellers or any Affiliate Seller and only to the extent Related to the Business; and (b) with respect to the foregoing items, all versions, updates, corrections, enhancements and modifications thereto.

"Software Contracts" means Contracts to which Sellers or any Affiliate Sellers are party respecting the ownership, license, acquisition, design, development, distribution, marketing, development, use, outsourcing or maintenance of Software, in each case Related to the Business.

"State Agency" means any state agency or regulatory authority with authority to regulate the activities of Sellers relating to the origination or servicing of Mortgage Loans determine the servicing requirements with regard to Mortgage Loan origination, purchasing, servicing, master servicing or certificate administration performed by Sellers, or to otherwise participate in mortgage lending.

"Straddle Period" means any taxable period that includes (but not end on) the Closing Date.

"Sublease Agreement" means any sublease agreement to be entered into between Purchaser as sublessor and the applicable Seller as sublessee with respect to any of the Leased Real Property located at the locations set forth on Schedule H.

"Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, of which (i) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries or (ii) such Person or any other Subsidiary of such Person is a general partner (excluding any such partnership where such Person or any Subsidiary of such Person does not have a majority of the voting interest in such partnership).

"Tax" or "Taxes" means all (i) taxes, charges, fees, duties, levies, penalties or other assessments imposed by any federal, state, local or foreign Government Entity, including income, gross receipts, excise, property, sales, gain, use, license, custom duty, unemployment, capital stock, transfer, franchise, payroll, withholding, social security, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, any amounts attributable thereto or attributable to any failure to comply with any requirement regarding Tax Returns, (ii) liability for the payment of any Taxes as a result of being or having been on or before the Closing Date a member of an affiliated, consolidated, combined or unitary group or other association, and (iii) any transferee or secondary Liability in respect of Taxes, and, in each case, any interest or penalty thereon or addition thereto, whether disputed or not.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

27

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any such document prepared on a consolidated, combined or unitary basis and also including any schedule or attachment thereto or amendment thereof.

"Technical Documentation" means all technical and descriptive materials (other than Inventory) relating to the acquisition, design, development, use, or maintenance of computer code and Computer Equipment.

"Termination Date" has the meaning specified in Section 11.1(b).

"Texas Data Center Interest" means the 51% interest in the Lewisville, Texas leased real property assigned by GMAC Mortgage to AFI pursuant to the Assignment of Leasehold Interest dated May 9, 2012 between GMAC Mortgage and AFI.

"Title Company" means Chicago Title Insurance Company.

"Title Documents" has the meaning specified in Section 6.12.

"Title IV Plan" means an employee pension benefit plan that is subject to Section 302 or Title IV of ERISA or Section 412 of the Tax Code.

"Trade Secrets" has the meaning specified in the definition of "Intellectual Property."

"Trademarks" has the meaning specified in the definition of "Intellectual Property."

"Transaction Accounting Principles" means prepared in accordance with GAAP on a consistent basis and measured and calculated using the same accounting principles, practices, methodologies and policies used in the preparation of the Historical Financial Statements, the Schedule of Purchased Assets and Assumed Liabilities, but subject to and in accordance with Schedule 3.1(a). Calculations pursuant to the Transaction Accounting Principles shall be subject to customary year-end closing processes and adjustments regardless of whether the Closing occurs on a year end, and may take into account all information relevant to the financial condition of the Business on the Closing Date regardless of whether such information was obtained or available on the Closing Date or otherwise. Without limiting the foregoing, all amounts shall be derived from the accounting records of ResCap using consistent accounts and subaccounts reflected in the preparation of the Historical Financial Statements and the Schedule of Purchased Assets and Assumed Liabilities.

"Transfer Taxes" means any federal, state, county, local, foreign and other excise, sales, use, value added, transfer (including real property transfer or gains), conveyance, stamp, documentary transfer, filing, recording or other similar Tax, fee or charge, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties, resulting directly from the transactions contemplated by this Agreement.

"Transferred Employee" has the meaning specified in Section 6.7(c).

"Transferred Employee List" has the meaning specified in Section 6.7(a).

28

"Transferred Intellectual Property" means all the Intellectual Property Related to the Business owned by (" Owned Transferred IP"), or licensed to ("Licensed Transferred IP"), any Seller or any Affiliate Seller in each case except as set forth on Schedule Q.

"Transferred IP Assignment Agreement" means one or more assignment agreements to be executed by and between Sellers and Purchaser in respect of Transferred Intellectual Property, in a customary form as mutually agreed between Sellers and Purchaser.

"Transferred IT Assets" means the IT Assets other than the IT Assets set forth on Schedule Q.

"Transferred Rights and Claims" has the meaning specified in Section 2.1(l).

"Transition Services Agreement" has the meaning specified in Section 6.20(c).

"VA" means the Department of Veteran Affairs of the United States of America, or any successor thereto.

"Walter Assets" means (i) Purchased Mortgage Servicing Rights in respect of Fannie Mae Agency Loans, the Servicing Advances in respect thereof, and rights to receive Servicing Compensation related thereto, including Servicing Compensation that is accrued and unpaid as of the Closing Date, (ii) the Interim Servicing Addendum to the Mortgage Selling and Servicing Contract, dated August 10, 2007, between Fannie Mae and GMAC Mortgage, the Servicing Advances in respect thereof and rights to receive Servicing Compensation related thereto, including Servicing Compensation that is accrued and unpaid as of the Closing Date and (iii) all assets including (w) all plant, property and equipment, employees and intellectual property (hardware and software) relating to the Consumer Lending Platform, (x) the WALT system, Eclipse, loan optimizer and any and all Intellectual Property- related to the Consumer Lending Platform and/or Business Lending, (y) other assets relating to residential mortgage loan originations and capital markets platforms as described in the Confidential Information Memorandum dated June 23, 2012 and (z) such other assets as shall be agreed among Purchaser, Sellers and the Walter Entity.

"Walter Assignment " has the meaning specified in Section 6.15.

"Walter Entity" means Walter Investment Management Corporation or one of its Affiliates.

"WARN" means the U.S. Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar state or local Law (including, for the avoidance of doubt, the California Worker Adjustment and Retraining Notification Act, as amended).

"Whole Loans" means the Mortgage Loans and any collateral, insurance, guaranty or other credit support arrangement related thereto.

29

**Section 1.2 Interpretation.** For purposes of this Agreement:

(a) The headings preceding the text of Articles and Sections included in this Agreement are for convenience only and shall not be deemed part of this Agreement or be given any effect in interpreting this Agreement.

(b) The use of the masculine, feminine or neuter gender or the singular or plural form of words herein shall not limit any provision of this Agreement.

(c) The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively.

(d) Reference to any Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of any applicable agreement. Reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

(e) Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.

(f) Underscored references to Articles, Sections, paragraphs, clauses or Exhibits shall refer to those portions of this Agreement. The use of the terms "hereunder," "hereby," "hereof," "hereto" and words of similar import shall refer to this Agreement as a whole and not to any particular Article, Section, paragraph or clause of, or Schedule or Exhibit to, this Agreement.

(g) All references to amounts denominated in dollars shall mean U.S. dollars, except where specifically noted otherwise.

(h) Whenever any payment hereunder is to be paid in "cash," payment shall be made in U.S. dollars and the method for payment shall be by wire transfer of immediately available funds.

(i) A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(j) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(k) Each of the parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if it is drafted by all the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

30

## ARTICLE II

## PURCHASE AND SALE OF ASSETS

**Section 2.1 Purchase and Sale of Assets.**   On the terms and subject to the conditions set forth herein, at the Closing, Sellers shall sell, convey, transfer, assign and deliver (or cause to be sold, conveyed, transferred, assigned and delivered) to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in, to and under the following assets as they exist on the Closing Date (collectively, the " Purchased Assets "), whether tangible or intangible, real, personal or mixed, Related to the Business, in each case free and clear of all Claims and Liens except Permitted Liens, as approved for sale, transfer and assignment pursuant to the Sale Approval Order:

(a) the Purchased Mortgage Servicing and rights to receive Servicing Compensation related thereto, including Servicing Compensation that is accrued and unpaid as of the Closing Date;

(b) except as provided in  Section 2.15, the Servicing Advances outstanding as of the Closing Date;

(c) subject to  Schedule M, the Ginnie Mae Loans;

(d) the Owned Transferred IP and Licensed Transferred IP;

(e) the Books and Records;

(f) copies of all Tax Returns and related books, records and workpapers filed by or on behalf of any REMIC as to which a Seller is REMIC Administrator (and the duties of which in that capacity the Purchaser will assume), together with all information technology or software in Sellers' possession related to the performance of the duties of the REMIC Administrator, including any such information technology or software used to assemble or supply information needed to be provided to any third-party service provider engaged by the REMIC Administrator to perform any or all of its duties on its behalf;

(g) all REMIC Residual Interests representing a De Minimis Interest in the residual interests of the related REMIC and required to be held by Purchaser as the REMIC Administrator of such REMIC;

(h) the Fixtures and Equipment;

(i) the Transferred IT Assets;

31

(j) the Owned Real Property, including, to the extent transferable, all easements, Government Authorizations and other rights and interests appurtenant thereto;

(k) certain other assets listed on  Schedule L-1;

(l) credits, prepaid expenses, deferred charges, security deposits, prepaid items and duties to the extent related to a Purchased Asset or an Assumed Liability; Schedule L-2 sets forth all such items for which the amount is at least $100,000 as of the date of this Agreement;

(m) the causes of action, lawsuits, judgments, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or Claims related to the Purchased Assets, the Assumed Liabilities and any foreclosure, recovery and other loss mitigation activities related to the Business, and, with respect to the Transferred Employees and any vendors (other than AFI and its Affiliates) with whom any of the Sellers have conducted business in the year prior to the Closing and with whom Purchaser will continue to engage in connection with the operation of the Business following the Closing (including, for the avoidance of doubt, any vendor that is a party to an Assumed Contract), all preference or avoidance claims and actions of any of the Sellers related thereto, including any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code (provided that, for the avoidance of doubt, Sellers shall be entitled to participate in the defense of any counterclaim that does not constitute an Assumed Liability) (the "Transferred Rights and Claims");

(n) all rights of and benefits accruing under the Assumed Contracts and the Purchased Assets;

(o) all telephone or facsimile numbers used by Sellers in connection with the Business, which, for the sake of clarity, does not include such numbers for Sellers' business locations or individuals that are not transferring to Purchaser pursuant to this Agreement;

(p) to the extent permitted by Law, all Permits held by Sellers to the extent primarily Related to the Business or the Purchased Assets;

(q) all signage, marketing materials, art and collectables relating to the Business;

(r) all rights to receive mail and other communications addressed to Sellers that pertains to the Business or the Purchased Assets, including any mail and communications from Serviced Mortgagors, Investors, ETS Customers, trustees, customers, suppliers, distributors and their respective representatives;

(s) all client lists, customer lists, supplier lists, mailing lists, do not call lists and other data Related to the Business, including service and warranty records, operating guides and manuals, studies, and correspondence (electronic or otherwise);

32

(t) to the extent transferable, all rights under insurance policies and insurance proceeds directly relating to Mortgage Loans serviced pursuant to any Servicing Agreement, all bank accounts, other accounts, safe deposit boxes, lock boxes and safes Related to the Business, and the responsibility for all cash and cash equivalents held in or required to be held in such accounts as identified in clause (i) of  Section 2.3(a) (exclusive of the parenthetical reference to investment income);

(u) to the extent transferable, all guaranties, warranties, indemnities and similar rights in favor of any Seller or any Affiliate Seller to the extent Related to the Business or related to any Purchased Asset or Assumed Liability; and

(v) the goodwill and other intangible assets Related to the Business or related to the Purchased Assets.

**Section 2.2 Assignment of Contracts, Leases and Other Assets.**  On the terms and subject to the conditions set forth in this Agreement and any applicable Ancillary Agreement, each Seller will assign and transfer to Purchaser, effective as of the Closing Date, all of Sellers' right, title and interest in, to and under, and Purchaser will assume, the following Contracts, as approved for sale, transfer and assignment pursuant to the Sale Approval Order (all of the following collectively are referred to herein as the " Assumed Contracts" and included in the term "Purchased Assets" as used herein):

(a) the Real Property Leases;

(b) except as provided in Section 2.15, the Servicing Agreements;

(c) the Intellectual Property Licenses;

(d) the Software Contracts;

(e) other Contracts to which any Seller is a party and that are Related to the Business, as set forth on  Schedule O, but excluding (i) any Plan to the extent not assumed by Purchaser pursuant to Section 6.7 and (ii) the Consent Order and the DOJ/AG Settlement Agreement; and

(f) Contracts that are solely Related to the Business entered into or made by any Seller in the Ordinary Course of Business after the date of this Agreement and before the Closing Date in accordance with the terms of this Agreement ( provided that Sellers shall have furnished Purchaser a true, correct and complete copy of each such Contract promptly following the execution and delivery thereof).

33

**Section 2.3 Excluded Assets.** Notwithstanding anything herein to the contrary, Sellers will not sell, assign, convey, transfer or deliver to Purchaser, and Purchaser will not purchase, acquire or assume or take assignment or delivery of, any and all assets, Contracts or rights that are not expressly Purchased Assets or Assumed Contracts, whether tangible, real, personal or mixed (collectively, the "Excluded Assets"). For the avoidance of doubt, Excluded Assets include the following:

(a) all cash and cash equivalents, including (i) all restricted cash, amounts held in Servicing Escrow Accounts and Servicing Custodial Accounts pursuant to Applicable Requirements or Servicing Agreements (which, for the avoidance of doubt, will be transferred pursuant to the Servicing Transfer Agreement and are not assets of Sellers except to the extent such cash represents investment income related to such accounts, which investment income constitutes Ancillary Income), (ii) the Cash Deposit, (iii) cash and cash equivalents on deposit in bank accounts maintained in accordance with the DIP Financing Agreements and cash received by Sellers that is or was required to be deposited into accounts maintained pursuant to the DIP Order (the "DIP Cash Proceeds"), but excluding in all cases cash flows under any Servicing Agreement or any net cash flow generated by operation of the Business on or after the Closing Date;

(b) all Mortgage Loans, including first and second lien mortgage loans, Whole Loans, pipeline loans and HELOCs owned or held by Sellers that are not specifically identified as Purchased Assets;

(c) all trading securities and available for sale securities;

(d) all REO Property owned by a Seller in its corporate capacity;

(e) all Contracts or other instruments that are considered derivatives;

(f) any asset or class of assets excluded from the defined terms set forth in Sections 2.1 and 2.2 by virtue of the limitations expressed or implied therein;

(g) all causes of action, lawsuits, judgments, claims, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or Claims of any nature other than the Transferred Rights and Claims, including any Claims relating to early payment default claims and any and all defenses and counterclaims relating to acts or omissions under the Assumed Contracts that occurred before the Closing;

(h) any of the rights of Sellers under this Agreement or any agreements between any Seller and Purchaser or any of its Affiliates entered into on or after the date of this Agreement;

(i) the Consent Order, the DOJ/AG Settlement and the Contracts, including rights and licenses thereunder; and other assets Related to the Business set forth on Schedule Q;

(j) all shares or equity interests in any Subsidiaries or Affiliates of the Sellers;

(k) any and all other assets, whether tangible or intangible, real, personal or mixed, including Intellectual Property, rights or other items that are not Related to the Business;

(l) the Purchase Price;

(m) all rights, claims and causes of action relating to any Excluded Asset or any Retained Liability;

(n) Tax refunds, Tax credits and other Tax benefits relating to Taxes imposed on any Seller or Affiliate Seller or Taxes for which any of them is liable;

(o) all Tax Returns (including working papers), all Books and Records relating to outstanding litigation and ongoing discovery and e-discovery obligations of any Seller and Affiliate Seller and all Books and Records that Sellers are required by Law to retain, other than copies of such Tax Returns, Books and Records, and obligations as may relate to Tax Returns filed by a Seller as REMIC Administrator by or on behalf of any REMIC, and the duties of which in that capacity the Purchaser will assume;

(p) REMIC Regular Interests and REMIC Residual Interests, other than any REMIC Residual Interest representing a De Minimis Interest in the residual interests of the related REMIC and required to be held by Purchaser as the REMIC Administrator of such REMIC;

(q) all rights, demands, Claims, actions and causes of action constituting avoidance actions of Sellers' estates under Chapter 5 of the Bankruptcy Code, and any other applicable provisions of the Bankruptcy Code, including any and all proceeds of the foregoing;

(r) other than as set forth in  Section 2.1(m), all rights, demands, Claims, causes of action, objections and defenses of Sellers and its Affiliates under sections 502 and 503 of the Bankruptcy Code and Bankruptcy Rule 3007 with respect to the assertion or defense of any claims that may be filed against Seller and any of its Affiliates that will file a petition for relief under the Bankruptcy Code;

(s) except as provided in Section 6.7, any Plan;

(t) other than as set forth in  Section 2.1, all insurance proceeds that Sellers have a right to receive as of the Closing or that relate to events, circumstances or occurrences prior to the Closing (which, for the avoidance of doubt, includes the proceeds of insurance policies providing coverage for errors and omissions or for directors, officers and employees, whether such policies are held by AFI or by one or more of the Sellers);

(u) all Privileged Documents;

(v) any Contracts excluded from Assumed Contracts pursuant to  Section 2.15; and

(w) the assets specifically identified on Schedule O;

35

**Section 2.4 Post-Closing Asset Deliveries.** If any Seller or Purchaser, in its reasonable discretion, determines after the Closing that any Books and Records or other materials or assets constituting Purchased Assets are still in the possession of such Seller or any Affiliate Seller, such Seller shall, or shall cause such Affiliate Seller to, promptly deliver them to Purchaser at no additional cost or expense to Purchaser. If any Seller or Purchaser, in its reasonable discretion, determines after the Closing that Books and Records or other materials or assets constituting Excluded Assets were delivered to Purchaser in error, Purchaser shall promptly return them to the applicable Seller at Sellers' sole cost and expense. In furtherance and not in limitation of the foregoing (and notwithstanding any provision in this Agreement to the contrary), each of Sellers and Purchaser acknowledges and agrees that it is neither Sellers' nor Purchaser's intention to sell, assign or transfer possession of any documents or communications of Sellers that are subject to Sellers' attorney-client privilege and/or the work-product immunity doctrine (the " Privileged Documents "). If it is discovered that any such Privileged Documents have been inadvertently or unintentionally turned over to Purchaser, Purchaser agrees, upon Sellers' request, to promptly turn over to Sellers or destroy such Privileged Documents, in each case at Sellers' sole cost and expense;  provided, that (i) Purchaser shall in no way be obligated or responsible for reviewing, identifying or making a determination that any documents or communications in its possession are Privileged Documents and (ii) Purchaser shall not be obligated to take any actions under this  Section 2.4 that may subject it to any liability or otherwise be in violation with any applicable Law.

**Section 2.5 Conveyance of Assets by Affiliate Sellers** .

(a) Notwithstanding anything to the contrary contained in this Agreement, if it is determined by Sellers and Purchaser before, at or after the Closing that any direct or indirect Subsidiary of ResCap (an " Affiliate Seller") owns or possesses any assets or properties that would be deemed to be Purchased Assets if such Affiliate Seller were a Seller under this Agreement (such assets and properties, the " Affiliate Purchased Assets "), then Sellers shall, upon Purchaser's request, promptly cause such Affiliate Seller to transfer, assign, convey and deliver to Purchaser such Affiliate Purchased Assets in accordance with the terms and conditions of this Agreement;  provided that Purchaser shall not be obligated to pay any additional amounts to Sellers in consideration for the transfer of such Affiliate Purchased Assets to Purchaser other than those amounts that Purchaser is obligated to pay to Sellers pursuant to Section 3.1. Unless otherwise consented to by Purchaser, any Affiliate Seller shall be required to be a debtor in the Bankruptcy Case.

(b) To the extent that any Affiliate Purchased Assets are transferred, assigned, conveyed and delivered by an Affiliate Seller to Purchaser pursuant to this Section 2.5, then each representation and warranty set forth in Article IV shall be deemed to be applicable to such Affiliate Seller as if such Affiliate Seller were a Seller and to such Affiliate Purchased Assets as if such Affiliate Purchased Assets were Purchased Assets.

(c) Article IX  and the Servicing Transfer Agreement shall also govern the transfer of any Mortgage Servicing owned by Affiliate Sellers, as set forth therein.

36

**Section 2.6 Non-Assignable Purchased Assets; Necessary Consents.** Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Purchased Asset if an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder, unless the Bankruptcy Court has entered a Final Order (which may include the Sale Approval Order) whose effectiveness has not been stayed providing that (i) such Necessary Consent is not required or (ii) the Purchased Assets shall be assigned or transferred regardless of any such Necessary Consent and there shall be no breach or adverse effect on the rights of Purchaser thereunder for the failure to obtain any such Necessary Consent. As Purchaser may reasonably request, if the Bankruptcy Court has not entered such an Order, Sellers and Purchaser will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser. If any such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of any Seller thereunder so that Purchaser would not in fact receive all such rights, such Seller and Purchaser will cooperate in a mutually agreeable arrangement under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including, to the extent that such an arrangement would be permitted by Law and the related Contract, subcontracting, sub-licensing, or sub-leasing to Purchaser, or under which such Seller would enforce for the benefit of Purchaser, with Purchaser assuming such Seller's obligations in accordance with this Agreement, any and all rights of such Seller against a third party thereto.

**Section 2.7 Assumption of Certain Liabilities.** On the terms and subject to the conditions set forth herein and as additional consideration for the Purchased Assets, at the Closing, Purchaser shall assume and be responsible for all of the Assumed Liabilities and Sellers shall have no further obligations with respect thereto. Other than the Assumed Liabilities, Purchaser shall not assume any Liability of any nature or kind whatsoever of Sellers.

**Section 2.8 Retained Liabilities.** Sellers shall retain and be responsible for all Retained Liabilities and Purchaser shall not have any obligation of any nature or kind with respect thereto.

**Section 2.9 Closing.** Subject to the terms and conditions of this Agreement, the closing (the " Closing") of the transactions contemplated hereby shall take place at the offices of Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104 on the second Business Day following the date on which the conditions set forth in Sections 8.1, 8.2 and 8.3 (other than those conditions that by their nature can be satisfied only at the Closing but subject to the fulfillment or waiver of those conditions) have been satisfied or waived, but no earlier than 18 Business Days following the Cut-off Date nor, at Purchaser's or Sellers' option, later than the last Business Day of the month in which such conditions are satisfied or waived, or at such other time and place as the parties hereto may mutually agree; provided, the parties shall use commercially reasonable efforts to effect any Closing on the last Business Day of a month. At the Closing, Purchaser shall deliver the Purchase Price in accordance with Sections 2.11 and 3.1, the transfer of title to the Purchased Assets and Assumed Contracts and the assumption of the Assumed Liabilities shall take place, and the appropriate parties shall take all actions required under Sections 2.10, 2.11 and 2.12 and all other actions not previously taken but required to be taken hereunder at or prior to the Closing Date. It is a condition of the Closing that all matters of payment and the execution and delivery of documents by any party to the others pursuant to the terms of this Agreement be concurrent requirements, and that nothing will be complete at the Closing until everything required as a condition precedent to the Closing has been paid, executed and delivered, as the case may be.

**Section 2.10 Ancillary Agreements.** At the Closing, Sellers shall duly execute and deliver to Purchaser, and Purchaser shall duly execute and deliver to Sellers, as applicable, each of the following agreements:

    (a) Bills of Sale;

    (b) Deeds of Transfer for Owned Real Property;

    (c) Assignment and Assumption Agreements;

    (d) Assignment and Assumption of Lease Agreements;

    (e) Transferred IP Assignment Agreement(s);

    (f) the Transition Services Agreement;

    (g) the Estate Servicing Agreement;

    (h) the Estate Subservicing Agreement;

    (i) Transfer Tax forms, if applicable, in the form required by Law;

    (j) if requested by Purchaser, the GM Transition License;

    (k) the Indemnity Escrow Agreement;

    (l) such documents and instruments as may be reasonably necessary to effect the Walter Assignment;

    (m) such other agreements as may be entered into between the parties in connection with this Agreement;

    (n) all instruments or documents necessary to change the names of the individuals who have access to or are authorized to make withdrawals from or dispositions of all bank accounts, other accounts, safe deposit boxes, lock boxes and safes Related to the Business or related to the Purchased Assets (together with all keys and combinations to all safe deposit boxes, lock boxes and safes Related to the Business and all keys related to the Purchased Assets); and

    (o) and any other documents that may be required by the Sale Approval Order or pursuant to any other direction by the Bankruptcy Court to be effected on or prior to the Closing.

38

**Section 2.11 Deliveries by Purchaser.**

(a) At the Closing, Purchaser shall deliver to Sellers the following:

(i) the Purchase Price calculated as of the Cut-off Date in accordance with  Section 3.1 (the "Cut-off Date Purchase Price "), in immediately available funds by wire transfer to an account or accounts designated by Sellers at least two Business Days prior to the Closing Date (less the sum of the Cash Deposit as applied in accordance with  Section 3.4(a), and the Indemnity Escrow Amount);

(ii) the certificate to be delivered pursuant to  Section 8.2(iii);

(iii) Ancillary Agreements duly executed by Purchaser and the Walter Entity; (iv) the Purchaser Payable Cure Amount in immediately available funds by wire transfer to an account or accounts designated by Sellers at least two Business Days prior to the Closing Date;

(v) if a Mutual Release is requested by any Person that is a director or officer of any Seller as of the Closing Date and executed and delivered by such director or officer, such Mutual Release duly executed by Purchaser; and

(vi) such other customary instruments of transfer and assumption and other instruments or documents, in form and substance reasonably acceptable to Sellers, as may be necessary to effectuate the assignment of any Assumed Contracts or other Purchased Assets, the assumption of the Assumed Liabilities by Purchaser or to give effect to this Agreement or any Ancillary Agreement.

**Section 2.12 Deliveries by Sellers.**

(a) At the Closing, Sellers shall deliver, or cause to be delivered, to Purchaser the following:

(i) the certificates to be delivered pursuant to  Section 8.3(iii);

(ii) a receipt acknowledging payment of the Cut-off Date Purchase Price payable in accordance with  Section 3.1(c);

(iii) affidavits of Sellers' non-foreign status, in form and substance reasonably satisfactory to Purchaser, that comply with Section 1445 of the Tax Code and the regulations thereunder;

(iv) the Title Documents;

(v) Ancillary Agreements duly executed by the applicable Sellers; and

(vi) such other customary instruments of transfer and assumption and other instruments or documents, in form and substance reasonably acceptable to Purchaser, as may be necessary to effect this Agreement, including Sellers' assignment of the Assumed Contracts or other Purchased Assets to Purchaser (or its assignee), or as may be required to give effect to any Ancillary Agreement.

**Section 2.13 Consumer Privacy Matters.** The sale, if any, of customer lists, customer data and other consumer privacy information pursuant to this Agreement is subject to and shall conform to the recommendations of any consumer privacy ombudsperson that may be appointed pursuant to section 332 of the Bankruptcy Code (the "Consumer Privacy Ombudsperson") (to the extent that appointment of a Consumer Privacy Ombudsperson is determined to be necessary) in connection with the transactions contemplated in this Agreement.

**Section 2.14 "As Is, Where Is" Transaction.** Purchaser hereby acknowledges and agrees that, except as expressly set forth in this Agreement, Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets. Without in any way limiting the foregoing, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Purchaser further acknowledges that it is proceeding with its acquisition of the Purchased Assets based solely upon its independent inspections and investigations and the representations and warranties herein and in the Ancillary Agreements. Accordingly, except as expressly set forth in this Agreement, Purchaser will accept the Purchased Assets on the Closing Date "AS IS" and "WHERE IS".

**Section 2.15 Exclusion of Certain Agreements.**

(a) From the date of this Agreement until two Business Days prior to the Closing Date, Purchaser shall have the right, upon written notice to Sellers, to exclude any Contract (other than a Servicing Agreement) from the Assumed Contracts for any reason; provided that the right to exclude any Lease related to Leased Real Property shall terminate on December 8, 2012.

(b) From the date of this Agreement until two Business Days prior to the Closing Date, Purchaser shall have the right, upon written notice to Sellers, to exclude any Servicing Agreement set forth in Schedule 2.15 and the related Servicing Advances.

(c) From the date of this Agreement until two Business Days prior to the Closing Date, Sellers shall have the right to delete any Servicing Agreements identified on Schedule E for the sole purposes of rejecting such Servicing Agreement in the Bankruptcy Case or terminating the Servicing Agreement.

(d) Any Contract excluded by Purchaser or Sellers pursuant to this Section 2.15 shall be deemed to no longer be an Assumed Contract, shall be deemed to be an Excluded Asset and any Liability thereunder shall be deemed to be a Retained Liability. Any Schedules hereto shall be amended to reflect any changes made pursuant to this Section 2.15. Any exclusion of an Assumed Contract under Section 2.15(a) shall not result in a change to the Purchase Price and any exclusion of a Servicing Agreement under Section 2.15(b) or Section 2.15(c) shall be reflected in the calculation of the Purchase Price as provided in Schedule 3.1(a).

**Section 2.16 [RESERVED]**

**Section 2.17 Indemnity Escrow Agreement**. At the Closing, Purchaser and Sellers shall execute and deliver an escrow agreement in a customary form as mutually agreed between Sellers and Purchaser (the "Indemnity Escrow Agreement"), which agreement shall designate an escrow agent (the "Indemnity Escrow Agent") and provide for the establishment of an escrow account (the "Indemnity Escrow Account") in the initial amount equal to 1% of the Purchase Price (the "Indemnity Escrow Amount"). The Indemnity Escrow Amount, together with income earned thereon as provided in the Indemnity Escrow Agreement (the "Indemnity Escrowed Funds") shall be held by the Indemnity Escrow Agent pursuant to the Indemnity Escrow Agreement as a source of funds for amounts owing to Purchaser Group Members under Article XI (Indemnification) and, in Purchaser's sole discretion, Section 3.2 (Purchase Price Adjustment). On the Closing Date, Purchaser shall deliver to the Indemnity Escrow Agent payment, by wire transfer to the Indemnity Escrow Account, immediately available funds in an amount equal to the Indemnity Escrow Amount.

## ARTICLE III

## PURCHASE PRICE; ADJUSTMENT; ALLOCATION

**Section 3.1 Purchase Price; Payment of Purchase Price.**

(a) Subject to the terms and conditions of this Article III, as aggregate consideration for the Purchased Assets, Purchaser will assume the Assumed Liabilities and pay an amount in cash equal to the amount calculated in accordance with Schedule 3.1(a), as determined as of the Closing Date (the "Purchase Price").

(b) As soon as reasonably practical following the Cut-off Date, but in no event later than seven Business Days following the Cut-off Date (and, in any event, at least three Business Days prior to the Closing Date), Sellers shall deliver to Purchaser the Cut-off Date Schedule of Purchased Assets and Assumed Liabilities prepared in good faith in accordance with the Transaction Accounting Principles, applied consistently with their application in connection with the preparation of the Balance Sheet, and the Cut-off Date Mortgage Loan Schedule and the Cut-off Date Servicing Advance Schedule, prepared in good faith consistently with the preparations of the Mortgage Loan Schedule and the Servicing Advance Schedule, respectively. No less than two Business Days prior to the Closing Date, Sellers will provide Purchaser a statement of Sellers' good faith calculation of the Purchase Price as of the Cut-off Date prepared on an unaudited basis in accordance with the Transaction Accounting Principles and, with respect to principal balance, Book Value and other amounts to be determined by reference to the Books and Records, on a basis consistent with the Cut-off Date Schedule of Purchased Assets and Assumed Liabilities, the Cut-off Date Mortgage Loan Schedule and the Cut-off Date Servicing Advance Schedule. The Cut-off Date Schedule of Purchased Assets and Assumed Liabilities, the Cut-off Date Mortgage Loan Schedule, the Cut-off Date Servicing Advance Schedule and the calculation of the Cut-off Date Purchase Price shall be subject to approval by Purchaser, such approval not to be unreasonably withheld, conditioned or delayed.

41

**Section 3.2 Purchase Price Adjustment; Final Payment.**

(a) <u>Post-Closing Determination</u>. As soon as reasonably practical following the Closing Date, but in no event later than 120 days following the Closing Date, Purchaser shall deliver to Sellers (i) the Closing Date Schedule of Purchased Assets and Assumed Liabilities, prepared in accordance with the Transaction Accounting Principles, the Closing Date Mortgage Loan Schedule and the Closing Date Servicing Advance Schedule, and (ii) a statement (the "<u>Purchase Price Adjustment Statement</u>") setting forth Purchaser's calculation (prepared on an unaudited basis in accordance with the Transaction Accounting Principles and, with respect to principal balance, Book Value and other amounts to be determined by reference to the Books and Records, on a basis consistent with the Closing Date Schedule of Purchased Assets and Assumed Liabilities, the Closing Date Mortgage Loan Schedule and the Closing Date Servicing Advance Schedule) of the Purchase Price as of the Closing Date. Sellers shall provide Purchaser and its representatives full cooperation, including full access to books, records and employees in connection with the preparation of the Purchase Price Adjustment Statement.

(b) <u>Purchase Price True-up</u>. Subject to <u>Section 3.2(d)</u>, within 60 days of delivery of the Purchase Price Adjustment Statement (or within 15 days of the final determination of the Purchase Price in accordance with <u>Section 3.2(d)</u>), (i) if the Purchase Price is less than the Cut-off Date Purchase Price, then Sellers shall pay to Purchaser an amount equal to such shortfall; and (ii) if the Purchase Price is greater than the Cut-off Date Purchase Price, then Purchaser shall pay to Sellers an amount equal to such excess (in either event, the "<u>Adjustment Amount</u>"). The Adjustment Amount will (A) bear simple interest from the Closing Date to the date of payment at an interest rate equal to the Fed Funds Rate per annum as published in *The Wall Street Journal* as of the Closing Date and (B) be paid by wire transfer of immediately available funds to an account or accounts designated by the recipient thereof.

(c) <u>Objections</u>. Unless Sellers deliver written notice to Purchaser of an objection to all or a part of the Purchase Price Adjustment Statement (a "<u>Dispute Notice</u>") prior to the expiration of the 60-day period provided in <u>Section 3.2(b)</u> above, the Purchase Price Adjustment Statement shall become binding in its entirety at the end of such 60-day period. The Dispute Notice shall set forth, in reasonable detail on a line-item by line-item basis, the basis for such dispute, the amounts involved and Sellers' determination of the Purchase Price. If Sellers deliver a Dispute Notice to Purchaser within such period and the parties are unable to agree as to all issues in the Dispute Notice within the ten Business Day period immediately following the day after the Dispute Notice is received by Purchaser, then the Dispute Notice may be submitted by either Sellers or Purchaser to an Independent Accounting Firm to resolve the disputed items set forth therein in accordance with <u>Section 3.2(d)</u>.

42

(d) Dispute Resolution. An Independent Accounting Firm shall conduct a review of the Dispute Notice and any supporting documentation submitted by either Purchaser or Sellers. The parties shall direct the Independent Accounting Firm to, as promptly as practicable and in no event later than 60 days following its receipt of the Dispute Notice, deliver to Sellers and Purchaser a report (the " Adjustment Report") setting forth in reasonable detail the Independent Accounting Firm's determination with respect to the issues specified in the Dispute Notice, and the revisions, if any, to be made to the Purchase Price Adjustment Statement together with supporting calculations. The Independent Accounting Firm has no authority to review or raise items not expressly identified in the Dispute Notice. With respect to each disputed line item, such determination, if not in accordance with the position of either Sellers or Purchaser, shall not be in excess of the higher, nor less than the lower, of the amounts advocated by either Sellers or Purchaser in the Dispute Notice or the Purchase Price Adjustment Statement, respectively, with respect to such disputed line item. Such Adjustment Report and the revisions, if any, to be made to the Purchase Price Adjustment Statement shall be final and binding on the parties, absent arithmetical error, and shall be deemed a final arbitration award that is enforceable against each of the parties in any court of competent jurisdiction, and the Purchase Price shall be adjusted according to such Adjustment Report and paid in accordance with Section 3.2(b). The fees and expenses of the Independent Accounting Firm shall be borne 50% by Sellers and 50% by Purchaser.

**Section 3.3 Allocation of the Purchase Price for Tax Purposes.**

(a) The Purchase Price and the Assumed Liabilities shall be allocated among the Purchased Assets in accordance with Section 1060 of the Tax Code and the Treasury Regulations thereunder in a manner consistent with an allocation schedule (the " Allocation Schedule"), which Allocation Schedule shall be prepared by Purchaser and provided to Sellers for their review and the parties' mutual agreement within 120 days after the Closing Date. The parties shall cooperate reasonably in attempting to reach such a mutual agreement. If the Allocation Schedule is not mutually agreed upon within such period, the parties shall submit such dispute to an Independent Accounting Firm for a decision that shall be rendered in a timely manner in order to permit the timely filing of all applicable Tax forms. The Independent Accounting Firm's review shall be final and binding on the parties except as otherwise required by a "determination" within the meaning of Section 1313(a) of the Tax Code or similar provision of other Tax law (a "Determination"). The fees and expenses of the Independent Accounting Firm shall be borne 50% by Sellers and 50% by Purchaser. The parties agree to adjust the Allocation Schedule as appropriate to reflect amounts released to Sellers from the Indemnity Escrow Account.

(b) Each of Sellers and Purchaser shall (i) be bound such allocation for purposes of determining Taxes ( but not for any other purpose), (ii) prepare and file, and cause its Affiliates to prepare and file, its Tax Returns on a basis consistent with such allocation, and (iii) take no position, and cause its Affiliates to take no position, inconsistent with such allocation on any applicable Tax Return, except in each case as otherwise required by a Determination. If the allocation set forth on the Allocation Schedule is disputed by any Government Entity with taxing authority, the party receiving notice of such dispute shall promptly notify the other party hereto concerning the existence of, material developments regarding, and resolution of such dispute.

43

**Section 3.4 Deposit.** Purchaser has executed and delivered the Deposit Escrow Agreement to Sellers and the Escrow Agent and delivered to the Escrow Agent, pursuant to the terms of the Deposit Escrow Agreement, $72,000,000 in immediately available funds (the " Cash Deposit"). Any Cash Deposit shall be held by the Escrow Agent in an interest-bearing account reasonably acceptable to Purchaser and Sellers. For the avoidance of doubt, the Cash Deposit shall not be the property of any Seller during such time that the Cash Deposit is held by the Escrow Agent. The Cash Deposit shall be held by the Escrow Agent to serve as an earnest money deposit under this Agreement to be released as follows:

(a) Effect of Closing. If the Closing occurs, Sellers and Purchaser shall jointly instruct the Escrow Agent to, on the Closing Date, apply the Cash Deposit, together with all accrued investment income thereon, toward the payment of the Cut-off Date Purchase Price in accordance with the terms of the Escrow Agreement.

(b) Effect of Termination. If this Agreement is terminated prior to the Closing Date, the Escrow Agent shall deliver the Cash Deposit in accordance with the terms of the Deposit Escrow Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed to Purchaser by Sellers in the Disclosure Memorandum, Sellers jointly and severally represent and warrant to Purchaser, as of the date of this Agreement and as of the Closing Date (except to the extent any such representations and warranties shall have been expressly made as of a particular date, in which case such representations and warranties shall be made only as of such date), as follows:

**Section 4.1 Organization and Authority.** Each Seller is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate or other organizational power and authority to own, lease, hold and operate its properties and assets and to carry on its business as conducted as of the date of this Agreement. Each Seller has the corporate or other organizational power, authority and right to enter into and deliver this Agreement and the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder, and to complete the transactions contemplated hereby and thereby (subject to entry of the Sale Procedures Order and the Sale Approval Order). The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby have been duly and (subject to entry of the Sale Procedures Order and the Sale Approval Order) validly authorized by all appropriate corporate or other organizational authority, and no other corporate or other organizational action on the part of any Seller is necessary to authorize the execution, delivery and performance by such Seller of this Agreement or any of the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby. This Agreement constitutes the valid and legally binding obligations of each Seller, enforceable against each Seller in accordance with its terms, except (i) as such enforceability may be limited by principles of public policy and subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditor's rights or by general equity principles (the " Enforceability Exceptions"); (ii) that enforceability of the provisions hereof requiring consummation of the transactions contemplated hereby is subject to entry of the Sale Approval Order or any other Order by the Bankruptcy Court; and (iii) that enforceability of all other provisions hereof is subject to entry of the Sale Procedures Order and any other action by the Bankruptcy Court. Each Ancillary Agreement, when required by this Agreement to be delivered to Purchaser, will be duly and validly executed and delivered by each Seller that will be a party thereto, and upon such execution and delivery (assuming such Ancillary Agreement constitutes a valid and binding obligation of each other party thereto) will constitute the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its respective terms, subject to the Enforceability Exceptions.

44

**Section 4.2 Non-Contravention.** Assuming all Consents, declarations, filings or registrations set forth on   Schedule 4.3 have been obtained or made, as applicable, and receipt of the Sale Approval Order, the execution, delivery and performance of this Agreement and the Ancillary Agreement by Sellers and the consummation of the transactions contemplated hereby and thereby and the compliance by Sellers with the applicable terms and conditions hereof and thereof, do not and will not (a) conflict with or violate, result in a material breach or violation of or default (or an event which with notice or the passage of time or both would become a material breach or default) under, give rise to a right of termination, cancellation, acceleration of any material obligation or loss of any material benefit under (i) the organizational or governing documents of any Seller, (ii) any Law or Order applicable to Sellers, or (iii) any terms, conditions or provisions of any Servicing Agreement or Material Contract or (b) result in the creation of any Lien, other than Permitted Liens, on the Purchased Assets.

**Section 4.3 Consents and Approvals.** Upon entry of the Sale Approval Order and the satisfaction of the conditions set forth therein, no material Consent of, or declaration, filing or registration with, any Government Entity or any other Person is required to be obtained or made, as applicable, by any Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements, or the consummation of the transactions contemplated hereby or thereby, except for Consents, declarations, filings and registrations listed on   Schedule 4.3;   provided   that Sellers are not making any representation with respect to any Consent, including Permits, or declarations, filings or registrations with, any Government Entity or any other Person that must be or may be made by Purchaser (as a result of facts and circumstances specific to Purchaser) in order to acquire the Purchased Assets or to operate the Business.

**Section 4.4 Financial Statements.**

(a) Sellers have delivered to Purchaser on or before the date of this Agreement (i) the Schedule of Purchased Assets and Assumed Liabilities as of August 31, 2012, (ii) the audited consolidated balance sheet of ResCap as of December 31, 2011 and 2010 and the audited consolidated statements of income and cash flows for the two years ended December 31, 2011 (including the notes thereto) and (iii) the unaudited condensed consolidated balance sheet of ResCap at June 30, 2012 and the unaudited condensed consolidated statements of income and cash flows for the six months ended June 30, 2012 and 2011 (including the notes thereto) (the financial statements in clauses (ii) and (iii) collectively, the "Historical Financial Statements"). The information set forth in the Schedule of Purchased Assets and Assumed Liabilities was derived from the accounting records of ResCap using accounts and subaccounts consistent with those used in preparing ResCap's Historical Financial Statements. The Historical Financial Statements were prepared in accordance with GAAP and fairly present in all material respects the consolidated financial condition, results of operations and cash flows of ResCap and its subsidiaries as of the dates thereof and for the periods covered thereby except that in the financial statements identified in clause (iii) reflect all adjustments that are necessary for the fair presentation of the results for the interim periods presented, which adjustments are of a normal recurring nature.

(b) Except as disclosed or reserved against in the Historical Financial Statements, Sellers and their subsidiaries do not, with respect to the Business or the Purchased Assets, have any material Liabilities other than (A) Liabilities or obligations incurred in the Ordinary Course of Business since August 31, 2012, (B) Liabilities incurred in connection with the preparation and negotiation of this Agreement, in accordance with this Agreement or the DIP Financing Agreements or in connection with the transactions expressly contemplated by this Agreement, including the filing of the Bankruptcy Case, or (C) for future performance under any Contracts to which any of them is a party or bound that were entered into in the Ordinary Course of Business.

(c) The books, records and accounts of Sellers accurately and fairly reflect, in reasonable detail, the transactions in and dispositions of the assets of Sellers, and Sellers maintain internal accounting controls that provide reasonable assurance that (i) transactions are recorded as necessary to permit preparation of their financial statements and to maintain accountability for their assets, (ii) transactions are executed, and access to their assets is permitted, only in accordance with management's authorization, and (iii) as part of the Sellers' account reconciliation process, the reporting of their assets is compared with existing assets at regular intervals and appropriate action is taken with respect to any differences.

**Section 4.5 Absence of Certain Changes or Events.**   Since August 31, 2012, Sellers have operated the Business only in the Ordinary Course of Business and (a) there has not been any condition, event, change or occurrence that, individually or in the aggregate, has had, or is reasonably likely to have, a Material Adverse Effect and (b) Sellers have not taken any action that, if taken after the date of this Agreement, would constitute a violation of  Section 6.5.

**Section 4.6 Title to Assets.**  Following entry of the Sale Approval Order, at the Closing, Sellers shall transfer to Purchaser good, valid and marketable title (and, in the case of the Owned Real Property, insurable fee simple title) to, or a valid lease or license interest in, the Purchased Assets free and clear of any Claim or Lien, other than Permitted Liens. To the Knowledge of Sellers, the Improvements are in all material respects (A) in good operating condition and repair (ordinary wear and tear excepted) and (B) suitable and adequate for continued use in the manner in which they are being used as of the date of this Agreement. True and complete copies of the most recent title commitments, surveys, appraisals and policies of title insurance or the equivalent currently in force in the possession of Sellers with respect to the Owned Real Property have been made available to Purchaser.

46

**Section 4.7 Purchased Assets Used in Business**. Except for the Excluded Assets listed on   Schedule O and any services to be provided by Sellers under the Transition Services Agreement, and by AFI under the AFI Transition Services Agreement, the Purchased Assets, whether real or personal, tangible or intangible, comprise all of the assets, properties and rights that are used by Sellers and their Affiliates as of the date of this Agreement and necessary to conduct the Business in the manner conducted as of the date of this Agreement.

**Section 4.8 Real Property Leases.**  Schedule H is a true, accurate and complete list of each Real Property Lease and copies of such leases, subleases and other agreements. have been made available to Purchaser. Each Real Property Lease is in full force and effect and is a valid and binding obligation of each Seller party thereto (assuming such Real Property Lease is the valid and binding obligation of the other party or parties to such Real Property Lease), enforceable against such Seller in accordance with its terms subject to the Enforceability Exceptions. Except as set forth on   Schedule H, (i) there are no security deposits under the Real Property Leases; (ii) Sellers have not assigned, transferred or pledged any interest in any of the Real Property Leases; and (iii) there are no leases, subleases, licenses or other agreements granting any Person the right of use or occupancy of any portion of the Leased Real Property (except under the Real Property Leases).

**Section 4.9 Mortgage Servicing Portfolio; Servicing Agreements; the Business.**

(a) Mortgage Servicing Portfolio. Sellers have delivered to Purchaser Electronic Data Files Tapes dated as of August 31, 2012 that provide loan level information with respect to the Agency Loans, the Private Investor Loans, and the Other Serviced Loans, with the loan level fields being those described on Schedule 4.9(a) (collectively, the "Mortgage Loan Schedule," which term includes, except where the context requires otherwise, updated data tapes to be prepared as of the close of business on the day immediately preceding the Cut-off Date (the " Cut-off Date Mortgage Loan Schedule")), each to be delivered as provided in Article III . The information set forth in the Mortgage Loan Schedule is true, complete and correct in all material respects as of the date thereof and the information in each of the Cut-off Date Mortgage Loan Schedule to be prepared and delivered to Purchaser in accordance with Article III will be true, complete and correct in all material respects as of the Cut-off Date.

47

(b) Agency Contracts; Servicing Agreements; ETS Contracts . Schedule E sets forth a true, correct and complete list of all Servicing Agreements as of the date of this Agreement. Schedule F sets forth a true, correct and complete list of all Agency Contracts as of the date of this Agreement. Schedule U sets forth a true, correct and complete list of all ETS Contracts as of the date of this Agreement. True, correct and complete copies of the Servicing Agreements, the Agency Contracts and the ETS Contracts have been made available to Purchaser in the electronic data room on or before the date of this Agreement. Except as set forth on set forth on Section 4.09(a) of the Disclosure Memorandum, (i) each Agency Contract, Servicing Agreement and ETS Contract is a legal, valid and binding obligation of each Seller that is a party thereto, and, to the Knowledge of Sellers, each other party thereto, enforceable against it in accordance with its terms, except as such enforceability may be limited by the Enforceability Exceptions; (ii) none of the other parties to any of the Agency Contracts, Servicing Agreements or ETS Contracts has provided written notice as of October 24, 2012 to any of Sellers that such party will be terminating any of the Agency Contracts, Servicing Agreements or ETS Contracts (or otherwise seeking to terminate such Agency Contracts, Servicing Agreements of ETS Contracts, including the Purchased Mortgage Servicing under any of the Servicing Agreements); and (iii) to the Knowledge of Sellers, no other party thereto is or, with the lapse of time or giving of notice or both, would be, in violation or default of any Agency Contract, Servicing Agreement or ETS Contract. The Agency Contracts, Servicing Agreements or ETS Contracts set forth all of the provisions with respect to fees and other income and set forth in all material respects all of the other terms and conditions of Sellers' rights and obligations relating to the servicing of the Mortgage Loans identified in the Mortgage Loan Schedule, and there are no other Contracts that modify or affect the Agency Contracts, the Servicing Agreements, the Servicing Compensation, the Purchased Mortgage Servicing, the related MSRs, the ETS Contracts or the ETS Contract Rights. Subject to entry of the Sale Approval Order, Sellers, as applicable, own the entire right, title and interest in and to (i) the ETS Contracts and the ETS Contract Rights, (ii) the Purchased Mortgage Servicing, the related MSRs and the right to service the Agency Loans, subject to the Agency Contracts and the applicable Seller/Servicer Guides, and (iii) the Private Investor Loans and the Other Serviced Loans, subject to the applicable Servicing Agreements, free and clear of all Liens except for the rights of subservicers under the Contracts set forth on Section 4.9(b) of the Disclosure Memorandum and the rights of the counterparties under the Fee-Based Subservicing Agreements. Except as set forth on Section 4.9(b) of the Disclosure Memorandum and subject to any actions by Purchaser that may be required in order to satisfy the conditions of Sections 8.1(v) and 8.1(vi), the execution and delivery of Assignment and Assumption Agreement(s) pursuant hereto and the transfer, assignment and delivery of the Servicing Agreements in accordance with the Servicing Transfer Agreement, in each case, in accordance with the terms and conditions of this Agreement, shall grant to Purchaser ownership of all of the Purchased Mortgage Servicing and the related MSRs, and all of the ETS Contract Rights.

(c) Servicing Advances. Sellers have delivered to Purchaser Electronic Data Files dated as of August 31, 2012 that set forth the amount of each Servicing Advance (shown, (i) in the case of P+I Advances (as defined in the applicable Servicing Agreement) on an aggregate portfolio basis, net of any unscheduled principal and interest payments and (ii) in the case of T&I and Corporate Advances (as defined in the applicable Servicing Agreement) on a loan-level basis, gross of any unscheduled principal and interest payments) with the data fields identified in Schedule 4.9(c) (the " Servicing Advance Schedule," which term includes, except where the context requires otherwise, an updated version of such schedule to be prepared as of the close of business on the day immediately preceding the Cut-off Date (the " Cut-off Date Servicing Advance Schedule")), each to be delivered as provided in Article III. Each Servicing Advance is a valid and subsisting amount owing to a Seller, made in accordance with and payable at the times and in accordance with the provisions of the applicable Servicing Agreement, and is a legal, valid and binding reimbursement right, and is enforceable against such securitization trust or owner in accordance with its terms, and is not subject to any Claims, defenses or set-off arising from acts or omissions of the Sellers that could be asserted against Purchaser. Each Servicing Advance is entitled to be paid, has not been repaid in whole and has not been compromised, adjusted (except by partial payment), extended, satisfied, subordinated, rescinded, amended or modified. No Servicing Advance has been sold, transferred, assigned or pledged (other than a pledge that has been released as of the Closing including pursuant to the DIP Financing Agreements) by the related Seller to any Person other than the Purchaser. All of the Servicing Advances included in the Purchased Assets relate to Mortgage Loans that are being serviced by a Seller pursuant to a Servicing Agreement. The information set forth in the Servicing Advance Loan Schedule is true, complete and correct in all material respects as of the date thereof and the information in the Cut-off Date Servicing Advance Schedule to be prepared and delivered to Purchaser in accordance with Article III will be true, complete and correct in all material respects as of Cut-off Date, in each case in accordance with the applicable Servicing Agreement.

(d) <u>Servicing Files</u>. The Servicing Files included in the Purchased Assets contain true, correct and complete copies of all documents, instruments and information necessary to service the Serviced Mortgage Loans and Other Serviced Loans serviced by Seller in accordance with the Applicable Requirements in all material respects.

(e) <u>Servicing Escrow Accounts and Servicing Custodial Accounts</u>. All Servicing Escrow Accounts and Servicing Custodial Accounts are maintained in accordance with the Applicable Requirements in all material respects.

**Section 4.10 Material Contracts.** <u>Schedules H</u> and <u>P</u> set forth a true, accurate and complete list, organized under the applicable sub-headings, of all Material Contracts as of the date of this Agreement (excluding Servicing Agreements). True, correct and complete copies of the Material Contracts have been made available to Purchaser on or before the date of this Agreement. Except as set forth in <u>Section 4.10</u> of the Disclosure Memorandum, (i) each Material Contract is a legal, valid and binding obligation of each Seller that is a party thereto, and, to the Knowledge of Sellers, each other party thereto, enforceable against the applicable Seller in accordance with its terms, except as such enforceability may be limited by the Enforceability Exceptions and after the Bankruptcy Case commences, the Bankruptcy Exceptions; (ii) none of the other parties to any of the Material Contracts has provided written notice as of October 24, 2012 to any of Sellers that such party will be terminating, any of the Material Contracts (or otherwise seeking to terminate any Material Contracts, including the Purchased Mortgage Servicing under any of the Servicing Agreements); and (iii) to the Knowledge of Sellers, no other party thereto is or, with the lapse of time or giving of notice or both, would be, in violation or default of a Material Contract. Following the assumption and cure and subsequent assignment of the Material Contracts by Sellers to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code and the Sale Approval Order, there will not be any existing defaults by any Seller under any of the Material Contracts and no events that (whether with or without notice, lapse of time or the happening or occurrence of any other event) would constitute a default under any Material Contract by any Seller. For the avoidance of doubt Sellers are not making any representation or warranty in this <u>Section 4.10</u> with respect to any Servicing Agreement.

**Section 4.11 Compliance with Law, Licensing and Data Security.**

(a) Except as set forth in Section 4.11(a) of the Disclosure Memorandum, since January 1, 2011, (i) Sellers have operated the Business in compliance, and are in compliance in all respects, with all Laws and the guides, programs and policies of the Agencies that are applicable to the Business or the ownership and operation of the Purchased Assets, except where any failure to comply with such Laws, individually or in aggregate, would not reasonably be expected to have a Material Adverse Effect; and (ii) the Sellers have not received any notification from any Government Authority that any Seller or any of its Affiliates is not in compliance with such Laws, guides, programs or policies, except as set forth in the Consent Order or the DOJ/AG Settlement.

(b) Schedule S sets forth a true, accurate and complete list of all active Business Licenses held by Sellers as of October 24, 2012. Each Seller and each employee or officer of each Seller has all material Government Authorizations of, and has made all material filings, applications and registrations with, all Government Entities that are required in order for such employee or officer to conduct his or her activities for the applicable Seller in the conduct of the Business and each Seller and each employee or officer of each Seller have received all required approvals as a result of such material filings. Since January 1, 2011, the Sellers have not received any notification from any Government Authority that any Seller or any of their Affiliates is not in compliance with the terms of such Origination and Servicing Licenses and no suspension, cancellation or restriction of any such Business Licenses is threatened.

(c) Except as set forth in Section 4.11(c) of the Disclosure Memorandum, since January 1, 2011 no Seller, nor, to the Knowledge of Sellers, any agent, servicer or contractor thereof with respect to its Contracts with Sellers, has experienced any actual, suspected or threatened breach in data security involving personally identifiable information of Serviced Mortgagors.

**Section 4.12 Employee Benefits.**

(a) Schedule R contains a complete and correct list of each material Plan applicable to the Business Employees. The Sellers have made available to Purchaser upon its request true, complete and correct copies of each such material Plan and any related summary plan description (or, in the absence of such documents, a detailed description thereof).

(b) Except as set forth in Section 4.12(b) of the Disclosure Memorandum, neither the execution of this Agreement nor the consummation of the transactions contemplated herein will (either alone or in connection with any other event) (i) entitle any Business Employee to any payment or compensation, or (ii) accelerate the time of payment, funding or vesting of, or increase the amount of, compensation due to any Business Employee. No amount paid or payable (whether in cash, in property, or in the form of benefits) to any Business Employee in connection with the transactions contemplated hereby (either alone or in connection with any other event) will be subject to Section 280G of the Code.

50

(c) To the Knowledge of the Sellers, each Plan that is intended to be qualified under Section 401(a) of the Code has obtained a currently effective favorable determination letter from the IRS regarding its qualification or is entitled to rely on a favorable advisory or opinion letter from the IRS regarding the master or prototype form on which it is established, or an application for such a determination letter has been or shall be submitted to the IRS by AFI, and the Sellers have provided a copy of each such letter to Purchaser to the extent any were issued. To the Knowledge of the Sellers, nothing has occurred that would be reasonably expected to cause any such Plan to fail to qualify under Section 401(a) of the Code.

**Section 4.13 Employees.**

(a) With respect to each Business Employee, Sellers have provided Purchaser with a list (the " Business Employee List") setting forth, to the extent such information is permitted to be disclosed under applicable Law: (i) title or job/position; (ii) job designation ( *i.e.*, salaried or hourly); (iii) location of employment and Employer; (iv) employment status (active, on leave or on unpaid leave); (v) annual base rate of compensation and target bonus amount for the current fiscal year to which he or she is entitled, including any retention or similar plans adopted prior to the Bankruptcy Case or approved by the Bankruptcy Court, and any bonus amount that he or she has received for the fiscal year immediately prior to the date of this Agreement; and (vi) if applicable, any material, individual specific provisions relating to such person's employment ( *e.g.*, golden parachute, etc.).

(b) There are no collective bargaining or other labor union agreements that have been in existence or currently are in existence, or that have been negotiated or that are being negotiated by any Seller, to which any Seller is or may become a party or by which any of them has been bound, is bound, or may become bound. There are no unfair labor practice charges or complaints pending or, to the Knowledge of Sellers, threatened against any Seller with respect to employees of a Seller.(c) As of the date of this Agreement, all bonuses and other compensation required to be paid on or prior to the date of this Agreement and payable to Business Employees have been paid in full; and no Seller is liable for any arrears of wages or any Taxes or penalties for failure to comply with any of the foregoing.

(d) Each Business Employee is employed at will and may terminate his or her employment or be terminated from such employment at any time for any or no reason with or without prior notice except as may be required by applicable law.

**Section 4.14 Litigation and Claims**. Except as listed on Section 4.14 of the Disclosure Memorandum, as of the date of this Agreement, (i) there is no action, suit, demand, inquiry, proceeding, claim, cease and desist letter, hearing or investigation by or before any Government Entity pending, or, to the Knowledge of Sellers, threatened in respect of the Business that could materially and adversely affect the ability of Sellers to complete the transactions contemplated by this Agreement, and (ii) no Purchased Asset is subject to any Order other than the Consent Order or the DOJ/AG Settlement.

**Section 4.15 Intellectual Property.**

(a) The Transferred IT Assets that are (i) material to the conduct of the Business and (ii) located at the Real Property have been disclosed to Purchaser by Sellers in the electronic data room on or before the date of this Agreement. Schedule K sets forth a true, accurate and complete list of (i) the material network-telecommunications, storage and server equipment that are Transferred IT Assets and (ii) the other material Computer Equipment that are Transferred IT Assets.

(b) Schedule N contains a complete and accurate list of all registrations and applications included within the Owned Transferred IP (including United States patents, patent applications, Trademark registrations or pending applications to register Trademarks filed in or issued by, as the case may be, the United States Patent and Trademark Office, Copyright registrations or pending applications to register Copyrights filed in or issued by the United States Copyright Office, or such other filing offices, domestic or foreign, and domain name registrations but excluding the registrations and applications set forth on Schedule Q). Except as disclosed in Section 4.15(b) of the Disclosure Memorandum, all such Owned Transferred IP is: (i) valid, subsisting, in proper form and enforceable, and have been maintained, including the submission of all necessary filings and fees in accordance with the legal and administrative requirements of the appropriate jurisdictions, from the date of this Agreement and continuing for the 90 day period after the Closing Date, and (ii) have not lapsed, expired or been abandoned. To the Knowledge of Sellers, no Transferred Intellectual Property or any registration or application therefor is the subject of any opposition, interference, cancellation proceeding or other legal proceeding (including litigation) or governmental proceeding before any Government Entity in any jurisdiction, or of any outstanding Order, judgment, decree or agreement that materially and adversely affects the ownership, validity, registrability, or enforceability of the Transferred Intellectual Property or Sellers' use thereof or rights thereto.

(c) Schedule N contains a complete and accurate list of all material Licensed Transferred IP. With respect to the Transferred Intellectual Property, except as listed on Section 4.15(c) of the Disclosure Memorandum: (i) Sellers own and possess all right, title and interest in and to, or have a valid, binding and enforceable license to use, such Transferred Intellectual Property; (ii) no material claim by any third party contesting the validity, enforceability, use or ownership of any of the Transferred Intellectual Property has been made in writing and delivered to a Seller or, to the Knowledge of Sellers, is threatened; (iii) to the Knowledge of Sellers, none of the Transferred Intellectual Property is being infringed upon or violated by any third party; (iv) Sellers have not received any material written notices from any third party claiming that any Transferred Intellectual Property infringes upon and/or misappropriates such third party's; and (v) to the Knowledge of Sellers, Sellers have not infringed, misappropriated or otherwise violated any Intellectual Property of any third parties in the United States.

(d) With respect to the IT Inventories and Technical Documentation portion of the Transferred IT Assets used by Sellers in the conduct of the Business, except as listed on Section 4.15(d) of the Disclosure Memorandum, each was either: (i) developed by employees of a Seller within the scope of their employment, (ii) developed by a third Person, and all ownership rights therein have been assigned or otherwise transferred to or vested in a Seller pursuant to written agreements, (iii) licensed from third parties, or (iv) are in the public domain. Software Contracts that are Transferred IT Assets and constitute Material Contracts have been disclosed to Purchaser by Sellers in writing on the date of this Agreement. To the Knowledge of Sellers, except as listed on Section 4.15(d) of the Disclosure Memorandum, Sellers have the legal power to convey to Purchaser under this Agreement the rights granted to Sellers (as applicable) under any license or assignment for any Transferred IT Assets and, to the Knowledge of Sellers, no Seller is subject to any contractual, legal or other restriction on the use of such Transferred IT Assets, except to the extent that such Transferred IT Assets are governed by Software Contracts and/or Intellectual Property Licenses that contain restrictions on the use of such Transferred IT Assets.

**Section 4.16 Brokers, Finders and Financial Advisors** . Except for Centerview Partners LLC, whose fees will be paid by ResCap in the Bankruptcy Case, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers or any Affiliate Seller, or will be entitled to any brokers' or finders' fee or any other commission or similar fee from Sellers or any Affiliate Seller, in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

**Section 4.17 Ginnie Mae Loans.** The Sellers represent and warrant as of the Closing Date:

(a) Each of the Ginnie Mae Loans comply in all material respects with Sellers' underwriting policies in effect as of the origination date of each such Ginnie Mae Loan. The origination, sale, and servicing of the Ginnie Mae Loans by Sellers comply with all Applicable Requirements with respect to the Ginnie Mae Loans in all material respects.

(b) With respect to each Ginnie Mae Loan originated by Sellers, (i) the loan files includes customer information and originals or copies of all material documents (either in physical or electronic form) that are required in order to service such Loan in accordance with Applicable Requirements, (ii) the loan files have been kept by Sellers in the Ordinary Course of Business, and (iii) the loan files are true, complete and accurate in all material respects. No payment of principal or interest is more than 60 days past due on any Ginnie Mae Loan and all of the information provided to Purchaser by or on behalf of the Sellers in each Servicing File is complete and accurate in all respects.

(c) Each Ginnie Mae Loan is a first lien residential Mortgage Loan, subject only to (i) the Lien of current real property taxes and assessments, (ii) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of the mortgage, (iii) such exceptions appearing of record that are acceptable to mortgage lending institutions generally in the area wherein the property subject to the mortgage is located or specifically reflected in any appraisal obtained in connection with the origination of the related Ginnie Mae Loan, and (iv) other matters to which like properties are commonly subject that do not materially interfere with the benefits of the security intended to be provided by such mortgage.

(d) There is no material default, breach, violation, fraud or event permitting acceleration existing under any Ginnie Mae Loan. The Sellers have not waived any such default, breach, violation or event permitting acceleration of any Ginnie Mae Loan.

(e) No material provision of any Ginnie Mae Loan has been waived, altered or modified in any respect, except by instruments or documents identified in the Servicing File relating to such Ginnie Mae Loan.

(f) No Ginnie Mae Loan is subject to any right of rescission, setoff, counterclaim or defense, including the defense of usury and the exercise of any right under any Ginnie Mae Loan will not render such Ginnie Mae Loan unenforceable in whole or in part or subject to any right of rescission (other than the statutory right of rescission), setoff, counterclaim or defense, including the defense of usury.

(g) No Ginnie Mae Loan has been satisfied or subordinated in whole or in part or rescinded (other than pursuant to a statutory right of rescission), and no collateral securing a Ginnie Mae Loan has been released from the Lien of the related mortgage in whole or in part.

(h) None of the Ginnie Mae Loans provides for recourse to the Sellers that would constitute an Assumed Liability.

(i) No Seller has taken any act or failed to take any act that it is required to take in order for any mortgage insurance with respect to each Ginnie Mae Loan to remain in full force and effect.

(j) No Seller has received any written notice from any Person that alleges a breach of any representation, warranty or covenant made by the Sellers with respect to any Ginnie Mae Loan for which a repurchase of, or any indemnity obligation relating to, such Ginnie Mae Loan could be required nor, to the Knowledge of Sellers, does there exist any such breach for which a repurchase of, or any indemnity obligation relating to, any such Ginnie Mae Loan may be required.

**Section 4.18 Tax Matters.**

(a) Except as set forth in Section 4.18(a) of the Disclosure Memorandum, each Seller has withheld and paid, or set aside in accounts for such purpose, or accrued or reserved on the Balance Sheet, all material Taxes required to have been withheld and paid in connection with amounts paid to employees or independent contractors.

(b) Except as set forth in Section 4.18(b) of the Disclosure Memorandum, for U.S. federal income tax purposes, no equity or other ownership interests in any Person are included in the Purchased Assets.

54

(c) No REMIC Residual Interests are included in the Purchased Assets, except for the De Minimis Interests required to be held by Purchaser as the REMIC Administrator of such REMIC.

(d) Attached hereto, as Section 4.18(d) of the Disclosure Memorandum, is an accurate and complete list of entities or arrangements for which any Seller acts, and the Purchaser will act, as REMIC Administrator.

(e) Except as set forth in Section 4.18(e) of the Disclosure Memorandum, as to each of the entities or arrangements identified as a REMIC in Section 4.18(c) of the Disclosure Memorandum, for which any Seller acts as the Servicer or REMIC Administrator (in the case of clause (i) below) or as REMIC Administrator (in the case of clauses (ii) and (iii) below), in the capacity or capacities as such identified in Section 4.18(e) of the Disclosure Memorandum, such REMIC:

(i) has engaged in no "prohibited transactions" (as defined in Section 860F(a)(2) of the Code) and has never received any contributions after its startup day subject to the tax imposed by Section 860G(d) of the Code;

(ii) has timely elected to be classified as a REMIC and has timely filed all Tax Returns required to be filed by such REMIC; and;

(iii) has never itself been examined by, or itself entered into any closing agreement with the IRS, and is not bound by any closing agreement entered into between the Sellers and the IRS.

**Section 4.19 Shared Services Agreement.** Exhibit 8 sets forth a true and accurate copy of the Shared Services Agreement, except for the specific statements of work thereto. The terms of the final statements of work to the Shared Services Agreement, as agreed to between ResCap and AFI as of the date of this Agreement, are not materially adverse, individually or in the aggregate, to ResCap relative to the terms of the statements of work as provided to Purchaser prior to the date of this Agreement.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed to Sellers by Purchaser in writing on the date of this Agreement, Purchaser represents and warrants to Sellers, as of the date of this Agreement and as of the Closing Date (except to the extent any such representations and warranties shall have been expressly made as of a particular date, in which case such representations and warranties shall be made only as of such date), as follows:

**Section 5.1 Organization and Authority.** Purchaser has been duly incorporated, and is validly existing and in good standing under the Laws of its jurisdiction of incorporation, has all corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby, and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of this Agreement and the Ancillary Agreements. This Agreement has been, and the Ancillary Agreements to which it is a party will be, duly and validly executed and delivered by Purchaser and this Agreement constitutes, and each of the Ancillary Agreements to which it is a party will constitute, the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by the Enforceability Exceptions.

55

**Section 5.2 Non-Contravention.** The execution, delivery and performance of this Agreement and the Ancillary Agreements by Purchaser and the consummation of the transactions contemplated hereby and thereby and the compliance by Purchaser with the applicable terms and conditions hereof or thereof, do not and will not conflict with or violate, result in a material breach of or default (or an event which with notice or the passage of time or both would become a material breach or default) under, give rise to a right of termination, cancellation, acceleration of any material obligation or loss of any material benefit under (i) the organizational or governing documents of Purchaser or (ii) assuming all Consents, declarations, filings or registrations set forth on Schedule 5.3 have been obtained or made, as applicable, any Law or Order applicable to Purchaser.

**Section 5.3 Consents and Approvals**. No Consent of, or declaration, filing or registration with, any Government Entity or any other Person is required to be obtained or made, as applicable, by Purchaser in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements, or the consummation of the transactions contemplated by this Agreement or by any of the Ancillary Agreements, except for Consents, declarations, filings and registrations (i) listed on Schedule 5.3, or (ii) Consents, the failure to have which, individually or in the aggregate, would not reasonably be expected to materially impact the ability of Purchaser to consummate the transactions contemplated hereby and satisfy all its obligations hereunder.

**Section 5.4 Financing.** Purchaser has available cash, the Commitment Letters and debt commitment letters, which together are sufficient to enable it to consummate the transactions contemplated hereby. Purchaser has delivered to the Sellers true, complete and correct copies of the Commitment Letters and the debt commitment letters entered into as of the date of this Agreement and true, complete and correct copies of the amendments to the debt commitment letters, if any, as of the date hereof, in connection with the transactions contemplated herein pursuant to which the respective signatories thereto have committed, subject to the terms and conditions set forth therein, to provide Purchaser with certain funds in the amounts described in the Commitment Letters and such debt commitment letters at the Closing. None of the Commitment Letters or debt commitment letters delivered to Sellers has been amended or modified (other than any amendment or modification consented to by Sellers), no such amendment or modification is contemplated by Purchaser, or, to the knowledge of Purchasers, the signatories thereto, and the commitments contained in the Commitment Letters and such debt commitment letters have not been withdrawn or rescinded in any respect. There are no side letters or other Contracts that would modify the obligations under the Commitment Letters or any debt commitment letter delivered to Sellers other than as expressly set forth in the Commitment Letters or such debt commitment letter delivered to the Sellers. There are no conditions precedent or other contingencies related to the funding of the full amount of the Commitment Letters or any debt commitment letter delivered to Sellers, other than as expressly set forth in or expressly contemplated by the Commitment Letters or any such debt commitment letter. No event has occurred that, with or without notice, lapse of time or both, would or would reasonably be expected to constitute a default or breach on the part of Purchaser under the Commitment Letters or any debt commitment letter delivered to Sellers other than any such default or breach that has been irrevocably waived by the applicable other signatories thereto or otherwise cured in a timely manner by Purchaser to the satisfaction of such other signatories. Purchaser will have at and after the Closing funds sufficient to (i) pay the Purchase Price and (ii) satisfy all of the other payment obligations of Purchaser contemplated hereunder.

56

**Section 5.5 Non-reliance.** Purchaser has not relied and is not relying on any representations, warranties or other statements whatsoever, whether written or oral (from or by the Sellers, or any Person acting on their behalf) other than those expressly set out in this Agreement (or other related documents referred to herein) and acknowledges and agrees that, except for any fraud claim, it will not have any right or remedy rising out of any representation, warranty or other statement not expressly set out in this Agreement.

**Section 5.6 Brokers, Finders and Financial Advisors** . No agent, broker, investment banker, financial advisor or other firm or Person is or will be entitled to any brokers' or finder's fee or any other commission or similar fee in connection with the transactions contemplated hereby as a result of any action taken by Purchaser.

## ARTICLE VI

## PRE-CLOSING MATTERS AND OTHER COVENANTS

**Section 6.1 Subsequent Actions; Further Assurances.** Subject to the Bankruptcy Exceptions, Sellers and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable, including, (i) opposing any objections to, appeals from or petitions to reconsider or reopen any such approval by Persons not a party to this Agreement and (ii) obtaining any Final Orders approving the transactions contemplated by this Agreement or the Ancillary Agreements, if required. Purchaser shall not amend or modify the Commitment Letters in connection with the transactions contemplated hereby and delivered to Sellers, except with the consent of Sellers (not to be unreasonably withheld or delayed). If at any time after the Closing, Purchaser shall consider or be advised that any assurances or any other actions or things are necessary or desirable (a) to vest, perfect or confirm ownership (of record or otherwise) in Purchaser, as applicable, its title or interest in the Purchased Assets or (b) otherwise to carry out this Agreement or the Ancillary Agreements, Sellers shall use commercially reasonable efforts to execute and deliver all bills of sale, instruments of conveyance, UCC filings, powers of attorney, assignments, assurances and orders and take and do all such other actions and things as may be reasonably requested by Purchaser, in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in the Purchased Assets.

**Section 6.2 Third Party Consents.** Sellers and Purchaser shall use commercially reasonable efforts to obtain, as soon as reasonably practicable, all Necessary Consents, including from Government Entities and Insurers; provided that Purchaser shall not be required to agree to actions, conditions or restrictions that would materially impair the value to Purchaser of the Business or the Purchased Assets or have a materially adverse effect on the business of Purchaser or its Affiliates. Each party hereto shall promptly provide the other parties with copies of any communication, including any written objection, litigation or administrative proceeding that challenges the transactions contemplated hereby received by such party from any Government Entity or any other Person regarding transactions contemplated hereby. For the avoidance of doubt, if and to the extent a rating agency "no-downgrade" letter is expressly required under any Servicing Agreement (if and to the extent required under Order of the Bankruptcy Court) and is not obtained by Closing, such Servicing Agreement and the related Servicing Advance shall not be transferred as part of the Purchased Assets at Closing and Purchaser shall not be required to pay for such assets as part of the Purchase Price.

**Section 6.3 Access to Information; Interim Financial Information** .

(a) From and after the date of this Agreement until the Closing Date, Sellers shall afford to Purchaser and its accountants, counsel, environmental consultants, financing sources and other representatives reasonable access, upon reasonable notice during normal business hours, to the personnel, properties, books, Contracts, Tax Returns and records of Sellers (to the extent Related to the Business) and during such period shall furnish to Purchaser any information concerning the Purchased Assets and Sellers (to the extent relating to the Business) that is reasonably available to Sellers, as Purchaser may reasonably request; provided, however, that such access shall not unreasonably disrupt the business of Sellers and that nothing herein will obligate Sellers to violate any applicable Law.

(b) From the date of this Agreement until the Closing Date, Sellers will deliver to Purchaser (i) such financial and operating information Related to the Business as is provided (and no later than two Business Days after being so provided) to the board of directors of ResCap in the Ordinary Course of Business, (ii) as soon as reasonably practicable, but in no event later than 30 days after the end of each calendar month during the period from the date of this Agreement to the Closing Date, unaudited monthly financial statements and operating or management reports of ResCap (with such statements and reports to be in the same form as made available pursuant to the DIP Financing Agreements), and (iii) as soon as reasonably practicable, but in no event later than 45 days after the end of each calendar quarter during the period from the date of this Agreement to the Closing Date, unaudited quarterly financial statements and operating or management reports of ResCap (with such statements and reports to be in the same form as made available pursuant to the DIP Financing Agreements).

(c) Sellers shall provide such cooperation as may be necessary and reasonably requested by Purchaser to assist Purchaser to obtain financing to enable it to consummate the transactions contemplated herein, including such financial information necessary as may be reasonably requested by Purchaser to assist in preparation of customary offering or information documents to be used for the completion of such financing, making available, at times mutually agreed upon, appropriate members of senior management of each Seller for the purpose of meeting with proposed lenders providing or arranging such financing, rating agencies, diligence sessions relating to Sellers and road shows and otherwise cooperating with diligence efforts of the applicable lenders to the extent customary and reasonable.

58

**Section 6.4 Records; Post-Closing Access to Information.**

(a) Each of Sellers and Purchaser shall, for a period of seven years after the Closing Date, preserve and retain in accordance with their respective document retention policies, as amended from time to time, and shall cause its respective Affiliates in accordance with their respective document retention policies, as amended from time to time, to preserve and retain, all agreements, documents, books, records and files (including any documents relating to any governmental or non-governmental actions, suits, proceedings or investigations) relating to the Business prior to the Closing Date; provided, that if at the end of the seven years, any third-party charge, complaint, action, suit, proceeding, hearing, investigation, claim or demand identified in Section 6.4(c) is ongoing, the parties shall maintain and preserve all such information relating thereto until one year after such action, suit, proceeding or investigation has been finally concluded.

(b) From and after the Closing Date, each party shall, and shall cause its Affiliates to, afford the other party and its counsel, accountants and other authorized representatives, with five Business Days' prior notice, reasonable access during normal business hours to the respective premises, properties, personnel, Books and Records and to any other assets or information that such other party reasonably deems necessary, including in connection with the Bankruptcy Case or any report or Tax Return required to be filed under applicable Law (but so as not to unduly disrupt the normal course of operations of Purchaser), including preparing or defending any Tax Return and any interim or annual report or other accounting statements.

(c) If and for so long as any party hereto is contesting or defending against any third-party charge, complaint, action, suit, proceeding, hearing, investigation, claim or demand, including in the Bankruptcy Case, in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction involving the Business and the Purchased Assets, or the Excluded Assets and Retained Liabilities, in any respect, each other party hereto shall (A) reasonably cooperate with and assist it and its counsel and other advisors in the contest or defense, (B) make available its personnel (including for purposes of fact finding, consultation, interviews, depositions and, if required, as witnesses) and (C) provide such information, testimony and access to its books and records, in each case as shall be reasonably requested in connection with the contest or defense, all at the sole cost and expense (not including employee compensation and benefits costs) of the contesting or defending party. For the avoidance of doubt, this Section 6.4(c) shall not apply with respect to disputes between the parties hereto.

(d) Purchaser agrees, at Sellers' cost and expense, to make available, at the reasonable request of Sellers, any books and records that may be included in the Purchased Assets to the extent they may relate to Excluded Assets and, if necessary, to provide such original books and records to any purchaser of such Excluded Assets and to retain only a copy thereof, subject to the delivery by such purchaser of a non-disclosure agreement as reasonably requested by Purchaser.

(c) Notwithstanding anything to the contrary in this Agreement, each of the parties will comply with federal and state laws and regulations regarding the confidentiality and privacy relating to information collected and used in connection with the application for and processing and servicing of Mortgage Loans.

**Section 6.5 Interim Operations of the Business**. Sellers covenant and agree that, after the date of this Agreement and prior to the Closing, subject to the Bankruptcy Exceptions and except as (i) provided in Section 2.15 or set forth in Section 6.5 of the Disclosure Memorandum, (ii) expressly provided in or as a result of the consummation of this Agreement, (iii) provided in the DIP Financing Agreements, (iv) ordered by the Bankruptcy Court or (v) may be agreed in writing by Purchaser:

(a) the Business shall be conducted in the Ordinary Course of Business in compliance with the Applicable Requirements and Sellers shall, and shall cause each Affiliate Seller to, use commercially reasonable efforts to preserve the Business organization and ongoing operations, including with respect to the relationships between and among such Seller and its Affiliates and AFI and its Affiliates, keep available the services of the current officers and employees of the Business and maintain the existing relationships with customers, suppliers, creditors, business partners and others having business dealings with the Business;

(b) Sellers and Affiliate Sellers shall (i) maintain the Purchased Assets in good repair and condition (subject to normal wear and tear); (ii) pay all Taxes, accounts payable and other expenses with respect to the Business and the Purchased Assets as they become due and payable; (iii) maintain proper business and accounting records relative to the Business, consistent with past practice; and (iv) maintain commercially reasonable procedures for protection of the Transferred Intellectual Property;

(c) Sellers and Affiliate Sellers shall not (i) modify or amend, or release, assign or waive any material rights or claims under, or materially accelerate or delay the performance under, any Assumed Contract; provided, however, Sellers and Affiliate Sellers may modify or amend any Assumed Contract that is not material to the Business (other than a Servicing Agreement), following commercially reasonable efforts to provide notice and consult with Purchaser regarding such action, or (ii) enter into any Contract Related to the Business that, if any Seller had entered into such Contract immediately prior to the date of this Agreement, would be a Material Contract or a Servicing Agreement; provided that (w) Sellers may enter into customary insurance Contracts, including director and officer liability insurance; (x) provided there is no adverse impact to the Business, Sellers may reduce or limit the services that are provided to them by AFI and its Affiliates as part of their management of their estates in the Bankruptcy Case; (y) if any owner of Servicing Rights other than Sellers transfers such Servicing Rights in accordance with their Servicing Agreements, Sellers may take all actions reasonably required by the applicable Servicing Agreements in connection with such transfer; and (z) Sellers may enter into Real Property Leases for executive office space for which the monthly lease payment does not exceed $5,000; provided that Purchaser shall have the right to exclude any such Real Property Lease from the Assumed Contracts and the Purchased Assets at the Closing. For the avoidance of doubt, nothing in this Agreement shall prevent Sellers from engaging in loss mitigation activities, including hiring and terminating counsel therefor even if such Contract may be or become a Material Contract, defending and/or settling routine litigation matters, or making payments to former mortgagors pursuant to the Consent Order or from offering and effecting refinancing of or modifications to Mortgage Loans as required by the terms of the DOJ/AG Settlement, or by HAMP, HARP, HASP or any similar program that the Sellers have or may develop in the Ordinary Course of Business; provided that Sellers shall promptly provide copies to Purchaser of any reports provided under the DOJ/AG Settlement to the monitor appointed to oversee Sellers' compliance with the DOJ/AG Settlement with respect to such agreements, arrangements and actions;

60

(d) Sellers and Affiliate Sellers shall not transfer, sell, lease, license, mortgage, pledge, surrender, encumber, divest, cancel, abandon, subject to any Lien (other than Permitted Liens) or allow to lapse or expire, permit the destruction of, or material damage or loss to, or otherwise dispose of any of the Purchased Assets, other than immaterial amounts of personal property sold or otherwise disposed for fair value in the Ordinary Course of Business;

(e) Except as would not give rise to any Assumed Liabilities, Sellers and Affiliate Sellers shall not (i) incur Liabilities, expenses, Indebtedness or other obligations Related to the Business except in the Ordinary Course of Business or (ii) enter into any new Contract to incur, assume or guarantee any Indebtedness other than the DIP Financing Agreements;

(f) Sellers and Affiliate Sellers shall not cancel any debts or waive any material claims or rights (including the cancellation, compromise, release or assignment of any Indebtedness owed to, or claims held by, any of Seller and its Subsidiaries) that constitute Purchased Assets except as required by the Consent Order, the DOJ/AG Settlement or the programs referenced in clause (c) above;

(g) Sellers and Affiliate Sellers shall not terminate or permit to lapse any material Permits that are necessary for the operation of the Business;

(h) Sellers and Affiliate Sellers shall not make any capital expenditure Related to the Business, including acquiring, leasing or licensing or creating or permitting to exist any Lien other than a Permitted Lien on any assets or property that are Purchased Assets or making any investment in, or making any loan or capital contribution to, any Person, in each case with a value in excess of $500,000 individually or $5 million in the aggregate;

(i) Sellers and Affiliate Sellers shall not (A) change any method, practice or principle of accounting, except as may be required from time to time by GAAP (without regard to any optional early adoption date); provided, that if any such changes are required, the Sellers shall promptly provide written notice to Purchaser with respect thereto, or (B) materially write-up, write-down or write-off the Book Value of any Purchased Asset except as required by GAAP;

61

(j) Sellers and Affiliate Sellers shall not with respect to the Purchased Assets, make or change any election in respect of Taxes, adopt or change any accounting method in respect of Taxes or otherwise, enter into any closing agreement, settle any claim or assessment in respect of Taxes, or consent to any extension or waiver of the limitation period applicable to any claim or assessment in respect of Taxes, except as required by Law or GAAP;

(k) Sellers and Affiliate Sellers shall not change their servicing practices in any material respect, except as required by Applicable Law, the Consent Order or the DOJ/AG Settlement; for the avoidance of doubt, an Investor's change to its delegated authority matrix under a Servicing Agreement shall not be or be deemed a material change;

(l) Sellers shall not (1) reject or terminate any Assumed Contract or seek Bankruptcy Court approval to do so or (2) fail to use commercially reasonable efforts to oppose any action by a third party to terminate (including any action by a third party to obtain Bankruptcy Court approval to terminate) any Assumed Contract other than notices of termination set forth in Schedule 4.9; provided that, prior to the Closing Date, Sellers may reject or terminate any Assumed Contract (other than any Servicing Agreement) that is both not material to the Business and is readily replaceable (and so replaced) at not more than the same cost, without disruption to the operation of the Business and otherwise on terms and conditions consistent with such rejected or terminated Assumed Contract, following commercially reasonable efforts to consult with Purchaser regarding such rejection or termination;

(m) With respect to any Purchased Asset, Sellers shall not, and shall use their best efforts to ensure that any Affiliates shall not: (1) agree to allow any form of relief from the automatic stay in the Bankruptcy Case except in accordance with the provisions of the Order Pursuant to Bankruptcy Code Sections 105(a) and 362(d) for Entry of an Order Approving Procedures by Which Third Parties May Request and Obtain Stipulated Relief from the Automatic Stay to Commence or Continue Actions to Foreclose Senior Liens [Dkt. # 1824]; provided, however, that Sellers shall obtain an amendment of such order on or before the date of the Sale Hearing designating Purchaser as a Notice Party (as defined therein) and providing that the Purchaser is entitled to all of the rights of a Notice Party thereunder, and pending the entry of such amended order, Sellers shall treat the Purchaser as a Notice Party and shall stipulate to Purchaser's exercising all rights in accordance therewith; and (2) fail to use commercially reasonable efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Case; (3) reject, or agree to a rejection of, any Assumed Contract except as provided in the proviso in clause (l) above and in Section 2.15(c); or (4) fail to use commercially reasonable efforts to oppose any action by a Person (other than Purchaser) seeking to have an Assumed Contract rejected, except as provided in the proviso in clause (l) above; for the avoidance of doubt, this clause (m) does not apply to (y) notices of termination of any Assumed Contract (as set forth in Schedule 4.9) in accordance with their terms received prior to the Petition Date so long as the Sellers do not have the contractual right to cure or remedy the basis for the notice of termination or (z) expirations of any Assumed Contracts in accordance with their terms;

62

(n) Sellers and Affiliate Sellers shall not take, or agree to or commit to take, any action that would or is reasonably likely to result in any of the conditions set forth in Article VIII, not being satisfied, or would make any representation or warranty of Sellers contained herein inaccurate in any material respect at, or as of any time prior to, the Closing Date or that would materially impair the ability of Sellers or Purchaser to consummate the Closing in accordance with the terms hereof or materially delay such consummation;

(o) Sellers and Affiliate Sellers shall not amend any of their Organizational Documents or enter into or amend any limited liability company, joint venture, partnership, strategic alliance, stockholders' agreement, co-marketing, co-promotion, joint development, operating agreement or similar arrangement Related to the Business or with respect to the Purchased Assets;

(p) Sellers and Affiliate Sellers shall not (i) transfer the employment of any individual not providing services Related to the Business as of the date of this Agreement to a role in which he or she will provide services Related the Business; or (ii) cause any employee who provides services Related to the Business as of the date of this Agreement to cease to provide services Related to the Business, if either of the foregoing shall unreasonably interfere with the Business or Purchaser's access to employees as reasonably necessary for purposes of making the Employment Offers;

(q) Sellers and Affiliate Sellers shall not modify the base salary, wages, benefits or other compensation of any employee who provides services Related to the Business or take any action that would accelerate, create or increase a right to payment to any Business Employee under any Plan, other than for increases in base salary or wages in the Ordinary Course of Business;

(r) Sellers and Affiliate Sellers shall not (i) enter into or amend any employment, change in control, retention, severance or similar agreement with respect to any individual who provides services Related to the Business, (ii) adopt, amend or terminate any Plan (or any plan, program, agreement, or agreement that would be a Plan if in effect as of the date of this Agreement), other than to comply with law, or (iii) enter into any collective bargaining or similar agreement;

(s) Except in connection with the Bankruptcy Case, Seller shall not pay, discharge, settle or otherwise satisfy any Liabilities (i) with any third party (other than a Government Entity) involving an amount greater than $100,000, or (ii) with any Government Entity involving an amount greater than $100,000 unless such settlement does not impose restrictions materially more onerous than any similar settlement between such Government Entity and two or more of the top ten mortgage servicers in the United States (based on unpaid principal balance serviced, as determined by Inside Mortgage Finance for 2011); provided that this clause (s) does not apply to payments made pursuant to Sellers' Contracts in the Ordinary Course of Business, which includes payments of servicing error claims provided that in connection with any such payment of servicing error claims, the Sellers receive a full release of all such claims and there is no ongoing effect on the operations of the Business;

63

(t) Sellers and Affiliate Sellers shall not accelerate the rate of collection of accounts receivable Related to the Business other than in the Ordinary Course of Business and in accordance with acceptable servicing practices; and

(u) With respect to clauses (c)-(t), Sellers and Affiliate Sellers shall not enter into any Contract to do any of the foregoing.

**Section 6.6 Servicing Approvals and Licenses.** Promptly following execution of this Agreement, in each case to the extent not already obtained by Purchaser, Purchaser shall have filed or shall file all applications and use commercially reasonable efforts to (i) be approved as (A) a Title II Supervised Mortgagee and servicer for FHA Loans by HUD; (B) an approved seller and servicer of residential mortgages by Freddie Mac and Fannie Mae; (C) an "issuer" by Ginnie Mae; and (D) a VA-approved lender; (ii) obtain all necessary licenses in all states in which it proposes to conduct the Business; (iii) enter into master mortgage insurance contracts with Insurers and take such other actions reasonably and customarily required to obtain the approval of any Insurer under a mortgage insurance policy to the transfer of Mortgage Servicing and MSRs contemplated hereby; and (iv) obtain all other material Permits and Business Licenses (including as may be needed in various states to accommodate shifting the Transferred Employees onto Purchaser's payroll) that are necessary to own or administer the Business, including the Purchased Mortgage Servicing and related MSRs (or, where legally permissible, any waiver of or exemption from any of the foregoing by such Agency, Government Entity or Insurer). All such actions shall be at Purchaser's cost and expense, and Sellers shall cooperate with, and use commercially reasonable efforts to provide assistance to, Purchaser in all such efforts.

**Section 6.7 Employee Matters.**

(a)(i) With respect to each Business Employee, not later than December 15, 2012, Sellers shall provide Purchaser with an updated version of the Business Employee List referenced in <u>Section 4.13(a)</u>, reflecting the Business Employees then currently employed by a Seller and any changes in the information set forth therein. Sellers shall further update such Business Employee List from time to time prior to the Closing Date.

(ii) As soon as reasonably practicable after the date of this Agreement, representatives of Sellers, Purchaser and the Walter Entity shall meet to discuss the employee needs of Sellers to complete the Post-Closing Pipeline and the Walter Entity to operate the Consumer Lending Platform post-Closing. Good faith consideration shall be given to an equitable distribution of management, operations, information systems and other personnel necessary to effectively operate the respective functions. Not later than January 15, 2013, Sellers, Purchaser and the Walter Entity shall finalize the respective lists with those Business Employees to be retained by Sellers being referred to as the "Retained Originations Employees" and "Retained ETS Employees" and those Business Employees to be transferred to (x) the Walter Entity being referred to as the "Transferred Originations Employees" and (y) Purchaser being referred to as the "Transferred ETS Employees". Sellers, Purchaser and the Walter Entity shall also agree upon a list of any Retained Originations Employees and Retained ETS Employees who will be transferred to the Walter Entity or Purchaser post-Closing, along with an estimated schedule for such transfer. Any such employees shall be deemed Transferred Originations Employees or Transferred ETS Employees as of the date of transfer to the Walter Entity or Purchaser, as applicable. Subject to the proviso in the first sentence of <u>Section 6.7(b)</u>, neither Purchaser nor the Walter Entity shall have any responsibility for Retained Originations Employees or Retained ETS Employees who are not transferred to the Walter Entity or Purchaser.

64

(b) Not later than January 15, 2013, Purchaser and the Walter Entity shall provide a list to Sellers of those Business Employees who will be offered employment by Purchaser or the Walter Entity effective as of the Closing Date (together with those employees on the list of Transferred Originations Employees and Transferred ETS Employees, the "Transferred Employee List"); provided that the severance obligation that would have been owed to personnel on the Transferred Employee List by the Sellers shall equal or exceed the Severance Threshold. No Seller shall preclude Purchaser or the Walter Entity from offering employment to any Business Employee or solicit any such Business Employee to refuse such offer of employment. It is understood and agreed that if the Transferred Employee List includes Business Employees to whom the Walter Entity will make offers of employment, the terms of this Section 6.7 that apply to Purchaser shall also apply to the Walter Entity.

(c) Prior to the Closing, Purchaser shall provide to each Business Employee on the Transferred Employee List an offer (the " Employment Offer") of employment on the terms set forth in this Section 6.7, effective as of the later of the Closing Date or the date such Business Employee accepts such Employment Offer; provided that each Employment Offer shall be a Qualified Employment Offer (" Qualified Employment Offer"). A Qualified Employment Offer to a Business Employee shall not result in any of the following: (1) a substantial change in current duties for which the employee no longer qualifies; (2) a substantial change in current duties which results in a twenty percent (20%) or more reduction in salary; (3) a geographic transfer such that the distance over the shortest, most commonly traveled route from the Business Employee's home to the new work location would be at least 50 miles greater than the distance from the Business Employee's home to his or her current work location;; (4) base salary and target incentive opportunity that is less than 80% of such Business Employee's current salary and incentive package. Each Business Employee who accepts Purchaser's offer of employment and who becomes an employee of Purchaser shall be a " Transferred Employee." Sellers shall cooperate with Purchaser in effecting the Transferred Employees' transfer of employment from Sellers to Purchaser as contemplated hereby.

(d) For at least one year following the Closing, to the extent that a Transferred Employee remains employed by Purchaser, subject to the terms of the applicable Employment Offer, Purchaser shall employ such Transferred Employee on terms and conditions not less favorable in the aggregate than those provided by Purchaser to similarly situated employees of Purchaser, including with respect to salary or wages, paid time off, bonus opportunity and employee benefits (it being understood and agreed that this sentence shall not require Purchaser to continue to employ any Transferred Employee). Sellers shall retain all responsibility for providing severance compensation and benefits to each Business Employee (including each Business Employee who is a Transferred Employee) to the extent such Business Employee is or becomes entitled to such severance compensation and benefits pursuant to any severance plan, program, agreement or arrangement maintained by a Seller or any Affiliate thereof. To the extent that a Transferred Employee is terminated by the Purchaser without cause within the first year of employment by Purchaser and such termination qualifies for severance benefits, such severance benefits shall be equal to the severance benefits that such Transferred Employee would have been eligible for pursuant to Seller's severance plan at the time of the Closing. Sellers shall retain all responsibility for paying retention bonuses or similar compensation to the extent not expressly assumed by Purchaser pursuant to this paragraph.

(e) Unless prohibited by Law or otherwise provided in an Employment Offer, all unused vacation and paid time off of the Transferred Employees accrued as of the Closing Date shall, effective as of the Closing Date or, if later, the date on which such Transferred Employee becomes an employee of Purchaser, be transferred to and assumed by Purchaser, and following the Closing Date, Purchaser shall recognize and provide all such unused paid time off to the extent such paid time off is reflected in the Closing Date Schedule of Purchased Assets and Assumed Liabilities. Sellers shall be responsible for paying out any earned and unused paid time off of (i) the Business Employees who are not Transferred Employees, and (ii) Transferred Employees to the extent such paid time off cannot be assumed by Purchaser in accordance with applicable Law (unless a Transferred Employee consents to such assumption by Purchaser, if allowed under applicable Law) or are not reflected in the Closing Date Schedule of Purchased Assets and Assumed Liabilities.

(f) Unless prohibited by Law, with respect to each Transferred Employee, Purchaser agrees to assume and honor all accrued but unpaid bonus compensation to the extent (i) such bonus compensation is reflected in the Closing Date Schedule of Purchased Assets and Assumed Liabilities and (ii) all terms and conditions applicable to such bonus compensation (including, the name of the recipient, the amount, as updated through the Closing Date, and the time and form of payment) are set forth on Section 4.13(a) of the Disclosure Memorandum. Sellers shall be responsible for paying all accrued but unpaid bonus compensation to the extent not assumed by Purchaser pursuant to this paragraph (including any amounts owed to Transferred Employees that are greater than the amount reflected on the Closing Date Schedule of Purchased Assets and Assumed Liabilities due to fluctuations in the value of equity on which such amounts are based or otherwise).

(g) Purchaser shall also recognize each Transferred Employee's service at such Seller for all purposes (other than benefit accruals under defined benefit plans or retiree medical arrangements) under any Plans maintained by Purchaser for the benefit of the Transferred Employees to the extent such service was recognized under the same or comparable Plans that covered the Transferred Employees immediately prior to the Closing Date.

(h) From and after the Closing Date, Sellers shall retain all (i) employment obligations with regard to those employees and former employees of Sellers (or who are otherwise Related to the Business) who are not Transferred Employees, and (ii) all liabilities related to any Transferred Employees to the extent such liability is not expressly assumed by Purchaser in this Section 6.7.

(i) The Sellers shall cause, effective as of the Closing Date, each Transferred Employee to become fully vested in his or her account balance under the Ally Financial Inc. Retirement Savings Plan (the "Seller 401(k) Plan"). To the extent not already provided for under the Seller 401(k) Plan, the Sellers shall amend, or cause to be amended, the Seller 401(k) Plan to provide for, with respect to any Transferred Employee who elects a "direct rollover" of his or her full account balance, the distribution and rollover of any promissory note evidencing a loan outstanding under the Seller 401(k) Plan.

(j) Without limiting the generality of Section 12.8, nothing in this Section 6.7 shall (a) be treated as an amendment of, or undertaking to amend, any employee benefit plan, (b) obligate Purchaser, Seller or any of their respective Affiliates to retain the employment of any particular employee or (c) confer any rights or benefits on any person, including any Transferred Employee, other than the parties to this Agreement. Purchaser shall be entitled to rely on information provided by Sellers with respect to any Business Employee Liabilities and the performance of its obligations under this Section 6.7.

(k) If and to the extent Sellers are not "liquidating fiduciaries in bankruptcy" within the meaning of the Worker Adjustment and Retraining Notification Act ("WARN"), Sellers shall assume any liabilities, obligations and commitments in respect of WARN and any similar state and local laws, if any, as a result of the transactions contemplated by this Agreement in respect of Business Employees who are not Transferred Employees.

**Section 6.8 Notices of Certain Events.** From the date of this Agreement until the Closing Date,

(a) A Seller shall promptly notify Purchaser of:

(i) any written notice or other written communication from any Person (including any notices or communications filed with the Bankruptcy Court other than notices or other written communications that provide for a copy to be provided to Purchaser) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, or objecting to the consummation of any of the transactions contemplated by this Agreement;

67

(ii) any written notice or other written communication from any Government Entity in connection with the transactions contemplated by this Agreement;

(iii) any change or fact with respect to any of Sellers' representations, warranties or obligations hereunder of which Seller becomes aware that, with notice or lapse of time or both, will or is reasonably expected to result in a material breach by Sellers of this Agreement or otherwise result in any of the conditions set forth in Article VIII becoming incapable of being satisfied; and

(iv) any Material Adverse Effect (but without giving effect to clause (ix) of the definition of Material Adverse Effect).

(b) Purchaser shall promptly notify Sellers of:

(i) any written notice or other written communication from any Person (other than notices or other written communications directed to Sellers or to the Bankruptcy Court, with a copy provided to Purchaser) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, or objecting to the consummation of any of the transactions contemplated by this Agreement;

(ii) any written notice or other written communication from any Government Entity (other than notices or other written communications directed to Sellers or to the Bankruptcy Court, with a copy provided to Purchaser) in connection with the transactions contemplated by this Agreement; and

(iii) any change or fact with respect to any of Purchaser's representations, warranties or obligations hereunder of which it becomes aware that, with notice or lapse of time or both, will or is reasonably expected to result in a material breach by Purchaser of this Agreement or otherwise result in any of the conditions set forth in Article VIII becoming incapable of being satisfied.

No disclosure by any party hereto pursuant to this Section 6.8 shall be deemed to amend or supplement the Disclosure Schedule with respect thereto or prevent or cure any misrepresentation or breach of warranty for purposes of this Agreement.

**Section 6.9 Tax Matters.**

(a) Sellers shall pay and be responsible for all Transfer Taxes imposed in connection with the closings of the transactions contemplated hereby, and Purchaser shall reimburse Sellers for such payments up to the Purchaser Payment Cap. Sellers and Purchaser shall cooperate to timely prepare, and Sellers shall file or cause to be filed any returns or other filings relating to such Transfer Taxes (unless Purchaser is required by applicable Law to file the return), including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.

68

(b) Sellers and Purchaser shall cooperate with each other and furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information (including access to books and records) and assistance relating to the Purchased Assets and Assumed Liabilities as is reasonably requested for the preparation or filing of any Tax Returns and for the satisfaction of legitimate Tax or accounting requirements.

(c) Purchaser shall assume the duties of REMIC Administrator for any and all REMICs for which a Seller is acting as REMIC Administrator, including the preparation, filing, and other obligations related to the Tax Returns for such REMICs.

**Section 6.10 Insurance.** From and after the date of this Agreement, Purchaser and Sellers shall not take any action that may adversely affect the rights of the other with respect to any outstanding claims made or for new claims that may be made against insurance policies purchased or maintained by Purchaser for the benefit of itself and its Subsidiaries and Affiliates that the other may or will have as of the Closing Date and shall use commercially reasonable efforts to cooperate with the other in the settlement or other resolution of such claims.

**Section 6.11 Mortgage Loan Schedules and Servicing Advance Schedules** . Sellers shall deliver to Purchaser (i) an updated version of the Mortgage Loan Schedule and the Servicing Advance Schedule within 15 Business Days after the end of each month during the period from the date of this Agreement to the Closing Date, and (ii) the Cut-off Date Mortgage Loan Schedule and the Cut-off Servicing Advance Schedule as provided in  Section 3.1(b).

**Section 6.12 Title Documents and Surveys.**  Sellers shall deliver to Purchaser prior to the Closing the following documents in respect of the Owned Real Property in form and substance reasonably acceptable to the Title Company and Sellers: (i) Owner's Affidavit; (ii) No Change to Survey Affidavit, if applicable; (iii) gap indemnity; and (iv) at least ten (10) Business Days prior to Closing, financial and other information regarding on-going construction, if any (collectively, the "Title Documents"). Sellers shall reasonably cooperate with Purchaser so that Purchaser may obtain, at Purchaser's sole cost and expense, ALTA surveys for the Owned Real Property.

**Section 6.13 Schedules and Disclosure Memorandum.**

(a) Concurrently with the execution and delivery of this Agreement, Sellers delivered to Purchaser the Schedules to be provided by Sellers identified in the Table of Contents (the "Schedules") and a disclosure memorandum (the "Disclosure Memorandum") that sets forth all of the items that it deems to be necessary or appropriate (i) as an exception to a provision of this Agreement, (ii) in response to an express disclosure requirement contained in a provision hereof or (iii) as an exception to one or more representations or warranties contained in  Article IV , as applicable, or to one or more of the covenants of Sellers contained in this Agreement; provided that the mere inclusion of an item in the Schedules or Disclosure Memorandum as an exception to a provision or representation or warranty shall not be deemed an admission by any Seller or Purchaser, as applicable, that such item represents a material exception or event, state of facts, circumstance, development, change or effect or that such item would reasonably be expected to have or result in a Material Adverse Effect; provided, further, that any disclosures or exceptions made with respect to a section or subsection of this Agreement shall be deemed to qualify not only the specific section(s) referenced but also such other sections or subsections that may be affected thereby to the extent the relevance of such disclosure or exception to such other sections or subsections is readily apparent on its face.

69

(b) Sellers and Purchaser agree that, with respect to Sellers' representations and warranties contained in this Agreement, Sellers shall have the obligation until the Closing to correct, supplement or amend no later than five Business Days prior to the expected Closing Date, Schedules and the Disclosure Memorandum to reflect changes in the Purchased Assets and with respect to any matter arising or discovered after the date of this Agreement (whether or not existing or known at the date thereof) that causes the representations and warranties of Sellers to be untrue or inaccurate in any respect; provided, however, that, in no event shall any such correction, supplement or amendment be taken into account when determining the accuracy, truth and correctness of the representations and warranties of Sellers for purposes of Article VIII, including the certificates to be delivered pursuant to Section 8.3(iii), except for the updates explicitly required by the representations set forth in Sections 4.9(a) and (c) (which required updates shall only be taken into account when determining the accuracy, truth and correctness of such representations and warranties as of the Closing Date).

**Section 6.14 Bankruptcy Actions.**

(a) [RESERVED].

(b) Sellers shall, and Sellers shall cause all of their Subsidiaries to, comply with all of the obligations of Sellers under the Sale Procedures Order (after entry of such Order by the Bankruptcy Court) and the Sale Approval Order (after the entry of such Order by the Bankruptcy Court), subject to the final proviso of Section 7.1.

(c) Sellers shall use reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement. Sellers shall serve on all required Persons in the Bankruptcy Case, including (i) all Persons who are known to possess or assert a Claim or Lien against or interest in any of the Purchased Assets, (ii) the IRS, (iii) all applicable state attorneys general, and local Government Entities, (iv) all applicable state and local Government Entities with taxing authority, (v) all other Persons required by any order of the Bankruptcy Court, (vi) all parties to Assumed Contracts, and (vii) using its commercially reasonable efforts to serve all third party investor beneficiaries of Assumed Contracts and any other Persons that Purchaser reasonably may request, any notice of the Sale Motion, the Sale Hearing, the Sale Procedures Order, the Sale Approval Order, and all objection deadlines in accordance with all applicable Bankruptcy Rules, the Sale Procedures Order, and any applicable local rules of the Bankruptcy Court.

(d) As provided in the Sale Procedures Order (including the Assumed Contracts Procedures), Sellers shall move or shall have moved to assume and assign to Purchaser (or Purchaser's designee or designees) the Assumed Contracts that are executory contracts capable of being assumed pursuant to section 365 of the Bankruptcy Code (collectively, the "Assumed Pre-Petition Contracts") and shall (A) provide notice thereof to (i) all counterparties to such contracts, (ii) any third party beneficiary to such contracts as requested by Purchaser (which third party beneficiaries shall be identified by Sellers using their best efforts), (iii) any other specific and identified Person that Purchaser requests, and (iv) any other Person as may be required by applicable Bankruptcy Rules, the Sale Procedures Order, and any applicable local rules of the Bankruptcy Court and any other Person requested by Sellers; and (B) use their commercially reasonable efforts to provide notice thereof to Investors and certificateholders. Sellers have the right to reject any Contract that is not an Assumed Contract in accordance with the Bankruptcy Code. Sellers shall request a ruling in the Sale Approval Order that the Purchaser shall not be liable for any Cure Amount or otherwise obligated to cure any defaults, known or unknown, arising prior to Closing under any Assumed Contract (whether or not such Assumed Contract is an Assumed Pre-Petition Contract).

(e) Sellers shall pay Cure Amounts in the time and manner specified by the Sale Approval Order.

**Section 6.15 Participation of Walter Entity.** Purchaser shall have the right to assign this Agreement and any or all rights or obligations hereunder to a Walter Entity solely with respect to the Walter Assets (the "Walter Assignment"); provided that the assignment right described in this Section 6.15 is subject to receipt by Sellers of a letter from the Walter Entity by November 6, 2012 confirming that the Walter Entity will comply with the representations and warranties from the Walter Entity substantially identical to those provided in Article V of this Agreement and an undertaking by the Walter Entity to be bound by the terms and provisions of this Agreement in respect of the Walter Assets, including payment of up to $550 million towards the Purchase Price therefor; and provided further that Sellers and Purchaser shall prepare the necessary documentation such that, at Closing, the Walter Assets and the related Assumed Liabilities described in this Section 6.15 as well as the rights and obligations hereunder with respect thereto, including the obligation to pay the Purchase Price in respect of the Walter Assets, shall be transferred to, and for the account of, the applicable Walter Entity. Upon any such permitted Walter Assignment, the references in this Agreement to Purchaser shall also apply to any such Walter Entity to the extent such references pertain to the Walter Assets unless the context otherwise requires. Until the consummation of the Walter Assignment, Purchaser shall remain fully responsible for all obligations of Purchaser under this Agreement.

**Section 6.16 Consent Order and DOJ/AG Settlement.** Sellers and Purchaser shall use their best efforts to, as promptly as is reasonably practicable after the date of this Agreement, amend on this Agreement (the "Section 6.16 Amendment"), on terms acceptable to each of Sellers, Purchaser and all applicable Governmental Entities, to address the treatment of (a) the Consent Order entered by the FRB and the FDIC on April 13, 2011 in the action styled *In the Matter of Ally Financial, Inc, et al.*, FRB Docket No. 11-020-B-HC & 11-020-B-DEO, FDIC-11-123b, with respect to an agreement among the FRB and the FDIC, on the one hand, and AFI, Ally Bank, ResCap, GMAC Mortgage, and their institution-affiliated parties, on the other hand, and (b) the Consent Judgment with accompanying exhibits entered by the United States District Court for the District of Columbia on April 5, 2012 (Docket # 13) in the action styled *United States of America, et al. v. Bank of America Corp., et al.*, No. 12-CV-00361, with respect to the settlement agreement among the plaintiffs in that action and AFI, ResCap, and GMAC Mortgage.

71

**Section 6.17 Antitrust Clearances and Obligations.**

(a) Each of Purchaser, Sellers and, if applicable, the Walter Entity, shall by November 15, 2012, prepare and file (or cause to be prepared or filed) all notification and report forms required to be filed under the HSR Act with respect to the transactions contemplated by this Agreement, and request early termination of the waiting period under the HSR Act. Purchaser, on the one hand, and Sellers, on the other hand, shall be responsible for payment of their own fees and expenses incurred in connection with or relating to the review of the transactions contemplated hereby pursuant to the HSR Act or their efforts to consummate the transactions contemplated hereby pursuant to this Section 6.17, and shall each bear the cost of 50% of the applicable filing fee under the HSR Act.

(b) Each of Purchaser and Sellers shall (i) respond as promptly as practicable to any inquiries or requests for additional information or documentation received from the Federal Trade Commission, the Department of Justice, any attorney general of any state of the United States, or any other antitrust or competition authority of any jurisdiction (" Antitrust Authority "); (ii) keep the other party reasonably informed of any communication received by such party from, or given by such party to, any Antitrust Authority regarding the transactions contemplated by this Agreement, and any communication received or given in connection with any proceeding by a private party regarding the transactions contemplated by this Agreement, in each case in a manner that protects attorney-client or attorney work product privilege; (iii) provide copies of any written communications received from or given to any Antitrust Authority unless prohibited by applicable Law; and (iv) permit the other party to review and incorporate the other party's reasonable comments in any communication given by it to any Antitrust Authority or in connection with any proceeding by a private party related to Antitrust Laws with any other person, in each case regarding the transactions contemplated under this Agreement and in a manner that protects attorney-client or attorney work product privilege.

72

(c) Purchaser further agrees that it shall, to the extent necessary to obtain the waiver or consent from any Antitrust Authority required to receive the Sale Approval Order or to avoid the entry of or have lifted, vacated or terminated any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Antitrust Authority that is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, take the following actions: (i) propose, negotiate, offer to commit and effect (and if such offer is accepted, commit to and effect), by consent decree, hold separate order or otherwise, and in connection with the consummation of the transactions contemplated by this Agreement, the sale, divestiture or disposition (including by licensing any Intellectual Property) of any Purchased Assets and/or any other assets or businesses of Purchaser or any of its Subsidiaries or controlled Affiliates (or equity interests held by Purchaser or any of its controlled Affiliates in entities with assets or businesses); (ii) terminate any existing relationships and contractual rights and obligations; (iii) otherwise offer to take or offer to commit to take any action that it is capable of taking and, if the offer is accepted, take or commit to take such action, that limits its freedom of action with respect to, or its ability to retain, any of the Purchased Assets and/or any other assets or businesses of Purchaser or any of its Subsidiaries or controlled Affiliates (or equity interests held by Purchaser or any of its controlled Affiliates in entities with assets or businesses); and (iv) take promptly, in the event that any permanent or preliminary injunction or other order is entered or becomes reasonably foreseeable to be entered in any proceeding that would make consummation of the transactions contemplated by this Agreement unlawful or that would prevent or delay consummation of the transactions contemplated by this Agreement, any and all steps (including the appeal thereof, the posting of a bond or the taking of the steps contemplated by clauses (i), (ii) and (iii) of this Section 6.17(c)) necessary to vacate, modify or suspend such injunction or order. For the avoidance of doubt, Purchaser's obligations under this Section 6.17 shall be absolute and not qualified by "commercially reasonable efforts." The Parties agree that Sellers' obligations under this Section 6.17 shall not include any obligation on the part of Sellers or their respective Subsidiaries or controlled Affiliates to commit to or effect, by consent decree, hold separate orders, trust or otherwise the sale or disposition of such of its assets or businesses (including the Purchased Assets) as may be required to be divested in order to avoid the entry of, or to effect the dissolution of, any decree, order, judgment, injunction, temporary restraining order or other order in any suit or proceeding.

(d) Neither Purchaser nor Sellers shall, after the entry of the Sale Approval Order, agree to accept any agreement that would have the effect of delaying the consummation of any action contemplated by this Agreement without the written consent of the other Party. For the avoidance of doubt, no Party shall commit to or agree with any Antitrust Authority to stay, toll or extend any applicable waiting period under the HSR Act or other applicable Laws, without the prior written consent of the other Parties.

(e) Neither Purchaser nor any of its controlled Subsidiaries shall take any action or acquire any assets or securities of any other Person or agree to acquire assets or securities of any other Person if such action, acquisition or agreement would reasonably be expected to impair Purchaser's ability to consummate the transactions contemplated hereby.

**Section 6.18 Post-Closing Amounts Received and Paid.** All amounts that are received by a Seller or any Seller Affiliates in respect of any of the Purchased Assets with respect to a period following the Closing shall be received by such Person as agent, in trust for and on behalf of Purchaser, and following the Closing, Sellers shall, on a monthly basis, pay, or cause to be paid, by wire transfer of immediately available funds to Purchaser all such amounts received by or paid to any such Seller or any of their respective Affiliates, and shall provide Purchaser with information as to the nature and source of all such payments, including any invoice related thereto. All amounts that are received by Purchaser or any of its Affiliates following the Closing in respect of any Excluded Assets shall be received by such Person as agent, in trust for and on behalf of Sellers, and Purchaser shall, on a monthly basis, pay or cause to be paid all such amounts over to Sellers by wire transfer of immediately available funds and shall provide Seller with information as to the nature and source of all such payments, including any invoice relating thereto.

**Section 6.19 Confidentiality.**

(a) After the Closing, Sellers will, and will cause their respective Subsidiaries and instruct their respective Affiliates to, hold in confidence and not use in any manner detrimental to the Business all Confidential Information concerning the Business, the Purchased Assets, the Assumed Liabilities or the Assumed Contracts, except to the extent that such information can be shown to have been (i) in the public domain prior to the Closing or (ii) in the public domain at or after the Closing through no fault of Sellers or any of their Affiliates or any of their respective representatives. If, after the Closing, Sellers or any of their Affiliates or any of their respective representatives are legally required to disclose any Confidential Information, Sellers shall to the extent permitted by Law (A) promptly notify Purchaser to permit Purchaser, at its expense, to seek a protective order or take other appropriate action and (B) cooperate as reasonably requested by Purchaser in Purchaser's efforts to obtain a protective order or other reasonable assurance that confidential treatment will be accorded such Confidential Information, but only at Purchaser's sole cost and expense. If, after the Closing and in the absence of a protective order, Sellers or any of their Affiliates or any of their respective Representatives are compelled as a matter of Law to disclose any such Confidential Information to a third party, such Person may disclose to the third party compelling disclosure only the part of such Confidential Information as is required by Law to be disclosed; provided, however, that to the extent permitted by Law, prior to any such disclosure, such Person consults in good faith with Purchaser and its legal counsel as to such disclosure and the nature and wording of such disclosure.

(b) For purposes of Section 6.19(a), "Confidential Information" shall mean any confidential information concerning the Business, the Purchased Assets, the Assumed Liabilities or the Assumed Contracts, including, without limitation, methods of operation, products, prices, fees, costs, markets or other specialized information or proprietary matters.

(c) If the Closing does not occur, each party shall, upon the written request of the other party, return to the other party or destroy (such destruction to be confirmed in writing to the other party upon written request) all materials, documentation, data, records and other papers and copies thereof (whether on paper or in electronic, magnetic, photographic, mechanical or optical storage) that constitutes Confidential Information of the other party, and not use any such information or knowledge for any purpose whatsoever, provided that a party may maintain such information to the extent required by Law or such party's established document retention policies (including any requirement to retain email on an automated email archival system) or relating to the safeguarding or backup storage of electronic data or in connection with a legal dispute with the other party.

74

(d) Notwithstanding the foregoing, the parties to this Agreement acknowledge that each of them (and each of their employees, representatives, or other agents) has been and is permitted to disclose to any and all persons, without limitation of any kind, the federal tax treatment and structure of this Agreement (including Confidential Information) and all materials of any kind (including opinions or other tax analyses) that are or have been provided to them relating to such federal tax treatment and structure. This provision is intended to qualify for the presumption that this Agreement is not offered under conditions of confidentiality as set forth in Treasury Regulation Section 1.6011-4(b)(3) and shall be interpreted to authorize disclosure only to the extent necessary to so qualify.

(e) In connection with the delivery by Purchaser to Sellers of the copy of the Commitment Letters and the debt commitment letters, Sellers shall comply with the confidentiality terms of the Commitment Letters and the debt commitment letters.

**Section 6.20 Real Property Matters and Transition Services.**

(a) With regard to any Real Property not included in the Purchased Assets or Assumed Contracts as of the Closing Date, Purchaser shall be permitted to occupy and have access thereto (in the same manner as the Business occupied and had access to such property prior to Closing) for a period of not less than 60 days following the Closing. For such 60 day period, Seller shall maintain and shall not reject any such Real Property. If requested by AFI, access and occupancy to such Real Property shall also be granted to AFI and its Subsidiaries in the same manner as AFI and its Subsidiaries had occupied and access to such property prior to Closing.

(b) Prior to the Closing Date, if the Sellers request a sublease with respect to any Leased Real Property to be transferred to Purchase at Closing, Sellers and Purchaser will undertake good faith efforts to negotiate the terms of any Sublease Agreement with respect to any such Leased Real Property.

(c) Sellers and Purchaser agree that, promptly after the date hereof, Sellers and Purchaser will be begin to negotiate in good faith and will use their commercially reasonable efforts to finalize, as promptly as practicable, a transition services agreement between Sellers, on the one hand, and Purchaser, on the other (the "Transition Services Agreement"), pursuant to which Purchaser will provide Sellers such transition services and Sellers shall provide Purchaser such transition services as may be mutually agreed upon by the parties, taking into account the anticipated Purchased Assets, Excluded Assets, Transferred Employees (and any employees that will not become Transferred Employees) in each case, as of the Closing Date (it is understood and agreed that it is expected that the Walter Entity will be required to provide Sellers with access to certain IT Assets included in the Walter Assets as well as to certain Business Employees hired by the Walter Entity for a transitional period subsequent to the Closing). The Transition Services Agreement shall include provisions facilitating Sellers in the closing of the Post-Closing Pipeline and provisions relating to the processing of pending non-judicial foreclosures. Fees for any other transition services shall be based on any actual, out-of-pocket costs and expenses incurred by the party performing such services plus the allocable portion of internal costs incurred in performing such services, including employee compensation and other costs, overhead and administrative costs. The Transition Services Agreement shall cover a period not to exceed the lesser of (x) the closing of the Bankruptcy Case or (y) six months after the Closing Date.

(d) On or prior to the Closing Date, effective as of the Closing Date, Purchaser expects to enter into the AFI Transition Services Agreement with AFI.

**Section 6.21 Required Financial Information.**  At Purchaser's cost and expense, Sellers shall reasonably cooperate with Purchaser in a timely manner as reasonably requested by Purchaser in connection with Purchaser's preparation of historical financial statements and pro forma financial information in respect of the Business as required by Regulation S-X under the Securities Act of 1933, as amended, and the timely filing of the necessary financial statements and pro forma financial information with the SEC under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, and for securities offerings by Purchaser and its Affiliates in which such financial information is reasonably necessary or advisable including (i) permitting Purchaser to use any audited or unaudited financial statements available, (ii) facilitating the delivery from Seller's independent public accountants relevant consent letters necessary in connection with the foregoing and (iii) if any requested financial statements are not available, assisting in the preparation of such audited or unaudited financial statements.

**Section 6.22 PSA Amendments.**  Prior to Closing, Sellers shall use best efforts (a) to obtain any PSA Amendment requested by Purchaser and (b) to obtain amendments requested by Purchaser to any Servicing Agreement with respect to servicing fees that are substantially similar to the amendments with respect to servicing advances under clauses (i) and (v) of the definition of Eligible Servicing Agreement, but Sellers shall not be required to seek any investor consent for such amendment for servicing fees. Purchaser agrees to provide Sellers such assistance as Sellers may reasonably request to obtain any PSA Amendment or other amendments to Servicing Agreements as requested by Purchaser.

**Section 6.23 Mortgage Loans Documents.**  Prior to Closing, Sellers shall use commercially reasonable efforts to obtain originals of the Mortgage Notes, the mortgage or deed of trust and all assignments thereof that are not currently included in the Mortgage Loan Documents (at Sellers' cost).

**Section 6.24 Preparation for Transfer of Certain Purchased Mortgage Servicing.**  Prior to Closing, Sellers shall use their best efforts to prepare for the potential transfer of the Fannie Mae Agency Loans to the Walter Entity and the potential transfer of Private Investor Loans as may be permitted by this Agreement on the Closing Date or as soon thereafter as reasonably possible;  provided  that any third party fees, costs and expenses incurred by Sellers shall be paid by Purchaser (or, with respect any Walter Assets, if the Walter Assignment has occurred, the Walter Entity) promptly after receipt of a request for payment therefor irrespective of whether the Closing occurs (it being understood and agreed that, prior to incurring any third party fee, cost or expense in excess of $25,000 in connection with the performance of Sellers' obligations under this Section 6.24, Sellers shall obtain Purchaser's consent for such fee, cost or expense, which consent shall not be unreasonably withheld or delayed). For the avoidance of doubt, (a) prior to the Closing Sellers shall have no obligations to prepare to transfer any loans other than as described in this Section 6.24 and (b) subsequent to the Closing, Sellers shall have no ongoing obligation regarding the master servicing rights, servicing advances or subservicing agreements transferred hereunder, whether pursuant to an interim servicing agreement or otherwise.

76

**Section 6.25 Purchaser Payment Cap.** Notwithstanding any of the terms of this Agreement, the aggregate amount that Purchaser shall be liable for under the Purchaser Payable Cure Amount, the Transfer Taxes under Section 6.9, the transfer costs under Section 9.2 (except to the extent paid for by Purchaser pursuant to section 6.24) and any other Section specifically referencing the Purchaser Payable Cure Amount shall not in the aggregate exceed $10,000,000 (the "Purchaser Payment Cap") (for the avoidance of doubt, clause (v) of "Assumed Liabilities" and Section 6.24 are not included within the Purchaser Payment Cap), and Sellers shall be liable for any such Cure Amount, Transfer Taxes and transfer costs in excess of the Purchaser Payment Cap.

**Section 6.26 DIP Financing Agreements.** Concurrently with the execution of this Agreement, Sellers entered (and caused their Subsidiaries to enter) into the DIP Financing Agreements, which includes a grant by Sellers to the lenders thereunder of a lien on Sellers' rights under the Deposit Escrow Agreement, subject to the terms and conditions described therein.

**Section 6.27 [RESERVED].**

**Section 6.28 Separation Services.**

(a) Following the date of this Agreement, Sellers shall, and shall cause its Subsidiaries to, continue the separation of the Business from AFI and its Affiliates (other than ResCap and its Subsidiaries) (the "Separation Services"). Sellers acknowledge and agree that the Separation Services are intended to permit Sellers to deliver at Closing to the Purchaser the Business and Purchased Assets as a stand-alone business separate from AFI, and with as minimal support from AFI as is necessary for Purchaser to operate the Business following the Closing. Purchaser and ResCap shall designate representatives to have biweekly meetings to discuss the Separation Services and to resolve any issues which may arise during the performance of the Separation Services.

(b) Sellers shall use commercially reasonable efforts to effect the Separation Services as reasonably directed by Purchaser in order to enable Purchaser to operate the Business in the ordinary course at Closing without the need of any services provided by AFI and its Affiliates (other than ResCap and its Subsidiaries). In connection with the Separation Services, the parties shall undertake good faith efforts to agree on a migration plan to the extent reasonably necessary in order to effect the Separation Services by Closing.

(c) Prior to Closing, the Sellers shall acquire good and valid title to the servers, software, computer equipment, systems and related information technology as contemplated by Sellers shared services and transition plan (as the same may be amended by mutual agreement of the parties hereto), such assets to be at least the same quality as in place as of the date of this Agreement and as used in the Ordinary Course of Business, and shall be included as part of the Purchased Assets under this Agreement. To the extent that Sellers shall not have acquired any such assets prior to Closing, the Purchase Price shall be reduced by the contemplated costs for such assets and Schedule 3.1(a) shall be amended accordingly.

**Section 6.29 Repurchase.** Purchaser shall have the right to cause Sellers to repurchase from Purchaser any Ginnie Mae Loan that is not FHA or VA insured within 60 days after the Closing Date. The closing of the repurchase of any Ginnie Mae Loan shall take place on a date mutually agreed upon between Sellers and Purchaser, but in any event, within seven days after receipt of notice by Seller from Purchaser that it is exercising its right to cause such repurchase. The repurchase price for any Ginnie Mae Loan sold to Sellers shall be the same price at which Purchaser acquired the Ginnie Mae Loan at Closing.

**Section 6.30 Rebranding.** Following the Closing Date, Purchaser shall proceed expeditiously to complete the rebranding of items used in the Business into a name or names designated by Purchaser. No later than 120 days following the Closing, Purchaser shall have completed such rebranding with respect to signage, letterhead, account statements, business cards, email accounts, marketing materials, VRU scripts and similar items. Until such rebranding is completed, Purchaser shall be authorized to continue to use such items bearing the names of Sellers, provided that to the extent covered by the GM Transition License, such use shall be governed by the terms thereof . The costs of such rebranding shall be borne by Purchaser and not be subject to the Purchaser Payment Cap.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

**Section 7.1 Competing Transaction.** Following entry of the Sale Procedures Order, other than pursuant to and in compliance with the terms and conditions of the Sale Procedures Order, in no event may Sellers or their respective Affiliates initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser and its Affiliates, agents and representatives) concerning any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of the Purchased Assets (each a " Competing Transaction") or accept an offer or proposal from any Person (other than Purchaser and its Affiliates, agents and representatives) with respect to a Competing Transaction;  provided, that notwithstanding the foregoing, prior to entry of the Sale Approval Order, Sellers shall be permitted to engage in any of the foregoing actions if the respective boards of directors of the Sellers determine in good faith, based on the advice of outside counsel after consultation with Sellers' financial advisors, that compliance with such procedures will constitute a breach of their fiduciary duties to the Sellers' creditors or other parties.

**Section 7.2 Bankruptcy Court Filings.** Sellers have filed the Sale Motion with the Bankruptcy Court. Subject to   Section 7.1, Sellers shall pursue diligently the entry of the Sale Procedures Order and the Sale Approval Order, including resolving any objections lodged to the Sellers' proposed Cure Amounts relating to Assumed Pre-Petition Contracts. Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Procedures Order and the Sale Approval Order and all parties hereto shall use their respective reasonable best efforts to obtain a finding of adequate assurance of future performance by Purchaser or its designee or designees under the Assumed Pre-Petition Contracts, and demonstrating that each of Purchaser and such designees is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court. In the event the entry of the Sale Procedures Order or the Sale Approval Order shall be appealed, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal. Notwithstanding anything contained herein to the contrary, and otherwise in accordance with the terms and conditions set forth herein, Sellers may, with the consent of the Purchaser (in Purchaser's sole discretion, and consistent with the Sale Procedures Order) seek Bankruptcy Court approval to proceed with approval of the transactions contemplated herein under section 1123 of the Bankruptcy Code.

## ARTICLE VIII

## CONDITIONS

**Section 8.1 Conditions to Obligations of Purchaser and Sellers** . The respective obligations of each party to consummate the Closing shall be subject to the satisfaction, or waiver by Purchaser and Sellers, on or prior to the Closing Date of all of the following conditions precedent:

(i) <u>Sale Procedures Order</u>. The Sale Procedures Order (a) shall have been entered by the Bankruptcy Court and not be subject to any stay of effectiveness, (b) shall not have been modified or amended in any manner materially adverse to Purchaser unless agreed to in writing by Purchaser in its sole discretion and (c) shall have become a Final Order;  <u>provided, however</u>, that the condition set forth in clause (c) shall be waivable only by Purchaser on behalf of both parties.

(ii) <u>Sale Approval Order</u>. The Sale Approval Order (a) shall have been entered by the Bankruptcy Court and not be subject to any stay of effectiveness, (b) shall not have been modified or amended in any manner adverse to Purchaser unless agreed to in writing by Purchaser in its sole discretion and (c) shall have become a Final Order.

(iii) <u>No Law, Judgments, Etc.</u> No Government Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or any decree, judgment, injunction or other Order, which is in effect and that restricts, prevents, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement. No proceeding or investigation by any Government Entity or other Person shall have been instituted that restricts, prevents, prohibits, makes illegal, enjoins or results in material damages in respect of the consummation of the transactions contemplated by this Agreement or any Ancillary Agreement.

(iv) <u>Injunctions</u>. No Government Entity shall have issued an Order enjoining, restraining or prohibiting the completion of the transactions contemplated hereby and no suit, action or proceeding shall have been instituted by a Government Entity or any other Person that would reasonably be expected to have a Material Adverse Effect on the Business or enjoin, restrain, prohibit or otherwise challenge the transactions contemplated by this Agreement, or that would be reasonably likely to prevent or make illegal the consummation of the transactions contemplated by this Agreement, and no Government Entity shall have notified Purchaser or Sellers in writing that this Agreement or the consummation of the transactions contemplated by this Agreement would in any manner constitute a violation of any Law and that it intends to commence any suit, action, or proceeding to restrain, enjoin or prohibit the transactions contemplated by this Agreement.

(v) Agency Approvals. Purchaser shall be approved as (A) a Title II Supervised Mortgagee and servicer for FHA Loans by HUD; (B) an approved seller and servicer of residential mortgages by Freddie Mac and Fannie Mae; (C) an "issuer" by Ginnie Mae; and (D) a VA-approved lender in all applicable jurisdictions.

(vi) Antitrust Clearances. The waiting period applicable to the transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated.

(vii) Section 6.16 Amendment. The Section 6.16 Amendment shall have been agreed upon by each of Sellers, Purchaser and all applicable Governmental Entities and shall be in full force and effect.

**Section 8.2 Conditions to Obligations of Sellers.** The obligations of Sellers to consummate the Closing shall be subject to the satisfaction or waiver, at or prior to the Closing Date, of the following conditions:

(i) Warranties of Purchaser True as of the Date of this Agreement and as of the Closing Date . The representations and warranties of Purchaser contained herein that are qualified by materiality or Material Adverse Effect shall be accurate, true and correct in all respects, and all other representations and warranties of Purchaser contained herein shall be accurate, true and correct in all material respects, in each case on and as of the date of this Agreement and as of the Closing Date as though made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such date).

(ii) Compliance with Covenants. Purchaser shall have performed and complied in all material respects with each of the covenants and agreements contained in this Agreement required to be performed and complied with by it on or prior to the Closing Date.

(iii) Certificate. Sellers shall have received a certificate, signed by a duly authorized officer of Purchaser and dated the Closing Date, to the effect that the conditions set forth in Sections 8.2(i)  and 8.2(ii) have been satisfied.

**Section 8.3 Conditions to Obligations of Purchaser.** The obligations of Purchaser to consummate the Closing shall be subject to the satisfaction or waiver, at or prior to the Closing Date of each of the following conditions:

(i) Warranties of Sellers True as of the date of this Agreement and as of the Closing Date . The representations and warranties of Sellers or any Affiliate Seller contained herein that are qualified by materiality or Material Adverse Effect (including the representation set forth in clause (a) of Section 4.5) shall be accurate, true and correct in all respects, and all other representations and warranties of Sellers or any Affiliate Seller contained herein shall be accurate, true and correct in all material respects, in each case on and as of the date of this Agreement and as of the Closing Date as though made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such date).

(ii) Compliance with Covenants. Sellers shall have performed and complied with the covenants set forth in  Sections 6.14(d) and (f) in all respects, and shall have performed and complied in all material respects with each of the covenants and agreements contained in this Agreement required to be performed and complied with by them on or prior to the Closing Date.

(iii) Certificate. Purchaser shall have received certificates, signed by duly authorized officers of Sellers and dated the Closing Date, to the effect that the conditions set forth in Sections 8.3(i) and 8.3(ii) have been satisfied.

(iv) Sale Approval Order. With respect to obligations and benefits that can be realized prior to the Closing Date, Sellers shall have complied, in all material respects, with all of their obligations under, and Purchaser shall have received the benefits of, the Sale Approval Order.

(v) Agency Consents. The Agency Consents described in Schedule 4.3 in form and substance reasonably satisfactory to Purchaser shall have been duly obtained, and shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

(vi) Other Third Party Consents. The Consents set forth on Schedule 8.3(vi) shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Purchaser, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

(vii) Agreement with AFI. AFI shall have executed and delivered to Purchaser the AFI Transition Services Agreement in such form as AFI and Purchaser shall agree.

(viii) Licenses. Purchaser shall have each of the Business Licenses set forth on  Schedule 8.3(viii) or, with respect to any such Business License, shall have received a written waiver by the relevant licensing Governmental Entity to operate the Business without such Business License, pending the final issuance thereof.

81

(ix) <u>Data Center Interests</u>. AFI shall have sold the Minnesota Data Center Interest to EPRE and re-assigned the Texas Data Center Interest to GMAC Mortgage, in each case on or prior to Closing, and such Data Center Interests shall be transferable at Closing to Purchaser, such that it owns good, valid and marketable title to 100% of the Eden Prairie Owned Real Property and 100% of the Lewisville, Texas Leased Real Property, in each case free and clear of all Claims and Liens (other than Permitted Liens).

## ARTICLE IX

## TRANSFER OF SERVICING

**Section 9.1 Transfer of Purchased Mortgage Servicing and MSRs.** Sellers and Purchaser shall use their respective reasonable best efforts to promptly negotiate in good faith and finalize, by November 30, 2012, the terms and conditions of the Servicing Transfer Agreement, which shall be consistent with this <u>Section 9.1</u> and contain customary terms for transactions of this type regarding the transfer of mortgage loan servicing, including related servicing transfer instructions, and shall include, among other provisions: (i) an agreement by Sellers to take such actions as are reasonably required to change the named party to Purchaser or its designee on documents related to the Purchased Mortgage Servicing that are currently in the name of a Seller, in its capacity as Servicer, including on all financing statements and insurance policies; (ii) authorization for Purchaser to communicate to third parties that it has purchased the Purchased Assets from Sellers and reference such names of Sellers, and (iii) an acknowledgment by the parties that the costs of the servicing transfer will be borne by the respective parties in accordance with <u>Section 9.2</u> hereof.

(b) The Servicing Transfer Agreement shall further (i) provide that Purchaser shall file appropriate documents within one hundred twenty (120) days after each applicable servicing transfer date to request that Purchaser be substituted for Seller in any Foreclosure proceeding in which a Seller is a plaintiff (the costs and expenses of any such filing to be divided equally between Purchaser and Sellers, subject to the Purchaser Payment Cap), unless Purchaser determines such substitution is not necessary or advisable to complete the Foreclosure, (ii) provide that in no event will Purchaser be required to take any action to request that Purchaser or any other Person be substituted for Seller to the extent that Seller is only a defendant in litigation and (iii) provide that, if agreed upon by Purchaser and Seller in writing, Purchaser shall conduct and control litigation in which Seller is a defendant from and after the Closing Date at Sellers' sole expense, it being understood that, (A) it is the parties' intention that Purchaser will assume management responsibility for all ordinary course servicing litigation other than litigation in which a Seller is solely a defendant and (B) notwithstanding any agreement to conduct and control such litigation, any liability with respect to such litigation shall be a Retained Liability.

82

(c) The Servicing Transfer Agreement shall be executed by Sellers and Purchaser no later than one Business Day following the date of the Sale Approval Order. The transfer of the Purchased Mortgage Servicing from Sellers to Purchaser shall occur on one or more transfer dates on or following the Closing Date determined in accordance with the Servicing Transfer Agreement. In the case of any inconsistency between this Agreement and the Servicing Transfer Agreement, the provisions of this Agreement shall govern.

**Section 9.2 Costs of Transfer**. Except as otherwise provided herein (including the Purchaser Payment Cap) or in the Servicing Transfer Agreement, Sellers, on the one hand, and Purchaser, on the other hand, shall each be responsible for 50% of all costs and expenses of transferring the Purchased Mortgage Servicing to Purchaser, including (i) transferring the servicer status of any Serviced Mortgage Loan registered on MERS from Sellers to Purchaser, (ii) preparing assignments of mortgages and deeds of trust in recordable form to the extent necessary or advisable for Purchaser to assume servicing responsibility for any Serviced Mortgaged Loan not registered on MERS (provided that the fees and expenses of recording assignments, if Purchaser chooses to do so, will be borne entirely by Purchaser), (iii) preparation and mailing of "hello-goodbye letters" to Serviced Mortgagors (as defined in the Servicing Transfer Agreement), (iv) preparation and delivery of notices to Investors, ETS Customers, trustees, bond insurers, custodians, master servicers, subservicers, vendors, foreclosure attorneys and other interested parties, (v) retitling custodial, escrow and other servicing related bank and investment accounts, (vi) obtaining Investor or ETS Customer consents and rating agency "no downgrade" letters (if and to the extent required under Orders of the Bankruptcy Court), (vii) obtaining PSA Amendments, (viii) recording of mortgage assignments, (ix) the cost of tax and flood contracts and (x) filing pleadings and other documents and instruments with the court or other appropriate body requesting that Sellers be removed as a party plaintiff to litigation and substituting Purchaser or another appropriate party plaintiff, as the real party-in-interest.

## ARTICLE X

## TERMINATION AND SURVIVAL

**Section 10.1 Termination.** Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time on or prior to the Closing Date:

(a) by the mutual written consent of Sellers and Purchaser;

(b) by Sellers or Purchaser if any court of competent jurisdiction shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such Order shall have become a Final Order unless such Final Order or action was issued or taken at the request or with the support of the party seeking to terminate this Agreement (or any of its Affiliates); it being agreed that the parties, hereto shall promptly appeal any such adverse order or other determination that is appealable (and argue such appeal with reasonable diligence);

(c) by Purchaser, if

(i) upon written notice to Sellers, if any condition to the obligations of Purchaser set forth in Sections 8.1 and 8.3 shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(ii) upon written notice to Sellers, if there has been a material violation or breach by any Seller of any covenant, agreement, representation or warranty contained in this Agreement, which violation or breach (A) has not been cured within ten Business Days following the delivery of written notice of such violation or breach or (B) is not capable of being cured within a ten Business Day period;

(iii) the Sale Procedures Order dated June 28, 2012 is changed in a manner that is materially adverse to Purchaser without the consent of Purchaser in its sole discretion;

(iv) [RESERVED]

(v) the Auction, if any, is not concluded by October 26, 2012;

(vi) the Sale Hearing does not occur by November 19, 2012;

(vii) the Sale Approval Order has not been entered and become a Final Order without stay of its effectiveness by December 3, 2012;

(viii) the Sale Approval Order, once entered, is changed in a manner that is adverse to Purchaser without the consent of Purchaser in its sole discretion; or

(ix) any Seller seeks to have the Bankruptcy Court enter an order dismissing the Bankruptcy Case of any Seller or converting it to a case under Chapter 7 of the Bankruptcy Code, or if the Bankruptcy Court enters an order dismissing the Bankruptcy Case of any Seller or converting the Bankruptcy Case of any Seller to a case under Chapter 7 of the Bankruptcy Code, or appoints a trustee in any Seller's Bankruptcy Case or an examiner with enlarged powers relating to the operation of Sellers' businesses, and such dismissal, conversion or appointment is not reversed or vacated within three business days after the entry thereof;

(d) by Sellers:

(i) upon written notice to Purchaser, if any condition to the obligations of Sellers set forth in   Sections 8.1 and 8.2 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(ii) upon written notice to Purchaser, if there has been a material violation or breach by Purchaser or any covenant, agreement, representation or warranty contained in this Agreement, which violation or breach (A) has not been cured within ten Business Days following the delivery of written notice of such violation or breach or (B) is not capable of being cured within a ten Business Day period; or

84

(iii) prior to the entry of the Sale Approval Order, upon written notice to Purchaser in accordance with   Section 10.2(b), if Sellers determine that their obligations under the final proviso of Section 7.1 require such termination, subject to Sellers' compliance with all the provisions of Section 10.2(b);

(e) [RESERVED]; or

(f) by Sellers or Purchaser if the Closing shall not have occurred on or before March 31, 2013 (or such later date as mutually agreed to by Sellers and Purchaser).

**Section 10.2 Procedure and Effect of Termination.**

(a) In the event of termination of this Agreement and abandonment of the transactions contemplated by this Agreement by either or both of the parties pursuant to Section 10.1, three Business Days' written notice thereof shall forthwith be given by the terminating party to the other party and this Agreement shall terminate and the transactions contemplated by this Agreement shall be abandoned, without further action by any of the parties hereto; provided that no notice shall be required with respect to termination pursuant to   Section 10.1(e) and provided further that (i)  Section 3.4, this Section 10.2 and Article XI shall survive the termination of this Agreement and (ii) no such termination shall relieve any party from any Losses arising out of any breach of this Agreement by a party that occurs upon or prior to the termination of this Agreement.

(b) Sellers may terminate this Agreement pursuant to   Section 10.1(d)(iii) only if (i) Sellers have notified Purchaser in writing with reasonable detail of Sellers' determination that their obligations under the final proviso of Section 7.1 require such termination, (ii) during the five (5) Business Day period following receipt by Purchaser of the notice referred to in clause (i) above, Sellers and their representatives have negotiated in good faith with Purchaser regarding any revisions to the terms of this Agreement proposed by Purchaser in response to such determination that Sellers' obligations under the final proviso of Section 7.1 require such termination, (iii) at least five (5) Business Days following receipt by Purchaser of the notice referred to in clause (i) above, and taking into account any proposed amendment to this Agreement made by Purchaser since receipt of the notice referred to in clause (i) above, that the respective boards of directors of the Sellers have again determined in good faith, based on the advice of outside counsel after consultation with Sellers' financial advisors, that Sellers' obligations under the final proviso of Section 7.1 require such termination and (iv) Sellers are in compliance with Section 7.1. Furthermore, Sellers may terminate this Agreement pursuant to   Section 10.1(d)(iii) only in response to a Competing Transaction received outside of the Auction process contemplated by the Sale Procedures Order.

85

## ARTICLE XI

### INDEMNIFICATION

**Section 11.1 Indemnification by Sellers.**

(a) Each Seller agrees, on a joint and several basis, to indemnify and hold harmless each of Purchaser, Ocwen Financial Corporation ("_Parent_"), Parent's direct and indirect Subsidiaries, Parent's controlling shareholders and its and their respective directors, officers and employees (each a "_Purchaser Group Member_") from and against any and all Losses incurred by such Purchaser Group Member in connection with or arising from any breach of any Core Representations or the inaccuracy of any Core Representations of Sellers contained or referred to in this Agreement or in any certificate delivered by or on behalf of Sellers pursuant hereto; _provided_, that in no event shall the aggregate amount required to be paid by Sellers pursuant to this _Section 11.1(a)_ exceed the Indemnity Escrow Amount.

(b) The indemnification provided for in _Section 11.1(a)_ shall terminate on the earlier of one year after the Closing Date and the entry of a Final Order closing the Bankruptcy Case (the "_Termination Date_") (and no claims shall be made by any Purchaser Group Member under _Section 11.1(a)_ after the Termination Date), except that the indemnification by Sellers shall continue as to any Loss of which any Purchaser Group Member has notified ResCap in accordance with the requirements of Section 11.2 on or prior to the Termination Date, as to which the obligation of Sellers shall continue until the liability of Sellers shall have been determined pursuant to this _Article XI_, and Sellers shall have reimbursed all Purchaser Group Members for the full amount of such Losses in accordance with this Article XI.

**Section 11.2 Notice of Claims.**

(a) Any Purchaser Group Member seeking indemnification hereunder shall give to each Seller obligated to provide indemnification to such Purchaser Group Member (the "Indemnitor") a notice (a "Claim Notice") describing in reasonable detail the facts giving rise to any claim for indemnification hereunder and shall include in such Claim Notice (if then known) the amount or the method of computation of the amount of such claim, and a reference to the provision of this Agreement or any other agreement, document or instrument executed hereunder or in connection herewith upon which such claim is based; provided, that a Claim Notice in respect of any pending or threatened action at law or suit in equity by or against a third Person as to which indemnification will be sought (each such action or suit being a "_Third Person Claim_") shall be given promptly after the action or suit is commenced; provided further that failure to give such notice shall not relieve the Indemnitor of its obligations hereunder except to the extent it shall have been actually prejudiced by such failure and then only to the extent of such prejudice.

86

(b) After the giving of any Claim Notice pursuant hereto, the amount of indemnification to which a Purchaser Group Member shall be entitled under this Article XI shall be determined: (i) by the written agreement between the Purchaser Group Member and the Indemnitor; (ii) by a final judgment or decree of any court of competent jurisdiction; or (iii) by any other means to which the Purchaser Group Member and the Indemnitor shall agree. The judgment or decree of a court shall be deemed final when the time for appeal, if any, shall have expired and no appeal shall have been taken or when all appeals taken shall have been finally determined. The Purchaser Group Member shall have the burden of proof in establishing the amount of Loss suffered by it.

**Section 11.3 Third Person Claims.**

(a) Subject to Section 11.3(b), the Purchaser Group Member shall have the right to conduct and control, through counsel of its choosing, the defense, compromise or settlement of any Third Person Claim against such Purchaser Group Member as to which indemnification will be sought by any Purchaser Group Member from any Indemnitor hereunder, and in any such case the Indemnitor shall cooperate in connection therewith and shall furnish such records, information and testimony and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by the Purchaser Group Member in connection therewith; provided, that:

(i) the Indemnitor may participate, through counsel chosen by it and at its own expense, in the defense of any such Third Person Claim as to which the Purchaser Group Member has so elected to conduct and control the defense thereof; and

(ii) the Purchaser Group Member shall not, without the written consent of the Indemnitor, pay, compromise or settle any such Third Person Claim, except that no such consent shall be required if, following a written request from the Purchaser Group Member, the Indemnitor shall fail, within 28 days after the making of such request or such shorter period if such Purchaser Group Member is required to respond prior to the end of such 28-day period, to acknowledge and agree in writing that, if such Third Person Claim shall be adversely determined, such Indemnitor has an obligation to provide indemnification hereunder to such Purchaser Group Member.

Notwithstanding the foregoing, the Purchaser Group Member shall have the right to pay, settle or compromise any such Third Person Claim without such consent, provided, that in such event the Purchaser Group Member shall waive any right to indemnity therefor hereunder unless such consent is unreasonably withheld.

(b) If any Third Person Claim against any Purchaser Group Member is solely for money damages or will have no continuing effect in any material respect on the Business or the Purchased Assets, then the Indemnitor shall have the right to conduct and control, through counsel of its choosing, the defense, compromise or settlement of any such Third Person Claim against such Purchaser Group Member as to which indemnification will be sought by any Purchaser Group Member from any Indemnitor hereunder if the Indemnitor has acknowledged and agreed in writing that, if the same is adversely determined, the Indemnitor has an obligation to provide indemnification to the Purchaser Group Member in respect thereof, and in any such case the Purchaser Group Member shall cooperate in connection therewith and shall furnish such records, information and testimony and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by the Indemnitor in connection therewith; provided, that the Purchaser Group Member may participate, through counsel chosen by it and at its own expense, in the defense of any such Third Person Claim as to which the Indemnitor has so elected to conduct and control the defense thereof. Notwithstanding the foregoing, the Indemnitor shall not be entitled to assume the defense of any Third Person Claim if the reasonably expected monetary damages for which the Purchaser Group Member would be entitled to indemnification under this Agreement is greater than the Indemnity Escrow Funds. Notwithstanding the foregoing, the Purchaser Group Member shall have the right to pay, settle or compromise any such Third Person Claim, provided, that in such event the Purchaser Group Member shall waive any right to indemnity therefor hereunder.

87

**Section 11.4 Claims Against the Indemnity Escrowed Funds.** Purchaser shall have the right to notify the Indemnity Escrow Agent of any claim for indemnification made by any Purchaser Group Member pursuant to this Article XI. Promptly following the final determination in accordance with this Article XI of any claim for indemnification made by any Purchaser Group Member, upon request by Purchaser, Sellers shall execute and deliver a certificate requesting the Indemnity Escrow Agent to deliver by wire transfer to an account designated by Purchaser immediately available funds in the amount of such claim as finally determined in accordance with this Article XI (not to exceed the Indemnity Escrowed Funds). On the Termination Date, the Indemnity Escrow Agent shall deliver to Sellers all the Indemnity Escrowed Funds then held by the Indemnity Escrow Agent by wire transfer to one or more accounts designated by ResCap; provided, however, that if prior to the Termination Date Purchaser notifies the Indemnity Escrow Agent in writing that all or a portion of the Indemnity Escrowed Funds is subject to claims for indemnification under this Agreement that have not been finally determined (the " Outstanding Claims"), the amount delivered to Sellers upon the Termination Date shall be equal to the Indemnity Escrowed Funds then held by the Indemnity Escrow Agent, less the sum of any amounts subject to the Outstanding Claims. If at any time after the Termination Date the amount of the Indemnity Escrowed Funds then held by the Indemnity Escrow Agent exceeds the sum of any amounts subject to the Outstanding Claims, ResCap and Purchaser shall execute and deliver a certificate requesting the Indemnity Escrow Agent to deliver such excess amount to Sellers by wire transfer to one or more accounts designated by ResCap.

**Section 11.5 Adjustment to Purchase Price.** To the extent that any payment by Sellers under this Article XI can be properly so characterized under applicable Tax law, such payment shall be treated by the parties as an adjustment to the Purchase Price.

**Section 11.6 Survival.** Sellers and Purchaser agree that all of the representations, warranties and covenants of Sellers and Purchaser contained in this Agreement, or any instrument delivered pursuant to this Agreement, shall terminate at the Closing Date, except that the Core Representations shall survive as provided in Section 11.1(b) and the covenants that by their terms survive the Closing Date shall survive the Closing Date.

**Section 11.7 Exclusive Remedy.** Except in the case of fraud or where a Party seeks to obtain specific performance pursuant to Section 12.11, from and after the Closing, the sole and exclusive remedy of any Purchaser Group Member in connection with any breach of any Core Representations or the inaccuracy of any Core Representations of Sellers contained or referred to in this Agreement or in any certificate delivered by or on behalf of Sellers pursuant hereto, whether under this Agreement or arising under common law or any other Law, shall be as provided in this Article XI. Nothing in this Section 11.7 shall operate to interfere with or impede the operation of the provisions of Section 3.2 or any Ancillary Agreement.

## ARTICLE XII

### MISCELLANEOUS

**Section 12.1 Expenses.** Except as otherwise provided in this Agreement or the Sale Procedures Order, all costs and expenses incurred in connection with this Agreement and the consummation of the transaction hereunder, shall be paid by the party incurring such expenses. Following approval of the Sale Procedures Order, any claims arising from breaches by any Sellers of their obligations pursuant to the terms of this Agreement shall constitute administrative expense claims against the Sellers under Sections 503(b)(1) and 507(a)(1), as applicable, of the Bankruptcy Code.

**Section 12.2 Amendment; Waiver.** This Agreement may be amended, modified or supplemented only in writing signed by each of the parties hereto. Any provisions of this Agreement may be waived, but only if such waiver is in writing and signed by the party against whom the waiver is to be effective. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**Section 12.3 Notices.** Any written notice to be given hereunder shall be deemed given: (a) when received if given in person or by nationally recognized courier; (b) on the date of transmission if sent by telecopy, e-mail or other wire transmission (receipt confirmed in each case); (c) five Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid, return receipt requested; and (d) if sent by an internationally recognized overnight delivery service, the second Business Day following the date given to such overnight delivery service (specified for overnight delivery and receipt confirmed). All notices shall be addressed as follows:

if to Sellers, to:

Residential Capital, LLC
1177 Avenue of the Americas
New York, New York 10036
Facsimile: 646-257-2703
Attention: Mr. Thomas Marano
Telephone: 646-781-2600
email: tom.marano@gmacrescap.com

89

with copies to (which copies shall not constitute notice):

Residential Capital, LLC
1100 Virginia Drive
Fort Washington, Pennsylvania 19034
Facsimile: 866-572-7524
Attn: Tammy Hamzehpour, Esq., General Counsel
Telephone: 215-682-1307
email: tammy.hamzehpour@gmacrescap.com

*and*

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
Facsimile: (212) 468-7900
Attention: Gary S. Lee, Esq.
Telephone: (212) 468-8163
email: glee@mofo.com

if to Purchaser, to:

Ocwen Loan Servicing, LLC
1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Facsimile: (202) 416-1602
Attention: Paul Koches
Telephone: (561) 682-8957
email: paul.koches@ocwen.com

with copies to (which copies shall not constitute notice):

Mayer Brown LLP
71 S. Wacker Drive
Chicago, Illinois 60603
Facsimile: (312)701-7711
Attention: Jon D. Van Gorp, Esq. and William R. Kucera, Esq.
Telephone: (312) 782-0600
email: jvangorp@mayerbrown.com and wkucera@mayerbrown.com

**Section 12.4 Waivers.** The failure of a party to require performance of any provision hereof shall not affect its right at a later time to enforce the same. No waiver by a party of any term, covenant, representation or warranty contained herein shall be effective unless in writing. No such waiver in any one instance shall be deemed a further or continuing waiver of any such term, covenant, representation or warranty in any other instance.

**Section 12.5 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 12.6 Applicable Law; WAIVER OF JURY TRIAL; Venue and Retention of Jurisdiction .**

(a) This Agreement shall be governed by and construed in accordance with the Laws of the State of New York without regard to any conflicts of law principles thereof or any other jurisdiction that would apply the law of another jurisdiction and, to the extent applicable, the Bankruptcy Code.

(b) EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND THE TRANSACTIONS CONTEMPLATED HEREBY.

(c) Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.3 hereof; provided, however, that if the Bankruptcy Case of Sellers have closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d) Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.3.

**Section 12.7 Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns; provided that no assignment of either party's rights or obligations may be made without the written consent of the other party, which consent shall not be unreasonably withheld or delayed; and provided that Purchaser may assign (i) its rights and interests in Servicing Advances to be acquired hereunder to any of its lenders as collateral security or (ii) this Agreement and any or all rights or obligations hereunder (including Purchaser's rights to purchase the Purchased Assets and assume the Assumed Liabilities) to (x) pursuant to the Walter Assignment as provided in Section 6.15 or (y) one or more Affiliates of Purchaser (an "Affiliate Assignment"); provided that any such Affiliate has at the Closing all Business Licenses necessary to own and conduct business with such Purchased Assets and to assume such Assumed Liabilities; provided, however, that (1) with respect to an Affiliate Assignment, Purchaser shall remain obligated to fulfill its obligations pursuant to this Agreement and for any damages arising from an unlawful breach hereof; and provided further, that Sellers are permitted to assign their right under the Deposit Escrow Agreement as provided in Section 6.26. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

**Section 12.8 No Third-Party Beneficiaries.** Except as provided in Article XI, this Agreement is solely for the benefit of the parties hereto, and no provision of this Agreement shall be deemed to confer any remedy, claim or right upon any third party, including any employee or former employee of Sellers or any participant or beneficiary in any benefit plan, program or arrangement.

**Section 12.9 Public Announcements.** Sellers and Purchaser each agree that they and their Affiliates shall not issue any press release or otherwise make any public statement or respond to any media inquiry with respect to this Agreement or the transactions contemplated hereby without the prior approval of the other parties, which shall not be unreasonably withheld or delayed, except as may be required by Law or by any stock exchanges having jurisdiction over Sellers, Purchaser or their Affiliates. Sellers, Affiliate Sellers and Purchaser will consult with each other regarding the content and timing of any internal announcements regarding the transactions contemplated by this Agreement and the Ancillary Agreements to Sellers' employees.

**Section 12.10 Severability.** Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

92

**Section 12.11 Matters Related to Purchaser as Next Highest Bidder; Specific Performance.**

(a) If the Auction is held pursuant to the Sale Procedures and Purchaser is not chosen as the Successful Bidder (as such term is defined in the Sale Procedures), then (i) the Cash Deposit (together with interest thereon in accordance with the terms of the Deposit Escrow Agreement) shall be returned to Purchaser on December 31, 2012 if the Cash Deposit had not previously been distributed prior to such date and (ii) the recourse against Purchaser with respect to any claim against Purchaser related to Purchaser's Bid Proposal (as defined in the Sale Procedures), the Auction, the Sale Procedures, this Agreement or any other matter in the Bankruptcy Case, whether with respect to a claim of breach by Purchaser, noncompliance by Purchaser or otherwise, shall be limited to a claim on the Cash Deposit being held pursuant to the Deposit Escrow Agreement.

(b) If the Auction is held pursuant to the Sale Procedures and Purchaser is chosen as the Successful Bidder, the parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that, subject to Section 12.11(a), each of Sellers and Purchaser shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court referenced in Section 12.6(c), this being in addition to any other remedy to which either party is entitled at Law or in equity.

**Section 12.12 Waiver of Bulk Transfer Laws.** Seller and Purchaser agree to waive compliance with Article 6 of the Uniform Commercial Code as adopted in each of the jurisdictions in which any of the Purchased Assets are located to the extent that such Article is applicable to the transactions contemplated hereby and any other bulk sale or bulk transfer or similar Law.

**Section 12.13 Personal Liability.** This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any officer, director, employee, representative or investor of any party hereto.

**Section 12.14 Entire Agreement.** This Agreement, together with the Ancillary Agreements, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter hereof.

*[SIGNATURES ON FOLLOWING PAGE]*

93

IN WITNESS WHEREOF, Purchaser and Sellers have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**OCWEN LOAN SERVICING, LLC**

By _____

Name:
Title:

94

**RESIDENTIAL CAPITAL, LLC**

By _____

     Name:
     Title:

**RESIDENTIAL FUNDING COMPANY, LLC**

By _____

     Name:
     Title:

**GMAC MORTGAGE, LLC**

By _____

     Name:
     Title:

**EXECUTIVE TRUSTEE SERVICES, LLC**

By _____

     Name:
     Title:

**ETS OF WASHINGTON, INC.**

By _____

     Name:
     Title:

**GMACM BORROWER LLC**

By _____

    Name:

    Title:

**RFC BORROWER LLC**

By _____

    Name:

    Title:

**EPRE LLC**

By _____

    Name:

    Title:

96

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): November 27, 2012 (November 20, 2012)

# Walter Investment Management Corp.

(Exact name of registrant as specified in its charter)

| Maryland | 001-13417 | 13-3950486 |
|---|---|---|
| (State or other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

3000 Bayport Drive, Suite 1100
Tampa, FL

33607

(Address of Principal Executive Offices)

(Zip Code)

Registrant's telephone number, including area code: (813) 421-7600

Not Applicable

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12(b))

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))



**Item 1.01 Entry into a Material Definitive Agreement**

As previously reported, Walter Investment Management Corp. (the "Company" or "Walter") entered into a Joint Bidding Agreement ("JBA") dated October 19, 2012 with Ocwen Loan Servicing LLC ("Ocwen") to jointly bid to acquire the mortgage servicing and originations and capital markets platforms (the "ResCap Assets") of Residential Capital LLC ("ResCap") in an auction sponsored by the U.S. Bankruptcy Court (the "Transaction"). Pursuant to the JBA, Walter agreed to acquire the rights and assume certain liabilities relating to all of ResCap's Fannie Mae mortgage servicing rights and related advances, and ResCap's mortgage originations and capital markets platforms (the "Walter Assets"). The remainder of the ResCap Assets and certain liabilities related thereto are to be acquired by Ocwen.

On October 24, 2012, Walter and Ocwen were determined at an auction sponsored by the US Bankruptcy Court to have submitted the highest and best bid to acquire the ResCap Assets. Walter and Ocwen presented a winning bid of $3 billion, with Walter's portion of the bid for the Walter Assets equal to approximately $540 million. The bid was subject to the negotiation of a mutually acceptable Asset Purchase Agreement ("APA") and the approval of the U.S. Bankruptcy Court. Ocwen and Walter jointly made an earnest money cash deposit of $72 million ($15 million of which was paid by Walter), which will be applied towards the purchase price upon closing of the Transaction.

On November 2, 2012, Ocwen entered into a definitive APA with Residential Capital, LLC, Residential Funding Company, LLC, GMAC Mortgage, LLC, Executive Trustee Services, LLC, ETS of Washington, Inc., EPRE LLC and the additional Sellers identified on Schedule A thereto (collectively, the "Sellers"). Consummation of the Transaction was subject to, among other things, (i) approval of the transaction by the Bankruptcy Court, (ii) certain licensing and regulatory approvals, including expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and (iii) certain customary closing conditions and termination rights. Subject to approval by the Bankruptcy Court and all of the conditions to closing, the Transaction is expected to close during the first quarter of 2013.

On November 20, 2012 Ocwen and the other parties to the APA executed Amendment Number 1 to Asset Purchase Agreement (the "Amendment") which, in addition to adding a number of definitions to the APA, amends and restates section 6.16 "DOJ/AG Settlement" of the APA in its entirety. In particular, the Amendment specifies the ResCap obligations under the DOJ/AG settlement and the Consent Order (as defined in the APA) would be performed by the purchasers (which includes the Company as the obligations pertain to the assets purchased by the Company); and which obligations would not be assumed by the purchasers. In general, with regard to the DOJ/AG Settlement, the obligations that are to be retained relate to monitoring by the DOJ/AG and the obligations that will not be assumed include any financial liability resulting from the Company's failure to comply with the settlement, unless resulting from a knowing failure to comply with the obligations. The Company will be subject to injunctive and other relief.

Except as set forth in the Amendment the terms, conditions, obligations, covenants and agreements contained in the APA remain in full force and effect. The APA, which is filed as Exhibit 2.1 to the Current Report on Form 8-K, filed November 8, 2012, is incorporated herein by reference.

The foregoing description of the Amendment does not purport to be complete and is qualified in its entirety by reference to the full text of the Amendment, which is filed as Exhibit 2.1 to this Current Report on Form 8-K and is incorporated herein by reference.

**Item 8.01 Other Matters**

On November 21, 2012 the United States Bankruptcy Court for the Southern District of New York signed an order approving the sale of the ResCap assets to the Company and Ocwen. A copy of the Press Release issued by the Company announcing the approval is attached hereto as Exhibit 99.1.

**Item 9.01 Financial Statements and Exhibits**

(d) Exhibits

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

WALTER INVESTMENT MANAGEMENT CORP.

Date: November 27, 2012

By:   /s/ Stuart Boyd
Stuart Boyd, Vice President
General Counsel and Secretary

## EXHIBIT INDEX

| Exhibit Number | Description |
|---|---|
| 2.1 | Amendment No. 1 to Asset Purchase Agreement, dated November 20, 2012 |
| 99.1 | Press Release dated November 21, 2012 |

Exhibit 2.1

EXECUTION COPY

## AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT

This AMENDMENT NO. 1 (this "Amendment No. 1" or this "Agreement"), dated as of November    , 2012, to the Asset Purchase Agreement, dated as of November 2, 2012 (the "Asset Purchase Agreement"), is made by and among Ocwen Loan Servicing, LLC, a Delaware limited liability company ( "Purchaser"), and Residential Capital, LLC ("ResCap"), Residential Funding Company, LLC ("RFC"), GMAC Mortgage, LLC ("GMAC Mortgage"), each of which is a Delaware limited liability company, Executive Trustee Services, LLC, a Delaware limited liability company (" ETS LLC"), ETS of Washington, Inc., a Washington corporation ("ETS WA" and together with ETS LLC, "ETS"), EPRE LLC, a Delaware limited liability company (" EPRE"), GMACM Borrower LLC, a Delaware limited liability company (" GMACM Borrower"), and RFC Borrower LLC, a Delaware limited liability company ( "RFC Borrower" and together with ResCap, RFC, GMAC Mortgage, ETS, EPRE and GMACM Borrower, the " Sellers").

WHEREAS, the parties hereto desire to amend and restate certain sections of the Asset Purchase Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing and intending to be legally bound hereby, the parties hereto agree as follows:

1. Defined Terms. Except as otherwise specified herein or as the context may otherwise require, capitalized terms used in this Amendment No. 1 shall have the respective meanings set forth in the Asset Purchase Agreement.

2. Amendments to Section 1.1.

(a) The following definitions are added to Section 1.1 of the Asset Purchase Agreement, to be included in the appropriate alphabetical location:

" "Assumed DOJ/AG Settlement Obligations" has the meaning set forth in  Section 6.16A(a)."

" "Applicable Internal Costs" means, with respect to Purchaser's employees who provide the support or assistance to ResCap Sellers described in Sections 6.16A and 6.16B, amounts equal to the allocable portion of their compensation, benefits and overhead in respect of such support or assistance, determined in accordance with a methodology agreed between Purchaser and ResCap Sellers in a Transition Services Agreement related to the Foreclosure Review Obligations and the DOJ/AG Settlement Obligations."

" "Borrower Payment Amount" has the meaning set forth in Exhibit C to the DOJ/AG Settlement."

" "Consumer Relief Requirement" has the meaning set forth in Exhibit D to the DOJ/AG Settlement."

" "Court" has the meaning set forth in Section 6.16A(c)."

" "Foreclosure Review Obligations" has the meaning set forth in  Section 6.16B."

" "Monitor" means the Monitor described in Exhibit E to the DOJ/AG Settlement."

" "Motion" has the meaning set forth in Section  6.16A(c)."

" "Performing Entity" means the ResCap Sellers, or one or more successor estate fiduciaries, or AFI solely to the extent that such entity is performing obligations of the ResCap Sellers under the DOJ/AG Settlement or the Consent Order. However, this definition does not alter in any way AFI's or the Rescap Sellers' obligations under the DOJ/AG Settlement, including but not limited to Exhibit I, "Addendum to Federal and State Agreements," and the Consent Order."

" "ResCap Sellers" means ResCap and GMAC Mortgage."

(b) The definition of "Consent Order" in Section 1.1 of the Asset Purchase Agreement is hereby amended and restated in its entirety to read as follows:

" "Consent Order" means the Consent Order entered by the FRB and the FDIC on April 13, 2011 in the action styled  *In the Matter of Ally Financial, Inc, et al.*, FRB Docket No. 11-020-B-HC & 11-020-B-DEO, FDIC-11-123b, with respect to an agreement among the FRB and the FDIC, on the one hand, and AFI, Ally Bank, ResCap, GMAC Mortgage, and their institution-affiliated parties, on the other hand."

(c) The definition of "DOJ/AG Settlement" in Section 1.1 of the Asset Purchase Agreement is hereby amended and restated in its entirety to read as follows:

" "DOJ/AG Settlement" means the Consent Judgment with accompanying exhibits entered by the United States District Court for the District of Columbia on April 5, 2012 (Docket # 13) in the action styled United States of America, et al. v. Bank of America Corp., et al., No. 12-CV-00361, with respect to the settlement agreement among the plaintiffs in that action and AFI, Ally Bank, ResCap and GMAC Mortgage."

3. Amendment to Section 6.16. Section 6.16 of the Asset Purchase Agreement is hereby amended and restated in its entirety to read as follows:

2

**Section 6.16A DOJ/AG Settlement**.

(a) Purchaser agrees to perform, from and after the Closing Date, the obligations of the ResCap Sellers under the DOJ/AG Settlement regarding the Purchased Assets; provided, however, that Purchaser is not required to perform the obligations excluded under Section 6.16A(b) below. The obligations under the DOJ/AG Settlement that Purchaser is obligated to perform as provided in this Section 6.16A are collectively referred to as the "Assumed DOJ/AG Settlement Obligations". Unless a different definition is provided in this Agreement, terms defined in the DOJ/AG Settlement have the same meaning when used in this Section 6.16A. The Assumed DOJ/AG Settlement Obligations include the obligations set forth in the following Exhibits to the DOJ/AG Settlement, except to the extent excluded under Section 6.16A(b) below:

(1) Exhibit A, entitled "Settlement Term Sheet";

(2) Exhibit C, entitled "Borrower Payment Amount";

(3) Exhibit D, entitled "Consumer Relief Requirements";

(4) Exhibit E, entitled "Enforcement Terms";

(5) Exhibit H, entitled "USDOJ Servicemembers Civil Relief Act Settlement Provisions: Ally Financial, Inc., Residential Capital, LLC, and GMAC Mortgage, LLC"; and

(6) Exhibit I, entitled "Addendum to Federal and State Agreements."

(b) Notwithstanding anything in this Agreement to the contrary, the Assumed DOJ/AG Settlement Obligations shall not include, and Purchaser shall have no obligation or responsibility to perform and shall have no liability in connection with, any obligation or responsibility under the DOJ/AG Settlement that:

(1) Relates to servicing or other activities other than those regarding the Purchased Assets;

(2) By its terms is required to be performed before the Closing Date; however, this does not exclude continuing obligations to perform the obligations or responsibilities set forth in this Section 6.16A from and after the Closing Date without regard to whether the obligation or responsibility was properly performed prior to the Closing Date; or

(3) Involves any payment, penalty or financial obligation provided for in or arising under the DOJ/AG Settlement, including but not limited to any such payment, penalty or obligation in connection with Articles III, IV or VI thereof or any of the Exhibits referenced in such Articles, including but not limited to any Borrower Payment Amount as set forth in Exhibit C or any Consumer Relief Requirement as set forth in Exhibit D (" Consumer Relief Requirement "), except with respect to the indemnity provided in Section 6.16A(e).

(c) Promptly upon approval by the Bankruptcy Court of the sale to Purchaser, ResCap Sellers and Purchaser shall file a motion and proposed order (the "Motion") in the form attached hereto as Exhibit 12 in the United States District Court for the District of Columbia (" Court") in *United States of America, et al. v. Bank of America Corp., et al.*, No. 12-CV-00361. Such Motion shall notify the Court and all Plaintiffs and Defendants of (i) the sale of the Purchased Assets to Purchaser, (ii) Purchaser's Assumed DOJ/AG Obligations as provided in this Section 6.16A, and (iii) Plaintiffs' confirmation that Plaintiffs' enforcement rights against Purchaser with respect to any Assumed DOJ/AG Settlement Obligations shall be limited to orders directing non-monetary equitable relief (including, injunctive relief, specific performance or other non-monetary corrective action). The proposed order granting the Motion shall provide that Plaintiffs may not seek imposition of civil penalties or other monetary relief of any type (including without limitation the penalties specified in Section J(3)(b) of Exhibit E of the DOJ/AG Settlement); however, this does not prohibit the imposition of civil contempt sanctions ancillary to any equitable relief granted by the Court to the extent the Purchaser fails to comply with its obligations in accordance with this Section 6.16A. Upon issuance of an order in the form attached to such Motion, Plaintiffs shall have the right to enforce Purchaser's obligations to perform the Assumed DOJ/AG Settlement Obligations under this Section 6.16A, as set forth in the order.

(d) Purchaser agrees to cooperate with and assist ResCap Sellers or any Performing Entity and their respective counsel and other advisors with regard to ResCap Sellers' performance of their obligations under the DOJ/AG Settlement regarding the Purchased Assets and that are not included in the Assumed DOJ/AG Settlement Obligations, including any such obligations in respect of the Consumer Relief Requirements, the SCRA foreclosure file review, and ResCap Sellers' monitoring, testing and reporting requirements during the Term of the DOJ/AG Settlement; provided any such requests for cooperation allows Purchaser a reasonably sufficient time to respond and if such requests requires Purchaser to incur any expenses or costs, ResCap Sellers or any Performing Entity shall promptly reimburse Purchaser for the same. Such cooperation and assistance will include making available all necessary Books, Records, and relevant Mortgage Loan Documents transferred by ResCap Sellers to Purchaser in connection with the Purchased Assets, and by providing such other information and access to systems and personnel as may reasonably be requested by ResCap Sellers, any Performing Entity, or their respective counsel and other advisors in connection with such obligations. The Purchaser's agreement to cooperate and assist in this Section 6.16A(d) is conditioned on the prompt reimbursement by the ResCap Sellers or any Performing Entity of any and all out-of-pocket or third party costs and expenses and Applicable Internal Costs incurred by Purchaser or its Affiliates in connection with such cooperation and assistance. Under no circumstances shall Purchaser have any obligation, responsibility or liability for any fees, costs or expenses of the Monitor or incurred as a result of requests or demands of Purchaser by the Monitor, which fees, costs and expenses shall be paid directly by ResCap Sellers or any Performing Entity.

(e) The parties agree that any liability that ResCap Sellers or Performing Entity may incur as a result of any failure of Purchaser or its Affiliates to comply with the terms of the DOJ/AG Settlement will remain the sole liability of ResCap Sellers or Performing Entity and Purchaser shall have no obligation, responsibility or liability therefor; provided, however, that Purchaser shall indemnify ResCap Sellers or Performing Entity for any fines or penalties that are imposed on ResCap Sellers or Performing Entity by Plaintiffs solely as a result of any knowing failure by Purchaser to comply with the Assumed DOJ/AG Settlement Obligations. ResCap Sellers or Performing Entity will provide prompt written notice to Purchaser following receipt of notice from Plaintiffs or Monitor alleging that any act or omission by Purchaser or its Affiliates has resulted in any failure to comply with the terms of the DOJ/AG Settlement.

4

**Section 6.16B Consent Order.**

Purchaser agrees to cooperate with and assist ResCap Sellers, any Performing Entity and their respective counsel and other advisors with regard to ResCap Sellers' performance of their obligations under paragraphs 3, 4 and 22 of the Consent Order regarding the Purchased Assets, including without limitation making available the necessary personnel, systems and processes, as well as the Books, Records, and relevant Mortgage Loan Documents that ResCap Sellers transferred to Purchaser in connection with the Purchased Assets as are reasonably necessary for ResCap Sellers, any Performing Entity and their respective counsel, the independent consultant and the law firms advising the independent consultant to (i) complete the independent review of foreclosure actions and associated reporting obligations to the FRB with respect thereto, and (ii) implement the related borrower remediation plan (including facilitating non-monetary remediation such as refinancings or loan modifications at the expense of ResCap Sellers' or any Performing Entity), in each case as such obligations are finally approved by the FRB (collectively, the "Foreclosure Review Obligations"); provided any such requests for cooperation allows Purchaser a reasonably sufficient time to respond and if such requests requires Purchaser to incur any expenses or costs, ResCap Sellers or any Performing Entity shall promptly reimburse Purchaser for the same. Furthermore, Purchaser's obligations under this Section 6.16B shall be conditioned upon the prompt reimbursement by ResCap Sellers or any Performing Entity of any and all out-of-pocket or third party costs and expenses and Applicable Internal Costs incurred by Purchaser or its Affiliates in connection with compliance with the Foreclosure Review Obligations. Under no circumstances shall Purchaser have any obligation or responsibility for any fees, costs and expenses of the independent consultant and its supporting law firms and advisors, which fees, costs and expenses shall be paid directly by ResCap Sellers or any Performing Entity.

**Section 6.16C Additional Related Provisions.**

(a) ResCap Sellers must comply with and ensure the continued performance of their obligations under paragraphs 3, 4 and 22 of the Consent Order, and will comply with all terms and conditions of the DOJ/AG Settlement not included in the Assumed DOJ/AG Settlement Obligations. If Purchaser transfers the servicing of any Mortgage Loan the servicing of which is included in the Purchased Assets and which is subject to the Consent Order or DOJ/AG Settlement to another Person, then Purchaser shall cause, including for the benefit of the ResCap Sellers and any Performing Entity, such other Person to assume Purchaser's obligations under Sections 6.16A, 6.16B and 6.16C with respect to such Mortgage Loan.

(b) Except as provided in Section 6.16A(c), only the ResCap Sellers or Performing Entity may enforce the Foreclosure Review Obligations and Assumed DOJ/AG Settlement Obligations against Purchaser. Furthermore, except as provided in Section 6.16A(c), nothing in this Agreement shall provide the FRB, the FDIC, or the Plaintiffs in the DOJ/AG Settlement with any rights to enforce the Foreclosure Review Obligations or Assumed DOJ/AG Settlement Obligations against Purchaser, or constitute any consent by Purchaser to the jurisdiction of the FRB, the FDIC, or the United States District Court for the District of Columbia in connection with such obligations.

(c) It is expressly understood and agreed that all references to Purchaser in this Section 6.16 shall refer to (i) the Purchaser solely with respect to the Purchased Assets other than the Walter Assets and (ii) the Walter Entity solely with respect to the Walter Assets. The Purchaser shall have no obligations pursuant to this Section 6.16, the Consent Order and the DOJ/AG Settlement with respect to the Walter Assets and the Walter Entity shall have no obligations pursuant to this Section 6.16, the Consent Order and the DOJ/AG Settlement with respect to the Purchased Assets other than the Walter Assets. For the avoidance of doubt, Purchaser agrees that it will be a condition to the transfer of the Walter Assets to the Walter Entity that such Walter Entity agrees to the same obligations, with respect to the Walter Assets, to which Purchaser has agreed pursuant to this Section 6.16 with respect to Purchased Assets."

4. <u>Amendment to Section 6.7(a)</u>. The date of November 15, 2012 set forth in Section 6.17(a) is hereby amended to be November 20, 2012.

5. <u>Amendment to Section 9.1(a)</u>. The date of November 30, 2012 set forth in Section 9.1(a) is hereby amended to be December 7, 2012.

6. <u>Amendment to Section 9.1(c)</u>. The first sentence of Section 9.1(c) is hereby deleted in its entirety.

7. <u>Conditions to Effectiveness; Reference to and Effect on the Asset Purchase Agreement</u>.

(a) This Amendment No. 1 shall be effective upon (i) the execution and delivery hereof by each of Purchaser and Sellers and (ii) entry of the Sale Approval Order.

(b) Each reference in the Asset Purchase Agreement to "this Agreement", "hereunder", "hereof" or words of like import shall mean and be a reference to the Asset Purchase Agreement as amended and supplemented by this Amendment No. 1.

(c) Except to the extent specifically set forth herein, the provisions of the Asset Purchase Agreement shall not be amended, modified, waived, impaired or otherwise affected hereby, and the Asset Purchase Agreement and the obligations thereunder are hereby confirmed as being in full force and effect.

8. <u>Governing Law</u>. This Amendment No. 1 shall be governed by and construed in accordance with the Laws of the State of New York without regard to any conflicts of law principles thereof or any other jurisdiction that would apply the law of another jurisdiction and, to the extent applicable, the Bankruptcy Code.

9. <u>Counterparts</u>. This Amendment No. 1 may be signed upon any number of counterparts with the same effect as if the signatures on all counterparts are upon the same instrument.

*[Signature Page Follows]*

6

IN WITNESS WHEREOF, the parties hereto have executed this Amendment No. 1 to the Asset Purchase Agreement as of the day and year first above written.

**OCWEN LOAN SERVICING LLC**

By _____
    Name:
    Title:

**RESIDENTIAL CAPITAL, LLC**

By _____
    Name:
    Title:

**RESIDENTIAL FUNDING COMPANY, LLC**

By _____
    Name:
    Title:

**GMAC MORTGAGE, LLC**

By _____
    Name:
    Title:

**EXECUTIVE TRUSTEE SERVICES, LLC**

By _____
    Name:
    Title:

**ETS OF WASHINGTON, INC.**

By _____
    Name:
    Title:

7

**EPRE LLC**

By _____

    Name:
    Title:

**GMACM BORROWER LLC**

By _____

    Name:
    Title:

**RFC BORROWER LLC**

By _____

    Name:
    Title:

8

**EXHIBIT 12**
MOTION

9

Exhibit 99.1



Press Release

**FOR IMMEDIATE RELEASE**
November 21, 2012

*Investor and Media Contact*: Whitney Finch
Vice President of Investor Relations
813.421.7694
wfinch@walterinvestment.com

## WALTER INVESTMENT MANAGEMENT CORP. ANNOUNCES
## BANKRUPTCY COURT APPROVAL OF RESCAP BID

November 21, 2012, Tampa, FL — Walter Investment Management Corp. (**NYSE MKT: WAC**) today announced that its joint bid with Ocwen Loan Servicing, LLC for the mortgage servicing and origination platform assets of Residential Capital, LLC (ResCap) was approved by the U.S. Bankruptcy Court for the Southern District of New York, subject to the court completing the final order which is expected today. The transaction is expected to close in the first quarter of 2013.

ResCap, a wholly-owned subsidiary of Ally Financial Inc., was servicing at March 31, 2012 over 2.4 million loans, with an aggregate unpaid principal balance (UPB) of approximately $374 billion. Of these, approximately 68% of the loans (by UPB) are owned, insured or guaranteed by Fannie Mae, Freddie Mac or Ginnie Mae. ResCap has operations in Ft. Washington, PA, Waterloo, IA, Dallas, TX, Burbank and Costa Mesa, CA and Minneapolis, MN.

Under the joint bidding arrangement, Walter Investment Management Corp. will acquire the Fannie Mae mortgage servicing rights (MSR) portion of ResCap's servicing portfolio, representing approximately $50.4 billion in UPB at August 31, 2012, as well as the origination and capital markets platforms.

"The Bankruptcy Court's confirmation of our joint bid is an important step towards closing the transaction," said Mark J. O'Brien, Chairman and Chief Executive Officer of Walter Investment. "We look forward to leveraging the ResCap originations platform to profitably achieve additional scale in our originations business and anticipate that in combination with the acquisition of the Fannie Mae MSR the transaction will be meaningfully accretive to our business and drive considerable value for our shareholders."

Closing of the transaction remains subject to the satisfaction of a number of conditions to closing contained in the purchase agreement, including the approval of Fannie Mae to the assumption of its contracts, and the resolution of several outstanding creditor claims.

### About Walter Investment Management Corp.

Walter Investment Management Corp. is an asset manager, mortgage servicer and mortgage portfolio owner specializing in less-than-prime, non-conforming and other credit-challenged mortgage assets. Based in Tampa, Fla., the company services a diverse loan portfolio.

WAC
LISTED
NYSE
AMEX

3000 Bayport Drive, Suite 1100, Tampa, Florida 30607
813.421.7600    www.walterinvestment.com

**Disclaimer and Cautionary Note Regarding Forward-Looking Statements**

This press release contains forward-looking statements, including forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements include, but are not limited to, statements concerning Walter Investment's plans, beliefs, objectives, expectations and intentions and other statements that are not historical or current facts. Forward-looking statements are based on Walter Investment's current expectations and involve risks and uncertainties that could cause actual results to differ materially from those expressed or implied in such forward-looking statements. Factors that could cause Walter Investment's results to differ materially from current expectations include, but are not limited to: the expiration of the appeal period of the Bankruptcy Court's Order, the resolution of all outstanding claims in the bankruptcy case, the satisfaction of all conditions to closing the transaction, Walter Investment's ability to efficiently transfer the Fannie Mae MSRs and the originations platform, the ability of Walter Investment to achieve the revenues that it expects from the MSRs and the revenues and synergies that it expects from originations and capital markets platforms, the ability of Walter Investment to retain key personnel from both the acquired ResCap platforms and within its own organization, potential disruption in Walter Investment's business as it seeks to close the transaction, transfer the purchased accounts and establish the originations and capital markets platforms; and other factors detailed in Walter Investment's 2011 Annual Report on Form 10-K and other periodic reports filed with the U.S. Securities and Exchange Commission. In addition, these statements are based on a number of assumptions that are subject to change. Accordingly, actual results may be materially higher or lower than those projected. The inclusion of such projections herein should not be regarded as a representation by Walter Investment that the projections will prove to be correct. This press release speaks only as of this date. Walter Investment disclaims any duty to update the information herein.

EXECUTION COPY

# SERVICING TRANSFER AGREEMENT

by and among

## GMAC MORTGAGE, LLC,

## EXECUTIVE TRUSTEE SERVICES, LLC,

and

## GREEN TREE SERVICING, LLC

dated as of January 31, 2013



EXHIBIT
Defendants
8
11/8/19    Am

# TABLE OF CONTENTS

Page

**ARTICLE I.    CERTAIN DEFINITIONS**

    Section 1.01    Certain Definitions ........................................................................ 2

**ARTICLE II.    PURPOSE AND SCOPE OF AGREEMENT**

    Section 2.01    Purpose and Scope of Agreement ............................................... 4

**ARTICLE III.    SERVICING TRANSFER PROCEDURES**

    Section 3.01    Servicing Transfer ....................................................................... 4
    Section 3.02    Servicing Transfer Instructions .................................................. 4
    Section 3.03    Evidence of Sale .......................................................................... 5
    Section 3.04    Possession of Servicing Loan Files ............................................. 5
    Section 3.05    Assignments ................................................................................. 5
    Section 3.06    Custodian and Custodial Loan Files ........................................... 6
    Section 3.07    Custodial Accounts and Escrow Accounts ................................. 6
    Section 3.08    Final Certification and Recertification for Agency Transfers ..... 6
    Section 3.09    Notice to Borrowers .................................................................... 6
    Section 3.10    Tax Service Contracts .................................................................. 7
    Section 3.11    Flood Insurance Contracts ........................................................... 7
    Section 3.12    Notice to Insurers and Other Parties ........................................... 7
    Section 3.13    Servicing of REO Property .......................................................... 8
    Section 3.14    Serviced Mortgage Loans in Litigation ...................................... 8
    Section 3.15    [Reserved.] ................................................................................. 12
    Section 3.16    No Personal Solicitation ............................................................ 12
    Section 3.17    [Reserved.] ................................................................................. 13
    Section 3.18    [Reserved.] ................................................................................. 13
    Section 3.19    [Reserved.] ................................................................................. 13
    Section 3.20    Costs of Transfer ....................................................................... 13
    Section 3.21    Further Assistance and Assurances ............................................ 13
    Section 3.22    [Reserved.] ................................................................................. 13
    Section 3.23    Recovery of Servicing Advances ............................................... 13

la-1198676

Section 3.24    Financing Statement Authorization ............................................................. 13

**ARTICLE IV.    TERMINATION**

Section 4.01    Termination............................................................................................. 14

Section 4.02    Effect of Termination............................................................................... 14

**ARTICLE V.    MISCELLANEOUS**

Section 5.01    Notices ................................................................................................. 14

Section 5.02    Parties in Interest; Assignment ................................................................ 15

Section 5.03    Complete Agreement .............................................................................. 15

Section 5.04    Counterparts........................................................................................... 16

Section 5.05    Severability ........................................................................................... 16

Section 5.06    Amendment; Waiver................................................................................ 16

Section 5.07    Applicable Law; WAIVER OF JURY TRIAL; Venue and
                Retention of Jurisdiction ......................................................................... 16

Section 5.08    Interpretation......................................................................................... 17

**EXHIBITS**

Exhibit A        Servicing Transfer Instructions
Exhibit B        Power of Attorney

la-1198676

# SERVICING TRANSFER AGREEMENT

## PREAMBLE

This SERVICING TRANSFER AGREEMENT (this "Agreement") is dated as of January 31, 2013, by and among GMAC Mortgage, LLC ("GMACM"), Executive Trustee Services, LLC ("ETS"; and together with GMACM, "Sellers"), and Green Tree Servicing, LLC ("Servicer"). Sellers and Servicer shall be referred to herein from time to time collectively as the "Parties" and individually as a "Party."

WHEREAS, Sellers, together with other Affiliates, have filed voluntary petitions for relief under Chapter 11 of Title 11, U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, Sellers and Ocwen Loan Servicing, LLC ("Ocwen"), and certain other Affiliates of each of them, have entered into that certain Asset Purchase Agreement, dated as of November 2, 2012 (as amended, the "APA"), providing for, among other things, the sale by Sellers to Ocwen of the certain Purchased Mortgage Servicing Rights, Servicing Advances, Servicing Compensation and other assets, and the assumption by Ocwen of, among other things, certain obligations of Sellers under agreements with Fannie Mae to service the Fannie Mae Agency Loans in accordance with the Fannie Mae Guide;

WHEREAS, pursuant to Section 6.15 of the APA, Ocwen and Sellers agreed that Walter Investment Management Corp. ("Walter") or an affiliate thereof would have the right to acquire the Walter Assets (as defined in the APA), including, without limitation, the Purchased Mortgage Servicing Rights in respect of Fannie Mae Agency Loans (the "Fannie Mae MSRs"), the Servicing Advances in respect thereof, and the right to receive Servicing Compensation related thereto, including Servicing Compensation that is accrued and unpaid as of the Closing Date, and to assume the Assumed Liabilities relating thereto;

WHEREAS, as of January 31, 2013, Sellers and certain of their Affiliates, Ocwen, Walter and Servicer entered into that certain Agreement for Partial Assignment and Assumption Under the Asset Purchase Agreement (the "Partial Assignment"), which provides, among other things, for the assignment of the Fannie Mae MSRs to Servicer; and

WHEREAS, the Parties desire to set forth the specific terms upon which the transfer of mortgage loan servicing with respect to the Fannie Mae MSRs shall be effected.

NOW, THEREFORE in consideration of the mutual covenants, representations, warranties and agreements herein contained and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

-1-

# ARTICLE I.

## CERTAIN DEFINITIONS

**Section 1.01  Certain Definitions**.

Capitalized terms which are not otherwise defined herein shall have the meanings ascribed to such terms in the APA.  As used in this Agreement the following terms have the following meanings:

"Accounts" means any Escrow Accounts, Custodial Accounts, lockbox accounts, disbursement accounts, suspense accounts and other accounts established and/or maintained by the Sellers pursuant to the Fannie Mae Guide and all amounts maintained therein.

"Assignment of Mortgage" means, with respect to any Serviced Mortgage Loan, an assignment of mortgage, assignment of deed of trust, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction where the related Serviced Mortgaged Property is located to reflect the transfer of the Serviced Mortgage to the party indicated therein or if the related Serviced Mortgage has been recorded or previously assigned in the name of MERS or its designee, such actions as are necessary to cause the designee to be shown as the owner of the related Serviced Mortgage on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

"Custodial Account" means (i) each trust account or bank account maintained by a Seller, as servicer, pursuant to the Fannie Mae Guide for the benefit of an Investor and (ii) any amounts deposited or maintained therein.

"Custodial Loan File" means, with respect to any Serviced Mortgage Loan, all of the documents that must be maintained on file with a document custodian, owner or trustee pursuant to the Fannie Mae Guide and otherwise under Applicable Requirements with respect to such Serviced Mortgage Loan, including but not limited to the Mortgage Loan Documents (sometimes referred to in the mortgage business as the "legal file").

"Escrow Accounts" means (i) all trust accounts or bank accounts maintained by Sellers in accordance with the Fannie Mae Guide and Applicable Requirements (other than the Custodial Accounts), including accounts holding buy-down funds, tax and insurance funds, suspense funds and other escrow and impound amounts and similar charges (including interest accrued thereon held for the benefit of the Serviced Mortgagors) and (ii) any amounts deposited or maintained therein.

"Eviction" means the process culminating in the acquisition of possession of a Serviced Mortgaged Property, following a Foreclosure or otherwise, pursuant to any procedure consistent with Applicable Requirements.

"Fannie Mae Guide" means the Fannie Mae Servicing Guide, including all waivers, directives and variances applicable to Sellers under Sellers' Master Agreements with Fannie Mae.

-2-

"Foreclosure" means the process culminating in the acquisition of title to a Serviced Mortgaged Property in a foreclosure sale or by a deed in lieu of foreclosure or pursuant to any other comparable procedure consistent with Applicable Requirements, including, for the avoidance of doubt, non-judicial foreclosure proceedings in jurisdictions where such proceedings are authorized.

"LPOA" means a limited power of attorney provided by a Seller to Servicer pursuant to Section 3.21.

"Partial Assignment" has the meaning given to such term in the preamble.

"Sale and Assumption Agreements" means, together, the APA and the Partial Assignment.

"Serviced Mortgage" means, with respect to any Serviced Mortgage Loan relating to a Fannie Mae MSR, a mortgage, deed of trust or other security instrument (including a security agreement) creating a Lien upon real property and any other property described therein which secures a Serviced Mortgage Note, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"Serviced Mortgage Loan" has the meaning ascribed to such term in the APA. For purposes of this Agreement "Serviced Mortgage Loan" shall include only those Serviced Mortgage Loans relating to the Fannie Mae MSRs purchased by the Servicer pursuant to the Sale and Assumption Agreements.

"Serviced Mortgage Note" means, with respect to a Serviced Mortgage Loan, a promissory note or notes, or other evidence of indebtedness, with respect to such Serviced Mortgage Loan secured by a Serviced Mortgage or Mortgages, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"Serviced Mortgaged Property" means (i) the real property and improvements thereon, (ii) the stock in a residential housing corporation and the lease to the related dwelling unit, (iii) a manufactured home and, as applicable, the real property upon which the home is situated, or (iv) the personal property or other collateral, in each case that secures a Serviced Mortgage Note and that is subject to a Serviced Mortgage.

"Servicing Loan File" means, with respect to each Serviced Mortgage Loan:

(i) the "Servicing File" as defined in the APA, including, for the avoidance of doubt, all documentation required to be maintained pursuant to HAMP, HARP or HASP; and

(ii) the right (if any) to request or demand copies of any document, instrument, agreement or record relating to such Serviced Mortgage Loan under the Fannie Mae Guide or applicable Mortgage Loan Documents.

"Servicing Transfer Date" means February 1, 2013, or such later date on which the Mortgage Servicing Rights are transferred to Servicer pursuant to the terms of the Sale and Assumption Agreements.

"Servicing Transfer Instructions" means the servicing transfer instructions attached as Exhibit A hereto.

"Title Action" means any legal action to determine ownership of, or rights with respect to, title to a Serviced Mortgaged Property, other than a Foreclosure.

"Transactions" means the purchase and sale by Servicer of Mortgage Servicing Rights, and other transactions between Sellers and Servicer contemplated by the applicable Sale and Assumption Agreements.

"Walter Assumed Liabilities" has the meaning given to such term in the Partial Assignment.

## ARTICLE II.

## PURPOSE AND SCOPE OF AGREEMENT

### Section 2.01  Purpose and Scope of Agreement.

This Agreement provides for the transfer of mortgage loan servicing from Sellers to Servicer under the Fannie Mae Guide and is subject to the terms and conditions contained in the Sale and Assumption Agreements. In the event of any conflict between this Agreement and the Fannie Mae Guide, the Fannie Mae Guide shall govern. In the event of a conflict between the terms of this Agreement and the terms of any Sale and Assumption Agreement, the terms of the applicable Sale and Assumption Agreement shall control unless the context shall otherwise require.

## ARTICLE III.

## SERVICING TRANSFER PROCEDURES

### Section 3.01  Servicing Transfer.

On the Servicing Transfer Date, Sellers shall cause the transfer to Servicer of all mortgage loan servicing relating to the Fannie Mae MSRs to Servicer in accordance with the terms of this Agreement, the Sale and Assumption Agreements and the Fannie Mae Guide. The Seller shall prepare all reports with respect to the Serviced Mortgage Loans required by the Applicable Requirements for the collection period ending January 31, 2013 and deliver such reports to Fannie Mae in February 2013 as required by the Applicable Requirements assuming the Sellers were still obligated to service the Serviced Mortgage Loans.

### Section 3.02  Servicing Transfer Instructions

In connection with the transfer of mortgage loan servicing, Sellers shall follow the Servicing Transfer Instructions attached hereto as Exhibit A (the "Servicing Transfer Instructions") and shall take all steps necessary or appropriate to effectuate and evidence the transfer of the Fannie Mae MSRs.

-4-

## Section 3.03   Evidence of Sale.

On or prior to the Closing Date and each subsequent Servicing Transfer Date, Servicer and Sellers shall cooperate in good faith to (i) execute (or cause to be executed) and deliver any documents requested by Fannie Mae to evidence the transfer of the Fannie Mae MSRs from Sellers to Servicer and the related transfer of mortgage loan servicing, in form and substance reasonably satisfactory to Fannie Mae, Servicer and Sellers, and (ii) shall execute and deliver such other instruments or documents as Servicer and Sellers shall reasonably determine are necessary to evidence the transactions contemplated hereby.

## Section 3.04   Possession of Servicing Loan Files.

Sellers shall deliver or cause to be delivered to Servicer all Servicing Loan Files pertaining to the related Serviced Mortgage Loans and all related servicing records as of such Servicing Transfer Date (to the extent not previously delivered to Servicer) as provided in the Servicing Transfer Instructions. To the extent such Servicing Loan Files are physically located with a vendor utilized by both Sellers and Servicer, transfer of possession of the Servicing Loan Files will be effected by the vendor reflecting its possession of such files for the account of Servicer on its records. Except to the extent inconsistent with the Applicable Requirements, Sellers may deliver Servicing Loan Files and any other documents required to be delivered to Servicer under this Agreement by means of electronic data files compatible with Servicer's computer systems and containing scanned images of such Servicing Loan Files or other documents. Any Servicing Loan Files which have not been delivered to Servicer by the Closing Date and are in the possession or control of any Seller, actually or constructively, shall be delivered to Servicer in accordance with Servicer's instructions and shall be held by such Seller in trust for the benefit of Servicer until delivery to Servicer.

## Section 3.05   Assignments.

If, pursuant to Applicable Requirements, an Assignment of Mortgage is required to be prepared and delivered to Servicer in connection with the transfer of the related Mortgage Servicing Rights to Servicer, Servicer shall, no later than one hundred eighty (180) days following the applicable Servicing Transfer Date, prepare such Assignment of Mortgage pursuant to one or more LPOAs or other form of corporate authorization reasonably acceptable to Servicer and authorizing Servicer to prepare such Assignment of Mortgage in the name and on behalf of the Sellers. However, Servicer shall have no such obligation to prepare an Assignment of Mortgage with respect to any Serviced Mortgage Loan which is the subject of any litigation for which Servicer does not cause Sellers to be replaced by a New Plaintiff, a New Plaintiff/Defendant, or a New Party, as applicable, pursuant to Section 3.14(b). MERS updates shall be effectuated according to the Servicing Transfer Instructions.

For the avoidance of doubt, (i) in connection with any and all Serviced Mortgage Loans for which Servicer does not prepare and record an Assignment of Mortgage in accordance with this Section, any claims brought, judgments rendered, or liability assessed against Sellers by virtue of Seller's status as the mortgagee or beneficiary of record and which result from acts or omissions of the Servicer from and after the Servicing Transfer Date shall be considered Walter Assumed Liabilities for which neither Sellers nor any Affiliate thereof shall have any liability

-5-

and (ii) in connection with any and all Serviced Mortgage Loans for which Seller does prepare and record and Assignment of Mortgage in accordance with this Section, any claims brought, judgments recorded, or liability assessed against Servicer which results from acts or omissions of any Seller prior to the Servicing Transfer Date shall be considered Retained Liabilities for which neither Servicer nor Walter nor any affiliate thereof shall have any liability.

## Section 3.06    Custodian and Custodial Loan Files.

On or prior to the Servicing Transfer Date, Sellers shall notify each existing third-party document custodian or vendor that Servicer will be the servicer of record of the related Serviced Mortgage Loans as of such Servicing Transfer Date. For any Custodial File currently held at a third-party vendor or custodian, delivery to Servicer shall be effected by the Custodian's reflection of its possession for the account of Servicer on its records. No later than thirty (30) days following the Servicing Transfer Date, Sellers shall transfer to Servicer or Servicer's custodian all Custodial Loan Files not held on the Servicing Transfer Date by a third-party document custodian or a vendor.

## Section 3.07    Custodial Accounts and Escrow Accounts.

Pursuant to the Servicing Transfer Instructions, Sellers shall transfer to Servicer all escrow funds, custodial funds and other amounts or balances related to the Serviced Mortgage Loans on deposit in Accounts held or controlled by Sellers or otherwise held or controlled by Sellers. All such funds and related Accounts shall become the responsibility of Servicer when transferred by Sellers.

## Section 3.08    Final Certification and Recertification for Agency Transfers.

Sellers shall use commercially reasonable efforts to obtain any and all documents and to take all actions reasonably necessary to enable Servicer to obtain final Agency certification and/or recertification, as applicable, with respect to each pool of Mortgage Loans requiring certification or recertification by the applicable Agency deadline, including any required recertification of pools in connection with the transfer of mortgage loan servicing to Servicer hereunder.

## Section 3.09    Notice to Borrowers.

Each Seller shall send (or cause to be sent) a written notice (a "goodbye letter") to all mortgagors under the applicable Serviced Mortgage Loans of the change in servicer from the applicable Seller to Servicer and any other notices required to be delivered by Seller to mortgagors to the extent required under applicable Law, all in accordance with applicable Law. Servicer shall send (or cause to be sent) a written notice (the "hello letter") to all mortgagors under the applicable Serviced Mortgage Loans of the change in servicer from the applicable Seller to Servicer, all in accordance with applicable Law. Each such letter shall be mutually agreed upon by the Parties and shall comply with all Applicable Requirements, including, without limitation, the Real Estate Settlement Procedures Act, as amended ("RESPA").

**Section 3.10   Tax Service Contracts.**

In accordance with the Servicing Transfer Instructions, each Seller shall transfer, assign and deliver to Servicer a valid, fully transferable tax contract with respect to each Serviced Mortgage Loan.

**Section 3.11   Flood Insurance Contracts.**

In accordance with the Servicing Transfer Instructions, each Seller shall transfer, assign and deliver to Servicer a flood insurance contract with respect to each Serviced Mortgage.

**Section 3.12   Notice to Insurers and Other Parties.**

(a)      Within five (5) Business Days following the Servicing Transfer Date, Sellers shall, in accordance with applicable Insurer requirements and the Servicing Transfer Instructions, provide or cause to be provided written or electronic notice to each Insurer of the transfer of the servicing of the applicable Serviced Mortgage Loans to Servicer; provided, however, that Sellers may give aggregate notice whenever possible.  Such notice shall instruct the Insurers to reflect Servicer as the servicer with respect to the Serviced Mortgage Loans on and after the Servicing Transfer Date in accordance with each Insurer's usual procedures.

(b)      Within five (5) Business Days following the Servicing Transfer Date (or on such earlier date required under the Applicable Requirements), Sellers shall notify or cause to be notified (i) applicable third party vendors and service providers under other relevant contracts with Sellers and (ii) applicable bureaus (including credit bureaus), of the transfer of servicing under the Servicing Agreement, such notice to be given in accordance with Applicable Requirements.  Sellers shall deliver or cause to be delivered a copy of each such notice (or an e-mail confirmation that such notice was sent in the case of third party notices sent by electronic means) to Servicer within five (5) Business Days after the Servicing Transfer Date, it being understood that such delivery may be effectuated by electronic means or by providing access to a web-based database.

(c)      For any Serviced Mortgage Loan for which the underlying secured property is currently registered under the name of Sellers with any state, county, or municipality or agency or department thereof (e.g., as a result of property occupancy, loan default, or ownership), Servicer shall, within the timeframe required under Applicable Requirements, notify such state, county, or municipality or agency or department thereof that Seller no longer has an interest in such property and take whatever steps are necessary to reflect Servicer as the party in interest with respect to such property.  For the avoidance of doubt, in connection with any and all Serviced Mortgage Loans for which Servicer does not take appropriate steps in accordance with this Section 3.12(c), any claims brought, judgments rendered, or liability assessed against Sellers which result from acts or omissions of the Servicer from and after the Servicing Transfer Date shall be considered Walter Assumed Liabilities and any claims brought, judgments rendered or liability assessed against Servicer which results from acts or omissions of the Seller prior to the Servicing Transfer Date shall be considered to be Retained Liabilities.

## Section 3.13  Servicing of REO Property.

To the extent a Seller holds title to an REO Property solely as a nominee for the benefit of the owner of the related Serviced Mortgage Loan, with respect to each such REO Property, such Seller shall provide to Servicer, on or prior to the applicable Servicing Transfer Date, a limited power of attorney or other form of corporate authorization reasonably acceptable to Servicer and authorizing Servicer to prepare, in the name and on behalf of such Seller, an original, executed, valid and enforceable, quit claim deed to Servicer (or such other person required by Applicable Requirements) in recordable form.

## Section 3.14  Serviced Mortgage Loans in Litigation.

(a)     Sellers shall deliver to Servicer no later than seven (7) days prior to the Closing Date a litigation report listing any legal actions concerning the Mortgage Servicing Rights, Serviced Mortgage Loans or ETS Contract Rights, including, without limitation, judgments, claims or demands involving foreclosures, bankruptcies, fraud and misrepresentation, contract and mortgage disputes, liens, title disputes, regulatory agency/fair lending, property condition, forfeiture, partition, easement, condemnation and eminent domain, probate, contested foreclosures, tax sale, mechanic's liens and stop notice claims. The Parties shall review such report and mutually determine, in good faith, the legal actions (or portion thereof) that relate to the Serviced Mortgage Loans, (such legal actions, excluding Seller Defendant Litigation (as defined below), are referred to herein, collectively, as the "Assumed Litigation"). Servicer shall prosecute or defend the Assumed Litigation as successor servicer pursuant to the terms of the APA and the provisions set forth below; provided, however, that Assumed Litigation shall not include any such legal actions in which the opposing party is asserting only monetary claims against Sellers that are not otherwise asserted as a defense to a Default Action (defined below) (each, a "Seller Defendant Litigation"). For the avoidance of doubt, in connection with any and all Assumed Litigation, (i) any claims brought, judgments rendered, or liability assessed against Sellers which result from acts or omissions of the Servicer from and after the Servicing Transfer Date shall be considered Walter Assumed Liabilities and (ii) any claims brought, judgments rendered, or liability assessed against Servicer, which results from acts or omissions of the Sellers prior to the Servicing Transfer Date shall be considered to be Retained Liabilities in respect to which Servicer shall have no liability whatsoever. For the further avoidance of doubt, except to the extent explicitly provided in this Section 3.14, the Servicer shall be solely liable for the costs and expenses of all Assumed Litigation as of the Servicing Transfer Date. In the event that, subsequent to the Servicing Transfer Date, the Serviced Mortgagor (x) in any Assumed Litigation asserts any new claim or cause of action against any Seller, or (y) commences any new action against any Seller (including any Adversary Proceeding or contested matter in the Bankruptcy Case) (each, a "New Action"), Seller or Servicer, as the case may be, shall provide prompt written notice to the other Party, and the Parties shall, in accordance with Section 3.14(a) hereof, meet and confer in good faith to determine whether such New Action constitutes an Assumed Litigation or a Seller Defendant Litigation. The terms of this Section 3.14, as applicable based on such determination, shall apply to any New Action.

(b)     (i)     Treatment of Uncontested Default Actions. With respect to any Assumed Litigation that is a Foreclosure, Eviction, or Title Action (collectively, "Default Actions") in which a Seller is a party plaintiff and where the Serviced Mortgagor has not asserted counter

-8-

claims to the Default Action (each, an "Uncontested Default Action"), Servicer shall file (or cause to be filed) appropriate pleadings and other documents and instruments with the applicable court or other appropriate body within one hundred eighty (180) days after the Servicing Transfer Date, requesting that Seller be removed as a party plaintiff to such Uncontested Default Action and substituting Servicer, the Investor with respect to such Serviced Mortgage Loan or another appropriate party plaintiff (the "New Plaintiff"), as the real party-in-interest (the costs and expenses of any such filings shall be divided equally between Servicer and Sellers, subject to the Purchaser Payment Cap). Notwithstanding the foregoing, Servicer shall not be required to seek substitution of the New Plaintiff for a Seller as the party plaintiff in any Uncontested Default Action (A) if doing so will require Servicer to re-commence the Uncontested Default Action, (B) if, based on the advice of counsel prosecuting the Default Action on behalf of the Sellers, doing so will delay the ultimate resolution of the Uncontested Default Action by three (3) months or more, (C) if doing so is otherwise not legally permissible, (D) if the Uncontested Default Action concludes (e.g., via judgment, voluntary dismissal, involuntary dismissal, or otherwise) within one hundred eighty (180) days of the Servicing Transfer Date, or (E) with respect to any non-judicial Foreclosure that is an Uncontested Default Action. Servicer shall provide Sellers with a monthly report of any Uncontested Default Actions for which Servicer has determined that it will not request a New Plaintiff to be substituted for a Seller (including the basis for such determination) and those for which substitution of a New Plaintiff was not permitted.

(ii)     Treatment of Contested Default Actions. With respect to any Default Action (whether judicial or non-judicial) in which the Serviced Mortgagor has asserted or subsequently asserts claims or counter claims against a Seller (each, a "Contested Default Action") that is not a Stayed Action (defined below), Servicer shall not be required to take any action to request that Servicer or any other Person be substituted for a Seller in such Contested Default Action (the "New Plaintiff/Defendant") as the real party-in-interest; provided, however, that the Parties shall confer in good faith to determine whether substitution is reasonable and appropriate under the circumstances with respect to each Contested Default Action, taking into consideration the exceptions to substitution enumerated in Section 3.14(b)(i)(A)-(E). In the event the Parties agree (it being understood that the decision to enter into such an agreement shall be made only by joint agreement of the Servicer and the Sellers), that a Seller shall be removed as a party to such Contested Default Action and substituted by a New Plaintiff/Defendant, Servicer shall file (or cause to be filed) appropriate pleadings and other documents and instruments with the applicable court or other appropriate body within one hundred eighty (180) days after the Servicing Transfer Date, requesting that Seller be removed as a party to such Contested Default Action and substituting the New Plaintiff/Defendant, as the real party-in-interest (the costs and expenses of any such filings shall be divided equally between Servicer and Sellers, subject to the Purchaser Payment Cap). To the extent any Contested Default Action entails the defense of a monetary claim asserted against the Sellers that would give rise to a Retained Liability, the Parties will confer in good faith to determine a reasonable allocation of costs and expenses to Seller for the defense of any such claim and to provide reasonable assurances to Servicer that Seller's obligation to pay such costs and expenses will constitute an administrative claim in the Bankruptcy Case and that a satisfactory mechanism has been established to ensure that Servicer will timely receive payment of such claim.

(iii)     Treatment of Serviced Mortgagor Bankruptcy Cases.  With respect to any Assumed Litigation where a Seller is a party in a contested matter or adversary proceeding in a case pending under the Bankruptcy Code (each, a "Bankruptcy Action"), in which the Serviced Mortgagor is a debtor or a co-debtor in a pending bankruptcy case or if the underlying Serviced Mortgaged Property is still property of the estate in a pending bankruptcy case as of the Servicing Transfer Date, Servicer shall file (or cause to be filed) appropriate pleadings and other documents and instruments with the applicable court within one hundred eighty (180) days after the Servicing Transfer Date, requesting that Seller be removed as a party to such Bankruptcy Action and substituting Servicer, the Investor with respect to such Serviced Mortgage Loan or another appropriate party (the "New Party"), as the real party-in-interest (the costs and expenses of any such filings shall be divided equally between Servicer and Sellers, subject to the Purchaser Payment Cap).  Notwithstanding the foregoing, Servicer shall not be required to request a New Party to be substituted for a Seller as the party in a Bankruptcy Action if (A) based on the advice of counsel representing the Sellers in the Bankruptcy Action, doing so will delay the ultimate resolution of the Bankruptcy Action by three (3) months or more, or (B) doing so is otherwise not legally permissible.  To the extent a New Party is substituted as the real party-in-interest in any Bankruptcy Action, then, notwithstanding anything in Section 3.14(a)(i) or (ii) to the contrary, Servicer shall also be required to seek substitution of the Sellers with respect to any Default Action against a Serviced Mortgaged Property or in respect of a Serviced Mortgage Loan involved in such Bankruptcy Action.  Servicer shall provide Sellers with a monthly report of any Bankruptcy Actions for which Servicer did not request a New Party to be substituted for a Seller (including the basis for such determination) and those for which substitution of a New Party was not permitted.

(iv)     Treatment of Seller Defendant Litigation.  With respect to any litigation that is not Assumed Litigation but is Seller Defendant Litigation Servicer shall not be required to take any action to request that Servicer or any other Person be substituted for a Seller in such Seller Defendant Litigation.  If agreed upon by Servicer and Sellers in writing (it being understood that the decision to enter into such agreement shall be within each Parties' sole discretion), Servicer shall conduct the defense of Seller in such Seller Defendant Litigation from and after the Servicing Transfer Date at Sellers' sole expense and subject to Sellers' right to participate in the conduct of such litigation.  Notwithstanding any agreement to conduct the defense of a Seller in any Seller Defendant Litigation, any liability with respect to such litigation shall be a Retained Liability subject to the provisions of the Bankruptcy Code and the jurisdiction of the Bankruptcy Court.  No settlement of any Seller Defendant Litigation may be agreed upon by Servicer or its agents or counsel without the express prior written consent of Sellers (subject to any applicable approval of the Bankruptcy Court or other requirements imposed by the Bankruptcy Court or any standing order issued by the Bankruptcy Court).  Servicer acknowledges and agrees that the settlement of any claim or cause of action asserted in any Seller Defendant Litigation will only be in the form of an allowed claim in the Bankruptcy Case and subject to the jurisdiction of the Bankruptcy Court.  Servicer further acknowledges and agrees that, to the extent any Seller Defendant Litigation gives rise to a judgment assessing monetary liability against a Seller, such judgments shall only be in the form of an allowed claim by the party plaintiff in the Bankruptcy Case and subject to the jurisdiction of the Bankruptcy Court.

(c)     Nothing set forth herein shall be deemed to be or construed as a waiver of the automatic stay in effect under section 362(a) of the Bankruptcy Code in the Bankruptcy Case (the "Stay"). To the extent the Stay applies to any claim or cause of action asserted against any Seller in any Assumed Litigation by any party to the Assumed Litigation (the "Stayed Litigation"), the Stay will remain in full force and effect and Sellers shall not be required to participate in or fund any cost or expense associated with the Stayed Litigation. Servicer shall not take any action to request that Servicer or any other Person be substituted for a Seller in any Stayed Litigation, and Sellers shall retain sole control over and discretion with respect to the conduct of any Stayed Litigation in respect of such claim or cause of action asserted against the Seller, including the defense, waiver, and/or settlement of the claim or cause of action asserted against the Seller in such Stayed Litigation (including with respect to any motion for relief from the Stay); provided, that, upon Sellers' request, Servicer will consult with Sellers with respect to the proposed treatment of any Stayed Litigation and any related Serviced Mortgage Loan. For the avoidance of doubt, Servicer may settle or resolve any Default Action that is related to or the subject of Stayed Litigation or otherwise administer and service the related Serviced Mortgage Loan, in its sole discretion, so long as such settlement, resolution, or administration does not resolve or address a Retained Liability or any claim or cause of action asserted against Sellers or otherwise give rise to a claim or other liability against any Seller in the Bankruptcy Case. Prior to any substitution of a Seller in any Assumed Litigation, to the extent necessary or practical, Seller will prepare and file in the Assumed Litigation appropriate notices describing the effect of the Stay, the Closing, the APA and/or this Agreement on the Stayed Litigation. Nothing set forth herein shall preclude Sellers from asserting in the Bankruptcy Case or the Assumed Litigation that any party to the Stayed Litigation is enjoined from proceeding with the Stayed Litigation by the Stay and any order entered in the Bankruptcy Case establishing deadlines for the filing of proofs of claims or requests for allowance of administrative expense claims. If the Stay is lifted in whole or in part with respect to any Stayed Litigation by an order of the Bankruptcy Court (each a "Lifted Stay Litigation)," then the Parties shall confer and determine in good faith whether such Lifted Stay Litigation should be treated as a Contested Default Action, a Bankruptcy Action, or a Seller Defendant Litigation.

(d)     With respect to Assumed Litigation in which a Seller is obligated to defend and/or indemnify a third party in its capacity as servicer (the "Third Party Defense Obligations"), it is acknowledged that such Third Party Defense Obligations shall constitute Walter Assumed Liabilities and shall be transferred to Servicer as successor servicer as of the Closing Date, except to the extent a Third Party Defense Obligation gives rise to a judgment against, or other right to payment from, such Seller that is a Retained Liability, in which case such liability shall not be a Walter Assumed Liability or otherwise be paid by Servicer either directly or subject to reimbursement by Sellers, but shall instead be deemed a claim against the applicable Seller's bankruptcy estate and subject to the jurisdiction of the Bankruptcy Court.

(e)     In the event that Servicer does not cause Sellers to be replaced in any Assumed Litigation by a New Plaintiff, a New Plaintiff/Defendant or a New Party, as applicable, pursuant to Section 3.14(b), Servicer shall instead act in the Assumed Litigation pursuant to a power of attorney enforceable in the relevant jurisdiction, (i) Servicer shall cause its attorney to conduct such litigation at Servicer's sole cost and expense, except to the extent such litigation entails the defense of a monetary claim asserted against the Sellers that would give rise to a Retained Liability, in which case the Parties will confer in good faith to determine a reasonable allocation

-11-

of costs and expenses to Seller for the defense of any such claim and to provide reasonable assurances to Servicer that Seller's obligation to pay such costs and expenses will constitute an administrative claim in the Bankruptcy Case and that a satisfactory mechanism has been established to ensure that Servicer will timely receive payment of such claim; (ii) Sellers shall cooperate with Servicer and Servicer's attorney as reasonably required in connection with such litigation or any settlement relating thereto; and (iii) no settlement that provides for the imposition of any liability against any Seller or the compromise of a claim by or against any Seller shall be agreed upon by Servicer or its agents or counsel without the express prior written consent of Sellers (subject to any applicable approval of the Bankruptcy Court and subject to the requirements of any standing Bankruptcy Court order); provided, however, that, notwithstanding the foregoing to the contrary, Servicer may settle or resolve such Assumed Litigation or otherwise administer and service the related Serviced Mortgage Loan, in its sole discretion, so long as (B) such settlement includes an irrevocable and complete waiver and release of any and all Retained Liabilities and any other potential claims against Sellers in relation to such litigation and the subject Serviced Mortgage Loans (including the withdrawal with prejudice of any applicable proof of claim or request for the allowance of an administrative claim filed or deemed filed in the Bankruptcy Case), without recourse of any other kind to Sellers or Sellers' assets, or (B) such settlement does not purport to resolve a Retained Liability or any claim or cause of action asserted against Sellers that could give rise to a claim against any Seller in the Bankruptcy Case.

(f)     (i)     Transfer of Claims.  In accordance with Rules 3001 and 3002 of the Federal Rules of Bankruptcy Procedure, Servicer agrees to prepare and file, within one hundred and eighty (180) days after the Servicing Transfer Date a Notice of Transfer of Claim or any similar forms as may be required in any relevant jurisdiction, to transfer a claim, for each Serviced Mortgage Loan, where a Serviced Mortgagor under such Serviced Mortgage Loan is a debtor or a co-debtor in an active bankruptcy case or if the underlying mortgaged property is still property of the estate in an active bankruptcy case as of the Servicing Transfer Date.  Such Notice of Transfer of Claims shall be in a form substantially similar to a form agreed upon among the Parties or otherwise acceptable to Sellers.

(ii)     Filing of Proofs of Claim.  Sellers shall, prior to the Servicing Transfer Date, take all actions necessary to approve and submit to counsel for filing (where applicable under the Federal Rules of Bankruptcy Procedure and the Bankruptcy Code) appropriate proofs of claim in any pending bankruptcy case involving any Serviced Mortgage Loans for which the claims bar date expires on or before February 28, 2013.  Servicer agrees to take all actions necessary to file (where applicable under the Federal Rules of Bankruptcy Procedure and the Bankruptcy Code) appropriate proofs of claim in accordance with the Federal Rules of Bankruptcy Procedure, local rules and other applicable jurisdictional requirements in any pending bankruptcy case involving any Serviced Mortgage Loans for which Sellers have not already filed a proof of claim where the bar date for the claims is after the Servicing Transfer Date.  In the event of a conflict between this Section 3.14(f) and the Fannie Mae Guide, the terms of the Fannie Mae Guide shall govern.  Sellers agree to cooperate with Servicer in connection with Servicer's obligations under this Section 3.14(f)(ii), including using reasonable efforts to provide Servicer with copies of any documents that are within Sellers' possession, custody or control that Servicer may need to prepare and file proofs of claim in any pending bankruptcy case involving any Serviced Mortgage Loans for which the claims bar date expires

-12-

on or before March 31, 2013, and designating a specific employee to whom Servicer may direct requests for such documents.

### Section 3.15 [Reserved.]

### Section 3.16 No Personal Solicitation.

From and after the Closing Date, each Seller agrees that it will not take any action or cause any action to be taken by any of its agents or Affiliates, or by any independent contractors on such Seller's behalf, to solicit the Serviced Mortgagor to refinance or prepay a Serviced Mortgage Loan, in whole or in part, without the prior written consent of Servicer; provided that, this Section 3.16 shall not prohibit any Seller, its Affiliates or agents from conducting a solicitation made by means of a general purpose advertisement not specifically targeted at the Serviced Mortgagors. Each Seller agrees that neither it nor its Affiliates will prepare or disseminate, for compensation or otherwise, any mailing list comprised solely of the Serviced Mortgagors to parties other than Servicer.

### Section 3.17 [Reserved.]

### Section 3.18 [Reserved.]

### Section 3.19 [Reserved.]

### Section 3.20 Costs of Transfer.

Except as otherwise provided herein, the costs and expenses of transferring the Fannie Mae MSRs and related mortgage servicing to Servicer shall be allocated among, and borne by, the Parties in accordance with Sections 9.2, 6.24 and 6.25 of the APA.

### Section 3.21 Further Assistance and Assurances.

On or prior to each Servicing Transfer Date, each Seller shall furnish Servicer a power of attorney in the form attached as Exhibit B (each, an "LPOA") to enable Servicer to carry out servicing and administrative duties related to the Serviced Mortgage Loans. To the extent Sellers rely on powers of attorney from investors or other third parties, Servicer shall obtain new powers of attorney in Servicer's name and in substance sufficient to allow Servicer to service the Serviced Mortgage Loans in accordance with the Applicable Requirements. Upon the reasonable request of Servicer, Sellers shall promptly execute, acknowledge, deliver or perform all such further acts, deeds, assignments, transfers, conveyances and assurances as are reasonably necessary to effectuate the purposes of this Agreement or to confer upon Servicer title in and to the Fannie Mae MSRs to effect the Transactions. Servicer shall, at any time and from time to time following the Closing, promptly, upon the reasonable request of Sellers, execute, acknowledge, deliver or perform all such further acts, deeds, assumption agreements, transfers and assurances as are reasonably necessary or convenient to effectuate the purposes of this Agreement. Each Party agrees that (i) if it receives any payment or amount after the Closing Date to which another Party is entitled, the recipient shall promptly transfer such payment or amount to the Party so entitled, and (ii) if it receives any notices or other written communications

-13-

with respect to the Fannie Mae MSRs that should have been delivered to another Party, it shall promptly deliver a copy of such notice or communication to such other Party.

### Section 3.22  [Reserved.]

### Section 3.23  Recovery of Servicing Advances.

If and to the extent any Seller shall receive after the Closing Date funds constituting the recovery of Servicing Advances acquired by Servicer under the Sale and Assumption Agreements or any other collections related to the related Serviced Mortgage Loans, it shall promptly remit such funds to Servicer, but in no event later than three (3) Business Days after the receipt thereof.

### Section 3.24  Financing Statement Authorization.

Sellers hereby authorize Servicer to file, on or after the Closing Date, a financing statement or statements and take such further actions as Servicer may in its discretion determine is necessary or advisable to evidence the sale to Servicer of the Fannie Mae MSRs and any accounts, general intangibles, documents, instruments (as such terms are defined under the Uniform Commercial Code as in effect in the State of New York), and any products and proceeds related to any of the foregoing.

### ARTICLE IV.

### TERMINATION

### Section 4.01  Termination.

This Agreement shall terminate automatically, without the requirement of any further action by any Party, upon the termination of the APA in accordance with its terms.

### Section 4.02    Effect of Termination.

In the event of termination of this Agreement pursuant to Section 4.01, this Agreement shall forthwith become void and have no further force, except that the provisions of this Section 4.02, Section 5.01, Section 5.07 and any other Section which, by its terms, relates to post-termination rights or obligations, shall survive such termination of this Agreement and remain in full force and effect.

### ARTICLE V.

### MISCELLANEOUS

### Section 5.01    Notices.

Any written notice to be given hereunder shall be deemed given:  (a) when received if given in person or by nationally recognized courier; (b) on the date of transmission if sent by telecopy, e-mail or other wire transmission (receipt confirmed in each case); (c) five Business

-14-

Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid, return receipt requested; and (d) if sent by an internationally recognized overnight delivery service, the second Business Day following the date given to such overnight delivery service (specified for overnight delivery and receipt confirmed). All notices shall be addressed as follows:

If to Sellers, to:

> Residential Capital, LLC
> 1177 Avenue of the Americas
> New York, New York 10036
> Facsimile: 646-257-2703
> Attention: Mr. Thomas Marano
> Telephone: 646-781-2600
> email: tom.marano@gmacrescap.com

> with copies to (which copies shall not constitute notice):

> Residential Capital, LLC
> 1100 Virginia Drive
> Fort Washington, Pennsylvania 19034
> Facsimile: 866-572-7524
> Attn: Tammy Hamzehpour, Esq., General Counsel
> Telephone: 215-682-1307
> email: tammy.hamzehpour@gmacrescap.com

> *and*

> Morrison & Foerster LLP
> 1290 Avenue of the Americas
> New York, New York  10104
> Attention: Gary S. Lee, Esq.
> Telephone: (212) 468-8163
> email: glee@mofo.com

If to Servicer, to:

> Green Tree Servicing, LLC
> 345 St. Peter Street, 1100 Landmark Towers
> St. Paul, Minnesota  55102
> Attention:  Brian F. Corey, General Counsel
> Telephone:  (651) 293-3472
> Email:  brian.f.corey@greentreecreditsolutions.com

> with copies to (which copies shall not constitute notice):

With required copies to:

> Brown Rudnick LLP
> One Financial Center
> Boston, MA  02111
> Attention:  Jeffrey L. Jonas, Esq.
> Telephone:  (617) 856-8577
> Email:  JJonas@brownrudnick.com

-15-

**Section 5.02    Parties in Interest; Assignment**.

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and permitted assigns; *provided*, *however*, that neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any Party without the prior written consent of the other Parties.  Except as specifically provided in this Agreement, nothing in this Agreement is intended to confer upon any other Person any rights or remedies under or by reason of this Agreement.

**Section 5.03    Complete Agreement**.

This Agreement, including the Exhibits and Schedules hereto and the documents and other writings referred to herein or therein or delivered pursuant hereto, together with the Sale and Assumption Agreements, contains the entire agreement and understanding of the Parties with respect to its subject matter. There are no restrictions, agreements, promises, warranties, covenants or undertakings between the Parties other than those expressly set forth herein or therein. This Agreement supersedes all prior agreements and understandings (other than the Sale and Assumption Agreements) among the Parties, both written and oral, with respect to its subject matter.

**Section 5.04    Counterparts**.

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**Section 5.05    Severability**.

Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the Parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

**Section 5.06    Amendment; Waiver**.

(a)    This Agreement may be amended, modified or supplemented only in writing signed by each of the Parties hereto. Any provisions of this Agreement may be waived, but only if such waiver is in writing and signed by the Party against whom the waiver is to be effective. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(b)     The failure of a Party to require performance of any provision hereof shall not affect its right at a later timer to enforce the same.  No waiver by a Party of any term, covenant, representation or warranty contained herein shall be effective unless in writing.  No such waiver in any one instance shall be deemed a further or continuing waiver of any such term, covenant, representation or warranty in any other instance.

**Section 5.07   Applicable Law; WAIVER OF JURY TRIAL; Venue and Retention of Jurisdiction.**

(a)     This Agreement shall be governed by and construed in accordance with the Laws of the State of New York without regard to any conflicts of law principles thereof or any other jurisdiction that would apply the law of another jurisdiction and, to the extent applicable, the Bankruptcy Code.

(b)     EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND THE TRANSACTIONS CONTEMPLATED HEREBY.

(c)     Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 5.01 hereof; provided, however, that if the Bankruptcy Case of Sellers has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)     Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 5.01.

**Section 5.08   Interpretation.**

When a reference is made in this Agreement to Sections or Exhibits, such reference shall be to a Section of or Exhibit to this Agreement unless otherwise indicated. Whenever the words "herein" or "hereunder" are used in this Agreement, they will be deemed to refer to this Agreement as a whole and not to any specific Section. References to Sections include subsections which are part of the related Section (e.g., a section numbered "Section 5.01(a)" would be part of

-17-

"Section 5.01" and references to "Section 5.01" would also refer to material contained in the subsection described as "Section 5.01(a)"). Any Law defined herein will mean such Law as amended and will include any successor Law. References to a Contract will be deemed to refer to such Contract as amended, restated or supplemented in accordance with its terms. The table of contents, index and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the person referred to may require. The phrases "the date of this Agreement", "the date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the preamble to this Agreement. Whenever a dollar figure ($) is used in this Agreement, it will mean United States dollars unless otherwise specified.

*[Remainder of Page Intentionally Left Blank]*

la-1198676

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers as of the date first set forth above.

GMAC MORTGAGE, LLC

By: _____

Name:  James Whitlinger
Title:   Chief Financial Officer


EXECUTIVE TRUSTEE SERVICES, LLC

By: _____

Name:  James Whitlinger
Title:   Chief Financial Officer


GREEN TREE SERVICING, LLC

By: _____

Name:
Title:

ln-1198676

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers as of the date first set forth above.

GMAC MORTGAGE, LLC

By: _____
    Name:
    Title:

EXECUTIVE TRUSTEE SERVICES, LLC

By: _____
    Name:
    Title:

GREEN TREE SERVICING, LLC

By: _____
    Name:
    Title:

*[Signature Page- Servicing Transfer Agreement]*

1

ia-1198676

21  Servicing Transfer Agreement

# EXHIBIT A
## SERVICING TRANSFER INSTRUCTIONS

**EXHIBIT B**
**POWER OF ATTORNEY**

Loan Schedule re Fannie Mae/Rescap/GMAC



| NEW_LOAN_ ACCOUNT_ID | CHECK_ DIGIT | ORIGINAL_ EXTERNAL_ ACCT_NBR | Borrower Name | BOARDED to GTA Y/N |
|---|---|---|---|---|
| 62379918 | 6 | 702075180 | DELIA | Y |



EXHIBIT
Defendants
9
1/8/19 Am

*Execution Copy*

## AGREEMENT FOR PARTIAL ASSIGNMENT AND ASSUMPTION
## UNDER THE ASSET PURCHASE AGREEMENT

This Agreement for Partial Assignment and Assumption under the Asset Purchase Agreement (this "<u>Agreement</u>"), dated as of January 31, 2013, entered into among Walter Investment Management Corp., a Maryland corporation ("<u>Walter</u>"), Green Tree Servicing LLC, a Delaware limited liability company ("<u>Green Tree</u>" and, together with Walter, the "<u>Walter Parties</u>"), Ocwen Loan Servicing, LLC, a Delaware limited liability company ("<u>Ocwen</u>"), and Residential Capital, LLC ("<u>ResCap</u>"), Residential Funding Company, LLC ("<u>RFC</u>"), GMAC Mortgage, LLC ("<u>GMAC Mortgage</u>"), each of which is a Delaware limited liability company, Executive Trustee Services, LLC, a Delaware limited liability company ("<u>ETS LLC</u>"), ETS of Washington, Inc., a Washington corporation ("<u>ETS WA</u>"), EPRE LLC, a Delaware limited liability company ("<u>EPRE</u>"), GMACM Borrower LLC, a Delaware limited liability company ("<u>GMACM Borrower</u>"), and RFC Borrower LLC, a Delaware limited liability company ("<u>RFC Borrower</u>" and, together with ResCap, RFC, GMAC Mortgage, ETS LLC, ETS WA, EPRE and GMACM Borrower, the "<u>Sellers</u>").

### RECITALS

**WHEREAS**, Sellers are engaged in the Business (as defined in the APA).

**WHEREAS**, Sellers, together with other Affiliates (as defined in the APA), filed voluntary petitions ("<u>Petitions</u>") for relief (collectively, the "<u>Bankruptcy Case</u>") under Chapter 11 of Title 11, U.S.C. §§ 101, et seq., as amended (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") on May 14, 2012 (the "<u>Petition Date</u>");

**WHEREAS**, Walter and Ocwen entered into a Joint Bidding Agreement, dated as of October 19, 2012 (the "<u>JBA</u>"), whereby Walter and Ocwen agreed to jointly pursue the acquisition the Business;

**WHEREAS**, as authorized under sections 105, 363 and 365 of the Bankruptcy Code, Ocwen and Sellers entered into an Asset Purchase Agreement, dated as of November 2, 2012, as amended by Amendment Number 1 dated as of November 20, 2012 and by Amendment Number 2, dated as of January 29, 2013, subject to entry of a Final Order of the Bankruptcy Court authorizing the effectiveness thereof, and Amendment No. 3 thereto, dated as of January 31, 2013 (as amended, the "<u>APA</u>"), pursuant to which Ocwen agreed to purchase the Purchased Assets (as defined in the APA) and assume the Assumed Liabilities (as defined in the APA) from Sellers, subject to Section 6.15 of the APA, which provided, consistent with the JBA, that Walter would purchase the Walter Assets and the related Assumed Liabilities as well as the rights and obligations under the APA with respect thereto;

**WHEREAS**, on November 6, 2012, in accordance with Section 6.15 of the APA, Walter delivered a letter to ResCap agreeing, among other things, that Walter, or a designated Affiliate of Walter, would be bound by the provisions of the APA in respect of the Walter Assets (as defined in the APA); and

**WHEREAS**, Green Tree is an Affiliate of Walter; and



EXHIBIT
Defendant's
10
11/8/19    Am
PENGAD 800-631-6989

**WHEREAS**, Ocwen, Walter, Green Tree and Sellers desire to effect a partial assignment and assumption of certain rights and obligations under the APA from Ocwen to Green Tree on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.1    Defined Terms**.   Capitalized terms used in this Agreement, but not defined herein, shall have the meanings ascribed to such terms in the APA.  As used in this Agreement, the following defined terms shall have the meanings specified below:

"Ocwen Assumed Liabilities" shall mean all Assumed Liabilities other than Walter Assumed Liabilities.

"Ocwen Closing" means the Closing as it relates the transfer and assumption of the Ocwen Purchased Assets and Ocwen Assumed Liabilities.

"Ocwen Closing Date" means the date on which the Ocwen Closing occurs.

"Ocwen Purchased Assets" shall mean all Purchased Assets other than Walter Purchased Assets.

"Purchaser" means Ocwen and/or Walter, as the context requires.

"Purchasers" means, collectively, Ocwen and Walter.

"Purchaser Transition Services Agreement" means the transition services agreement to be entered into, as of the date hereof, by and among Ocwen, for itself and its Affiliates, and Walter, for itself and its Affiliates, pursuant to which Ocwen and Walter will each provide certain transition services from and after the later of the Walter Closing Date and the Ocwen Closing Date, a form of which is attached as Exhibit B hereto.

"Related to the Walter Business" means required for, held for, or used in the conduct of the Walter Business as conducted by Sellers in the Ordinary Course of Business.

"Walter Assumed Contracts" means:

(a)    the Intellectual Property Licenses listed on Schedule 1.1(a) hereto;

(b)    the Software Contracts listed on Schedule 1.1(b) hereto;

(c)     other Contracts to which any Seller is a party that are set forth on Schedule O to the APA and that are listed on Schedule 1.1(c) hereto as may be updated to include any Contracts assigned to Green Tree pursuant to Section 2.15(d) of the APA subsequent to the Walter Closing, but excluding (i) any Plan to the extent not assumed by Green Tree pursuant to Section 6.7 of the APA and (ii) the Consent Order and the DOJ/AG Settlement Agreement; and

(d)     Contracts that are solely Related to the Walter Business entered or made by Seller in the Ordinary Course of Business after the date of the APA and before the date of the Walter Closing in accordance with the terms of the APA (provided that Sellers have furnished Walter or Green Tree with a true, correct and complete copy of each such Contract promptly following the execution and delivery thereof).

"Walter Assumed Liabilities" means the following, solely to the extent included as Assumed Liabilities pursuant to the APA:

(a)     the Business Employee Liabilities to the extent related to the Walter Transferred Employees;

(b)     the Liabilities relating to Permitted Liens to the extent related to the Walter Purchased Assets (to the extent not discharged in the Bankruptcy Case);

(c)     the Liabilities arising under any Walter Assumed Contract to the extent such Liabilities arise on or after the Walter Closing:

(d)     all Liabilities of the Walter Business or Walter Purchased Assets to the extent arising from the conduct of the Walter Business on or after the Walter Closing other than Retained Liabilities and Ocwen Assumed Liabilities;

(e)     to the extent that Green Tree requests the physical transfer of Purchased Mortgage Servicing from the Sellers' systems, any fees, costs and expenses related to the preparation for, and physical transfer of Purchased Mortgage Servicing from the Seller's systems, including all third party fees, costs and expenses incurred prior to later of the Ocwen Closing Date and the Walter Closing Date; and

(f)     any applicable compensatory fees related to a failure to adhere to the foreclosure timelines relating to any Fannie Mae Agency Loan that is a Non-Lagging Defaulted Loan.

"Walter Business" means that portion of the Business, directly or indirectly, engaged in by Sellers and Affiliate Sellers of (i) originating Mortgage Loans, including through Sellers' Consumer Lending Platform; (ii) owning the Other Purchased Assets to the extent included as Walter Purchased Assets; (iii) providing primary servicing, back-up servicing and related activities for Fannie Mae Agency Loans; (iv) financing and reselling Mortgage Loans to be serviced by Green Tree and related capital markets transactions; and (v) other operations related to the foregoing.

"Walter Closing" means the Closing as it relates the transfer and assumption of the Walter Purchased Assets and Walter Assumed Liabilities.

"Walter Closing Date" means the date on which the Walter Closing occurs.

"Walter Purchased Assets" means, to the extent included as Purchased Assets pursuant to the APA and subject to the terms and conditions set forth in the APA, the following assets of Sellers as they exist on the Walter Closing Date (whether tangible, intangible, real, personal or mixed), as approved for sale, transfer and assignment pursuant to the Sale Approval Order:

(a)     the Purchased Mortgage Servicing relating to Fannie Mae Agency Loans and rights to receive Servicing Compensation related thereto, including Servicing Compensation that is accrued and unpaid as of the Walter Closing Date;

(b)     except as provided in Section 2.15 of the APA, the Servicing Advances relating to Fannie Mae Agency Loans outstanding as of the Walter Closing Date;

(c)     the Walter Assumed Contracts;

(d)     the Owned Transferred IP and Licensed Transferred IP, in each case as described on Schedule 1.1(d) hereto (as such schedule may be amended after the date hereof by agreement of Ocwen and Walter, each acting in good faith);

(e)     the Books and Records primarily Related to the Walter Business or primarily related to the Walter Purchased Assets;

(f)     the Fixtures and Equipment (other than Transferred IT Assets) located in the Walter Space as of the Walter Closing Date;

(g)     (i) the Transferred IT Assets related to the applications described on Schedule 1.1(e) hereto, (ii) the Transferred IT Assets comprising employees' personal computers, mobility and workstation equipment that are located in the Walter Space as of the Walter Closing Date, and (iii) the laptop computers assigned to any Walter Transferred Employee as of the Walter Closing Date;

(h)     credits, prepaid expenses, deferred charges, security deposits, prepaid items and duties to the extent Related to the Walter Business or to the extent related to a Walter Purchased Asset or to a Walter Assumed Liability;

(i)     the causes of action, lawsuits, judgments, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and other rights or Claims to the extent related to the Walter Purchased Assets or to the Walter Assumed Liabilities and any foreclosure, recovery and other loss mitigation activities to the extent Related to the Walter Business, and, with respect to the Walter Transferred Employees and any vendors (other than AFI and Affiliates) with whom the Sellers have conducted business in the year prior to the Walter Closing and with whom Green Tree will continue to engage in connection with the operation of the Walter Business following the Walter Closing (including, for the avoidance of doubt, any vendor that is a party to a Walter Assumed Contract), all preferences or avoidance claims and actions of any of the Sellers related thereto, including any such claims and actions arising under sections 544, 547, 548, 549 and 550 of the Bankruptcy Code (provided that, for the avoidance of doubt,

Sellers shall be entitled to participate in the defense of any counterclaim that does not constitute a Walter Assumed Liability);

(j)      all rights and benefits accruing under the Walter Assumed Contracts and the Walter Purchased Assets;

(k)      all telephone or facsimile numbers that are set forth on Schedule 1.1(f) or are used by Sellers primarily in connection with the Walter Business;

(l)      to the extent permitted by Law, all Permits held by Sellers to the extent Related to the Walter Business or the Walter Purchased Assets;

(m)     all signage, marketing materials, art and collectibles that is (i) located in the Walter Space as of the Walter Closing Date and not primarily related to the Business other than the Walter Business; or (ii) primarily Related to the Walter Business;

(n)      all rights to receive mail and other communications addressed to Sellers to the extent pertaining to the Walter Business or the Walter Purchased Assets;

(o)      all client lists, customer lists, supplier lists, mailing lists, do not call lists and other data to the extent Related to the Walter Business, including service and warranty records, operating guides and manuals, studies and correspondence (electronic or otherwise);

(p)      to the extent transferable, all guaranties, warranties, indemnities and similar rights in favor of any Seller or any Affiliate Seller to the extent Related to the Walter Business or to the extent related to any Walter Purchased Asset or to any Walter Assumed Liability;

(q)      such other assets that are listed on Schedule 1.1(g) hereto; and

(r)      the goodwill and other intangible assets to the extent Related to the Walter Business or to the extent related to the Walter Purchased Assets.

"Walter Space" means the facilities, or portions of facilities, described on Schedule 1.2.

"Walter Transferred Employees" means each Transferred Employee that accepts Green Tree's offer of employment and who becomes an employee of Green Tree as provided in , subject to entry of a Final Order of the Bankruptcy Court authorizing the effectiveness thereof, and Amendment No. 3 thereto, dated as of January 31, 2013 of the APA.

**Section 1.2    Interpretation**.  The provisions of Section 1.2 of the APA are hereby incorporated into this Agreement and made a part hereof.

## ARTICLE II.

## PARTIAL ASSIGNMENT OF APA; COVENANTS

### Section 2.1    Partial Assignment of APA.

(a)    Assignment and Assumption.  On the terms and subject to the conditions set forth herein, Ocwen hereby assigns to Green Tree and Green Tree hereby assumes from Ocwen, all of Ocwen's right and obligations as "Purchaser" under the APA to the extent such rights and obligations relate to the Walter Business, Walter Purchased Assets and Walter Assumed Liabilities.  From and after the date hereof, Green Tree shall be the "Purchaser" under the APA with respect to the Walter Business, Walter Purchased Assets and Walter Assumed Liabilities; shall have sole rights, obligations and liability as a Purchaser under the APA with respect to the Walter Business, Walter Purchased Assets and Walter Assumed Liabilities; and shall have no rights, obligations or liability under the APA as a Purchaser with respect to the Business (other than the Walter Business), Ocwen Purchased Assets or Ocwen Assumed Liabilities.  From and after the date hereof, Ocwen shall have no further rights, liability or obligations under the APA with respect to the Walter Business, Walter Purchased Assets or the Walter Assumed Liabilities.

(b)    Sellers' Agreement.  Sellers hereby consent to the assignments and assumptions contemplated by this Agreement and acknowledge and agree that, from and after the date hereof: (i) Green Tree shall be the "Purchaser" under the APA with respect to the Walter Purchased Assets and Walter Assumed Liabilities and shall have sole rights, obligations and liability as Purchaser under the APA with respect to the Walter Purchased Assets and Walter Assumed Liabilities; and (ii) Ocwen shall be the "Purchaser" under the APA with respect to the Ocwen Purchased Assets and Ocwen Assumed Liabilities and shall have sole rights, obligations and liability as Purchaser under the APA with respect to the Ocwen Purchased Assets and Ocwen Assumed Liabilities.  Sellers hereby represent to Green Tree that, except for the Excluded Assets listed on Schedule Q of the APA and the services to be provided by Sellers to Walter and its Affiliates under the Transition Services Agreement between Sellers and Walter and its Affiliates, and by AFI under the AFI Transition Services Agreement with Walter and its Affiliates, the Walter Purchased Assets, whether real or personal, tangible or intangible, comprise all of the assets, properties and rights that are used by Sellers and their Affiliates as of the date of the APA and necessary to conduct the Walter Business in the manner conducted as of the date of the APA.

(c)    General.  The parties hereby agree that, to the extent a provision of the APA is not specifically addressed in this Agreement, the parties intend that (i) Green Tree will have exclusive rights and obligations under the APA in respect of the Walter Business, Walter Purchased Assets and Walter Assumed Liabilities; and (ii) Ocwen will have exclusive rights and obligations under the APA in respect of the Business (other than in respect of the Walter Business), Ocwen Purchased Assets and Ocwen Assumed Liabilities.  To the extent the context requires, the terms of the APA shall be interpreted to refer to the relevant Purchaser and the Business, Purchased Asset or Assumed Liability relevant to such Purchaser.  The parties hereby acknowledge and agree that every obligation of "Purchaser" under the APA relates (i) solely to the Walter Business, Walter Purchased Assets or Walter Assumed Liabilities; (ii) solely to the Business (other than the Walter Business), Ocwen Purchased Assets or Ocwen Assumed Liabilities; or (iii) to some extent to both (x) the Walter Business, Walter Purchased Assets or

Walter Assumed Liabilities and (y) the Business (other than the Walter Business), Ocwen Purchased Assets or Ocwen Assumed Liabilities.

**Section 2.2    Closing Mechanics and Deliverables; Indemnity Escrow; Purchase Price**.

(a)    Pre-Closing Cooperation.  Prior to the later of the Walter Closing Date and the Ocwen Closing Date, subject to the terms and conditions of this Agreement and the APA, each of the Purchasers shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to cooperate with the other Purchaser in order to do or cause to be done, all things necessary, proper or advisable under applicable Law to consummate the transactions contemplated by this Agreement and the APA as soon as practicable and cause the fulfillment at the earliest practicable date of the conditions to the parties' obligations to consummate the transactions contemplated by this Agreement and the APA.

(b)    Closing Mechanics.  At the Walter Closing, Sellers shall, in accordance with the APA, convey the Walter Purchased Assets to Green Tree and Green Tree shall assume from Sellers the Walter Assumed Liabilities.  At the Ocwen Closing, Sellers shall, in accordance with the APA, convey the Ocwen Purchased Assets to Ocwen and Ocwen shall assume from Sellers the Ocwen Assumed Liabilities.  Except as set forth on Schedule 2.2(b) hereto, Sellers shall deliver to each Purchaser separate, but substantially identical, closing deliverables as required pursuant to Section 2.12 of the APA in respect of the Ocwen Closing and the Walter Closing, as applicable.

(c)    Purchase Price Allocation.  The parties hereto hereby agree that the calculation of the Purchase Price payable by Green Tree (the "Walter Purchase Price") shall be calculated as set forth on Schedule 2.2(c) hereto.  At the Walter Closing, Green Tree shall be responsible for delivery of the Walter Purchase Price.  Neither Green Tree nor its Affiliates shall have any liability with respect to any portion of the Purchase Price payable by Ocwen and Ocwen shall have no liability with respect to the Walter Purchase Price.    Fifteen Million Dollars ($15,000,000) of the Cash Deposit shall be allocated in respect of the Walter Purchase Price and any interest on such amount shall be delivered to Green Tree.

(d)    Purchase Price Adjustments; Purchase Price Allocations.  The parties hereto hereby agree that any adjustment to the Purchase Price contemplated by the APA, including the adjustments pursuant to Section 3.2 of the APA, shall adjust the Walter Purchase Price to the extent that the adjustment is related to or arises from the Walter Purchased Assets or Walter Assumed Liabilities and shall adjust the Ocwen Purchase Price to the extent that the adjustment is related to or arises from the Ocwen Purchased Assets or Ocwen Assumed Liabilities.  Green Tree shall have sole rights and obligations of a Purchaser under the APA with respect to deliveries and agreements regarding any adjustment to Purchase Price or allocation of the Purchase Price relating to Walter Purchased Assets or Walter Assumed Liabilities.

(e)    Indemnity Escrow.  At each Closing, Sellers shall execute and deliver a separate, but substantially identical, Indemnity Escrow Agreement with Ocwen (in the case of the Ocwen Closing) and Green Tree (in the case of the Walter Closing).  The Indemnity Escrow Amount for each of Green Tree and Ocwen shall equal one percent (1%) of their respective Purchase Prices.

(f)     Expenses, Purchaser Payment Cap.  In respect of the Purchaser Payable Cure Amount and any other amounts referenced in Section 6.25 of the APA (such amounts, the "Purchaser Expenses"): (i) Green Tree shall pay to Sellers $5 million at the Walter Closing and (ii) Ocwen shall pay to Sellers $5 million at the Ocwen Closing (each such payment, an "Purchaser Expense Payment").  Within seventy-five (75) days of the later of the Walter Closing Date and the Ocwen Closing Date, Green Tree and Ocwen shall determine in good faith an appropriate adjustment to the amount of the Purchaser Expense Payment, if necessary, to result in (x) the relative amount of the Purchaser Expense Payment made by Green Tree as compared to Ocwen to be in the same proportion as (y) the relative amount of Purchaser Expenses due in respect of the Walter Assets as compared to the amount of Purchaser Expenses due in respect of the other Purchased Assets.  Within three (3) Business Days of such determination, Green Tree or Ocwen (as applicable) shall make payment of such adjustment amount to the appropriate party.

**Section 2.3     Closing Conditions**.  Purchasers and Sellers hereby agree as follows:

(i)     The Walter Closing and the Ocwen Closing shall be separate and independent of each other and need not occur simultaneously.  The failure of either the Walter Closing or the Ocwen Closing to occur as contemplated by the APA shall not affect the rights or obligations of the other Purchaser or the Sellers with respect to the other Closing.

(ii)     If a condition to Closing contained in Section 8.1 or Section 8.3 of the APA is applicable to the Walter Purchased Assets or the Walter Assumed Liabilities, Green Tree shall have the sole right to determine if such condition has been satisfied or to waive such condition as to the Walter Closing.  If a condition to Closing contained in Section 8.1 or Section 8.3 of the APA is applicable to the Ocwen Purchased Assets or Ocwen Assumed Liabilities, Ocwen shall have the sole right to determine if such condition has been satisfied or to waive such condition at to the Ocwen Closing.

(iii)     To the extent a condition to Closing contained in Section 8.1 or Section 8.2 of the APA is applicable solely to the Walter Purchased Assets or the Walter Assumed Liabilities, the failure of Green Tree to satisfy such condition shall not affect the obligations of the Sellers to consummate the Ocwen Closing.  To the extent a condition to Closing contained in Section 8.1 or Section 8.2 of the APA is applicable solely to the Ocwen Purchased Assets or the Ocwen Assumed Liabilities, the failure of Ocwen to satisfy such condition shall not affect the obligations of the Sellers to consummate the Walter Closing.

**Section 2.4     Purchaser Transition Services Agreement**.  The Purchasers hereby agree that, immediately upon the effectiveness of the later to occur of the Walter Closing Date and the Ocwen Closing Date, the Purchasers shall enter into the Purchaser Transition Services Agreement.

**Section 2.5     Post-Closing Asset Deliveries; Cooperation.**

(a)     If either Ocwen or a Walter Party, in its reasonable discretion, determines after Closing that any assets constituting Walter Purchased Assets are in the possession of Ocwen or that any asset constituting Ocwen Purchased Assets are in the possession of a Walter Party, each

such party holding such assets shall promptly deliver or transfer them to the appropriate Purchaser at no cost or expense to the recipient Purchaser. To the extent the delivery or transfer of any such asset may not be effected without the approval, authorization or consent by, any third party, which approval, authorization or consent has not been obtained or which is not effective pursuant to a Final Order of the Bankruptcy Court, Ocwen and the Walter Parties shall use their respective commercially reasonable efforts to obtain such approval, authorization or consent. If such approval, authorization or consent is not obtained, Ocwen and the Walter Parties will cooperate pursuant to the Purchaser Transition Services Agreement to ensure that the benefits and obligations relating to such asset received by the appropriate Purchaser.

(b)     If any Walter Purchased Asset is used by or otherwise relates to the Business (other than the Walter Business) or the Ocwen Purchased Assets, then, if reasonably requested by Ocwen, the Walter Parties shall cooperate with Ocwen in providing Ocwen with reasonable access to such Walter Purchased Asset or otherwise provide Ocwen with the benefit of such Walter Purchased Assets. If any Ocwen Purchased Asset is used by or otherwise relates to the Walter Business or the Walter Purchased Assets, then, if reasonably requested by a Walter Party, Ocwen shall cooperate with such Walter Party in providing such Walter Party with reasonable access to such Ocwen Purchased Asset or otherwise provide such Walter Party with the benefit of such Ocwen Purchased Assets. If any particular Purchased Asset is divided between Ocwen and Green Tree (pursuant to, for example, a "to the extent" mechanic) then each of Ocwen and the Walter Parties shall cooperate with each other with respect to the division of, or the maintenance of, such Purchased Asset.

## ARTICLE III.

## MISCELLANEOUS

**Section 3.1     Expenses**. Except as otherwise provided in this Agreement, the APA or the Sale Procedures Order, all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such expenses.

**Section 3.2     Amendment; Waiver**. This Agreement may be amended, modified or supplemented only in writing signed by each of the parties hereto. Any provisions of this Agreement may be waived, but only if such waiver is in writing and signed by the party against whom the waiver is to be effective. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**Section 3.3     Notices**. Any written notice to be given hereunder shall be deemed given if delivered as provided in Section 12.3 of the APA, provided that notices to "Purchaser" under the APA shall be delivered to Ocwen, Green Tree or both, as the context requires. Notices to Green Tree under the APA and this Agreement shall be addressed as follows:

**if to Green Tree, to:**

c/o Walter Investment Management Corp.
3000 Bayport Drive, Suite 1100
Tampa, FL 33607
Facsimile:
Attn: Stuart Boyd, General Counsel
Telephone:
email: sboyd@walterinvestment.com

with copies to (which copies shall not constitute notice):

Brown Rudnick LLP
One Financial Center
Boston, MA 02111
Facsimile: (617) 856-8201
Attention: Jeffrey L. Jonas, Esq. and Samuel P. Williams, Esq.
Telephone: (617) 856-8200
email: jjonas@brownrudnick.com and swilliams@brownrudnick.com

**Section 3.4    Waivers**. The failure of a party to require performance of any provision hereof shall not affect its right at a later time to enforce the same. No waiver by a party of any term, covenant, representation or warranty contained herein shall be effective unless in writing. No such waiver in any one instance shall be deemed a further or continuing waiver of any such term, covenant, representation or warranty in any other instance.

**Section 3.5    Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 3.6    Applicable Law; WAIVER OF JURY TRIAL; Venue and Retention of Jurisdiction**.

(a)    This Agreement shall be governed by and construed in accordance with the Laws of the State of New York without regard to any conflicts of law principles thereof or any other jurisdiction that would apply the law of another jurisdiction and, to the extent applicable, the Bankruptcy Code.

(b)    EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND THE TRANSACTIONS CONTEMPLATED HEREBY.

(c)    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.3 of

the APA; provided, however, that if the Bankruptcy Case of Sellers have closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.3 of the APA.

**Section 3.7    Assignment.**  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns; provided that, except as provided herein, no assignment of any party's rights or obligations may be made without the written consent of the other parties, which consent shall not be unreasonably withheld or delayed; and provided that either Purchaser may assign this Agreement and any or all of its rights or obligations hereunder (including such Purchaser's rights to purchase the respective Purchased Assets and assume the respective Assumed Liabilities) to one or more Affiliates of such assigning Purchaser (an "Affiliate Assignment"); provided that any such Affiliate has, at the time of such assignment, all Business Licenses necessary to own and conduct business with such Purchased Assets and to assume such Assumed Liabilities; provided, however, that with respect to an Affiliate Assignment, such assigning Purchaser shall remain obligated to fulfill its obligations pursuant to this Agreement and the APA and for any damages arising from an unlawful breach hereof or thereof.  Upon any such permitted assignment, the references in this Agreement and in the APA to Green Tree, Ocwen or Purchasers shall also apply to any applicable assignee unless the context otherwise requires.

**Section 3.8    No Third-Party Beneficiaries.**  This Agreement is solely for the benefit of the parties hereto, and no provision of this Agreement shall be deemed to confer any remedy, claim or right upon any third party, including any employee or former employee of Sellers or any participant or beneficiary in any benefit plan, program or arrangement.

**Section 3.9    Public Announcements.**  Prior to Closing, Sellers and Purchasers each agree that they and their Affiliates shall not issue any press release or otherwise make any public statement or respond to any media inquiry with respect to this Agreement or the transactions contemplated hereby without the prior approval of the other parties, which shall not be unreasonably withheld or delayed, except as may be required by Law or by any stock exchanges having jurisdiction over Sellers, Purchasers or their Affiliates.  Prior to Closing, Sellers, Affiliate Sellers and Purchasers will consult with each other regarding the content and timing of any internal announcements regarding the transactions contemplated by this Agreement, the APA and the Ancillary Agreements to Sellers' employees.

Section 3.11   **Severability**.  Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

Section 3.12   **Specific Performance.**  The parties hereto each agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that each of Sellers, Ocwen and the Walter Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court referenced in Section 3.6(c), this being in addition to any other remedy to which either party is entitled at Law or in equity.**Walter Guaranty**.  Walter hereby guarantees any and all obligations of Green Tree arising from this Agreement and the transactions contemplated hereby.

Section 3.14   **Waiver of Bulk Transfer Laws**.  Sellers and Purchasers agree to waive compliance with Article 6 of the Uniform Commercial Code as adopted in each of the jurisdictions in which any of the Purchased Assets are located to the extent that such Article is applicable to the transactions contemplated hereby and any other bulk sale or bulk transfer or similar Law.

Section 3.15   **Personal Liability**.  This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any officer, director, employee, representative or investor of any party hereto.

Section 3.16   **Entire Agreement**.  This Agreement, together with the APA, and the Ancillary Agreements, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter hereof.  In the event of a conflict between the terms of this Agreement and the terms of the APA or any Ancillary Agreement, the specific terms of this Agreement shall control.

*[SIGNATURES ON FOLLOWING PAGE]*

**IN WITNESS WHEREOF,** Purchasers and Sellers have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**OCWEN LOAN SERVICING, LLC**

By:

Name: John V. Britti
Title: Authorized Signatory


**WALTER INVESTMENT
MANAGEMENT CORP.**

By:

Name:
Title:


**GREEN TREE SERVICING LLC**

By:

Name:  Stuart D. Boyd
Title:  Assistant Secretary

**IN WITNESS WHEREOF**, Purchasers and Sellers have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**OCWEN LOAN SERVICING, LLC**

By:_____
   Name:
   Title:

**WALTER INVESTMENT MANAGEMENT CORP.**

By:_____
   Name: Stuart D. Boyd
   Title: Secretary

**GREEN TREE SERVICING LLC**

By:_____
   Name:  Stuart D. Boyd
   Title:  Assistant Secretary

**RESIDENTIAL CAPITAL, LLC**

By: _____

    Name: JAMES WHITLINGER

    Title: CFO

**RESIDENTIAL FUNDING COMPANY, LLC**

By: _____

    Name: JAMES WHITLINGER

    Title: CFO

**GMAC MORTGAGE, LLC**

By: _____

    Name: JAMES WHITLINGER

    Title: CFO

**EXECUTIVE TRUSTEE SERVICES, LLC**

By: _____

    Name: JAMES WHITLINGER

    Title: CFO

**ETS OF WASHINGTON, INC.**

By: _____

    Name: JAMES WHITLINGER

    Title: CFO

**GMACM BORROWER LLC**

By: _____

    Name: JAMES WHITLINGER

    Title: CFO



When Recorded Return To:
Green Tree Servicing LLC
Attn: Document Custody, T326
7360 South Kyrene Rd
Tempe, AZ 85283

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
2009-1032395 11/09/09 02:33 PM
2 OF 10

# LIMITED POWER OF ATTORNEY

| TO: | **GREEN TREE SERVICING LLC** |
| --- | --- |
| **FROM:** | GMAC Mortgage, LLC |
| **DATED:** | **10/8/09** |
| **FOR:** | **GMAC – 2006 HE3 Trust (Oct 2009)** |



## LIMITED POWER OF ATTORNEY

LIMITED POWER OF ATTORNEY, dated as of October 1, 2009 (this "Limited Power of Attorney"), granted to Green Tree Servicing LLC, a Delaware limited liability company ("Green Tree Servicing") by GMAC Mortgage, LLC, formerly known as GMAC Mortgage Corporation and its affiliates and/or subsidiaries Residential Funding Company, LLC, formerly known as Residential Funding Corporation, Ditech LLC and Homecomings Financial, LLC (collectively, "GMACM").

WITNESSETH:

WHEREAS, GMACM, GMACM Home Equity Loan Trust 2006-HE3 and The Bank of New York Mellon Trust Company, N.A., successor to The Bank of New York Trust Company, successor to JPMorgan Chase Bank, National Association, as Trustee, have entered into that certain Servicing Agreement, dated as of August 30, 2009 (as amended, supplemented or modified from time to time in accordance with its terms, the "2006-HE3 Servicing Agreement"), providing for, among other things, GMACM's undertaking of the servicing obligations with respect to the Mortgage Loans; and

WHEREAS, GMACM has been replaced as the Servicer under the 2006-HE3 Servicing Agreement by Green Tree Servicing and Green Tree Servicing has assumed as successor servicer the rights and duties of GMACM under the 2006-HE3 Servicing Agreement;

NOW, THEREFORE, pursuant to the 2006-HE3 Servicing Agreements and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, GMACM hereby agrees as follows:

1.    Definitions. As used herein, the following term shall have the meaning set forth below:

"Serviced Loans" means each loan to be serviced pursuant to the 2006-HE3 Servicing Agreement.

2.    Limited Power of Attorney. For the purpose of effectuating the efficient servicing of the Serviced Loans, GMACM hereby names, constitutes and appoints Green Tree as its duly authorized attorney-in-fact, with full power and authority in its name, place and stead (but on behalf and for the benefit of, and at the expense of, Green Tree) to (i) execute such deeds and other documents as are necessary to sell or convey real and personal property securing the Serviced Loans, including, but not limited to, signing deeds to convey real property acquired through foreclosure of a Serviced Loan; (ii) execute documents and instruments necessary to release any and all mortgages, security instruments, liens, security interests or related documents with respect to the Serviced Loans, (iii) execute documents and instruments necessary to release all obligations under any promissory note or related documents with respect to the Serviced Loans; (iv) execute documents and instruments necessary to sign subordination agreements and consent to easements related to the Serviced Loans (v) execute such documents as are necessary

to assign the Serviced Loans; (vi) endorse checks and other payment instruments that are payable to the order of GMACM and that have been received by Green Tree from mortgagors or any insurer in respect of insurance proceeds related to any Serviced Loans; and (vii) execute such other documents as may be necessary or appropriate to enable Green Tree to carry out its servicing and administrative duties under the 2006-HE3 Servicing Agreement.

3.       2006-HE3 Servicing Agreement.  The execution and delivery of this Limited Power of Attorney by GMACM shall not be (or be deemed) a waiver or discharge of any representation, warranty, covenant or agreement of GMACM or Green Tree Servicing in or under the 2006-HE3 Servicing Agreement (other than a discharge of the obligations of GMACM under the 2006-HE3 Servicing Agreement, if any, to execute and deliver this Limited Power of Attorney), and such execution and delivery shall not be (or be deemed) a modification or amendment of any provision of the 2006-HE3 Servicing Agreement in any respect.

4.       Waivers and Amendments.  This Limited Power of Attorney may be amended, modified, supplemented or restated only by a written instrument executed by GMACM.  The terms of this Limited Power of Attorney may be waived only by a written instrument executed by the party waiving compliance.

5.       Headings.  The headings in this Limited Power of Attorney are for convenience of reference only and shall not define, limit or otherwise affect any of the terms or provisions hereof.

6.       Successors and Assigns.  This Limited Power of Attorney shall inure to the benefit of, and be binding upon, GMACM and Green Tree Servicing and their respective successors and assigns; provided, however, that Green Tree Servicing shall not assign any of the rights under this Limited Power of Attorney (except by merger or other operation of law) without the prior written consent of GMACM and any such purported assignment without such consent shall be void and of no effect.

7.       Governing Law.  This Limited Power of Attorney shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to any conflicts of law rules that might apply the Laws of any other jurisdiction.

8.       Expiration.  This Limited Power of Attorney shall expire and be of no further force or effect upon the earlier to occur of (a) termination of the 2006-HE3 Servicing Agreement, or (b) Green Tree Servicing's resignation or removal as servicer under the 2006-HE3 Servicing Agreement, or Green Tree Servicing otherwise ceasing to act as servicer under the 2006-HE3 Servicing Agreement.

*[signature page follows]*

IN WITNESS WHEREOF, the undersigned have executed and delivered this Limited Power of Attorney as of the date first above written.

**GMAC MORTGAGE, LLC, formerly known as GMAC MORTGAGE CORPORATION**

By: _Patricia C. Taylor_

Name:   Patricia C. Taylor

Title:   Vice President

State of Pennsylvania )
County of Montgomery ) SS.
)

On 10/8/09, before me, Elizabeth Lineman, personally appeared Patricia C. Taylor and _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose names is subscribed to the within instrument and acknowledged to me that he or she executed the same in his or her authorized capacity, and that by his or her signature on the instrument the entity, on behalf of which the person acted, executed the instrument.

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
ELIZABETH LINEMAN, NOTARY PUBLIC
UPPER DUBLIN TWP, MONTGOMERY COUNTY
MY COMMISSION EXPIRES JAN 15, 2013

WITNESS my hand and official seal.

_Elizabeth Lineman_

Notary Public in and for said                    [SEAL]
County and State

- 3 -

When Recorded Return To:
Ditech Financial LLC
Attn: Document Custody, T326
7360 South Kyrene Rd
Tempe, AZ 85283

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
2016-0019965 01/12/16 12:32
PAPER RECORDING

0025699-4-3-3
Hoyp

# LIMITED POWER OF ATTORNEY

| TO | DITECH FINANCIAL LLC |
|---|---|
| FROM | RESCAP LIQUIDATING TRUST OCWEN LOAN SERVICING, LLC GMAC Mortgage, LLC SUCESSOR BY MERGER TO GMAC MORTGAGE CORPORATION RESIDENTIAL FUNDING COMPANY, LLC F/K/A RESIDENTIAL FUNDING CORPORATION HOMECOMINGS FINANCIAL, LLC |
| Deal | RESCAP - GMAC |
| Investor | FNMA |
| Transfer Date | 2/1/2013 |
| ISSUE DATE | 01/07/2016 |
| EXPIRATION DATE | N/A |



EXHIBIT
Defendant's
12
11/8/19    Am

## LIMITED POWER OF ATTORNEY

**WHEREAS**, Ditech Financial LLC (formerly known as Green Tree Servicing LLC), a Delaware limited liability company, having its principal place of business at 3000 Bayport Drive, Suite 880, Tampa, Florida 33607 ("Ditech"), purchased mortgage loans and mortgage loan servicing rights pursuant to that certain Asset Purchase Agreement, as amended, by and among Ocwen Loan Servicing, LLC, a Delaware limited liability company ("Ocwen"), GMAC Mortgage, LLC (successor by merger to GMAC Mortgage Corporation), a Delaware limited liability company, having its principal place of business at 1100 Virginia Drive, Suite 250, Fort Washington, Pennsylvania 19034 ("GMACM") and Residential Funding Company, LLC (formerly known as Residential Funding Corporation), a Delaware limited liability company having its principal place of business at 8400 Normandale Lake Boulevard, Suite 175, Minneapolis, Minnesota 55437 ("RFC") and certain affiliates, and the Agreement for Partial Assignment and Assumption Under the Asset Purchase Agreement, dated as of January 31, 2013, by and among ("Ocwen"), Walter Investment Management Corporation the Companies and certain of their affiliates (together, the "Agreements"); and

**WHEREAS**, as of the date of the Agreements, Homecomings Financial, LLC (together with GMACM and RFC, the "Companies") was a direct subsidiary of RFC; and

**WHEREAS**, the Companies have previously issued a Limited Power of Attorney to appoint Ditech as the Attorney-in-Fact of the Companies, effective February 1, 2013; and

**WHEREAS**, effective December 17, 2013, the ResCap Liquidating Trust (the "Trust") is the successor-in-interest to the Companies, pursuant to the Second Amended Joint Chapter 11 Plan proposed by Residential Capital, LLC, the Companies and certain affiliates, and the Official Committee of Unsecured Creditors, and related Order, as filed in the US Bankruptcy Court of New York on December 6, 2013 and December 11, 2013, respectively.

**NOW THEREFORE**, the Trust hereby issues this Limited Power of Attorney to Ditech, which shall supersede and replace the aforementioned Limited Power of Attorney provided on February 1, 2013.

**KNOW ALL MEN BY THESE PRESENTS**, that effective January 7, 2016, the ResCap Liquidating Trust, a Delaware Statutory Trust, having a place of business at 8400 Normandale Lake Boulevard, Suite 175, Minneapolis, Minnesota 55437, (the "Trust"), does hereby constitute and appoint Ditech Financial LLC, a Delaware limited liability company, having a place of business at 3000 Bayport Drive, Suite 880, Tampa, Florida 33607 ("Ditech"), by and through its officers, its true and lawful Attorney-in-Fact in its name place and stead and for the purpose of performing all acts and executing all documents in the name of the Companies necessary and incidental to (i) implement the Agreements, (ii) service the mortgage loans, or (iii) take any and all action necessary to perfect the interest of Ditech (or other parties in interest) in any mortgage loan, including but not limited to:

1. Foreclosing delinquent loans or discontinuing such foreclosure proceedings, including, but not limited to, the execution of notices of default, notices of sale, assignments of bids, and assignments of deficiency judgments, and appearing in and prosecuting bankruptcy proceedings;

2. Selling, transferring or otherwise disposing of real property acquired through foreclosure or otherwise, including, but not limited to, executing all contracts, agreements, deeds, assignments or other instruments necessary to effect such sale, transfer or disposition, and receiving proceeds and endorsing checks made payable to the order of any Company or Companies from such proceedings;

3. Preparing, executing, and delivering satisfactions, cancellations, discharges, lost note instruments, or full or partial releases of lien, subordination agreements, modification agreements, assumption agreements, substitutions of trustees under deeds of trust, and UCC-3 Continuation Statements;

4. Endorsing title certificates or promissory notes (including allonges) and executing assignments of mortgages, deeds of trust, deeds to secure debt, and other security instruments securing said promissory notes;

5. Endorsing insurance policies or insurance proceeds checks and mortgage payment checks to the order of any Company or Companies; and

6. Any and all such other acts of any kind and nature whatsoever that are necessary or appropriate to implement the transactions contemplated by the Agreements or to take any and all action necessary to perfect the interest of Ditech (or any other party in interest) in any mortgage loan, including, without limitation, delegating the authority granted herein to necessary third parties, including but not limited to law firms or trust companies and each of their officers, directors, employees, agents and assigns.

The Trust further grants to Ditech full power and authority to do and perform all acts necessary for Ditech to carry into effect the power or powers granted by or under this Limited Power of Attorney as fully as the Trust might or could do with the same validity as if all and every such act had been herein particularly stated, expressed and especially provided for, and hereby ratifies and confirms all that Ditech shall lawfully do by virtue of the powers and authority granted and contemplated hereby, and all that Ditech has previously done pursuant to any power of attorney previously granted by the Companies or the Trust to Ditech. This Limited Power of Attorney shall be effective January 7, 2016 and remain in full force and effect until revoked or terminated by the Trust.

Third parties without actual notice may rely upon the exercise of the power granted under this Limited Power of Attorney, and may be satisfied that this Limited Power of Attorney has not been revoked by the Trust.

SIGNATURE PAGES TO FOLLOW

ResCap Liquidating Trust
LPOA to Ditech Financial LLC
January 7, 2016

**RESCAP LIQUIDATING TRUST**

By:

Name:    Charles Laubach

Title:    Authorized Officer

Witness:

Name:    Matthew Boyer

Witness:

Name:    Eileen Oles

STATE OF PENNSYLVANIA

COUNTY OF MONTGOMERY

On this __7__ day of __January__ 20 16 before me, the undersigned, a Notary Public in and for said State and County, personally appeared Charles Laubach personally known to me to be the person who executed the within instrument as an Authorized Officer on behalf of the Trust and he or she acknowledged that said instrument is the act and deed of the Trust and that he or she, being authorized to do so, executed and delivered said instrument for the purposes therein contained

In witness hereof, I hereunto set my hand and official seal.

Notary Public

May 4, 2016
My Commission Expires

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
[Seal] JENNIFER A. SHANK, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires May 4, 2016

3

relationships that work

# green tree

PO Box 6172
Rapid City, SD 57709-6172

Tel 1-800-643-0202
GTServicing.com

+ 0416657 000007594 09GTR8 0055272 W
DENNIS DELIA
2400 CHELSEA STREET
ORLANDO FL 32803-2124

February 15, 2013

lalıtl·ll··ıll·llıll·lllılılılılılılılılılılıl

**GMAC Mortgage, LLC ("GMACM") Account Number: 702075180**
**Green Tree Servicing LLC ("Green Tree") New Account Number: 623799186**

Dear Dennis Delia:

**Welcome to Green Tree.** The servicing of your mortgage loan ¯ that is, the right to collect loan payments from you - is being transferred from GMACM to Green Tree effective February 1, 2013. The servicing transfer does not affect any terms or condition of your current mortgage loan, other than the terms directly related to the servicing of your loan. You can mail your payments directly to Green Tree at the following address: **Green Tree Servicing LLC, PO Box 94710, Palatine, IL 60094 - 4710.**

Green Tree will begin posting payments to your account on or about February 14, 2013. If your payment was received by Green Tree or GMACM prior to the posting date, we will apply your payment as of the day that it was received and no late fee will be assessed to your account.*

You should be receiving your first statement from Green Tree by mail the week of February 18, 2013. If you have any questions about the transfer of your mortgage loan servicing to Green Tree, we encourage you to visit:

## www.gtservicing.com/welcome

There you can register to securely access your account online, make a payment, establish a recurring electronic mortgage loan payment and obtain answers to frequently asked questions.

We are pleased to have you as a new customer. The following pages include more detailed information about our services, including details about payoff requests, and insurance loss payee information. Please keep this documentation for future reference. Should you ever need additional account information, please visit our website at GTServicing.com, or contact customer service toll-free at 1-800-643-0202, or write to Green Tree Customer Service, PO Box 6172, Rapid City, SD 57709-6172.

At Green Tree, we build relationships that work and we look forward to providing you with quality service for years to come.

Respectfully,

Green Tree
New Servicer Effective 2-1-2013

This communication is from a debt collector. It is an attempt to collect a debt, and any information obtained will be used for that purpose.

* Please note: If you participate in Automatic Clearing House payments (also known as Auto Pay), this program will continue without interruption. If you were previously using GMACM website to schedule your on-line payments this program will cancel as of February 1, 2013. You can easily make an electronic payment or reestablish a recurring automatic loan payment on our website: GTServicing.com.



EXHIBIT
Defendant's
13
11/8/19   Am

relationships that work

Detach and return this portion with remittance

NOTICE OF ASSIGNMENT, SALE, OR TRANSFER OF SERVICING RIGHTS

You are hereby notified that the servicing of your mortgage loan, that is, the right to collect payments from you, is being assigned, sold or transferred from GMAC Mortgage, LLC ("GMACM") to Green Tree Servicing LLC ("Green Tree") effective February 1, 2013.

The assignment, sale, or transfer of the servicing of the mortgage loan does not affect any term or condition of the mortgage instruments, other than the terms directly related to the servicing of your loan.

Except in limited circumstances, the law requires that your present servicer send you this notice at least 15 days before the effective date of transfer, or at closing. Your new servicer must also send you this notice no later than 15 days after this effective date or at closing.

Your present servicer is GMACM. If you have any questions relating to the transfer of servicing from your present servicer, call Customer Service toll-free at 1-800-766-4622 between 6:00 a.m. and 10:00 p.m., Monday through Friday, CST and 8:00 a.m. and 2:00 p.m. Saturday, CST.

Your loan file will be transferred from GMACM with the following information relating to your payments and escrow account:

| | |
|---|---|
| Principal Balance: | $219,526.32 |
| Current Interest Rate: | 5.87500% |
| Monthly Payment Amount 1: | $1,310.85 |
| Principal Payment Amount: | $350.65 |
| Interest Payment Amount: | $960.20 |
| Escrow Balance: | $31,946.21 - |
| Escrow Payment Amount: | $135.27 |
| Payment Due: | 05/01/2006 |

Interest Calculation method is Scheduled Interest Calculation. 1Please refer to your billing statement for any future possible changes to this payment amount.

Your new servicer will be Green Tree. The business address for your new servicer is: PO Box 6172, Rapid City, SD 57709-6172. To ensure timely posting of your payments, please send payments to the address indicated below.

If you have any questions relating to the transfer of servicing to your new servicer, call Customer Service toll free at 1-800-643-0202 between 7:00 a.m. and 8:00 p.m. CST, Monday through Friday or between 7:00 a.m. and 1:00 p.m. CST, on Saturday.

The date that your present servicer will stop accepting payments from you is January 31, 2013. The date that your new servicer will start accepting payments from you is February 1, 2013. **SEND ALL PAYMENTS DUE ON OR AFTER FEBRUARY 1, 2013 TO YOUR NEW SERVICER:**

**Green Tree Servicing LLC
PO Box 94710
Palatine, IL 60094 - 4710**

The transfer of servicing will affect the terms of or the continued availability of any other mortage life or disability insurance or other types of optional insurance products or optional products. You will need to contact the company directly for continued coverage or enrollment.



---

## NOTICE ABOUT YOUR RIGHTS

You should be aware of the following information, which is set out in more detail in Section 6 of the Real Estate Settlement Procedures Act ("RESPA") (12 U.S.C. §2605):

During the 60 day period following the effective date of the transfer of the loan servicing, a loan payment received by your present servicer before its due date may not be treated by your new servicer as late, and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. §2605) gives you certain consumer rights. If you send a "qualified written request" to your loan servicer concerning the servicing of your loan, your servicer must provide you with a written acknowledgement within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and your reasons for the request. If you want to send a "qualified written request" regarding the servicing of your loan to your new servicer, it must be sent to this address: Green Tree, PO Box 6176, Rapid City, SD 57709-6176.

Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, and must provide you with a written clarification regarding any dispute. During this 60 Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request. However, this does not prevent the servicer from initiating foreclosure if proper grounds exist under the mortgage documents.

## Additional Important Information

**Payment Processing:**
You will be receiving your monthly statement from Green Tree within the next twenty-five days. If your payment is due prior to receiving a statement please send your payment to the address below with your new Green Tree account number noted on the memo line. After receiving your first Green Tree statement, please destroy any GMACM payment coupons and begin using the coupon attached to the bottom of the monthly statement. Please be sure to include your new Green Tree account number and send any future payments made after January 31, 2013 to the following address:

**Green Tree Servicing LLC**
**PO Box 94710**
**Palatine, IL 60094 - 4710**

### AUTO PAY & BILL PAYMENT SERVICES

**Automatic Payments Deductions:** Your payment will be withdrawn from your bank account on or about February 15, 2013. Green Tree will post your payment effective the date your payment was scheduled to be withdrawn, and you will not be charged a late fee.

**Bill Payment Services**: If your payments currently are made through a military allotment process, or a third-party bill payment service (including online banking services), please inform your vendor or financial institution of the following:

- The above-referenced Green Tree account number.
- Change of payee to Green Tree Servicing LLC.
- The new payment mailing address is:

**Green Tree Servicing LLC**
**PO Box 94710**
**Palatine, IL 60094 - 4710**

If you currently have future dated Pay By Phone payment(s) set up with GMACM, these transactions were canceled upon transfer of servicing to Green Tree. If you would like to set up future Pay by Phone payments with Green Tree, please contact our Customer Service Department at 1-800-643-0202.

**Loan Modifications**: If you are currently in an active trial modification or have a modification review underway, this information will be forwarded to Green Tree so they can continue the process with you. Please call 1-800-643-0202 if you have questions about your modification.

**Payoffs**
Payoff checks sent via regular mail, or via United States Postal Service overnight delivery, sent after January 31, 2013, should be sent to the following address:

**Green Tree Servicing LLC**
**Dept CH 9052**
**Palatine, IL 60055-9052**

Payoff checks sent via UPS/FedEx/Airborne Priority Mail, sent after January 31, 2013, should be sent to the following address:

**Green Tree Servicing LLC**
**Attn: Payoff 9052**
**5505 N. Cumberland Ave, Suite 307**
**Chicago, IL 60656**

**Insurance Loss Payee Information**
The mortgagee clause of your homeowners insurance policy, and if applicable your flood insurance policy, needs to be updated to reflect Green Tree Servicing LLC as a loss payee. Please have your insurance agent update your policy with the information listed below. If your loan or line of credit is in a second lien position, in addition to the mortgagee clause below, your policy should also still have a separate mortgagee clause for the lender in the first lien position. Proof of insurance can be faxed to 1-866-263-8962 or mailed to Green Tree Servicing LLC at the following address:

Green Tree Servicing LLC
Its affiliates and/or assigns

**Customer Service:**
Any questions, complaints or inquiries you have regarding your loan may always be directed in writing to our Customer Service Department at the below-referenced address or by calling the toll-free phone number at 1-800-643-0202, between 7:00 a.m. and 8:00 p.m. CST, Monday through Friday and between 7:00 a.m. and 1:00 p.m. CST, on Saturday. You can also access our website at GTServicing.com 24 hours a day. The website allows convenient, secure access to your basic account information, and allows you to make payments on your account, obtain payoff quotes and insurance information. The website will be available to you shortly after the servicing transfer day. You may also contact Green Tree by writing to us at the following address:

Green Tree Servicing LLC
PO Box 6172
Rapid City, SD 57709-6172

Respectfully,

Green Tree

This communication is from a debt collector. It is an attempt to collect a debt, and any information obtained will be used for that purpose.

**Fair and Accurate Credit Transactions Act Notice - We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.**



## AFFIDAVIT OF LOST NOTE

STATE OF **Arizona**

COUNTY OF **Maricopa**

BEFORE ME this day personally appeared Teresa G. Harris who, after first being duly sworn, deposes and states under the penalty of perjury:

1. I am over the age of 18, competent to testify, and the statements made in this affidavit are based on my personal knowledge after review of the applicable business records.

2. I am employed as an Assistant Vice President of Ditech Financial LLC and am authorized to sign this affidavit on Ditech's behalf. This affidavit is being made in connection with the following mortgage loan:

   Loan number: 33139262

   Borrower(s): Dennis Delia

   Property Address: 2400 Chelsea Street, Orlando FL 32803

3. In the regular performance of my job duties, I have access to and am familiar with Ditech's business records ("Records") relating to the above-referenced mortgage loan. The information contained in this affidavit is based on my review of information contained in the Records, which are kept in the course of Ditech's regularly conducted business activities. It is Ditech's practice to make these business records at or near the time of occurrence of the incidents related to them by a person with knowledge. I have personal knowledge of Ditech's procedures with respect to the safekeeping and retrieval of original documents serviced by Ditech and Ditech's procedures for determining if an original note is lost.

4. This Lost Note Affidavit is made in connection with a promissory note ("Note"), executed on June 10, 2005 in which Dennis Delia ("Borrower(s)") promised to pay USAA Federal Savings Bank the sum of $221,600.00 (the "Loan").

5. A true and correct copy of the Note is attached hereto as **Exhibit A.**

6. The Note is endorsed from USAA Federal Savings Bank to Blank. A true and correct copy of all allonges and endorsements on the Note are attached as part of **Exhibit A**.

7. Ditech acquired the right to enforce the Note from RESCAP Liquidating Trust as successor in interest to GMAC Mortgage, LLC, successor by merger to GMAC Mortgage Corporation which was entitled to enforce the Note when the loss of possession occurred.

8. Ditech has made a diligent, good faith effort to locate the original Note consistent with its policies and procedures.

9. The original Note has been inadvertently lost, misplaced, or destroyed, or is in the wrongful possession of an unknown person or a person who cannot be found or is not amenable to service of process.

10. The original Note is not in the custody and control of Ditech.

11. According to the Records, the Note has not been paid, satisfied, pledged, transferred or lawfully seized.

12. Ditech hereby agrees to indemnify Borrower(s) against any loss that might occur by reason of a claim by another person to enforce or foreclose under the Note.

EXHIBIT
Defendants
14
8/18/19  Am

Under penalties of perjury, I declare that I have read the foregoing Affidavit and that the facts stated in it are true and correct.

FURTHER AFFIANT SAYETH NOT

Date: December **4** 2018.

_____
Signature of Affiant

State of Arizona_____}
County of Maricopa_____} ss.

On the **4** day of December in the year 2018 before me, the undersigned, personally appeared Teresa G. Harris personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their/capacity(ies), that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument, and that such individual made such appearance before the undersigned in the City of Tempe State of Arizona.

_____
Notary Public
My Commission Expires: **4.3.2020**

Patricia A Outcalt
Notary Public
Maricopa County, Arizona
My Comm. Expires April 3, 2020

# NOTE

June 10, 2005                     Orlando                         FLORIDA

[Date]                            [City]                          [State]

2400  Chelsea Street, Orlando, FL  32803

[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 221,600.00          (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is USAA Federal Savings Bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of       5.875 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of
this Note.

## 3.  PAYMENTS

(A)  Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1st     day of each month beginning on August 01, 2005        . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before
Principal. If, on July 01, 2035          , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."

I will make my monthly payments at Attn: Payment Processing, P.O. Box 205, Waterloo, IA  50704
or at a different place if required by the Note Holder.

(B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $          1,310.85 .

## 4.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment
to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of
the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless
the Note Holder agrees in writing to those changes.

702075180                                                        505116903

MULTISTATE FIXED RATE NOTE-Single Family

US5N (0104)

VMP MORTGAGE FORMS - (800)521-729?

Page 1 of 3                    Initials:

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

702075180

US5N (0104)

Page 2 of 3

505116903

Initials

## 10. APPLICABLE LAW

Lender is a federally chartered savings bank governed, in part, by the Home Owner's Loan Act of 1933 and the rules and regulations promulgated pursuant thereto (the "Act"). To the extent permitted by the Act, this Note will be governed by applicable federal law and by the interest rate and usury provisions of the state of Texas.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
Dennis Delia                    -Borrower                                    -Borrower

_____ (Seal)      _____ (Seal)
                                -Borrower                                    -Borrower

_____ (Seal)      _____ (Seal)
                                -Borrower                                    -Borrower

_____ (Seal)      _____ (Seal)
                                -Borrower                                    -Borrower

*[Sign Original Only]*

Pay to the Order of

_____
without recourse
USAA Federal Savings Bank
By_____
Name___ Eva Perez Huey
Title___ Post Closing Manager

702075180                                                        505116903

US5N (0104)

Return To:

USAA Federal Savings Bank
10750 McDermott Freeway
San Antonio, TX  78288

This document was prepared by:

Ernesto Garza IV
10750 McDermott Freeway
San Antonio, TX  78288

INSTR  20050421641
OR BK 08037 PG 0412 PGS=16
MARTHA O. HAYNIE, COMPTROLLER
ORANGE COUNTY, FL
06/23/2005  11:15:57 AM
MTG DOC TAX 775.60
INTANG TAX 443.20
REC FEE 137.50

8251005 ─────────[Space Above This Line For Recording Data]─────────

## MORTGAGE

MIN 100105600017524686

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated June 10, 2005
together with all Riders to this document.
(B) "Borrower" is Dennis Delia

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is USAA Federal Savings Bank

505116903

702075180

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3010  1/01

-6A(FL) (0005).02
Page 1 of 16          Initials

VMP MORTGAGE FORMS - (800)521-7291

Lender is a **Federally Chartered Savings Bank**
organized and existing under the laws of **the United States of America**
Lender's address is **10750 McDermott Freeway, San Antonio, TX   78288**

(E) "Note" means the promissory note signed by Borrower and dated **June 10, 2005**
The Note states that Borrower owes Lender **Two Hundred Twenty One Thousand Six Hundred**
**And Zero/100**                                                                          Dollars
(U.S. **$221,600.00**             ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **July 01, 2035**

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider  ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider          ☐ Planned Unit Development Rider ☐ 1-4 Family Rider
☐ VA Rider               ☐ Biweekly Payment Rider         ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

702075180                                              Initials:                    505116903

-6A(FL) (0005).02                   Page 2 of 16                         Form 3010   1/01

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the County          [Type of Recording Jurisdiction]
of Orange                                                                    [Name of Recording Jurisdiction]:
Lot 13, Block E, PHILLIPS 1SR REPLAT LAKEWOOD, according to the plat thereof as recorded in Plat Book R, Page 105, of the Public Records of Orange County, Florida.

Parcel ID Number:                                              which currently has the address of
2400 Chelsea Street                                                                [Street]
Orlando                                                       [City], Florida 32803        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

702075180                                                    Initials: _____        505116903

-6A(FL) (0005).02                    Page 3 of 16                           Form 3010  1/01

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment

702075180

-6A(FL) (0005).02

Page 4 of 16

505116903

Form 3010  1/01

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

702075180

505116903

-6A(FL) (0005) 02

Page 5 of 18

Form 3010 1/01

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement: (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

702075180

-6A(FL) (0005).02

Page 6 of 16

Initials:

505116903

Form 3010  1/01

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

702075180

-6A(FL) (0005).02

Page 8 of 16

invisible 

505116903

Form 3010 1/01

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

702075180

-6A(FL) (0005).02

Page 9 of 16

Initials: ___

505116903

Form 3010   1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of

702075180

505116903

Initials: ___

-6A(FL) (0005).02

Page 10 of 16

Form 3010  1/01

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers

702075180

Initials _____

505116903

-6A(FL) (0005) 02

Page 11 of 16

Form 3010  1/01

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the

702075180

-6A(FL) (0005).02

Page 12 of 16

Initials: ___

505116903

Form 3010  1/01

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

702075180   505116903

-6A(FL) (0005).02   Page 13 of 18   Form 3010  1/01

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

702075180

Initials: _____

505116903

-6A(FL) (0005).02                    Page 14 of 16                    Form 3010  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____
TINA B. ALABAUGH

_____ (Seal)
Dennis Delia                -Borrower

2400 Chelsea Street, Orlando, FL 32803                (Address)

_____
                              _____ (Seal)
                                          -Borrower

                              (Address)

_____ (Seal)
          -Borrower
                              _____ (Seal)
                                          -Borrower

          (Address)                (Address)

_____ (Seal)
          -Borrower
                              _____ (Seal)
                                          -Borrower

          (Address)                (Address)

_____ (Seal)
          -Borrower
                              _____ (Seal)
                                          -Borrower

          (Address)                (Address)

702075180                          505116903

VMP -6A(FL) (0005) 02        Page 15 of 16        Form 3010  1/01

STATE OF FLORIDA,                   *Orange*     County ss:          by

The foregoing instrument was acknowledged before me this **June 10, 2005** by

Dennis Delia

who is personally known to me or who has produced *Drivers license* as identification.

Notary Public

TINA S. ALABAUGH
MY COMMISSION # DD 084304
EXPIRES January 26, 2006
Bonded Thru Notary Public Underwriters

702075180

505116903

-6A(FL) (0005) 02                   Page 16 of 16      Initials: _____      Form 3010  1/01

DOC # 20130139106 B: 10536 P: 3078
03/15/2013 11:30:36 AM Page 1 of 1
Rec Fee: $18.50
Deed Doc Tax: $0.00
Mortgage Doc Tax: $0.00
Intangible Tax: $0.00
Martha O. Haynie, Comptroller
Orange County, FL
Ret To: SIMPLIFILE LC

When Recorded Return To:
Green Tree Servicing LLC
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

Loan #: 62379918

## ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR USAA FEDERAL SAVINGS BANK, ITS SUCCESSORS AND ASSIGNS PO BOX 2026, FLINT, MI, 48501, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Mortgage together with all interest secured thereby, all liens, and any rights due or to become due thereon to **GREEN TREE SERVICING LLC, WHOSE ADDRESS IS 7360 SOUTH KYRENE ROAD, T314, TEMPE, AZ 85283 (800)643-0202, A DELAWARE CORPORATION, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).**

Said Mortgage was made by **DENNIS DELIA** and was recorded in Official Records of the Clerk of the Circuit Court of ORANGE County, Florida, in Book 08037, Page 0412, or Instrument # 20050421641 upon the property situated in said State and County as more fully described in said Mortgage.

**IN WITNESS WHEREOF,** this Assignment is executed **this 06th day of March in the year 2013.**
**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR USAA FEDERAL SAVINGS BANK, ITS SUCCESSORS AND ASSIGNS**

ASHLEY BRABAND
ASST. SECRETARY

[SEAL: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC CORPORATE SEAL 1999 DELAWARE]

WENDY RAMIREZ          WITNESS

ERICA SNYDER          WITNESS

**Document Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**
GTSAV 19519753 FNMA/MERS DQ AOM   MIN 100105600017524686 MERS PHONE 1-888-679-MERS
T061303-0015  EFRMFL1

*19519753*

EXHIBIT
15
8/19   Am

STATE OF FLORIDA
COUNTY OF PINELLAS

The foregoing instrument was acknowledged before me on this 06th day of March in the year 2013, by ASHLEY BRABAND as ASST. SECRETARY for MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR USAA FEDERAL SAVINGS BANK, ITS SUCCESSORS AND ASSIGNS, who, as such ASST. SECRETARY being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

**CYNTHIA ALBANO - NOTARY PUBLIC**
**COMM EXPIRES: 08/01/2016**



Cynthia Albano
Notary Public State of Florida
My Commission # EE 221270
Expires August 1, 2016

**Document Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**
GTSAV 19519753 FNMA/MERS DQ AOM    MIN 100105600017524686 MERS PHONE 1-888-679-MERS
T061303-0015  EFRMFL1

*19519753*

DOC # 20170441068
08/15/2017 02:54:50 PM Page 1 of 1
Rec Fee: $18.50
Deed Doc Tax: $0.00
Mortgage Doc Tax: $0.00
Intangible Tax: $0.00
Phil Diamond, Comptroller
Orange County, FL
Ret To: SIMPLIFILE LC

When Recorded Return To:
Ditech Financial LLC
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683



## ASSIGNMENT OF MORTGAGE

**CORRECTIVE GAP ASSIGNMENT: TO REMEDY A GAP IN THE RECORDED OWNERSHIP INTEREST BETWEEN THE ASSIGNMENT RECORDED 04/22/2009, BOOK 9861, PAGE 0162 AS INSTRUMENT NUMBER 20090227791 AND THE ASSIGNMENT RECORDED ON 03/12/2013, BOOK 10536, PAGE 3078 AS INSTRUMENT NUMBER 20130139106.**

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **RESCAP LIQUIDATING TRUST, AS SUCCESSOR IN INTEREST TO GMAC MORTGAGE, LLC, SUCCESSOR BY MERGER TO GMAC MORTGAGE CORPORATION, WHOSE ADDRESS IS 1100 VIRGINIA DR, FORT WASHINGTON, PA 19034-3200, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR USAA FEDERAL SAVINGS BANK, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE) (MERS Address: P.O. Box 2026, Flint, Michigan 48501-2026).**

Said Mortgage was made by **DENNIS DELIA** and recorded in Official Records of the Clerk of the Circuit Court of **ORANGE** County, **Florida**, in **Book 08037, Page 0412 and Doc # 20050421641**, upon the property situated in said State and County as more fully described in said Mortgage.

**Dated this 08th day of August in the year 2017**
**RESCAP LIQUIDATING TRUST, AS SUCCESSOR IN INTEREST TO GMAC MORTGAGE, LLC, SUCCESSOR BY MERGER TO GMAC MORTGAGE CORPORATION, by DITECH FINANCIAL LLC, its Attorney-in-Fact**

**LAUREN ZOOK**
**VICE PRESIDENT**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

CORPORATE
--•--
SEAL

**KRISTIN PRICE**
**WITNESS**

**PATRICK MCCABE**
**WITNESS**

EXHIBIT
Defendants
16
11/18/19   AM

**Document Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**
GTSAV 399480803 DEFREQ  MIN 100105600017524686 MERS PHONE 1-888-679-6377 MERS Mailing
Address: P.O. Box 2026, Flint, MI 48501-2026 DOCR T081708 04:28:07 [C 1] FFRMFL1

STATE OF FLORIDA
COUNTY OF PINELLAS

The foregoing instrument was acknowledged before me on this 08th day of August in the year 2017, by Lauren Zook as VICE PRESIDENT of DITECH FINANCIAL LLC as Attorney-in-Fact for RESCAP LIQUIDATING TRUST, AS SUCCESSOR IN INTEREST TO GMAC MORTGAGE, LLC, SUCCESSOR BY MERGER TO GMAC MORTGAGE CORPORATION, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

CYNTHIA ALBANO
COMM EXPIRES: 08/01/2020

CYNTHIA ALBANO
Notary Public - State of Florida
My Comm. Expires August 1, 2020
Commission # GG001222

**Document Prepared By: E.Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**
GTSAV 399480803  DEFREQ  MIN 100105600017524686 MERS PHONE 1-888-679-6377 MERS Mailing Address: P.O. Box 2026, Flint, MI 48501-2026  DOCR T081708-04:28:07 [C-1]  EFRMFL1

*D0025019159*

```
DOC # 20090227791   B: 9861 P: 0162
04/22/2009 07:56:19 AM   Page 1 of 2
Rec Fee: $18.50  Doc Type: A
Deed Doc Tax: $0.00
Intangible Tax: $0.00
Mortgage Stamp: $0.00
Martha O. Haynie, Comptroller
Orange County, FL
MB - Ret To: DAVID J STERN
```

This space is for recording purposes only

Prepared by:   DAVID J. STERN, ESQ
Record &Return to: 900 South Pine Island
Road #400
                      Plantation, FL 33324-3920
                      06-61235(GMAP)

MERS MIN: 100105600017524686
MERS PHONE NUMBER: 1-888-679-6377

## ASSIGNMENT OF MORTGAGE

*KNOW ALL MEN BY THESE PRESENTS*

*THAT* MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

Residing or located at c/o GMAC MORTGAGE CORPORATION, C/O 500
ENTERPRISE ROAD , STE 150
HORSHAM, PA 19044, herein designated as the assignor for and in consideration
of the sum of $1.00 Dollar and other good and valuable consideration the receipt of
which is hereby acknowledged, does hereby grant, bargain, sell, assign, transfer and
set over unto GMAC MORTGAGE CORPORATION residing docated at: C/O
500 ENTERPRISE ROAD , STE 150
HORSHAM, PA 19044 herein designated as the assignee the mortgage executed by
DENNIS DELIA recorded in ORANGE County, Florida at book 8037 and page 412
encumbering the property more particularly described as follows:

LOT 13, BLOCK E, OF PHILLIPS FIRST REPLAT OF LAKEWOOD, ACCORDING TO THE PLAT THEREOF, AS
RECORDED IN PLAT BOOK R, PAGE 105, OF THE PUBLIC RECORDS OF ORANGE COUNTY, FLORIDA

together with the note and each and every other obligation described in said
mortgage and the money due and to become due thereon

TO HAVE AND TO HOLD the same unto the said assignee, its successors and
assigns forever, as of the 31ST day of August, 2006, but without recourse on the
undersigned.

*In Witness Whereof*, the said Assignor has hereunto set his hand and seal or caused these
presents to be signed by its proper corporate officers and its corporate seal to be hereto
affixed, as of the _26_ day of _March_____, 20_07_.

Signed in the presence of:          MORTGAGE ELECTRONIC
                                    REGISTRATION SYSTEMS, INC.

ATTEST: _Kristine Wilson_          BY: _____
         _Vice President_          PRINT NAME: John Kerr, Assistant Secretary

WITNESS: _Greta Buch_              TITLE: VICE PRESIDENT
Print Name: _Greta B_

WITNESS: _____
Print Name: _BRITTANY GRANT_

STATE OF _PA_
COUNTY OF _Montgom_



_____     NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Mary Lynch, Notary Public
Upper Dublin Twp., Montgomery County
My Commission Expires Nov. 2, 2018
Member, Pennsylvania Association of Notaries